**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

          Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

_____

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF**
**MOTIONS TO COMPEL DISCOVERY**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

DISCUSSION ..................................................................................................................... 4

   **I.      PRESIDENT TRUMP HAS MADE A *PRIMA FACIE* SHOWING OF
SELECTIVE AND VINDICTIVE PROSECUTION** .................................................... 4

      A.    Background ............................................................................................... 4

      B.    Applicable Law ....................................................................................... 6

      C.    Discussion ............................................................................................... 8

   **II.     EVIDENCE OF POLITICAL ANIMUS IS DISCOVERABLE IRRESPECTIVE
OF SELECTIVE AND VINDICTIVE PROSECUTION** ............................................ 12

   **III.    AN ORDER DEFINING THE PROSECUTION TEAM IS NECESSARY** ......... 14

      A.    The Special Counsel's Office Is Wrong On The Law .................................. 15

      B.    The Intelligence Community And National Security Council Are Part Of The
Prosecution Team .................................................................................... 17

      C.    The Prosecution Team Includes White House Entities And NARA ............ 19

   **IV.    THE SPECIAL COUNSEL'S OFFICE FAILED IN THEIR EFFORTS TO
MINIMIZE THE SIGNIFICANCE OF DISCOVERABLE EVENTS DURING THE
INVESTIGATION** ...................................................................................................... 20

      A.    NARA's Sham Referral ............................................................................ 20

      B.    The May 4, 2023 NARA Meeting ............................................................ 22

      C.    The Department Of Energy's Retroactive Decision To Rescind A Clearance ............ 23

   **V.      THE COURT SHOULD REJECT VAGUE PRIVILEGE-RELATED CLAIMS** 25

   **VI.    MISREPRESENTATIONS MADE BY THE SPECIAL COUNSEL'S OFFICE
CONCERNING THE PRODUCTION OF FORENSIC IMAGES** .................................... 28

   **VII.   DEFENDANTS NAUTA AND DE OLIVEIRA'S REQUESTS FOR
DISCLOSURE OF NON-CLASSIFIED DISCOVERY** ........................................ 31

CONCLUSION ................................................................................................................. 33

## <u>INTRODUCTION</u>

President Donald J. Trump[1] respectfully submits this consolidated reply memorandum, and the accompanying Classified Supplement, in support of the Defendants' motions for an order regarding the scope of the prosecution team, and to compel the Special Counsel's Office to produce certain discoverable materials, ECF No. 262.

The Defendants seek judicial intervention to thwart ongoing discovery abuses by the Special Counsel's Office in connection with a case that should have never been brought and must ultimately be dismissed on the basis of, *inter alia*, selective and vindictive prosecution. Yesterday, the U.S. Department of Justice released a report issued by Special Counsel Robert Hur, finding that President Biden has "willfully retained and disclosed classified materials after his vice presidency when he was a private citizen," over the course of his decades-long career.[2] President Biden will not be charged, and President Trump should not have been either.

The Hur Report is the latest entry on a long list of similarly situated government officials not being charged with a crime in connection with allegations relating to the handling of classified information. Others include former President William Clinton, former Vice President Mike Pence, former Secretary of State Hillary Clinton, and former FBI Director James Comey. There is also significant evidence that this prosecution is motivated by impermissible considerations concerning President Trump's status as the leading candidate in the 2024 election and President Biden's chief political rival. Dating back to April 2022, the Biden Administration has urged prosecutors to coopt the criminal justice system to try and accomplish what President Biden cannot do on the campaign

---

[1] Defendant's Waltine Nauta and Carlos De Oliveira join in this submission.

[2] Special Counsel's Office, U.S. Department of Justice, Report on the Investigation into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr. at 1 (Feb. 5, 2024) (the "Hur Report"), *available at* https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

trial, defeat President Trump.  Earlier this week, a super PAC supporting President Biden stated its intention to spend more than $40 million to "amplify" the Biden Administration's unjust election-interference mission.[3]  Supporters of President Biden are spending tens of millions of dollars to amplify prosecutions brought by the Biden Administration; that is election interference in its clearest form. Based on this evidence, the Defendants are entitled to discovery and a hearing concerning selective and vindictive prosecution, and they will ultimately demonstrate that the Superseding Indictment must be dismissed.

In addition to the selective prosecution theory, evidence of political animus targeting President Trump is discoverable for other reasons.  History provides ready examples.  On August 8, 2016, an FBI attorney sent a message to an FBI colleague: "[Trump's] not ever going to become president, right? Right?!"  He responded, "No.  No he's not.  We'll stop it."[4]  Although the FBI failed in that mission in 2016, the defense is entitled to similar communications to be used during cross-examination at trial and in connection with the defense investigation to identify additional witnesses with first-hand knowledge of the bias that has permeated every aspect of this case.

Similarly, in August 2022, a former Archivist who participated in the investigation used social media to promote NARA's role in the Mar-a-Lago raid and to help the agency bask "in the bright light of national visibility":

---

[3] Matt Dixon, *Pro-Biden super PAC set to spend up to $40M amplifying Trump's legal woes*, NBC NEWS (Feb. 6, 2024),    https://www.nbcnews.com/politics/2024-election/biden-super-pac-40-million-ad-campaign-trump-legal-rcna135326.

[4] Office of the Inspector General, U.S. Department of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election at 149 (June 2018) (the "Horowitz OIG Report"), *available at* https://www.justice.gov/file/1071991/download.



Remarkably, given this evidence, the Special Counsel's Office claims that its discovery obligations are limited with respect to NARA because President Trump has the option of disclosing sensitive defense strategy by requesting materials from the same agency that assisted the investigation almost as soon as he left office. The suggestion strains credulity. For the millions of people who support President Trump, NARA is hardly the "nation's record keeper." Gov. Mem. at 39. NARA witnesses providing trial testimony regarding, for example, the 15 Boxes, will be confronted with public displays of the agency's bias. The defense is entitled to similar private communications by NARA personnel for use to the same effect, and in order to develop additional evidence of misconduct by NARA in violation of the Presidential Records Act, due process, and President Trump's executive privilege.

Despite the claim by the Special Counsel's Office that "all" discovery would be available on "day one," *see* ECF No. 167 at 1 (citing 7/18/23 Tr. at 62), the Office has continued to produce a steady stream of disclosures and exculpatory details—as recently as yesterday, when the Office produced approximately 350 pages of unclassified discovery, over 400 pages of classified discovery, and additional classified details that undercut the Office's proof with respect to "national defense information" under § 793(e).[5] To the extent the Office finds the Defendants to be "unceasing" in efforts to seek adequate time to prepare defense motions based on all of the

---

[5] Due to the timing of the production, the Defendants have not had an opportunity to review these new materials. We reserve the right to supplement these motions based on that newly disclosed information.

discovery to which we are entitled, ECF No. 292 at 1, the defense proudly accepts that jab. This is an extraordinarily complex and seriously flawed case. The only explanation for the Office's continued rush to trial ahead of the 2024 election is the same constitutionally infirm position that requires dismissal due to the unacceptable animus underling the whole prosecution. For purposes of this submission, it suffices to say that the discovery sought herein is necessary and appropriate to prepare motion practice and trial defenses based on the Defendants' fundamental rights. Therefore, the Court should grant the motions.

