UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.

Case No. 23-80101-CR
CANNON/REINHART

# PRESIDENT TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON THE PRESIDENTIAL RECORDS ACT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

DISCUSSION ................................................................................................................................... 1

    I.    The Superseding Indictment ............................................................................................. 1

    II.   Motions To Dismiss .......................................................................................................... 2

    III.  The Presidential Records Act ........................................................................................... 2

    IV.  Discussion ......................................................................................................................... 4

        A.   President Trump's PRA Designations Are Not Reviewable ......................................... 4

        B.   The PRA's Recovery Mechanism Is Exclusive And Does Not Permit Referrals Used
            To Predicate Criminal Investigations ................................................................................ 10

CONCLUSION ............................................................................................................................... 14

**INTRODUCTION**

President Donald J. Trump respectfully submits this motion to dismiss the Superseding Indictment pursuant to the Presidential Records Act ("PRA"). First, the PRA conferred unreviewable discretion on President Trump to designate the records at issue as personal. As such, President Trump's possession of those records was not "unauthorized" as alleged in Counts 1 through 32. Second, the PRA's exclusive remedy for records collection efforts by NARA is civil in nature and forecloses criminal investigations.[1] Therefore, as with Counts 1 through 32, the remaining Counts charging President Trump in the Superseding Indictment fail to state a claim under Rule 12(b)(3)(v) of the Federal Rules of Criminal Procedure. Accordingly, pursuant to the PRA, the Superseding Indictment must be dismissed.

**DISCUSSION**

**I.     The Superseding Indictment**

The Special Counsel's Office concedes that the "genesis" of this case dates back to at least "the tail end of the Trump Administration itself." Compel Oppn. at 3.[2] The Office alleges in the Superseding Indictment that President Trump "*caused* scores of boxes, many of which contained classified documents, to be transported" to Mar-a-Lago. ECF No. 85 ¶ 4 (emphasis added). The Superseding Indictment makes clear that this decision and the related transportation of records occurred while President Trump was still in office. *Id.* ¶ 25 (alleging that President Trump caused boxes of records to be packed and shipped "[i]n January 2021, as he was *preparing* to leave the White House" (emphasis added)). President Trump departed the White House prior to "12:00 p.m.

---

[1] President Trump reserves the right to supplement this motion and file any other motions based on discovery provided as a result of the motions to compel. *See* ECF No. 314.

[2] "Compel Mot." refers to the Defendants' motions to compel discovery. ECF No. 262. "Compel Oppn." refers to the Special Counsel's Office's response to the Defendants' motion to compel discovery. ECF No. 277.

-1-

on January 20, 2021," and as such he is alleged to have made these decisions concerning the documents at issue while he was the Commander-in-Chief. *Id.* ¶ 4.

## II. Motions To Dismiss

"[A]n indictment may be dismissed where there is an infirmity of law in the prosecution." *United States v. Stokes*, 2023 WL 6462066, at *1 (S.D. Fla. Oct. 4, 2023) (cleaned up); *see also* Fed. R. Crim. P. 12(b)(3)(B). "[A] district court may dismiss an indictment . . . when immunity, double jeopardy, or jurisdictional issues are implicated." *United States v. Salman*, 378 F.3d 1266, 1267 n.3 (11th Cir. 2004). "An indictment that requires speculation on a fundamental part of the charge is insufficient." *United States v. Bobo*, 344 F.3d 1076, 1084 (11th Cir. 2003).

## III. The Presidential Records Act

"Beginning with George Washington, Presidents of the United States have, without notable exception, treated their presidential papers as personal property." *Nixon v. United States*, 978 F.2d 1269, 1277-78 (D.C. Cir. 1992). In 1974, Congress enacted the Presidential Recordings and Materials Preservation Act of 1974, based on "concern that President Nixon might destroy records related to the Watergate Investigation." *Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 298 n.3 (D.D.C. 2012). "The controversy over President Nixon's records and whether the PRMPA interfered with his right to privacy in his personal records led to the passage of the PRA in 1978." *Id.*

When passing the PRA, "Congress was also keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations." *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282, 290 (D.C. Cir. 1991). "Congress therefore sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential

records during the President's term in office." *Id.* Congress also "limited the scope of judicial review and provided little oversight authority for the President and Vice President's document preservation decisions." *CREW v. Cheney*, 593 F. Supp. 2d 194, 198 (D.D.C. 2009).

