**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVERIA,

               Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

**BRIEF OF AMICUS CURIAE AMERICA FIRST LEGAL FOUNDATION**
**IN SUPPORT OF PRESIDENT TRUMP'S MOTION TO DISMISS THE**
**INDICTMENT BASED ON THE PRESIDENTIAL RECORDS ACT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES.................................................................................... ii

ARGUMENT.......................................................................................................... 1

   I.    NARA's criminal referral to the Department of Justice violated the Administrative Procedure Act...................................................................... 1

      A.    The Presidential Records Act requires DOJ to obtain documents through 44 U.S.C. § 2205(2)(A)................................................................ 1

      B.    Historical practice indicates that NARA lacks the authority to make criminal referrals to DOJ................................................................... 3

      C.    NARA lacks the authority to challenge Presidential record determinations by the President. ....................................................... 5

      D.    The White House impermissibly tainted NARA's decision-making. ......... 8

   II.    NARA is bound to defer to the former President's rights and privileges yet ignored them. .................................................................................... 10

      A.    Notwithstanding the *ultra vires* nature of the NARA referral, NARA also failed to defer to the President's right to assert a privilege or defense............. 10

      B.    NARA lacks discretion to override a former President's determination concerning his rights, defenses, and privileges. .................................. 12

   III.    Because NARA is an Independent Establishment, it must be insulated from political influence, yet the Biden White House directly politicized how NARA treats the records of former President Trump. ................................. 13

   IV.    If a court finds that the APA was violated, then that is a basis for dismissing the indictment........................................................................................ 17

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Aera Energy LLC v. Salazar,*
    642 F.3d 212 (D.C. Cir. 2011) ........................................................................ 8

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
    141 S. Ct. 2485 (2021) .................................................................................. 4

*American Historical Ass'n v. Peterson,*
    876 F. Supp. 1300 (D.D.C. 1995) ................................................................ 7

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) ..................................................................... 6

*Armstrong v. Exec. Office of the President, Office of Admin.,*
    303 U.S. App. D.C. 107 (D.C. Cir. 1993)................................................... 16

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) .................................................................................. 4

*Citizens for Resp. & Ethics in Washington v. Trump,*
    438 F. Supp. 3d 54 (D.D.C. 2020) .............................................................. 7

*Connally v. General Constr. Co.,*
    269 U.S. 385 (1926) ................................................................................... 19

*Connecticut v. U.S. Dep't of the Interior,*
    363 F. Supp. 3d 45 (D.D.C. 2019) ............................................................ 16

*CREW v. Trump,*
    924 F.3d 602 (D.C. Cir. 2019) ..................................................................... 6

*D.C. Federation of Civic Ass'ns v. Volpe,*
    459 F.2d 1231 (D.C.Cir.1971) .................................................................... 9

*F.C.C. v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) .............................................................................. 18, 19

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ..................................................................................... 5

*Freytag v. Commissioner,*
    501 U.S. 868 (1991) ................................................................................... 14

*Judicial Watch, Inc. v. NARA,*
    845 F. Supp. 2d 288 (D.D.C. 2012) ................................................................ 4

*Koniag, Inc., Village of Uyak v. Andrus,*
    580 F.2d 601 (D.C.Cir.1978). ........................................................................... 9

*Limnia, Inc. v. United States Dep't of Energy,*
    857 F.3d 379 (D.C. Cir. 2017) ....................................................................... 16

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ........................................................................................ 4

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ....................................................................................... 10

*Papachristou v. Jacksonville,*
    405 U.S. 156 (1972) ....................................................................................... 19

*Seila Law LLC v. CFPB,*
    140 S. Ct. 2183 (2020) .................................................................................... 4

*Trump v. Thompson,*
    142 S. Ct. 680 (2022) .................................................................................... 12

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) ......................................................................... 12

*United States v. Cain,*
    583 F.3d 408 (6th Cir. 2009) ......................................................................... 17

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) ......................................................................... 17

*United States v. McElvenny,*
    2003 WL 17414422 (S.D.N.Y. Apr. 1, 2003) ................................................ 4