## DISCUSSION

**I.   President Trump Has Made A *Prima Facie* Showing Of Selective And Vindictive Prosecution**

In light of the decision not to prosecute President Biden for his "willful" violation of the Espionage Act, the Special Counsel's Office can no longer avoid discovery on a selective and vindictive prosecution theories. This discovery includes all materials within the possession of the prosecution team that "might corroborate" President Trump's motion to dismiss on behalf of the Defendants, including with respect to Counts 33 through 40. *United States v. Armstrong*, 517 U.S. 456, 468 (1996).[6]

### A.  Background

In April 2022, the Biden Administration leaked to the *New York Times* President Biden's view that President Trump "should be prosecuted" and his instruction that Attorney General Garland should "take decisive action." Def. Mem. Ex. 62 at 1. In November 2022, through remarks that were plainly timed in response to rumors of President Trump's expected candidacy,

---

[6] As suggested in the defense's February 6, 2024 filing, ECF No. 285, the Defendants will file a separate dismissal motion based on selective and vindictive prosecution theories. In this reply submission, the Defendants are addressing arguments by the Special Counsel's Office concerning discoverability under *Armstrong* and seeking the discovery prescribed by that case and its progeny.

President Biden declared publicly that he was "making sure" President Trump "will not take power" and "does not become the next President again."[7]

After President Biden's subordinates had started to gather classified records from the Penn Biden Center during the summer of 2022, Biden endorsed the Mar-a-Lago raid during a September 2022 interview on *60 Minutes* in which he presumed publicly that President Trump is guilty. In that session, President Biden falsely accused President Trump of being "totally irresponsible," asked "[h]ow that could possibly happen[?]," and expressed concern about "[w]hat data was in there that may compromise sources and methods?"[8] Suffice it to say that those remarks have not aged well.

Although the Attorney General claimed previously that Jack Smith's appointment "underscore[d]" DOJ's "commitment" to "independence,"[9] the Attorney General confirmed his backing of the Biden Administration's use of Mr. Smith as a puppet during an interview last month. Specifically, the Attorney General inappropriately sought to place DOJ's imprimatur behind the untenable demand by the Special Counsel's Office for a "speedy trial" in this case and on the lawless charges filed in the District of Columbia.[10]

As noted above, on February 6, 2024, a super PAC supporting President Biden announced anticipated efforts to bring attention to the Biden Administration's manufactured prosecutions of

---

[7] Remarks by President Biden in Press Conference, The White House (Nov. 9, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/11/09/remarks-by-presidentbiden-in-press-conference-8.

[8] Scott Pelley, *President Joe Biden: The 2022 60 Minutes Interview*, CBS NEWS (Sept. 18, 2022), https://www.cbsnews.com/news/president-joe-biden-60-minutes-interview-transcript-2022-09-18/.

[9] Press Release, U.S. Department of Justice, Appointment of a Special Counsel (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0.

[10] Evan Perez, Holmes Lybrand and Hannah Rabinowitz, *Exclusive: Attorney General Merrick Garland says there should be 'speedy trial' of Trump as 2024 election looms*, CNN (Jan. 19, 2024, 8:25 AM), https://www.cnn.com/2024/01/19/politics/merrick-garland-trump-speedy-trial/index.html.

President Trump.  Before yesterday, this coordinated strategy permitted President Biden to pretend to be taking the high road by ignoring these cases, while others tout his corrupt accomplishments.

On February 8, 2024, Special Counsel Hur released a report concluding "that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen."  Hur Report at 1.  As described, the classified materials retained by President Biden were strikingly similar to some of the materials at issue in this case, including Sensitive Compartmented Information and materials from Special Access Programs and relating to President's Daily Briefs.  *Compare* Hur Report at 2 and 20, *with* Superseding Indictment ¶¶ 16-17, 20.  However, President Biden did not have those materials from his time as President and possessed the materials for a much longer period of time.  He maintained classified information in "unsecured and unauthorized spaces at his Virginia and Delaware homes" and "share[d] . . . some classified information . . . with his ghostwriter."  Hur Report at 3.  Critically, Hur decided not to charge President Biden based on the facts and prosecutorial discretion, rather than any immunity claim to which President Biden is entitled as the sitting President.  *See id.* at 1.

### B.  Applicable Law

The government may not pursue cases "with an evil eye and an unequal hand so as practically to make unjust and illegal discrimination between persons in similar circumstances . . . ."  *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).  Prosecutors "must exercise their charging discretion within constitutional constraints, including those imposed by the equal protection component of the Due Process Clause of the Fifth Amendment."  *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) (cleaned up).  Under the Due Process Clause, a prosecution decision "may not be based on an unjustifiable standard . . . or arbitrary classification."  *Id.* (cleaned up).

"The government violates a defendant's due process rights when it vindictively seeks to retaliate against him for exercising his legal rights." *United States v. Schneider*, 853 F. App'x 463, 469 (11th Cir. 2021). "A defendant can establish actual prosecutorial vindictiveness if he can show that the government's justification for a retaliatory action is pretextual." *Id.* at 469. "To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Simbaqueba Bonilla*, 2010 WL 11627259, at *5 (S.D. Fla. May 20, 2010) (cleaned up).

"In order to establish unconstitutional selective prosecution, the claimant must show [1] that the prosecution has a discriminatory effect and [2] that it was motivated by a discriminatory purpose." *United States v. Emmanuel*, 2007 WL 9705934, at *2 (S.D. Fla. July 3, 2007) (cleaned up). "The first prong, discriminatory effect, is demonstrated by a showing that similarly-situated individuals were not prosecuted for the same crime." *Id.* (cleaned up). "[A] 'similarly situated' person for selective prosecution purposes as one who engaged in the same type of conduct . . . ." *Smith*, 231 F.3d at 810. "The second prong, discriminatory purpose, is demonstrated by a showing that the decision to prosecute was invidious or in bad faith." *Emmanuel*, 2007 WL 9705934, at *2 (cleaned up). This includes prosecutions "predicated on a constitutionally impermissible motive, such as on the basis of race or religion, or in retaliation for her exercise of constitutional rights." *United States v. Ndiaye*, 434 F.3d 1270, 1288 (11th Cir. 2006). Undue political interference is evidence of a discriminatory purpose. *See, e.g.*, *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (3d Cir. 1981)) ("an agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge."). Accordingly, in supporting a selective prosecution claim,

"a defendant may obtain discovery in support of a selective prosecution claim where the defendant provides some evidence tending to show the existence of the essential elements of the defense." *United States v. Williams*, 684 F. App'x 767, 777 (11th Cir. 2017) (citing *Armstrong*, 517 U.S. at 468)."

### C. Discussion

"Nothing is so politically effective as the ability to charge that one's opponent and his associates are not merely wrongheaded, naive, ineffective, but, in all probability, 'crooks.' And nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution." *Morrison v. Olson*, 487 U.S. 654, 713 (1988) (Scalia, J., dissenting). "The present [indictment] provides ample means for that sort of attack . . . ." *Id.*

There is ample evidence that this case has been brought based on impermissible considerations relating to President Trump's political remarks, his leading presidential candidacy, and protected speech relating to his campaign. *See United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) ("[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government."); *United States v. Crowthers*, 456 F.2d 1074, 1079 (4th Cir. 1972) ("What the government has done here is to undertake to suppress a viewpoint it does not wish to hear under the guise of enforcing a general regulation prohibiting disturbances on government property."); *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) ("[T]he Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs.").[11]

---

[11] With respect to the First Amendment freedoms implicated by this impermissible prosecution, see, for example, *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." (cleaned up)); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819,

President Biden used media leaks in April 2022 and November 2022 to urge the Attorney General and other prosecutors to charge President Trump. President Biden's responsibility for these instructions is supported by the Court's prior finding of the "unfortunate existence of leaks to the press" in this case. *Trump v. United States*, 625 F. Supp. 3d 1257, 1266 n. 11 (S.D. Fla. 2022).