Under the PRA, "[d]uring a President's term of office," "[t]he President shall remain exclusively responsible for custody, control, and access to . . . Presidential records." 44 U.S.C. § 2203(f); *see also* 44 U.S.C. § 2201(a) (defining "Presidential records"). "The use of the word 'shall' often denotes a mandatory obligation, but what the President must do is exercise his discretion, and the rest of the text calls for the exercise of considerable judgment." *CREW v. Trump*, 438 F. Supp. 3d 54, 68 (D.D.C. 2020) (discussing 44 U.S.C. § 2203(a)). This includes sole discretion to "categorize[]" materials as "Presidential records or personal records." 44 U.S.C. § 2203(b); *Armstrong I*, 924 F.2d at 290 (reasoning that the PRA "accords the President virtually complete control over his records during his term of office").

"[T]he PRA does not confer any mandatory or even discretionary authority on the Archivist to classify records" as Presidential Records or Personal Records. *Judicial Watch*, 845 F. Supp. 2d at 301. The responsibility is left solely to the President. "Upon the conclusion of a President's term of office," the Archivist "shall assume responsibility for the custody, control, and preservation of, and access to, the *Presidential records* of that President." 44 U.S.C. § 2203(g)(1) (emphasis added). NARA's "responsibility" under § 2203(g)(1) applies only to "records *that were designated as Presidential records during the President's term*." *Judicial Watch*, 845 F. Supp. 2d at 300 (emphasis in original). Thus, the PRA "assigns the Archivist no role with respect to personal records once the Presidency concludes." *Id.* at 291.

"[C]ourts may review *guidelines* outlining what is, and what is not, a 'presidential record' to ensure that materials that are not subject to the PRA are not treated as presidential records."

*Armstrong v. Exec. Off. of the President, Off. of Admin.* ("*Armstrong II*"), 1 F.3d 1274, 1294 (D.C. Cir. 1993) (emphasis added); *see also CREW v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009) (considering judicial review of "*policies and guidelines* that exclude from the reach of the PRA all but a narrow category" of Vice Presidential Records (emphasis added)); *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1314 (D.D.C.1995) (considering judicial review of agreement that "on its face constitutes an opting out of the provisions of the PRA governing the Archivist's disposal of Presidential records following a term of office," which "are distinct from those that govern disposal of Presidential records by an incumbent President"). However, "a close reading of the *Armstrong II* decision suggests that the limited judicial review authorized by the D.C. Circuit left untouched that portion of *Armstrong I* that gave the President unfettered control over his own documents." *Judicial Watch*, 845 F. Supp. 2d at 297; *see also id.* at 298 (noting "that the D.C. Circuit has not yet blessed" *Am. Historical Ass'n v. Peterson*).

## IV.  Discussion

### A.  President Trump's PRA Designations Are Not Reviewable

President Trump's possession of the documents charged in Counts 1 through 32 was not "unauthorized" under 18 U.S.C. § 793(e) because President Trump exercised virtually unreviewable Article II executive authority to designate the records as personal when, as alleged in the Superseding Indictment, he "caused" the materials to be transported out of the White House while he was still in office. President Trump was still the President of the United States when, for example, many of the documents at issue were packed (presumably by the GSA), transported, and delivered to Mar-A-Lago.[3]  DOJ previously took a substantially similar position on behalf of

---

[3] *See* Patricia Mazzei and Julia Echikson, *Trump has arrived in Palm Beach to begin life as a private citizen*, N.Y. TIMES, (Jan. 20, 2021), https://www.nytimes.com/2021/01/20/us/trump-palm-beach.html.

-4-

NARA: "President Clinton . . . *presumably* classified the tapes as personal records *by not transferring them* to the [A]rchives at the conclusion of his administration." ECF No. 14 at 6, *Judicial Watch, Inc. v. NARA*, No. 10 Civ. 1834 (D.D.C. Mar. 5, 2012) (emphasis added).