*United States v. Navarro,*
    644 F. Supp. 3d 48 (D.D.C. 2023) ................................................................ 4

*United States v. Picciotto,*
    875 F.2d 345 (D.C. Cir. 1989) ....................................................................... 17

*United States v. Ross,*
    848 F.3d 1129 (D.C. Cir. 2017) ..................................................................... 17

*United States v. Williams,*
    553 U.S. 285 04 (2008) .................................................................................. 19

*United States v. Zook*,
    No. 12 Civ. 1465 (D. Md. May 15, 2012)............................................................ 4

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................................ 5

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................................ 5

## STATUTES

44 U.S.C. § 2102 ............................................................................................... 14

44 U.S.C. § 2203 ......................................................................................... 5, 6, 15

44 U.S.C. § 2205 ........................................................................................... passim

44 U.S.C. § 2208 ..................................................................................... 11, 12, 13

44 U.S.C. § 2212 ............................................................................................... 4, 9

44 U.S.C. § 3106 ............................................................................................... 4, 9

5 U.S.C. § 706 ....................................................................................................... 1

Presidential and Federal Records Act Amendments of 2014,
    Pub. L. No. 113-187, 128 Stat. 2003 (2014)..................................................... 14

## OTHER AUTHORITIES

Am. First Legal Found., The Presidential Records Act
    Cannot Supersede a Former President's Authority
    Over Presidential Papers (Oct. 10, 2023) ....................................................... 8

E-mail from Debra Steidel Wall, Acting Archivist of the United States,
    to All Employees (Aug. 24, 2022, 3:34 PM) ................................................. 2, 9

E-mail from Gary M. Stern, Gen. Counsel, NARA,
    to Debra Wall et al. (Aug. 23, 2022, 9:08 PM).................................................. 2

E-mail from Gary M. Stern, Gen. Counsel, NARA,
    to Debra Wall et al. (Aug. 23, 2022, 9:53 PM).................................................. 2

Exec. Order No. 13489, 70 Fed. Reg. 4669 (Jan. 26, 2009) ........................ 11, 13, 14

Jennifer L. Selin, *What Makes an Agency Independent?*
    59 Am. J. Pol. Sci. 971 (2015) .......................................................................... 16

President Trump's Motion to Dismiss the Indictment
    Based on the Presidential Records Act, ECF. No. 237 ............................. 3, 4, 6

## REGULATIONS

36 C.F.R. § 1270 ........................................................................................... 11

# ARGUMENT

The Department of Justice (DOJ) indicted former President Trump based on a criminal referral from the National Archives and Records Administration (NARA). This referral violated Administrative Procedure Act (APA) sections 706 (2)(A) (prohibiting agency actions not in accordance with law)  and (2)(B) (prohibiting agency actions in excess of statutory jurisdiction or authority). Relevant precedent holds that an indictment based upon rules or adjudications in violation of the APA's formal requirements should be dismissed. Accordingly, the Special Counsel's indictment should be dismissed.

## I.    NARA's criminal referral to the Department of Justice violated the Administrative Procedure Act

### A.    The Presidential Records Act requires DOJ to obtain documents through 44 U.S.C. § 2205(2)(A).

The Presidential Records Act (PRA) provides three "exceptions to restricted access" of Presidential records: (1) "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding;" (2) through the request of an incumbent President for information "that is needed for the conduct of current business of the incumbent President's office," or (3) "to either House of Congress." 44 U.S.C. § 2205(2). Here, the documents were not requested by Congress, so the question is whether DOJ can rely on the remaining two exceptions to obtain these documents.

Although publicly available documents suggest the White House initially requested these documents, they allegedly did so "on behalf of the Department of

Justice (DOJ) … so that the FBI and others in the Intelligence Community could examine them."[1] NARA reveals that the White House did not request the records for information "needed for the conduct of current business of the incumbent President's office." 44 U.S.C. § 2205(2)(B). Rather, agencies requested these documents—albeit through the White House—for agency use. Nothing in the record shows that these documents were "needed for the conduct of current business of the incumbent President's office." DOJ is not the President's office, nor a part of it.