This case is "vindictive" because it has been brought in an effort to punish President Trump for exercising those rights on behalf of the American people. *See United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006) ("Vindictiveness in this context means the desire to punish a person for exercising his rights."). Without question, this is a "high-profile prosecution with international ramifications no less," which has a "far greater potential to give rise to a vindictive motive." *United States v. Slatten*, 865 F.3d 767, 799-800 (D.C. Cir. 2017). The efforts by President Biden and the Special Counsel's Office violate Justice Manual § 9-85.500 and established norms prohibiting election interference by prosecutors, which, ironically, DOJ relied upon in declining to prosecute Hillary Clinton in connection with the deletion of 31,830 emails that included classified information and were stored at the Clinton's home. *See* Horowitz OIG Report at 253-263.[12] Thus, the record is sufficient to establish—on a *prima facie* basis, at minimum—that Jack Smith "was prevailed upon to bring the charges by another with animus such

---

829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (reasoning that speech "at the core of our electoral process" is "an area . . . where protection of robust discussion is at its zenith" (cleaned up)); *see also Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then . . . speak and listen once more," as a "fundamental principle of the First Amendment"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, to its source and to its recipients both.").

[12] *See also* Horowitz OIG Report at 18 ("Several Department officials described a general principle of avoiding interference in elections rather than a specific time period before an election during which overt investigative steps are prohibited. Former AG Lynch told the OIG, '[I]n general, the practice has been not to take actions that might have an impact on an election, even if it's not an election case or something like that.'").

that the prosecutor could be considered a 'stalking horse.'" *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000).

The existence of this case is also extraordinarily disturbing and unprecedented when compared to similarly situated individuals who were not charged. In 2015, the Society of American Archivists observed that, "[d]espite the fact that records management laws and regulations have been on the books for decades, non-compliance with the letter and spirit of accountability and transparency, which are inherent in these statutes, is a regular occurrence."[13]

In addition to the declination concerning President Biden, the same National Security Division within DOJ that investigated President Trump—and likely some of the same prosecutors who have investigated President Trump—appropriately declined to prosecute former Vice President Mike Pence. They made that decision in June 2023, just before Pence announced his since-aborted presidential campaign, and despite an iterative process that involved three separate instances in which classified documents were discovered in Pence's home (but no obstruction charges or interference with Pence's attorney-client privilege).[14] The same month, the Special Counsel's Office charged the Defendants in this case. The timing suggests that the Biden Administration and DOJ wanted to facilitate Pence's campaign while stifling President Trump's, and as a result of President Trump's subsequent nationwide success it is now clear why.

---

[13] SOCIETY OF AMERICAN ARCHIVISTS, *Issue Brief: Strengthening of Federal Records Authority* (last updated Dec. 2, 2015), https://www2.archivists.org/statements/issue-brief-strengthening-of-federal-records-authority.

[14] *See* Letter from Vice President Pence's designated representative to NARA (Jan. 18, 2023), *available at* https://www.archives.gov/files/foia/greg-jacob.01-18-2023-ltr-to-archives.re-pence-pra-records.pdf; Letter from Vice President Pence's designated representative to NARA (Jan. 22, 2023), *available at* https://www.archives.gov/files/foia/greg-jacob.01-22-2023-ltr-to-archives.re-pence-pra-records.pdf; *see also* Jeremy Herb and Katelyn Polantz, *Justice Department will not seek criminal charges in Pence classified document probe*, CNN (June 2, 2023, 10:46 AM), https://www.cnn.com/2023/06/02/politics/mike-pence-justice-department-documents/index.html.

It has been public knowledge for 15 years that President Clinton possesses recordings containing classified information, including:

- "'[F]oreign-policy decisions such as the United States' military involvement in Haiti'";

- "'President Clinton's side of telephone conversations with foreign leaders'";

- "'President Clinton's side of a telephone conversation with U.S. Secretary of State Warren Christopher concerning a diplomatic impasse over Bosnia'"; and

- Details from "'technical forecasts that he received during presidential briefings.'"

*Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 290 n.1 (D.D.C. 2012). To our knowledge, DOJ never took any steps to recover these materials or investigate the circumstances of the creation, possession, transmission, and ongoing retention. The record of the *Judicial Watch* litigation indicates that such an investigation was inconceivable to the government employees responsible for that case. NARA even took the position—apparently without reviewing the recordings—that the requested materials were "personal records of President Clinton as defined by the PRA." *Id.* at 293 (quoting NARA letter). Here, NARA essentially and improperly deemed nearly every piece of paper in Mar-a-Lago to be a Presidential Record. The well-documented declination decision relating to James Comey's possession and transmission of classified memoranda serves as another example of a government official who was not charged in connection with the retention and dissemination of classified information.[15]

In sum, conclusory denials by the Special Counsel's Office are no longer sufficient for the Biden Administration and the Office to avoid discovery on the biases and motives that drove the charges against the Defendants. The Hur Report, coupled with additional evidence described

---

[15] Office of the Inspector General, U.S. Department of Justice, Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda (Aug. 2019), https://www.oversight.gov/sites/default/files/oig-reports/o1902.pdf.

above, provides an adequate basis for the Court to order the discovery discussed in *Armstrong*, which must be gathered from all members of the properly defined prosecution team.

## II.   Evidence Of Political Animus Is Discoverable Irrespective Of Selective And Vindictive Prosecution

Irrespective of the *Armstrong* standard for discovery on selective and vindictive prosecution motions, evidence of political animus and bias by participants in the investigation is discoverable.   Indeed, the entire thrust of the operative language from *Kyles* is that pretrial disclosure of evidence on these issues is required.  *Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995) (reasoning that "[t]here was a considerable amount of such *Brady* evidence," which "[t]he police failed to disclose," that the defense could have used to "attack[] the investigation as shoddy"). There are also numerous instances in which, contrary to the claims by the Special Counsel's Office, defendants were permitted to challenge prosecutors' motivations at trial.  In *Eley*, for example, the defense summation argued, in substance, "that the investigating officers were callous in their attitude towards the case and that the government's prosecution of the case was abusive."  *United States v. Eley*, 723 F.2d 1522, 1526 (11th Cir. 1984).  The Eleventh Circuit held the prosecution was permitted to rebut the argument but made no suggestion whatsoever that the defense summation was inappropriate.