President Trump made the challenged designations, while in Office, as the "constitutional superior of the Archivist." *Public Citizen v. Burke*, 843 F.2d 1473, 1478 (D.C. Cir. 1988). "The only reference in the entire [PRA] to the designation of records as personal versus Presidential also calls for the decision to be made by the executive, and to be made during, and not after, the presidency." *Judicial Watch*, 845 F. Supp. 2d at 300-01. "The categorization of the records during the Presidency controls what happens next . . . . The statute assigns the Archivist no role with respect to personal records once the Presidency concludes." *Id.* at 291. Thus, NARA has no authority over Personal Records, and the PRA does not establish property rights for the United States in those materials. *See* 44 U.S.C. § 2203(g)(1) (providing that, "[u]pon the conclusion of a President's term of office," NARA "shall assume responsibility for . . . Presidential records"); *see also* Hur Report at 193[4] ("'[P]ersonal records' remain the property of the former officeholder.").[5] Thus, "NARA does not have the authority to designate materials as 'Presidential records.'" *Judicial Watch*, 845 F. Supp. 2d at 290; *see also Armstrong I*, 924 F.2d at 290 ("The Archivist also lacks the authority under the PRA to inspect the President's records or survey the President's

---

[4] U.S. Dep't of Justice Special Counsel's Office, Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden center and the Delaware Private Residence of President Joseph R. Biden, Jr., (Feb. 5, 2024) (the "Hur Report"), *available at* www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

[5] *Trump v. United States*, 625 F. Supp. 3d 1257 (S.D. Fla. 2022), vacated and remanded, 54 F.4th 689 (11th Cir. 2022) ("Although the Government argues that Plaintiff has no property interest in any of the presidential records seized from his residence, that position calls for an ultimate judgment on the merits as to those documents and their designations.").

records management practices."); *CREW*, 593 F. Supp. 2d at 225 ("[T]he Court is left with the undeniable conclusion that Congress vested almost no authority in the Archivist and NARA over Vice-Presidential records during a Vice President's term in office.").[6]

The PRA also "precludes judicial review of the President's recordkeeping practices and decisions," including President Trump's decision to designate materials as Personal Records. *Armstrong I*, 924 F.2d at 291. "[P]ermitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." *Id.* at 290; *see also id.* at 291 (describing the "carefully crafted balance" based in part on "political compromises"). It would be incongruous to permit judicial review of Personal Records designations in light of the fact that presidents' decisions to restrict access to Presidential Records for up to 12 years are not reviewable. *See* 44 U.S.C. § 2204(a); *see also Judicial Watch*, 845 F. Supp. 2d at 289 n.3. Even with respect to an incumbent president's decision to *destroy* records while in Office, the PRA provides only "cautious authority for the Archivist and Congress" to question those actions. *Armstrong I*, 924 F.2d at 290. Therefore, courts "must steer clear of efforts to supervise day-to-day operations within the White House, even when a complaint presents legitimate concerns about an ongoing practice that threatens the preservation of, and public access to, presidential records." *CREW v. Trump*, 438 F. Supp. 3d at 61; *accord CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019) ("[W]hen it comes to compliance with the PRA, courts have no jurisdiction to review the President's 'day-to-day operations.'"). That structure is rooted in the separation of powers doctrine, which stands as

---

[6] A bill pending in Congress, H.R. 1791, impliedly acknowledges the PRA's existing restrictions on NARA's authority by seeking to require a NARA employee to be "present" in the Executive Office of the President to "ensure" what NARA deems to be the "proper logging and handling of Presidential records." H.R. 1791, 118th Cong. (2023).

a key basis for our system of government and rule of law. Moreover, it would demolish the notion of chain of command within the Executive Branch if a NARA employee, including the Archivist, was able to dictate to a President, who embodies that whole branch of the government, how to handle records.

DOJ and NARA have adopted this position with respect to government officials whose last name is not Trump. Last fall, on behalf of the Attorney General and other federal government defendants, DOJ argued that "D.C. Circuit precedent provides that the Court lacks jurisdiction to review . . . day-to-day White House records management decisions under the Presidential Records Act." Ex. 1 at 13 (citing *CREW*, 924 F.3d at 609); *see also* Hur Report at 199 ("[D]uring the *Poindexter* litigation, Mr. Reagan's personal attorneys and the Department of Justice repeatedly asserted that the diaries [containing classified information] were Mr. Reagan's personal property."); *see also id.* at 251 ("[E]ven though it is possible the Department lacked knowledge of all the facts about how Mr. Reagan stored his diaries, officials knew they contained classified information and that Mr. Reagan was treating them as his personal records, and it appears no one ever asked how the diaries were stored or made efforts to recover them."). During congressional testimony in March 2023, Jay Bosanko—NARA's Chief Operations Officer at the time—testified that, "[i]f our general counsel were sitting next to me, he would tell me that I should defer to the President with respect to the implementation of the PRA." Intelligence Committee Tr.[7] In other words, as expected and accepted, inferior officers did not challenge the President's handling of classified information.