To hold that the documents were "needed for the conduct of current business of the incumbent President's office" simply because the request came from the White House would be to allow agencies to make an end run around the restrictions in section 2205(2) by routing requests through the White House Counsel's Office. The plain meaning of the text precludes such an interpretation: it limits the need only for the "current business of the incumbent President's office," and an application of the *expressio unius* canon demonstrates that this precludes the "current business" of all other parts of the executive branch, including DOJ. Furthermore, the documents under this exception are made available to "an incumbent President" — not any

---

[1] E-mail from Debra Steidel Wall, Acting Archivist of the United States, to All Employees (Aug. 24, 2022, 3:34 PM) (Bates 15B001043–44), https://bit.ly/3mjVHDR; *see also* E-mail from Gary M. Stern, Gen. Counsel, NARA, to Debra Wall et al. (Aug. 23, 2022, 9:53 PM) (Bates 15B001016), https://bit.ly/3mjVHDR (stating that "the Justice Department, via the Biden White House, had made the [special access] request."); E-mail from Gary M. Stern, Gen. Counsel, NARA, to Debra Wall et al. (Aug. 23, 2022, 9:08 PM) (Bates 15B001012), https://bit.ly/3mjVHDR (referencing letter from NARA to President Trump's attorney "concerning the DOJ special access request").

agency head — thus further suggesting that the exception excludes requests from executive agencies. 44 U.S.C. § 2205(2)(B).

Not only would this interpretation of the PRA authorize indirect criminal investigations through the White House out of accord with the plain meaning of the statute, but it would also dangerously expand the ability of an incumbent President to harass a former President by seizing documents based on the request of *any* agency for nearly *any* reason. Indeed, if the justification here is accepted — "so that the FBI and others in the Intelligence Community could examine [the documents]" — it is hard to imagine what sort of reason would not allow an incumbent President to request documents under the justification that they are "needed for the conduct of current business of the incumbent President's office."

Therefore, DOJ is precluded from using this exception to justify obtaining these documents, and it must rely solely on the exception granted for documents "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding." 44 U.S.C. § 2205(2)(A). Accordingly, the Court should follow the plain meaning of section 2205(2) and find that DOJ can only obtain documents through section 2205(2)(A).

**B.    Historical practice indicates that NARA lacks the authority to make criminal referrals to DOJ.**

As stated in President Trump's motion to dismiss, a NARA official confirmed that, before this case, NARA had "never made a referral to DOJ" in the context of the Presidential Records Act. ECF No. 327 at 10 (internal quotation marks omitted). Previous courts have not recognized that NARA has the authority to make DOJ

3

referrals under the PRA. While the Federal Records Act, by its text, expressly authorizes "the Attorney General to institute an action for the recovery of missing records," *Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 302 (D.D.C. 2012), no parallel provision exists in the text of the PRA. *Compare* 44 U.S.C. § 2212(c) ("[the Archivist] may exercise … all functions and responsibilities otherwise vested in him pertaining to Federal records"), *with* 44 U.S.C. § 3106(b) ("the Archivist shall request the Attorney General to initiate [an action for the recovery of records]"). NARA historically sought recovery of Presidential records by requesting DOJ to pursue a *civil* "replevin action rather than criminal investigations, grand jury subpoenas, and search warrants." ECF. No. 237 at 12 (citing *United States v. Navarro*, 644 F. Supp. 3d 48 (D.D.C. 2023); *United States v. Zook*, No. 12 Civ. 1465 (D. Md. May 15, 2012); *United States v. McElvenny*, 2003 WL 17414422 (S.D.N.Y. Apr. 1, 2003)).[2]

Further, as noted in President Trump's motion to dismiss, the Supreme Court has continuously struck down uses of executive power with weak foundations in the text and that have little historical precedent. ECF No. 327 at 10 (citing *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020)); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) ("The Secretary has never previously claimed powers of this magnitude"); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 141 S. Ct. 2485, 2489 (2021) ("The claim of expansive

---

[2] Even so, NARA may not do the same to recover alleged Presidential records from the former President because the President's designation of his papers is fully within his discretion and unreviewable. *See* Part I.C., *infra*.

authority … is unprecedented"). To read NARA's power to "request … to institute an action for the recovery of missing records" as allowing it to make DOJ referrals indeed stretches the text, and adding the lack of any historical precedent for such action puts NARA's strained reading squarely in the type of administrative action which the Supreme Court has time and again rejected.