President Trump's position does not "conflate the concepts of witness bias and selective prosecution.'"  Gov. Mem. at 34-35 (quoting *United States v. Abboud*, 438 F.3d 554, 580 (6th Cir. 2006)).  Rather, the defense is contesting efforts by the Special Counsel's Office to jump ahead to an analysis of the admissibility of hypothetical evidence that no one has seen.  The defense approach is consistent with *United States v. Grenon*, which the Office cited, where the court precluded trial evidence of "selective prosecution" but declined to "exclude all references to Defendants being 'targeted'" because the court could "envision other scenarios" where the

evidence would be admissible, "for example, to expose the bias of certain witnesses." 2023 WL 3947712, at *6 (S.D. Fla. June 12, 2023); Gov. Mem. at 34.[16]

Appellate decisions engaging in abuse-of-discretion review of evidentiary rulings with the benefit of a developed trial record lend no support to the position of the Special Counsel's Office. *See* Gov. Mem. at 37. Most of these cases involved situations where the prosecutors complied with their pretrial discovery obligations, and none suggest that it would have been appropriate to withhold the evidence at issue. *Patrick* concerned the admissibility of notes of "tipsters' calls" in connection with an alternate perpetrator defense. 248 F.3d 11, 22 (1st Cir. 2001). The First Circuit affirmed the preclusion of the notes under Rule 403, but never suggested that the notes should not have been produced in the first place. *Veal* involved evidence disclosed by the prosecution suggesting "that the government originally miscalculated the number of bogus prescriptions." *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994). Regarding admissibility, only, the Sixth Circuit relegated that evidence to proof of irrelevant "slopp[iness]." *Id.* No party here is in a position to address that question because the evidence has not been disclosed. *McVeigh* "involve[d] the exclusion of FBI and ATF reports" that the prosecution produced, which the court concluded "[did] not support his claim that the government's investigation of Elohim City was shoddy." *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). Again, that conclusion cannot be litigated here where the Office is improperly withholding the evidence in question.

Pursuant to *Kyles*, the defense seeks information and evidence demonstrating that participants in the investigation were *biased* against President Trump and *motivated* to reach false

---

[16] The Special Counsel's Office also cites *United States v. Chugay*, which is inapposite because the defendant "concede[d]" that "selective prosecution is a matter for the Court to decide" and did not articulate alternative theories of admissibility. 2022 WL 1782583, at *2 (S.D. Fla. June 1, 2022); Gov. Mem. at 34. The Office's reliance on *United States v. Maxwell* is even more dubious, as the defendant in that case did not even file a selective prosecution motion. 2006 WL 8439795, at *1 (S.D. Fla. Oct. 4, 2006); Gov. Mem. at 34.

and inaccurate conclusions based on political animus.  Materiality is the standard, and it is a low bar.  Relevance and admissibility are for another day—if this case survives that long.  The question of whether and how the defense will be permitted to present evidence at trial does not excuse the Special Counsel's Office from disclosing evidence that may be used to cross-examine witnesses or develop defenses based on defense investigative efforts that the Office cannot give short shrift. "Foreclosing that defense now—before [the defense] has had an opportunity to establish it—would simply be unjust."  *United States v. Saab Moran*, 2022 WL 4291417, at *3 (S.D. Fla. Sept. 15, 2022).

## III.    An Order Defining The Prosecution Team Is Necessary

In discovery letters and motion papers, the Special Counsel's Office has sought to avoid their discovery obligations by claiming that otherwise-discoverable materials are not in the possession of the prosecution team.  *E.g.*, Gov. Mem. at 43-44, 50.  In fact, other than by seeking to exclude the possessors of the evidence from the prosecution team's scope, the Office largely declined to address the specific types of political-animus and bias evidence President Trump is seeking, such as documents relating to the lengthy meeting between White House personnel and Georgia Special Assistant District Attorney Nathan Wade on the same day that Jack Smith was appointed, Def. Mem. at 47-48; written findings concerning Intelligence Community bias by former Director of National Intelligence John Ratcliffe and Intelligence Community Analytic Ombudsman Dr. Barry Zulauf, *id.* at 48-50; nine specific requests concerning NARA's role in the investigation, *id.* at 51; and other public and private statements reflecting bias by DOJ personnel, *id.* at 52.  Thus, President Trump's motion concerning the prosecution team does not seek "abstract rulings."  *Id.*  Rather, the defense is seeking an order that requires the Special Counsel's Office to produce discoverable materials from the agencies and entities that are part of the prosecution team.

Once the prosecution team is appropriately defined, the Office must conduct case-file reviews at targeting relevant personnel at the agencies and entities the Office improperly excluded for purposes of discovery at the outset of the case. *See* Justice Manual § 9-5.002.

### A.  The Special Counsel's Office Is Wrong On The Law

The Special Counsel's Office repeatedly invokes the concept of prosecutorial "authority" as the "principal consideration" regarding prosecution team scope in the Eleventh Circuit. *E.g.*, Gov. Mem. at 25 (citing *Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002)).  To the contrary, analysis of the prosecution team involves "a case-by-case analysis of the extent of *interaction and cooperation*."  *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (emphasis added). Regardless of "authority," or actual possession, information and evidence that is "readily available" to the prosecutors must be produced.  *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980).

The Special Counsel's Office cites *Moon*, which is not to the contrary.  *See* Gov. Mem. at 25.  *Moon* involved deferential *habeas* review of a state court's decision finding no discovery violation.  In addition to the deferential posture, *Moon* has been described as involving "separate" investigations by "separate investigative teams" in Georgia and Tennessee targeting two different murders.  *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011); *see also United States v. Bryant*, 2016 WL 8732411, at *23 (S.D. Fla. Oct. 27, 2016) ("By contrast [to *Moon*], in the instant case, Agent Jackson played an important role in the investigation of the defendants."). Thus, the concept of "authority" in *Moon* related to separate sovereigns lacking the ability to control the other.  That concept does not fit with cases involving federal prosecutors working with federal agencies.  *See Auten*, 632 F.2d at 481 (emphasizing that there is "no suggestion in *Brady*

that different arms of the government are such separate entities as to be insulated one from the other").

An agency's purported "victim" status does not exclude it from the prosecution team or the discovery obligations of the Special Counsel's Office.  *See, e.g.*, Gov. Mem. at 18 (arguing inaccurately that agencies "did not participate in the investigation or prosecution except as victimized governmental entities").  The only case cited by the Office in connection with this so-called "victim" theory is the Tenth Circuit's decision in *United States v. Burger*, 964 F.2d 1065, 1071 (10th Cir. 1992).  Gov. Mem. at 42, 43.  *Burger*, however, did not involve a discovery dispute; the court found that the defendant could not withdraw his guilty plea based on two agencies' sentencing submissions concerning restitution.  *See* 964 F.2d at 1071.  There was no suggestion in *Burger* that the agencies had played any role in the case other than having emerged at sentencing to seek compensation.  Thus, there is no fair analogy from those circumstances to the roles played in this case by White House entities, NARA, and the Intelligence Community.

On the other hand, in *United States v. Deutsch*, the Eleventh Circuit found an agency to be part of the prosecution team because the prosecutors had "access" to the agency's files, even if not "present possession."  475 F.2d 55, 57 (5th Cir. 1973).  Unlike the separate-sovereign issues between states discussed in *Moon*, *Deutsch* involved federal prosecutors working with a federal agency that "closely connected" during the investigation.  *Id.*  In *Deutsch*, as here, the prosecutors sought to avoid their *Brady* obligations based on the false claim that the defendant "failed to show that the records which he sought to inspect contained anything favorable to him."  *Id.* at 58.  The Eleventh Circuit issued a stern—and equally applicable—admonition: "This is . . . not the answer to *Brady*.  The burden is on the government to produce, not on the defendant."  *Id.*  In other words,

the Office is obligated to produce all exculpatory information within the possession of the prosecution team irrespective of defense requests.