---

[7] Transcript – U.S. House of Rep., Permanent Select Comm. on Intelligence, Washington, D.C. (Mar. 1, 2023) (the "Intelligence Committee Tr."), *available at* https://intelligence.house.gov/uploadedfiles/3.1.23_nara_briefing_transcript.pdf.

DOJ attorneys acting on behalf of NARA also pressed these points in *Judicial Watch*. *See* Ex. 2. There, a non-profit sent a FOIA request seeking 79 recordings that constituted "a verbatim record of President Clinton *being* President." 845 F. Supp. 2d at 290 (emphasis in original). The recordings contained some of the same types of information that the Special Counsel's Office claims constitute national defense information in this case, including:

- "'[F]oreign-policy decisions such as the United States' military involvement in Haiti'";
- "'President Clinton's side of telephone conversations with foreign leaders'";
- "'President Clinton's side of a telephone conversation with U.S. Secretary of State Warren Christopher concerning a diplomatic impasse over Bosnia'"; and
- Details from "'technical forecasts that he received during presidential briefings.'"

*Id.* at 290 n.1 (quoting pleading).

In response to the FOIA request in *Judicial Watch*, NARA took the position—apparently without even reviewing the recordings—that the requested materials were "'personal records of President Clinton as defined by the PRA.'" *Id.* at 293 (quoting NARA letter). NARA relied on the definition of "personal records" at 44 U.S.C. § 2201(3). *Id.* at 292. The definition excludes the "functional equivalent of a diary or journal" that was "prepared or utilized for, or circulated or communicated in the course of, transacting Government business." 44 U.S.C. § 2201(3)(A). It is clear that President Clinton's recordings did not meet that definition based on the *Judicial Watch* pleadings and Taylor Branch's related book about the recordings, titled *The Clinton Tapes: Wrestling History With the President* (2009).[8] Nevertheless, neither the government nor the court demonstrated any interest in disputing that position. In contrast to the approach of DOJ and NARA

---

[8] DOJ tried to compare President Clinton's recordings to President Reagan's diaries. *See* Ex. 3 at 22. However, President Reagan's diaries also included classified information. Hur Report at 194.

in this case, there was no claimed rush to conduct classification reviews or a damage assessment. Despite the apparently sensitive nature of the recordings, it was beyond the imagination of those government employees that the recordings could, or should, be recovered through a subpoena or a search warrant.

Rather, citing *Armstrong I*, DOJ and NARA argued that "courts cannot directly review a President's compliance with the PRA." Ex. 2 at 29. The government's conclusion followed from a fact that is essentially dispositive here: "The PRA contains no provision compelling the Archivist to assume responsibility for, or to review, the materials that the President 'categorized' and 'filed separately' as personal records." *Id.* at 15 (quoting the PRA). DOJ and NARA also invoked policy considerations to support their non-reviewability argument by asserting that Congress gave "each President complete control over his personal papers" in order to "encourage Presidents to create and preserve such papers," and in the hope "that Presidents would later voluntarily donate those papers to the National Archives." *Id.* at 35. "Congress was extremely concerned about future Presidents' privacy rights," "judicial review would be extremely intrusive," and "[s]uch review would undoubtedly discourage Presidents from creating or preserving personal records in the first place, which is the very opposite of Congress's desired goal." *Id.* at 37. At oral argument, the court asserted that 44 U.S.C. § 2203(f) "seems to vest exclusive authority for saying this is personal on" the president, "the person who would know." Ex. 3 at 56. In a written opinion, the court expressed "serious doubts about whether the former President's retention of the audiotapes as personal is a matter that is subject to judicial review," and resolved the case on the basis that the claims were not redressable. *Judicial Watch*, 845 F. Supp. 2d at 298-99. As relevant here, the court, NARA, and the DOJ attorneys representing NARA found it "extraordinary" and

"unfounded" for the plaintiff to suggest that the recordings could be recovered from President Clinton. *Id.* at 302.