Finally, one cannot ignore the context of this case: NARA has used its heretofore unused DOJ referral power to criminally pursue a former President—and current presidential candidate—during an election season. Indeed, the exercise of NARA's textually ambiguous (at best) power in the extraordinary prosecution of a former President implicates issues of "vast economic and political significance," and so the Court should "expect Congress to speak clearly" to conclude the agency has such power. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)); *see also West Virginia v. EPA*, 597 U.S. 697, 716 (2022). Since Congress has not done so, and for the other reasons noted, the Court should reject NARA's power grab to make DOJ referrals.

### C. NARA lacks the authority to challenge Presidential record determinations by the President.

The PRA gives no role to NARA in the designation of materials as "Presidential" or "personal" either during a President's term or after; this duty of designation is given exclusively to the President during his term of office. 44 U.S.C. § 2203(a) ("[T]he President shall take all such steps as may be necessary to assure that the activities … that reflect the performance of the President's constitutional,

5

statutory, or other official or ceremonial duties are adequately documented"); 44 U.S.C. § 2203(b) ("Documentary materials produced or received by the President … shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately"); *see also Judicial Watch, Inc.*, 845 F. Supp. 2d at 300–01. Nothing in the statute gives NARA the power to challenge the designations made by the President or to change them after he has left office.

As noted in President Trump's motion to dismiss, the documents in this case were transported to Mar-A-Lago before the end of his term, thus reflecting his determination that these documents were "personal" and not "Presidential." ECF No. 327 at 4. In accordance with the statutory text, NARA did not play a role in making these designations. 44 U.S.C. § 2203(b). Indeed, when the documents were deemed "personal," NARA lacked the authority to challenge this determination through its own statutory power. Even after President Trump left office, NARA lacks the statutory authority to redesignate these documents and so cannot challenge President Trump's designations.

Because NARA cannot contend that it has the power to redesignate the documents, it may simply argue that it can challenge the initial designation through the judicial process. However, courts have refused to second-guess how a President carries out his duties under the PRA while in office. *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991); *CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019) ("courts have no jurisdiction to review the President's day-to-day operations") (internal

quotation marks omitted). In sum, the indictment as a whole asks the Court to do precisely what it is precluded from doing: to review the "day-to-day operations" of the White House concerning Presidential records, including "the adequacy of the President's records management practices or … his records creation, management, and disposal decisions." *Citizens for Resp. & Ethics in Washington v. Trump*, 438 F. Supp. 3d 54, 66 (D.D.C. 2020). Therefore, when President Trump initially determined that the documents were "personal," NARA lacked any authority to challenge this designation through its statutory power or judicial review.

NARA is also precluded from challenging a President's "personal" designation in the courts after the President has left office. Even after the President has left office, courts have been reluctant to judicially review his designation of certain documents as "personal." *See Judicial Watch,* 845 F. Supp. 2d at 297–98 (refusing to second guess a "personal records" designation to foreign policy audio tapes because of the practical difficulties and lack of statutory guidance) ("*Armstrong II* did not announce that there was any limit to the President's discretion to segregate materials as personal … the Court has serious doubts about whether the former President's retention of the audiotapes as personal is a matter that is subject to judicial review"); *cf. American Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1314 (D.D.C. 1995) (finding that a former President's guidelines and agreements for disposing is reviewable).

The reasons are clear: the PRA gives courts no guidance for handling cases of individual disposal decisions and does not mention challenges to designation at all. *See Judicial Watch*, 845 F. Supp. 2d at 298 ("If [judicial review] is available, why is

7

the PRA entirely silent on the subject? What standard of review would apply? Would there not be a high level of deference … How could a challenge to a President's classification decision be litigated without the decision-maker participating as a party to the lawsuit … what is the statute of limitation that applies?").