### B.  The Intelligence Community And National Security Council Are Part Of The Prosecution Team

The Special Counsel's Office did not address the significance of the majority of DOJ's representations to Your Honor regarding the relationship with the Intelligence Community in *Trump v. United States*.  *See* Def. Mem. at 19-21.

The Intelligence Community and the National Security Council are part of the prosecution team because these agencies authored the documents at issue, "pooled their investigative energies" during the classification review process, *Antone*, 603 F.2d at 569, and participated in meetings relating to "prosecutorial or investigative strategy," Gov. Mem. at 44, as discussed in the Classified Supplement.  These activities were not "legally distinct events" similar to the comparison of extradition proceedings and criminal prosecutions in *Saab Moran*, 2022 WL 4291417, at *4.  Gov. Mem. at 46.  Extraditions involve diplomatic requests to foreign counterparts to secure a defendant's presence in the jurisdiction where the charges are already pending; evidence collection and collaborative investigative work with foreign parties involves separate requests, often pursuant to different treaties.  In contrast, the classification reviews and damage assessments by the Intelligence Community and the National Security Council involved the collection and disclosure of evidence during the investigation, as well as the generation of information in a pre-charge setting based on consultation with DOJ and FBI, which the Office used in grand jury proceedings and will seek to rely upon at trial.  Those processes were a part of the investigation and cannot reasonably be said to have been distinct from it.

In support of this argument, the defense is not relying on these entities' purported status as "victims," Gov. Mem. at 43, but rather the entities' assistance to the Special Counsel's Office and

the FBI and the constructive access to these entities' files demonstrated by comments during interviews and discovery produced to date.  For those reasons, *United States v. Chalmers*, where "no one from any of the Federal Entities substantially participated in this prosecution or investigation," is inapposite.  410 F. Supp. 2d 278, 288 (S.D.N.Y. 2006); *see* Gov. Mem. at 44.

President Trump's block-quoted reliance on *Libby* is neither "brief" nor "misplaced."  Gov. Mem. at 25 n.11; *see also* Def. Mem. at 29.  In *Libby*, similar to here, the prosecutors had "sought and received a variety of documents" from the CIA and the Office of the Vice President during the investigation.  429 F. Supp. 2d 1, 11 (D.D.C. 2006).  The *Libby* court found that it would "clearly conflict with the purpose and spirit" of the discovery rules to allow the prosecutors to "leave other documents with these entities that . . . are material to the preparation of the defense." *Id.*  This reasoning mirrors that in *United States v. McGowan*, where the Eleventh Circuit explained that "the government may not leave evidence in the hands of a third party to avoid disclosure." 552 F. App'x 950, 953 (11th Cir. 2014).  Therefore, the D.C. Circuit caselaw concerning entities that are "closely aligned" with the prosecution, *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992), is not substantively different from the Eleventh Circuit's emphasis on "interaction and cooperation" between agencies, *Antone*, 603 F.2d at 570, and evidence being discoverable because it is "readily available" to the prosecutors, *Auten*, 632 F.2d at 481.  *See* Gov. Mem. at 25 n.11. Therefore, *Libby* is compelling authority for President Trump's position regarding the Intelligence Community.  As are *Poindexter*, *Giffen*, *Oseguera Gonzalez*, *Griffith*, and *O'Keefe*, which the Office made no effort to address.  *See* Def. Mem. at 29-30.

The claim by the Special Counsel's Office that "prosecutors do not exert authority over [these] entities" does not change the analysis because, *inter alia*, it applies equally to the FBI, which is indisputably part of the prosecution team.  If anything, *Alahmedalabdaloklah* hurts rather

than helps the Office.  *See* Gov. Mem. at 43 citing *United States v. Ahmed Alahmedalabdaloklah*, 76 F.4th 1183, 1246-47 (9th Cir. 2023).  In that case, on the eve of trial, the district court "ordered the Government to search" Defense Department holdings for the information sought by the defendant and to "provide a written response." *Alahmedalabdaloklah*, 76 F.4th at 1245-46.  The prosecutors subsequently "searched the DoD databases on which it primarily relied for its investigation," including "primary producer of ground forces intelligence." *Id.* at 1245.  Thus, *Alahmedalabdaloklah* is an example of the type of efforts that can and will be undertaken by prosecutors in response to a court order directing the Office to comply with its discovery obligations.  Just such an order is appropriate on these facts.

### C.  The Prosecution Team Includes White House Entities And NARA

If the 17 pages that the Special Counsel's Office devoted in its opposition brief to "set[ting] the record straight" accomplished anything, it was to further demonstrate the intricate involvement in the investigation by White House personnel and NARA.  These are exactly the type of "closely connected" activities that the Eleventh Circuit found significant in *Deutsch*.  475 F.2d at 57.

NARA and the White House had started to work together with DOJ by September 1, 2021.  Def. Mem. Ex. 5 at USA-00383606.  The Special Counsel's Office does not address the significance of this early coordination with DOJ for purposes of President Trump's prosecution-team argument.  By January 2022, NARA was coordinating directly with the White House, the Inspector General of the Intelligence Community, and DOJ, including in connection with the collection and review of the 15 boxes from Mar-a-Lago.  *See* Def. Mem. Ex. 2 at USA-00813156; *see also* Def. Mem. Exs. 7, 10, 12.  The following month, NARA coordinated with the White House and DOJ to route a sham referral via NARA-OIG, and NARA also worked with the FBI to

circumvent notice obligations relating to President Trump's presidential records. Def. Mem. Ex. 2 at USA-00813151-52.

Despite providing information regarding the 15 Boxes to prosecutors and law enforcement by February 2022, the Acting Archivist suggested in a May 10, 2022 letter that NARA waited to do so until the White House "formally transmitted a request." Def. Mem. Ex. 24 at 1. Further demonstrating the White House's role in actions that were central to the investigation, "Counsel to the President . . . informed" the Acting Archivist that President Biden had purported to defer to NARA's view on President Trump's executive privilege, and DOJ provided advice in connection with NARA's determination. *See id.* at 2; *see also* Justice Manual § 9-5.001 (defining "prosecution team" to include "other government officials," as a category distinct from "law enforcement officers"). Irrespective of the intentions behind NARA's conduct, the agency is part of the prosecution team in light of its actions in support of the White House and DOJ to target President Trump by manipulating the Presidential Records Act. *Cf. United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995) ("[U]nder *Brady* the agency charged with administration of the statute, which has consulted with the prosecutor in the steps leading to prosecution, is to be considered as part of the prosecution in determining what information must be made available to the defendant charged with violation of the statute."). Accordingly, based on all of the available evidence, the prosecution team includes NARA, the White House Counsel's Office, and WH-ORM. *See* Def. Mem. at 17-19 (NARA), 21-22 (White House).

## IV.   The Special Counsel's Office Failed In Their Efforts To Minimize The Significance Of Discoverable Events During The Investigation

### A. NARA's Sham Referral

There is no real question about the "legal significance" of the sham referral to DOJ by NARA-OIG on February 9, 2022. Gov. Mem. at 10. At most, there are disputed facts that require a hearing.