The Court should preclude the Special Counsel's Office from further contradicting the positions that DOJ and NARA took in *CREW v. Trump* and *Judicial Watch*. *See, e.g.*, *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1176 (11th Cir. 2017) (en banc) (discussing doctrine of judicial estoppel). Counts 1 through 32 must be dismissed because, by alleging inaccurately that President Trump's possession of the records was "unauthorized," the Superseding Indictment seeks impermissible judicial review of President Trump's PRA designation decisions.

### B. The PRA's Recovery Mechanism Is Exclusive And Does Not Permit Referrals Used To Predicate Criminal Investigations

In February 2022, a NARA official informed the FBI that NARA had "never" made a "referral to DOJ." Compel Mot. Ex. 2 at USA-00813153. That history is entirely consistent with the absence of both criminal investigative tools and criminal penalties in the PRA. *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (reasoning that the "lack of historical precedent . . . is a telling indication" that OSHA's COVID vaccine mandate "extends beyond the agency's legitimate reach" (cleaned up)); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) ("Perhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." (cleaned up)). Given the PRA's limitations, as acknowledged by NARA's historical practices, NARA-OIG lacked "reasonable grounds to believe there has been a violation of Federal criminal law" when it transmitted the sham referral to DOJ on February 9, 2022. 5 U.S.C. § 404(d); *see also* Compel Mot. Ex. 18 at USA-00309423-26. NARA's purported referral to DOJ prosecutors was improper and not foreseeable to President Trump given NARA's

historical practices. Because the referral was improper, there was no basis for the FBI to "predicate" an investigation.[9]

Consequently, the obstruction and false-statements allegations in Counts 33 through 42 relating to that lawless investigation must also be dismissed. *See, e.g.*, *United States v. Beach*, 80 F.4th 1245, 1256-57 (11th Cir. 2023) (requiring "nexus" to an "official proceeding" under 18 U.S.C. § 1512); *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008) (requiring "intent to impede or influence a federal investigation" under 18 U.S.C. § 1519); *United States v. Blankenship*, 382 F.3d 1110, 1136-40 (11th Cir. 2004) (holding that "jurisdiction" for purposes of 18 U.S.C. § 1001 is limited to situations where the agency "has power to exercise authority").[10]

As DOJ put it in *Judicial Watch*, "the alleged violator here is a former President of the United States. When enacting the PRA, Congress was keenly aware of 'the stark separation of powers questions implicated by legislation regulating the conduct of the President's daily operations.'" Ex. 2 at 15 (quoting *Armstrong I*, 924 F.2d at 292). To the extent NARA seeks to recover properly designated Presidential Records from any third party, including a former president, the PRA provides the exclusive means for doing so, which is civil rather than criminal in nature.

---

[9] The FBI's guidelines require that, to properly "predicate" a preliminary or full investigation, "[a]n activity constituting a federal crime . . . has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity." U.S. Dep't of Justice, Attorney General's Guidelines for Domestic FBI Operations 21 (2008), *available at* https://www.justice.gov/archive/opa/docs/guidelines.pdf.

[10] Sections 1512(k) (Count 33), 1512(b)(2)(A) (Count 34), 1512(b)(2)(B) (Count 40), and 1512(c)(1) (Counts 35, 41), and 1519 (Count 36) all require that the alleged obstruction affect—or attempt to affect—an official proceeding. *See United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005); *United States v. Friske*, 640 F.3d 1288, 1292 (11th Cir. 2011).

Specifically, "[t]he PRA authorizes NARA to invoke the same enforcement mechanism embodied in the Federal Records Act . . . ." *Judicial Watch*, 845 F. Supp. 2d at 302 (citing 44 U.S.C. § 2112(c) (PRA), 3106 (Federal Records Act)).[11]  "[T]he Federal Records Act establishes only one remedy for the improper removal of a 'record' from the agency," and Congress "opted in favor of a system of administrative standards and enforcement." *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 148-49 (1980).  The process "begins with a request to the Attorney General to institute an action for the recovery of missing records." *Judicial Watch*, 845 F. Supp. 2d at 302 (citing 44 U.S.C. § 2112(c) (PRA), 3106 (Federal Records Act)).