Furthermore, judicial review of a President's in-office determinations, even after the President has left office, implicates concerns about separation of powers and an executive restrained in his duty by the threat of future criminal investigations. Since the founding of the United States, Presidents leaving office have taken custody of their papers, and the PRA can be read to apply only to presidential papers that the President *voluntarily relinquishes*.[3] For these reasons, the Court should find that NARA lacks the authority to challenge Presidential record determinations made by the former President.

### D. The White House impermissibly tainted NARA's decision-making.

When political pressure is applied to an ultimate agency decisionmaker to shape an agency action, that agency action is invalid. *Aera Energy LLC v. Salazar*, 642 F.3d 212, 221 (D.C. Cir. 2011) ("political pressure invalidates agency action only when it shapes, in whole or in part, the judgment of the ultimate agency decisionmaker"). The standard for this test has been "whether extraneous pressure intruded into the [agency decisionmaker's] calculus of consideration." *Id.* (quoting

---

[3] *See* AM. FIRST LEGAL FOUND., THE PRESIDENTIAL RECORDS ACT CANNOT SUPERSEDE A FORMER PRESIDENT'S AUTHORITY OVER PRESIDENTIAL PAPERS (Oct. 10, 2023), https://bit.ly/3SWfBkK.

*D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C.Cir.1971) (internal quotation marks omitted). Courts have found that just the appearance of political pressure influencing a decision is enough to invalidate an agency's action. Even a simple letter from a congressman is enough to render an agency action invalid because of the "[compromised] appearance of … impartiality." *Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C. Cir. 1978).

Here, it is undisputed that the Biden White House initially requested the documents from NARA.[4] Regardless of the claim that this request was at the behest of DOJ, a request from the Biden White House Counsel's Office which eventually leads to an FBI raid of a political opponent's home eviscerates any "appearance of … impartiality" in NARA's decision-making. This compromised decision-making is compounded when one notes that NARA had complete discretion over its ability to ask DOJ to recover such documents under 44 U.S.C. § 3106(b). Still, NARA only made its DOJ referral because of the Biden White House's request. *Id.*; 44 U.S.C. § 2212(c) ("[the Archivist] *may* exercise [its ability to make requests to DOJ]") (emphasis added).

In other words, NARA had not decided to request DOJ to recover the documents from President Biden's principal political opponent until the Biden White House requested for it to do so. If a simple letter from a congressman is enough to

---

[4] E-mail from Debra Steidel Wall, Acting Archivist of the United States, to All Employees (Aug. 24, 2022, 3:34 PM) (Bates 15B001043–44), https://bit.ly/3mjVHDR ("the White House Counsel's Office … formally transmitted a request to NARA").

render an agency action void because of the appearance of improper political influence, certainly a request from the White House to investigate a political opponent—which NARA admits led to its action—reflects impermissible political pressure on NARA's decisionmaking. Therefore, the Court should find NARA's request to DOJ invalid.

## II.    NARA is bound to defer to the former President's rights and privileges yet ignored them.

### A.    Notwithstanding the *ultra vires* nature of the NARA referral, NARA also failed to defer to the President's right to assert a privilege or defense.

The relevant section of the Presidential Records Act, 44 U.S.C. § 2205(2)(A), states that the Archivist can provide records to the Department of Justice "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding." As stated in Part I, *supra*, NARA lacks statutory authority to make a referral to DOJ absent a subpoena or other court process. Additionally, 44 U.S.C. § 2205 states that Presidential records provided by subpoena (or an *ultra vires* referral) are "subject to any rights, defenses or privileges which … any … person may invoke." The Supreme Court has held that presidential privileges extend beyond a President's tenure. *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425,  448–49  (1977)  ("[t]he confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore, the privilege survives the individual President's tenure.").