Despite the fact that NARA contacted DOJ as early as September 2021, and coordinated with the White House to facilitate further direct contact between DOJ leadership and NARA by January 2022, NARA-OIG purported to send a separate referral to DOJ on February 9, 2022. Def. Mem. Exs. 2, 5, 17. The apparent purpose of the referral was to suggest to the public and the courts that NARA-OIG had reached an independent conclusion pursuant to the Inspector General Act that contacting DOJ was appropriate, as opposed to the reality of a coordinated decision by the Biden Administration, NARA, and DOJ to paper the file using the auspices of NARA-OIG.

This sham process is legally significant for several reasons. The coordinated effort is further evidence that the personnel involved from the White House, NARA, and DOJ are part of the prosecution team. The circumstances indicate that these parties used NARA-OIG to try to suggest a lack of prior involvement in the investigation by criminal authorities. Evidence that prosecutors abused civil and administrative processes under the PRA and other authorities to collect evidence that they intended to use in criminal proceedings is material, and therefore discoverable, with respect to due process motions outlined in the defense brief. *See* Def. Mem. at 44 (citing, *inter alia*, *United States v. Cizkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) and *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021)). The Special Counsel's Office parroted its false sham-referral story in the warrant used to raid Mar-a-Lago, which supports President Trump's forthcoming motion to suppress and for a *Franks* hearing. The Office did the same in the Superseding Indictment, which is another basis for motion practice concerning abuse of the grand

21

jury process.  Last, but not least, prosecutors misled Your Honor about this issue, twice, and have a duty to correct.  *See* Def. Mem. at 8 n.4.

### B.  The May 4, 2023 NARA Meeting

President Trump seeks further disclosures concerning the May 4, 2023 meeting in which NARA coordinated with the Special Counsel's Office on a response to a purported grand jury subpoena.  The meeting itself is strong evidence of the close relationship that NARA maintained with the prosecutors, which further supports the defense position that NARA is part of the prosecution team.  Moreover, the handling of the alleged subpoena described in the materials that have been produced to date reflects abuse of the grand jury process as a pretext for pursuing the political objectives of the Biden Administration and the Office.  Further disclosures are necessary to resolve disputed issues of fact on this topic, as the actions of those involved are favorable to the defense.

Seeking to rewrite the record, the Special Counsel's Office claims that NARA identified 81 "potentially responsive" documents in connection with the purported grand jury subpoena, and that 15 documents "were actually responsive."  Gov. Mem. at 40.  The Office's story is contradicted by documents such as Exhibit 57, which does not use those terms, and cannot be credited in the absence of sworn declarations or other competent evidence.  A set of notes relating to the meeting suggests that certain of the documents related to topics that are exculpatory because they involved instances of declassification, which supports President Trump's defense that he reasonably believed he exercised absolute declassification authority under Article II.  Def. Mem. Ex. 58 at USA-00943087; *see also* Def. Mem. at 35.  The Office has not clarified whether they included in discovery all 81 documents, just the 15, or a different subset of the materials NARA deemed responsive.

In a failed effort to address the optics of the May 4 negotiation, the Special Counsel's Office claims that NARA "required" grand jury subpoenas to turn over alleged Presidential records pursuant to the PRA. Gov. Mem. at 39; *see also id.* at 39 n.19. That supposed requirement was inconsistent at best. NARA's May 10, 2022 letter indicates that the agency provided the FBI access to the 15 Boxes pursuant to a request from the White House, presumably pursuant to 44 U.S.C. § 2205(2)(B) in connection with the "current business" of President Biden. *See* Def. Mem. Ex. 24 at 1. Someone appears to have decided that it was politically risky, if not altogether unseemly, to create a record acknowledging that the Biden Administration's "current business" included the investigation and prosecution of President Trump. At that point, it appears that NARA started to "require" grand jury subpoenas so that the parties could rely on a different PRA provision, 44 U.S.C. § 2205(2)(A).

The defense position that these efforts were pretextual, and that documents reflecting the underlying bias behind this pretext is discoverable, is supported by evidence of efforts by the Special Counsel's Office to abuse President Trump's executive privilege. *See In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, 2024 WL 158766, at *1 (D.C. Cir. Jan. 16, 2024) (Rao, J., statement respecting the denial of rehearing en banc) ("The Special Counsel's approach obscured and bypassed any assertion of executive privilege and dodged the careful balance Congress struck in the Presidential Records Act."). Therefore, the arguments by the Office concerning the discoverability of additional documents relating to the May 4, 2023 meeting and negotiations relating to the subpoena at issue have, at best, created disputed issues of fact that must be addressed before the motion is resolved.

### C. The Department Of Energy's Retroactive Decision To Rescind A Clearance

Until this summer, President Trump maintained a "Q" clearance that authorized him to possess the document charged in Count 19. This evidence is directly contrary to the authorization element of § 793(e), and the circumstances surrounding the Energy Department's decision to paper the file with memoranda rescinding the clearance constitute discoverable evidence of bias. Whatever technical limitations may exist with respect to the application of that clearance to the documents charged in the other § 793(e) counts—and we do not concede at this point that there are any such limitations—possession of a security clearance supports the argument that President Trump had a good faith belief that he was authorized to possess the other charged documents. Any evidence that supports that type of good-faith belief is inconsistent with the willfulness element of § 793(e) and thus exculpatory. The fact that the Special Counsel's Office devotes several sentences in a footnote to responding to the implications of the Q clearance only underscores the viability of these defenses in pretrial motions and at trial. *See* Gov. Mem. at 49 n.24. Accordingly, further disclosures on this issue are required.

Even if the Special Counsel's Office was correct that the "only possible justification" for seeking information regarding the Energy Department's decision is to "support a pretrial motion . . . for selective prosecution," Gov. Mem. at 50, President Trump has already made an adequate showing that such discovery is appropriate. *See* Part I, *supra*. However, the Office is not correct. Prosecution testimony from Energy Department witnesses will be necessary to provide context for the document charged in Count 19, its purported classification under the somewhat different classification system used by the Energy Department, and any supposed "national defense information" that it contains. The Office has a *Giglio* obligation with respect to those witnesses, which includes evidence of bias and motivation that could be used to impeach the agency's analysis or conclusions. The Energy Department's disparate treatment of clearances maintained

24

by other Presidents falls into that category.  And, as with some other issues, if the Energy Department had handled this issue consistently and in a manner that did not reflect animus toward President Trump, it would have been straightforward for the Office to say so.  Their silence is telling, and this is plainly not a "fishing expedition."  Gov. Mem. at 50.

Lastly, the claimed lack of "authority" and access by the Special Counsel's Office to Energy Department holdings cannot withstand scrutiny.  *Id.*  The Energy Department participated in the classification reviews and provided the Office with the memoranda in Def. Mem. Ex. 59. Since President Trump filed the motion, the Office was able to obtain and produce to the defense "30 pages of responsive materials."  *See* Gov. Mem. at 26 n.12 (citing *Auten* for the proposition that "information held by another entity but 'readily available' to prosecutors falls within the Government's custody or control for discovery purposes").  Given this history, the Court should reject the Office's assertion that additional responsive records are not available to the Office because the Energy Department is not part of the prosecution team.