In response to a NARA request, the Attorney General may pursue recovery via replevin. *See* ECF No. 1, *United States v. Zook*, No. 12 Civ. 1465 (D. Md. May 15, 2012); *United States v. McElvenny*, 2003 WL 1741422 (S.D.N.Y. Apr. 1, 2003) (replevin action relating to map annotated by President John F. Kennedy during Cuban Missile Crisis).  Tellingly, that is precisely what DOJ did in response to the portion of the February 9, 2022, sham referral from NARA-OIG that did not relate to President Trump.  In an effort to recover those records, DOJ initiated a replevin action rather than a criminal investigation, grand jury subpoenas, and search warrants.  *See* ECF No. 1 ¶ 6, *United States v. Navarro*, No. 22 Civ. 2292 (D.D.C. Aug. 3, 2022).

---

[11] In *Amstrong II*, the D.C. Circuit went even further by suggesting that "[n]either the Archivist nor an agency head can initiate any action through the Attorney General to effect recovery or ensure preservation of presidential records.  *Compare* 44 U.S.C. § 3106 (requiring agency heads to notify the Archivist of unlawful removal or destruction of federal records and to seek legal action through the Attorney General to recover or preserve the records); *id.* § 2905(a) (directing the Archivist to assist the agency head in initiating an action through the Attorney General for the recovery of wrongfully removed federal records or for other legal redress, and requiring the Archivist to make her own request to the Attorney General if the agency head is recalcitrant)." 1 F.3d at 1291.

According to a brief filed by DOJ and NARA in *Judicial Watch*, "[t]his administrative enforcement scheme is *exclusive*," and "courts may not order the recovery or retrieval of records that may have been removed or destroyed." Ex. 2 at 11 (emphasis added); *see also id.* at 20 ("The PRA does not require NARA to physically seize presidential records, but instead relies upon a much more limited (and sensible) administrative enforcement scheme."); *id.* at 21 ("NARA—the agency charged with administering this provision—treats this enforcement mechanism as exclusive for both the PRA and the FRA.").[12] Relatedly, the *Judicial Watch* court observed that, "because the [Clinton recordings] are not physically in the government's possession," NARA "would be required to seize them directly from President Clinton" and NARA considered such a seizure to be an "'extraordinary request' that is 'unfounded [and] contrary to the PRA's express terms . . . .'" *Id.* at 302-03 (emphasis added). DOJ made similar assertions at oral argument:

> Judge: Let's say a president kind of maliciously over classifies [as Presidential Records to avoid FOIA], what is the remedy?
>
> DOJ: The first one and the primary remedy is that it always lies with the archivist and the attorney general, who have the authority if they believe that the president has misclassified something that they can invoke the discretionary enforcement mechanism and pursue recovery of those records.

Ex. 3 at 13. DOJ characterized recourse to the PRA's "discretionary enforcement mechanism" as a "very serious" step for the Archivist to take, *id.* at 14, and noted that "if Congress believes that a president is wildly misclassifying information, it can pass a law to change the statutory structure or to seize some of those records . . . ." *Id.* at 15. Congress has not done so, leaving in place this civil recovery mechanism as NARA's exclusive enforcement option under the PRA.

---

[12] Congress knows that explicit language is required to rebut the exclusivity default. For example, in a pending bill that would add a civil enforcement option to 18 U.S.C. § 1924, the House included language that is expressly *not* exclusive: "[t]he imposition of a civil penalty under this subsection does not preclude any other criminal or civil statutory, common law, or administrative remedy . . . ." H.R. 1791, 118th Cong. (2023).

**CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the Court should dismiss the Superseding Indictment based on the Presidential Records Act.

Dated: February 22, 2024

Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

-15-

## **CERTIFICATE OF SERVICE**

I, Christopher M. Kise, certify that on February 22, 2024, I filed the foregoing document and served it on the Special Counsel's Office via email, or CM/ECF to the extent possible, as required by the Court's February 20, 2024 Order.   ECF No. 320.

*/s/ Christopher M. Kise*
Christopher M. Kise