As such, the unambiguous meaning of the Presidential Records Act is that the provisions governing public access are immaterial to questions regarding access pursuant to a lawful criminal process. Problematically, NARA's fiat-based determination that it has inherent referral authority is based on its specious application of its own interpretations of its power under the public access provisions of the PRA to the enumerated provisions of section 2205. Two crucial sources of law relied upon by NARA — the procedural rules adopted by the Archivist at 36 C.F.R. § 1270.44 governing exceptions to restricted access and Executive Order 13489[5] — are plainly invalid as applied to any referral power. This is because, without any textual basis in 44 U.S.C. § 2205, the Archivist has applied procedures Congress established in 44 U.S.C. § 2208 concerning public access under the Freedom of Information Act (FOIA) to criminal procedures.[6] Why would Congress establish procedures governing public access to Presidential records but exempt those procedures from applying to access for the purposes of criminal inquiries if its real intent was to have those procedures apply?

The plain reading of section 2205(2)(A) not only limits NARA's powers but 44 U.S.C. § 2205 specifically states that Presidential records provided by subpoena (or obtained via an *ultra vires* referral) are "subject to any rights, defenses or privileges which … any … person may invoke." Thus, a former President's constitutional

---

[5] Exec. Order No. 13489, 70 Fed. Reg. 4669 (Jan. 26, 2009).
[6] Compare the consistency between 44 U.S.C. § 2208 and 36 C.F.R. § 1270.48, with the lack of consistency between 44 U.S.C. § 2205 and 36 C.F.R. § 1270.44.

privilege assertions or defenses (*i.e.*, that the records are personal, not official) constrain NARA.

**B.   NARA lacks discretion to override a former President's determination concerning his rights, defenses, and privileges.**

Courts are bound by the rights, privileges, and defenses asserted by a former President. The limited holding of the Supreme Court in *Trump v. Thompson*, 142 S. Ct. 680 (2022), was restricted to congressional access to a former President's records. This Court is not constrained by *Trump v. Thompson* when evaluating a former President's claims of control over records he created or received.[7] What has led to confusion over the PRA on questions of an incumbent President's authority to deny privileges or defenses of a former President is NARA's failure to admit that the procedures announced in 44 U.S.C. §§ 2204 and 2208 do not govern disputes arising from criminal inquiries delineated in 44 U.S.C. § 2205. 44 U.S.C. § 2204 specifically cites FOIA and the Privacy Act, and 44 U.S.C. § 2208 applies "[w]hen the Archivist determines … to make available to the *public* any Presidential record that has not previously been made available to the *public*." (Emphasis added).

---

[7] On December 9, 2021, the D.C. Circuit affirmed the district court's ruling that NARA could produce former President Donald Trump's Presidential records to the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee). *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021). On December 23, 2021, Trump asked the Supreme Court to intervene to prevent the Select Committee from accessing his White House records (filing both a petition for certiorari as well as an application for the Supreme Court to stay the D.C. Circuit's mandate pending its disposition on the cert. petition). *See* Petition for Writ of Certiorari, *Trump v. Thompson*, 142 S. Ct. 680 (No. 21-5254); Appl. for a Stay of Mandate and Inj. Pending Review, *Trump v. Thompson*, 142 S. Ct. 680 (No. 21-5254). On January 19, 2022, the Supreme Court denied President Trump's request for a stay. *Trump v. Thompson*, 142 S. Ct. 680 (2022) .

Sections 2204 and 2208 govern public requests for Presidential records, *viz.,* those filed under FOIA, not criminal investigations contemplated under section 2205(2)(A). 44 U.S.C. § 2205 clearly states that it is to be interpreted "[n]otwithstanding any restrictions on access imposed pursuant to sections 2204 and 2208 of this title."

### III. Because NARA is an Independent Establishment, it must be insulated from political influence, yet the Biden White House directly politicized how NARA treats the records of former President Trump.

The political pressure from the incumbent President unlawfully tainted the Archivist's decision concerning the legal effect of the former President's assertions of his rights, privileges, and defenses. No law mandates that the Archivist defer to the incumbent President concerning the validity of a privilege assertion by a former President in the context of a criminal request where no compulsory process (subpoena) has been issued. Because the Archivist permitted the incumbent President to direct him in making decisions regarding rights asserted by the former President, the Archivist's decision-making was impermissibly tainted, requiring judicial invalidation of the Archivist's referral decision, which cannot be cured through remand to NARA.