## V.    The Court Should Reject Vague Privilege-Related Claims

In both unclassified and classified opposition filings, the Special Counsel's Office suggested that the Office was withholding, or could withhold, "certain" discoverable materials on the basis of the work-product and deliberative-process privileges.  *See* Gov. Mem. at 27-29.  As examples, the Office takes the position that:

- "[A]ny items that *may*, in fact, be within the possession, custody, or control of the Government" concerning NARA bias "are privileged and not subject to disclosure," *see* Gov. Mem. at 30 (emphasis added);

- "[T]o the extent any request seeks material information within the Government's custody and control that takes the form of an internal communications within the Department of Justice or the Special Counsel's Office"—which almost all of the Requests do—"such information is privileged from disclosure," *id.* at 46; and

- The Office has the authority to unilaterally withhold "eight emails under the deliberative-process privilege" concerning the Department of Energy's manipulation of President Trump's security clearance and related efforts to modify evidence, *id.* at 50.

At least with respect to internal DOJ communications, the Office's blanket assertion of privilege is contrary to the Justice Manual, which requires review of all "'Substantive' case-related communications" by the prosecution team because they "may contain discoverable information." Justice Manual § 9-5.002(B)(5). It is not even clear that the Office has reviewed the materials they claim are privileged. As a result, they are in no position to responsibly argue that they are entitled to withhold discoverable information from the defense.

For example, although the Office has not disclosed the transcript, a former FBI official told the House Judiciary Committee that there was a dispute between DOJ and the FBI regarding whether to seek consent for the search of Mar-a-Lago, which is a courtesy that was extended to President Biden in [January 2023], that included email communications between members of the prosecution team that have not been produced.[17] Internal disputes concerning the Mar-a-Lago raid are relevant to the bias defense, cross-examination concerning motive, and the application of the suppression remedy and good-faith doctrine in connection with President Trump's forthcoming motion to suppress. Insofar as the Office has withheld these materials on the basis of a privilege, it is incumbent on the Office to disclose that to the Court and counsel so that disputes can be resolved. Of course, having already produced an internal FBI email concerning a DOJ official's

---

[17] Transcribed Interview, H. COMM. ON THE JUDICIARY, at 23 (June 7, 2023), *available at* https://shorturl.at/adovL ("It would be the best thing for all parties. And I firmly believed that, right. For the FBI, for former President Trump, and for the country, the best scenario would have been consent."); *see also id.* ("[T]here are emails that I have written back and forth that my view is we want consent . . . ."); *id.* at 30 ("[T]here's an email exchange . . . in which I basically said, you know -- he was telling us when we were going to do the search, and I'm like, We're not doing the search that day.").

callous approach to the unprecedented raid, Def. Mem. Ex. 35 at USA-00940276, it will be difficult for the Office to justify withholding other internal emails on that topic.

Further disclosures are necessary because these privileges are qualified.  The application of the deliberative process privilege requires "balancing of the competing interests, taking into account factors such as [1] the relevance of the evidence, [2] the availability of other evidence, [3] the seriousness of the litigation, [4] the role of the government, and [5] the possibility of future timidity by government employees." *In re Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997) (cleaned up); *see also United States v. Nobles*, 422 U.S. 225, 239 (1975) ("The privilege derived from the work-product doctrine is not absolute.").  "For example, where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d at 738 (cleaned up); *see also In re Comptroller of the Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992) (reasoning that "the privilege may be overridden where necessary . . . to shed light on alleged government malfeasance" (cleaned up)).

As a result, "an *in camera* examination of the withheld documents is necessary to weigh the government's interest in nondisclosure against the interests of the litigants and the public in disclosure." *Fed. Home Loan Mortg. Corp. v. Deloitte & Touche, LLP*, 2015 WL 12766388, at *3 (S.D. Fla. Aug. 4, 2015).  In *Kahn v. United States*, the court employed a two-stage review to (1) "determine whether the material is relevant to the plaintiff's malicious prosecution claim or the government's defenses thereto;" and (2) "if relevant, determine whether the material is privileged as attorney work product or by the law enforcement privilege."  2015 WL 4112081, at *2 (S.D. Fla. July 8, 2015).  *Kahn* involved multiple privilege logs, which the Office should be required to

produce to facilitate privilege-related litigation.  *See id.* at *1; *see also United States v. Sutton*, 2022 WL 2383974, at *9 (D.D.C. July 1, 2022) (requiring production of privilege log).

The Court should also require production of any materials that are otherwise subject to Rule 16(a)(2) to the extent the materials contain information that is discoverable under *Brady*.  *See Armstrong*, 517 U.S. at 474-75 (Breyer, J., concurring) (citing 2 C. Wright, Federal Practice and Procedure § 254 at 81 & n.60 (2d ed. 1982) ("Because *Brady* is based on the Constitution, it overrides court-made rules of procedure.  Thus the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within *Brady*.")); *United States v. Goldman*, 439 F. Supp. 337, 350 (S.D.N.Y. 1977) ("Of course, if [work product] material be of a *Brady* nature, then it must be produced.").  As disclosure requirements, *Brady* and Rule 16(a)(e)(1) are similar in scope.  These motions to compel seek evidence that is discoverable under either authority, and Rule 16(a)(2) offers no refuge to the Special Counsel's Office from its *Brady* obligations.

Accordingly, for all of these reasons, the Court should order the Office to produce a privilege log of withheld documents, confer with defense counsel in an effort to resolve disputes, and conduct *in camera* review of documents for which the defense contests the Office's invocation of a privilege.

## VI.    Misrepresentations Made By The Special Counsel's Office Concerning The Production Of Forensic Images

The Special Counsel's Office continues to refuse to produce forensic images of the devices it obtained in its investigation and prosecution of this matter.  The Office first misrepresents, Gov. Mem. at 15 n.6, that it has provided Mr. Nauta with a forensic image of Mr. Nauta's phones.  The images provided, however, cannot be forensic images insofar as the Special Counsel contends that Mr. Nauta's phones contained classified materials and thus could not have been produced in

28

unclassified discovery and no forensic images have been produced in classified discovery. The images provided by the Office's filter attorney—an attorney with the United States Attorney's Office for the Southern District of Florida where this case is now obviously pending—are therefore incomplete insofar as the Special Counsel's Office has removed material from at least one of the phones it deems classified.

Second, the Special Counsel's Office suggests that defendants are not entitled to forensic images for other devices it may have obtained over the course of investigation because, "defense counsel are not entitled to privileged material for anyone other than their own client." *Id.* Unsurprisingly, the Office cites no authority for this blanket proposition, likely because none exists. To the extent that any such material is subject to an applicable privilege, the Special Counsel's Office has no standing to assert such a privilege. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 346 (E.D. Va. 2015). Moreover, only with a forensic extraction of a mobile device can defense counsel, and potentially their expert, assess the authenticity and/or reliability of data contained therein. Such an analysis includes assessing the location of a device when calls were made to/from the phone and whether they were answered, as well as with whom they were made; when messages were sent and/or received from the device and with whom; whether photographs and/or video were created with the device and whether they were sent or otherwise transmitted by the device and to whom, the source of photographs and/or video on the device that were not created by the device; and any social media and/or internet searches utilized by a device owner. Defense counsel specifically requests:

> (i)   All records related to the seizure and/or search of the same, including, but not limited to any search warrant or consent for the seizure and/or search of the device and reports regarding the seizure and resulting chain of custody of each device;

      (ii)     Any forensic examiner's report detailing the tools and all procedures used to examine each device;

      (iii)    A copy of the forensic extraction file in native (original) format of each device or software used to conduct the extraction of each device;

      (iv)    A full extraction report for each device in PDF and HTML format;

      (v)     A Cellebrite UFED Reader (UFDR) report (.udf/.bin file) for each device with a UFED Reader file viewer; and

      (vi)    The proprietary file viewer for the specific forensic tool used to create the extraction.