In White House Counsel Dana Remus's letters to the Archivist, she states, "President Biden instructs you, in accord with Section 4(b) of Executive Order 13489, to provide to the Select Committee the pages identified as privileged by the former

13

President."[8] While these communications occurred prior to the Special Counsel investigation, they reflect apparent White House influence over the Archivist in a manner that relates to the authorities established in 44 U.S.C. § 2205 (which excepts the President's unilateral control over his records in, *inter alia*, cases of congressional oversight and law enforcement investigations).

The 2014 amendments to the PRA[9] invalidated Executive Order 13489's procedures, which applied to all requests for access to Presidential records, by establishing procedures concerning public requests for access distinct from requests originating from Congress. Notwithstanding questions regarding its continuing validity, Executive Order 13489 contains a safety valve to prevent the White House from directing how the Archivist reviews a presidential claim of privilege; White House determinations "shall not prejudice the Archivist's determination with respect to the former President's claim of privilege." *Id.* § 4. This safety valve exists because Congress established NARA as an "independent establishment" under 44 U.S.C. § 2102, while vesting in the incumbent President the ability to control the Archivist's judgment regarding the releasability of a former President's records would raise constitutional problems. *See Freytag v. Commissioner*, 501 U.S. 868, 921 (1991)

---

[8] *See* Second Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://bit.ly/3IfjbBs; Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 25, 2021), https://bit.ly/3OWGOTi; *see also* Letters from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://bit.ly/49yJxua.

[9] Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003 (2014).

(Scalia, J., concurring) (explaining, albeit begrudgingly, that Congress created "independent establishments" to insulate certain entities from presidential control). Suppose Congress cannot assign ministerial duties to agency heads insulated from presidential control. In that case, statutes like the APA, the Ethics in Government Act, or the Civil Service Reform Act are legal nullities to the extent they are interpreted to disallow complete presidential discretion and control over, *e.g.*, rulemaking, permitting, ethics compliance, or the firing of civil service employees. NARA must be free from White House influence over its decisions.

The more constitutionally sound view is that the records of a former President are presumptively privileged and subject to his unilateral control, *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991), and only in the context of public requests for access once a former President's restrictions have expired does a sitting President have any say in the matter of control. *See* 44 U.S.C. § 2203(g) ("Upon the conclusion of a President's term of office … the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President"); 44 U.S.C. § 2204(c)(1) ("Presidential records shall be administered in accordance with section 552 of title 5, United States Code … and for the purposes of such section such records shall be deemed to be records of the National Archives and Records Administration"). Because a former President's confidentiality interests have largely dissipated over the statutory 12-year restricted access period established in section 2204 of the Presidential Records Act, the incumbent President is in the best position *at that time* to determine whether records

15

should be subject to automatic release or remain privileged. *E.g.*, *Armstrong v. Exec. Office of the President, Office of Admin.,* 303 U.S. App. D.C. 107 (D.C. Cir. 1993).

Finally, that the Archivist must respond to a valid law enforcement request for archived records independent of the incumbent President is an additional reason why the former President's assertion of a right, defense, or privilege (including the right, defense, or privilege that records are "personal") should be determinative. It is well-established that the decisions of independent establishments are improperly tainted when shaped by outside political interests. Jennifer L. Selin, *What Makes an Agency Independent?* 59 AM. J. POL. SCI. 971–87 (2015) (collecting scholarly and legal authorities). White House Counsel Dana Remus wrote letters to the Archivist, directing the Archivist to ignore former President Trump's privilege assertions. This impermissibly influenced the head of an independent establishment. *Aera Energy LLC v. Salazar*, 642 F.3d 212, 221 (D.C. Cir. 2011); *see also Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019) ("Both formulations suggest that an agency's decision may be arbitrary and capricious if political pressure influenced the decision in a manner not dictated by the relevant statutes and regulations."). That NARA allowed itself to be biased by the White House in terms of claims of privilege risks that NARA's subsequent decision to refer the former President to the Department of Justice was impermissibly tainted. *See, e.g., Limnia, Inc. v. United States Dep't of Energy*, 857 F.3d 379, 388 (D.C. Cir. 2017) (Kavanaugh, J.).