As at least one District Court has acknowledged, it remains a best practice for the government to image devices it obtains through the course of its investigation: "Without commenting on what the ultimate disposition of the pending motion should be, perhaps the Government needs to be reminded that Savedoff's 'irrelevant motions' were prompted by a law enforcement agent's failure to follow a widespread, best practice with electronic discovery: *Make a forensic image immediately of any electronic devices surrendered or seized.*" *United States v. Rodriguez*, 2018 WL 947266, at *6 (W.D.N.Y. Feb. 20, 2018) (citing authorities). And the failure to properly produce electronic discovery can give rise to a dismissal of an indictment. *See, e.g.*, *United States v. Morgan*, 493 F. Supp. 3d 171, 199 (W.D.N.Y. 2020) ("Accordingly, the record is clear that of the eight computers seized pursuant to the May 2018 search warrant, the government failed to provide Rule 16 discovery for three of those devices by the July 31, 2019 deadline. Similarly, the government failed to provide (and still has failed to provide) Rule 16 discovery for defendant Todd Morgan's iPhone seized pursuant to the May 2018 search warrant."); *see also Id.* at 199 n.22 (noting that the production of mirrored [(or forensic)] images alone does not satisfy the government's obligation under Rule 16); *Id.* at 201-203 (summarizing the process for

collecting and producing electronic discovery, and the government's repeated failure to adhere to that process).

Accordingly, the Special Counsel's Office should be compelled to produce forensic images of any devices it obtained through the course of its investigation. To the extent there are privileged materials on such devices, the proper course would have been for the Office to seek leave of Court not to produce such materials and/or invite the privilege holders themselves to do so.

## VII.    Defendants Nauta and De Oliveira's Requests For Disclosure Of Non-Classified Discovery

With respect to Messrs. Nauta and De Oliveira's request that that the Court compel the disclosure of unclassified materials, the Office advises that the defendants' "request should principally be denied as moot because the [Special Counsel's Office] has already produced such material." Gov. Mem. at 58.[18] The Special Counsel's blanket statement exemplifies the problem with the Office's approach to discovery: bury a needle in a haystack and expect the defendants to find it on a compressed timeline. Specifically, while the Special Counsel's Office claims that *all* unclassified records produced in classified discovery have been provided in unclassified discovery, it has refused to provide defense counsel with a cross-reference to the materials available in both classified and unclassified discovery.

Consider, for example, the Office's eighth production, which included, "*inter alia*, material previously produced in classified discovery that is unclassified or for which the relevant equity holder(s) have determined that the documents no longer need to be protected through classification and have declassified them." Gov. Supp. Resp. Standing Discovery Order, at 1 (Dec. 6, 2023)

---

[18] Of note, defense counsel for Messrs. Nauta and De Oliveira were unable to either review or discuss with their respective clients the Office's Classified Opposition to the Defendants' Classified Supplement to their Motion to Compel given the Office's classified designations within the same. That submission, however, consists of 83 paragraphs, 58 of which are designated unclassified (and include substantial briefing), a central tenant of the deprivation of due process to which Messrs. Nauta and De Oliveira have been subjected as a result of this prosecution.

(ECF No. 235).  Upon receipt of this production, defense counsel requested a cross-reference of the newly unclassified records as against the previously classified records that had been produced. The Special Counsel's Office refused, instead providing only a cross-reference to newly unclassified records produced without classified bates numbers or whose bates numbers were illegible ("partially obscured").

The Office's method of production only serves to hamper defense counsel's review of discovery in this case.  Its refusal to provide a cross-reference of the newly unclassified discovery is exacerbated by the fact that the newly unclassified discovery was not produced in the same order that it had been produced in classified discovery.  The first newly unclassified record, with an unclassified bates number of USA-01285310 and a classified bates number of 3157, was followed by a newly unclassified record with an unclassified bates number of USA-01285312 *and no classified bates number*.  Only after it was requested by defense counsel did the Special Counsel's Office advise that this record was bates numbered 1112 when it was produced in classified discovery; some 2,000 pages earlier than the first newly declassified record produced by the Office. The third newly unclassified record bore a classified bates number of 3175, jumping ahead of the first newly declassified record to have been produced.  And the fourth newly declassified record, bates number USA-01285577, bore an unclassified bates number of 0181, some *three thousand pages* before the newly unclassified record preceding it.

The photographs from the execution of the search warrant at Mar-a-Lago in both classified and unclassified discovery serve as another example of the Office's efforts to hamper defense counsel's review of discovery insofar as there is no way to know what materials have been produced in both classified and unclassified discovery without comparing every image produced in unclassified discovery as against the images produced in classified discovery.  Unlike the

32

Special Counsel's Office, defense counsel does not have access to both the classified and unclassified discovery at the same time, and there is no feasible way to compare what has been produced in unclassified discovery as against classified discovery absent a cross-reference of such records. Put differently, the Office had no reason to reproduce the search warrant photographs in classified discovery other than to burden defense counsel with additional unnecessary review. Moreover, the Office's admission of at least one duplicative production begs the question of what other materials have been duplicitously produced in both classified and unclassified discovery.

By way of a final example, the Office's production of newly unclassified materials includes *pages* of records, the entirety of which remain classified. Absent any cross-reference, there is no way to know which page the record was taken from without reviewing every single one of the 5569 pages produced in classified discovery. Consider the page produced at USA-01285646. This page contains the handwritten notes of President Trump on the back of another page the Special Counsel's Office deemed classified, but the Office has provided no cross-reference to the same.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Defendants' opening motion papers, the Defendants respectfully submit that the Court should: (1) following any necessary hearing to resolve factual disputes, issue an order setting the appropriate scope of the prosecution team in this case for purposes of the discovery obligations of the Special Counsel's Office, and (2) compel the Office to disclose the information described in the Defendants' motion papers.


[SIGNATURE BLOCK NEXT PAGE]

Dated: February 9, 2024                    Respectfully submitted,

                                           */s/ Todd Blanche*
                                           Todd Blanche (PHV)
                                           toddblanche@blanchelaw.com
                                           Emil Bove (PHV)
                                           emil.bove@blanchelaw.com
                                           BLANCHE LAW PLLC
                                           99 Wall Street, Suite 4460
                                           New York, New York 10005
                                           (212) 716-1250

                                           */s/ Christopher M. Kise*
                                           Christopher M. Kise
                                           Florida Bar No. 855545
                                           ckise@continentalpllc.com
                                           CONTINENTAL PLLC
                                           255 Alhambra Circle, Suite 640
                                           Coral Gables, Florida 33134
                                           (305) 677-2707

                                           *Counsel for President Donald J. Trump*

**<u>CERTIFICATE OF SERVICE</u>**

I, Sasha Dadan, certify that on February 9, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

*<u>/s/ Sasha Dadan</u>*
Sasha Dadan