But here, political remedies were readily available to prevent tainting the Archivist's decision-making, most obviously the ability for the Special Counsel to

16

submit its law enforcement request directly to President Biden and command him, under subpoena, to release the relevant former President's records. If such direct requests were prohibited, certainly indirect oversight of a former President's records through a referral by the Archivist would also be prohibited. It is obvious that if President Biden were to have been shielded from disclosing all of former President Trump's records to the Special Counsel, the Special Counsel would have an entirely different reading of what the Presidential Records Act requires.

## IV.  If a court finds that the APA was violated, then that is a basis for dismissing the indictment.

Many courts have held that an agency's violations of the Administrative Procedure Act are grounds for dismissing a criminal indictment. *See United States v. Picciotto,* 875 F.2d 345, 346 (D.C. Cir. 1989); *see also United States v. Ross,* 848 F.3d 1129, 1131 (D.C. Cir. 2017); *United States v. Johnson,* 632 F.3d 912, 930 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 422 (6th Cir. 2009).

In *Picciotto*, the criminal indictment resulted from a regulatory interpretation for which it "did not publish a general notice of proposed rulemaking in the Federal Register and neither appellant nor the general public was given an opportunity to comment." *Picciotto*, 875 F.2d at 346. Unsurprisingly, the D.C. Circuit held that a decision made in violation of the APA's procedural requirements "is invalid." *Id.*

Here, NARA never engaged in appropriate informal rulemaking to lawfully adopt its interpretation of 44 U.S.C. § 2205(2)(A)—or any other statutory provision— as authorizing a criminal referral to the Department of Justice in this or any other case. The Park Service in *Picciotto* acted exactly as NARA did here — "grant[ing]

itself a valid exemption to the APA" "free of APA's troublesome rulemaking procedures" "simply by announcing its independence in a general rule." *Id*. at 347. Just like the "Park Service cannot construct its own veto of Congressional directions," *id*., neither can NARA. The ultimate issue in *Picciotto*, was "whether a conviction based on a violation of [a decision adopted] without notice and comment, can stand." *Id*. The answer is "no."

Likewise, the U.S. Court of Appeals for the Sixth Circuit held in *Cain* that an agency decision "on pain of severe criminal sanctions" must comply with the strict letter of the APA. Similarly, the Fifth Circuit in *United States v. Johnson*, *supra*, involved a criminal prosecution based upon an agency decision that did not comport with the APA's requirements. While the court in *Johnson* affirmed the criminal conviction, it only did so in finding that the "outcome of the process" would not "have differed" had administrative procedures been complied with. *United States v. Johnson*, 632 F.3d 912, 933 (5th Cir. 2011).

Here, compliance with the Administrative Procedure Act would have changed the outcome in at least two ways: first, by requiring a validly issued subpoena subject to constitutional requirements, and second, by requiring that any referral be subject to valid rights and defenses of the former President. At a minimum, NARA's referral rule would be subject to notice and comment procedures that would have forced NARA to address these two arguments and explain itself so that the Defendant would have had fair notice of the conduct that NARA considered grounds for criminal referral. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A statute

which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926); *Papachristou v. Jacksonville,* 405 U.S. 156, 162 (1972). Living under the rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids. This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. *Fox,* 567 U.S. at 253 (citing *United States v. Williams,* 553 U.S. 285, 304 (2008)). NARA's failure to provide advance warning of its claimed referral authority or to outline the parameters of the conduct that would trigger this authority means that the indictment should be dismissed.

## CONCLUSION

Accordingly, America First Legal respectfully requests that the Court grant President Trump's Motion to Dismiss the Indictment Based on the Presidential Records Act.

Dated: March 1, 2024

Respectfully submitted,

Daniel Z. Epstein
Michael Ding
Gene P. Hamilton
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003

By:     /s/ *Samuel J. Salario, Jr.*
Samuel J. Salario, Jr.
Fla. Bar. No. 083460
samuel@lawsonhuckgonzalez.com
LAWSON HUCK GONZALEZ, PLLC

19

1700 South Mac Dill Avenue
Suite 300
Tampa, FL. 33629

*Attorneys for Amicus Curiae*
*America First Legal Foundation*