**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

       Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA,**

       Defendants.

_____/

**GOVERNMENT'S OPPOSITION TO DONALD J. TRUMP'S**
**MOTION TO DISMISS THE INDICTMENT BASED ON**
**THE PRESIDENTIAL RECORDS ACT**

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................. 4

I.  Section 793(e) Applies Regardless of Whether the Records He Possessed Were
    "Personal" Under the PRA ................................................................................... 5

    A.  Section 793(e)'s Prohibition of Unauthorized Possession in This Prosecution
        Takes Its Meaning from the Relevant Executive Order ................................. 5

    B.  The PRA Does Not Authorize the Possession of Classified Information .................... 9

II.  A Presidential Designation of Records as "Personal" Is Not Binding ............................. 12

    A.  A President Cannot Unilaterally Transform Presidential Records into Personal
        Records by Removing Them from the White House ................................... 13

    B.  Any Implied Designation of Records as "Personal" by a President Who Takes
        Them upon Leaving Office Is Not Immune from Judicial Review .......................... 16

III.  The Investigation into Trump's Unauthorized Retention of Classified Records
     Was Valid and Trump's Contrary View Provides No Defense to Charges that
     He Obstructed the Investigation ........................................................................ 20

    A.  NARA's Remedies Do Not Preempt Criminal Statutes or Investigative
        Authorities .............................................................................................. 21

    B.  Trump Had No Right to Lie and Obstruct the FBI's Investigation ........................... 23

CONCLUSION ............................................................................................................ 25

i

Defendant Donald J. Trump moves to dismiss the Superseding Indictment based on the Presidential Records Act, 4 U.S.C. § 2201, *et seq.* ("PRA").  ECF No. 327.  Trump's claims rest on three fundamental errors, all of which reflect his view that, as a former President, the Nation's laws and principles of accountability that govern every other citizen do not apply to him.

First, the PRA does not affect the scope of 18 U.S.C. § 793(e), the statute that underlies Counts 1 through 32 of the Superseding Indictment.  Section 793(e) prohibits the unauthorized possession and willful retention of national defense information.  Even if the raft of highly classified documents that Trump took from the White House to Mar-a-Lago were somehow categorized as "personal" under the PRA, that would not render his retention of those documents "authorized" for purposes of Section 793(e).  The authorization for a former President to possess classified information comes from the applicable executive order—not from the PRA—and Trump was not authorized to possess classified records at all (let alone at unsecured locations at Mar-a-Lago, as the Superseding Indictment alleges, *see* ECF No. 85 ¶¶ 4-5).

Second, the charged documents are indisputably presidential, not personal, and Trump offers no basis to conclude otherwise.  Instead, he contends that because he transferred the documents to Mar-a-Lago, rather than to the National Archives Records Administration ("NARA"), the Court must conclusively presume that he designated the documents as personal—despite contrary allegations in the Superseding Indictment, the presidential nature of the records, and his own public statements saying the opposite.  He further contends that an implied (and counterfactual) decision to treat the records as personal lies beyond the scope of judicial review.  That is wrong.  Nothing in the PRA leaves it to a President to make unilateral, unreviewable, and perpetually binding decisions to remove presidential records from the White House in a manner that thwarts the operation of the PRA—a statute designed to ensure that presidential records are

1

the property of the United States and that they are preserved for the people.  Although it is not necessary to resolve that issue for the Government to prove the charges under Section 793(e)—because categorizing a classified document as "personal" does not make retention of the document "authorized" under Section 793(e)—if it were necessary, determining that the documents at issue are presidential, not personal, is obvious and well within judicial competence.

Third, Trump is wrong to assert that the PRA's civil remedy for recovering presidential records preempts the Justice Department's authority to investigate and enforce criminal law. Congress enacted Section 793(e) to allow criminal prosecution of persons who jeopardize national security by improperly retaining the government's closely held defense secrets.  The civil remedy to recover records serves an entirely different purpose:  to vindicate Congress's determination that the United States owns presidential records.  44 U.S.C. § 2202.  The two statutory schemes are complementary and compatible; neither forecloses resort to the other.  The Government therefore had valid legal authority to conduct a criminal investigation involving the charged documents. And Trump's disagreement provides no defense to the obstruction-of-justice charges in Counts 33-36, 40, and 41, the scheme-to-conceal charges in Count 37, and the false-statement charges in Count 38.  The law provides many means to challenge the Government's right to investigate. "Lying [to investigators] is not one of them." *Bryson v. United States*, 396 U.S. 64, 72 (1969).

## BACKGROUND

On July 27, 2023, a grand jury in this district returned a Superseding Indictment charging Trump with 32 counts of willful retention of national defense information, in violation of 18 U.S.C. § 793(e), and eight counts under various provisions addressing obstruction of justice and concealment of records.  ECF No. 85.  The Superseding Indictment alleges that, as part of his official duties as President, Trump received intelligence briefings from senior members of the

United States Intelligence Community ("USIC") and regularly received classified intelligence as part of the "President's Daily Brief." *Id.* ¶ 20. On January 20, 2021, Trump ceased to be President. As he departed the White House, he took with him scores of boxes, including many containing classified documents, to the Mar-a-Lago Club, where he had a residence. *Id.* ¶ 4. "Trump was not authorized to possess or retain those classified documents." *Id.* These classified documents were originated by and implicated the equities of components of the USIC. *Id.* ¶ 22.

NARA made extensive efforts to recover the presidential records that Trump took and kept after leaving office. *Id.* ¶ 38. In January 2022, Trump provided 15 boxes of materials to NARA. *Id.* ¶ 49. On opening the boxes, NARA discovered that 14 of the boxes contained documents with classification markings. *Id.* Ultimately, the FBI determined that the boxes contained 197 documents with classification markings, including "CONFIDENTIAL," "SECRET," and "TOP SECRET," with some marked with even more restrictive indications of containing Sensitive Compartmented Information ("SCI") and Special Access Programs ("SAP"). *Id.*; *see also id.* ¶¶ 16-17. NARA referred the matter to the Department of Justice ("DOJ"). *Id.* ¶ 50.

In March and April 2022, the FBI and a grand jury opened investigations. *Id.* ¶¶ 51-52. In May 2022, the grand jury subpoenaed the Office of Donald J. Trump for all documents with classification markings in the custody or control of that office or Trump himself. *Id.* ¶ 53. On June 3, 2022, attorneys working on Trump's behalf provided an additional 38 documents bearing classification markings as well as a certification that all boxes moved from the White House to Mar-a-Lago had been subjected to a "diligent search" and that "[a]ny and all responsive documents accompan[ied]" the certification. *Id.* ¶¶ 65-72. That was not true. On August 8, 2022, the FBI executed a court-authorized search warrant at Mar-a-Lago and recovered an additional 102 documents with classification markings. *Id.* ¶¶ 89-90.

In the Superseding Indictment, Counts 1-32 charge Trump with the unauthorized possession and willful retention of documents relating to the national defense, in violation of 18 U.S.C. § 793(e).  *Id.* ¶ 93.  The additional counts allege obstruction crimes based on conspiracy and substantive violations of criminal law when Trump and his co-defendants used deception to obstruct the return of the documents.  *See id.* ¶¶ 94-119.

## ARGUMENT

Trump's reliance on the PRA as a basis for dismissing the indictment is wrong.  The PRA does not exempt Trump from the criminal law, entitle him to unilaterally declare highly classified presidential records to be personal records, or shield him from criminal investigations—let alone allow him to obstruct a federal investigation with impunity.

In his motion, Trump contends, first, that his possession of the records underlying Counts 1 through 32 was not "unauthorized," as required to prove a violation of 18 U.S.C. § 793(e), because he had exercised his authority as President "to designate the records as personal when, as alleged in the Superseding Indictment, he 'caused' the materials to be transported out of the White House while he was still in office."  ECF No. 327 at 4.  Second, he argues that a President's designation of the records as "personal" under the PRA is not subject to judicial review.  *Id.* at 5-10.  Third, he contends that "the PRA's exclusive remedy for records collection efforts by NARA is civil in nature and forecloses criminal investigation."  *Id.* at 3; *see id.* at 10-13.  None of these contentions has merit.  Proof of unauthorized possession under Section 793(e) does not turn on the purported characterization of records as "personal," but on an executive order governing who may possess classified information and under what circumstances.  Under that order, Trump's possession was unauthorized, and nothing in the PRA changes that result.  Moreover, his claim that obviously presidential records—highly sensitive government documents bearing classification

markings that were presented to Trump during his term in office—can be transformed into "personal" records by the alchemy of removing them from the White House is false. So too is his suggestion that courts are powerless to say that presidential records are not personal records. And, finally, the civil remedy for record recovery does not preempt criminal laws or investigative authorities, and even if it did, it would not provide Trump a license to obstruct justice.

**I.      Section 793(e) Applies Regardless of Whether the Records He Possessed Were "Personal" Under the PRA**

Section 793(e) provides that "[w]hoever having *unauthorized* possession of, access to, or control over any document . . . relating to the national defense . . . willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it," is guilty of an offense. 18 U.S.C. § 793(e) (emphasis added). While Trump contends (without any plausible basis) that he designated the records underlying the Section 793(e) counts as "personal" under the PRA when he caused their removal from the White House, ECF No. 327 at 4, that contention, even if accurate, would not make his possession of classified records "authorized" under Section 793(e).

**A.      Section 793(e)'s Prohibition of Unauthorized Possession in This Prosecution Takes Its Meaning from the Relevant Executive Order**

The violations of Section 793(e) alleged against Trump require proof of three elements: (1) unauthorized possession of a document, (2) that related to the national defense, (3) by a defendant who willfully retained the document and failed to deliver it to the employee or officer entitled to receive it. 18 U.S.C. § 793(e). The Superseding Indictment charges Trump with Section 793(e) violations based on his possession of classified documents. Establishing that documents were classified does not automatically establish that the documents related to the national defense,

although it is relevant to that issue.[1]  But classification status *does* establish who may lawfully possess classified documents, and under what circumstances.  And, if a person is not entitled to possess those documents, his possession is not authorized for purposes of Section 793.

Because Section 793 does not define the term "unauthorized," the term bears its "ordinary meaning."  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quotation marks omitted); *see Campbell v. Universal City Dev. Partners, Ltd.*, 72 F. 4th 1245, 1254-55 (11th Cir. 2023).  Dictionary definitions establish that "unauthorized" means without official approval or permission.  *See* Black's Law Dictionary (11th ed. 2019) (defining "unauthorized" as "[d]one without authority," defining "authority" as "[t]he official right or permission to act," and defining "authorization" as "[o]fficial permission to do something; sanction or warrant"); Random House Unabridged Dictionary 139 (2001) (defining "authorization" as "permission or power granted by an authority"); Webster's Third International Dictionary 146 (2002) (defining authorization as "the state of being authorized" and defining "authorize" as "to endorse, empower, justify, permit by or as if by some recognized or proper authority").  That definition accords with the interpretation of similar terms in other criminal statutes.  *See, e.g.*, *United States v. Nosal*, 844 F.3d 1024, 1028, 1034-35 (9th Cir. 2016) ("'[W]ithout authorization' [in 18 U.S.C. § 1030(a)(4)] is an unambiguous, non-technical term that, given its plain and ordinary meaning, means accessing a protected computer without permission").  Accordingly, for purposes of Section 793, "without authorization" means without official permission or approval.

---

[1] The concept of national defense information ("NDI") refers to information relating to "the military and naval establishments and the related activities of national preparedness."  *Gorin v. United States*, 312 U.S. 19, 28 (1941) (quotation marks omitted).  "NDI . . . is not synonymous with 'classified'; information that is classified by the executive branch of government may or may not qualify as NDI."  *United States v. Rosen*, 599 F. Supp. 2d 690, 694 (E.D. Va. 2009).  Classification may nevertheless be relevant to proving that information qualifies as NDI.  *See, e.g.*, *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 n.9 (4th Cir. 1980).

Permission or approval to possess classified information flows from executive orders issued by the President.  "The authority to protect [national security] information falls on the President as head of the Executive Branch and as Commander in Chief."  *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).  As Commander in Chief, the President's "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant."  *Id.*  Congress has long required that "the President shall, by Executive order or regulation, establish procedures to govern access to classified information which shall be binding upon all departments, agencies, and offices of the executive branch of Government."  50 U.S.C. § 3161(a); *see* National Security Act ("NSA") of 1947, Pub. L. No. 118-31 § 801, 61 Stat. 496 (1947), as amended.  Congress exempted the President, Vice-President, and officials from the Judicial and Legislative Branches from the provisions of the NSA, *see* 50 U.S.C. § 3163, but it provided no similar exemption for a former President or any other former official.

Consistent with these constitutional and statutory authorities, Presidents have issued a series of executive orders to govern access to and storage of classified information.  *See Egan*, 484 U.S. at 527-528.  The current executive order—and the one in force throughout Trump's Presidency and through the allegations in the Superseding Indictment—is Executive Order ("EO") 13526, issued on December 29, 2009.  See ECF No. 85 ¶ 14.  Pursuant to EO 13526, classified information can be accessed only by a person who an appropriate United States official determines is eligible for such access; who has signed an approved non-disclosure agreement; and who has a "need to know" the classified information.  EO § 4.1.  And as the Eleventh Circuit has made clear,

the requirements of EO 13526 apply "equally to former Presidents, unless the current administration, in its discretion, chooses to waive [them]." *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sept. 1, 2022).  For former Presidents, the need-to-know requirement can be waived but only if an official "determines in writing that access is consistent with the interest of national security"; "takes appropriate steps to protect classified information from unauthorized disclosure or compromise"; and "ensures that the information is safeguarded in a manner consistent with this order."  EO § 4.4(a), (b)(1) & (2).

Given the Article II authority of the President and the statutory backdrop for the President's regulation of classified information, unauthorized possession under Section 793(e) in this case is measured by the terms of EO 13526.  That is the approach courts have followed in construing the related phrase "not entitled to receive" NDI in the same statute.[2]  Under the provisions of EO 13526, the Superseding Indictment alleges, once Trump left office, he no longer had authorization to possess classified information, he never received a waiver entitling him, as a former President, to possess it, and he stored documents at a location that was not an authorized location for the storage, possession, review, display, or discussion of classified documents.  ECF No. 85 ¶¶ 4-6, 18-19.  Accordingly, the Superseding Indictment sufficiently alleges "unauthorized possession."

---

[2] *See United States v. Morison*, 844 F.2d 1057, 1065-66, 1075 (4th Cir. 1988) ("[T]he words 'entitled to receive' in the statute in this case can be limited and clarified by the Classification Regulations."); *see United States v. Rosen*, 445 F. Supp. 2d 602, 622-23 (E.D. Va. 2006) ("[T]he rule regulating who is 'entitled to receive' is the Executive Order setting forth a uniform classification system for national security information . . . [T]he statute incorporates the executive branch's classification regulations." (quoting EO 13526)); *see also Truong Dinh Hung*, 629 F.2d at 919 n.10 (trial judge provided "adequate content" to "unauthorized possession" by instructing that "a person would have authorized possession if he had appropriate security clearance and if he gained access to the document because it was necessary to the performance of his official duties").

**B.    The PRA Does Not Authorize the Possession of Classified Information**

The PRA does not authorize the possession of classified information by a former President; indeed, it does not address the subject of classified information at all (other than in a provision that is not relevant here, governing restrictions on access to certain presidential records, including those that are properly classified, *see* 44 U.S.C. § 2204(a)(1)).  Congress enacted the PRA "to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office."  *Armstong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) ("*Armstrong I*"); *see* Pub. L. No. 95-591, 92 Stat. 2523 (1978).  The PRA defines "Presidential records" to mean "documentary materials, or any reasonably segregable portion thereof, created or received by the President" or his staff "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or official or ceremonial duties of the President."  44 U.S.C. § 2201(2).  The category of presidential records does not include "personal records."  *Id.* § 2201(2)(B).  "The term 'personal records' means all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or official or ceremonial duties of the President."  *Id.* § 2201(3).  Under the PRA, "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records."  *Id.* § 2202.  "Documentary materials produced or received by the President . . . shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and filed separately."  *Id.* § 2203(b).  At the conclusion of

the President's term, "the Archivist . . . shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(g)(1).

The PRA thus enshrines the public's ownership of documents that reflect the President's performance of his official duties. The PRA says nothing about the legal requirements that attach to *classified* information or who is authorized to possess classified information after a President's term ends. Whatever authorization a former President may have to possess his *personal* records, that authority does not override the legal requirements that attach to *classified* information. And the PRA can readily be harmonized with EO 13526: *Presidential records* belong the United States, and classified documents the President receives are inherently documents "received by the President . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official . . . duties of the President." 44 U.S.C. § 2201(2). *Personal records*, which are documents "of a purely private or nonpublic character which do not relate to or have an effect upon" presidential duties, *id.* § 2201(3), are not the United States' property. But *classified information* within personal records is still subject to EO 13526's requirements, including restrictions on safekeeping and disclosure. Reconciling these provisions allows each to operate within its appropriate sphere.

That straightforward reading of the PRA also avoids the constitutional question that would be raised if the Court were to find that legislation has overridden the President's determinations about who may possess classified information. As noted, the President's "authority to classify and control access to information bearing on national security . . . flows primarily" from the Commander-in-Chief Clause "and exists quite apart from any explicit congressional grant." *Egan*, 484 U.S. at 527. Congressional regulation that would override the President's judgment by giving a private party the right to possess classified information that the President would disallow raises

a significant constitutional question.  *See Zivotofsky v. Kerry*, 576 U.S. 1 (2012) (separation of powers may be violated by congressional intrusion on unique presidential authority).  The judiciary should strive to avoid any such conflict.  *See Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161-62 (1989) (per curiam) (remanding with instructions that lower courts address whether a congressional statute and an executive-branch form dealing with conditions of access to classified information "are susceptible of a reconciling interpretation" to avoid constitutional questions).  And at a minimum, any congressional intrusion on the President's Commander-in-Chief power to protect national-security information would require that "Congress *specifically* ha[d] provided otherwise."  *Egan*, 484 U.S. at 530 (emphasis added).  The PRA provides no specific exception to EO 13526 that would authorize Trump to keep classified government records at Mar-a-Lago.[3]

Trump alludes to DOJ's inaction over former President Reagan's diaries, which he retained after leaving office and which contained classified information.  ECF No. 327 at 7.  But DOJ's decisions decades ago with respect to a former President's *diaries* establish no legal precedent for the interaction of the PRA and Executive Orders governing classified documents.  This case involves classified records created by intelligence and military officials for highly sensitive Presidential briefings.  Trump did not create them, they do not reflect his personal thoughts, they came into his possession only through his official duties, and (except for one charged document) bear classification markings.  They have no resemblance to diaries.  *See* 44 U.S.C. § 2201(3)(A) (defining "personal records" to include "diaries, journals or other notes serving as the functional

---

[3] The *Hur Report* reached the same conclusion: "We therefore decline to adopt the argument that compliance with the [PRA] authorizes former presidents and vice presidents to retain national defense information in unsecured and unapproved locations."  Special Counsel Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 181-182 (Feb. 2024).

equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business"). In any event, the Reagan example does not override EO 13526, and that text does not authorize Trump's possession and storage of classified documents. Nothing in the PRA calls into question the Section 793(e) counts.[4]

## II.    A Presidential Designation of Records as "Personal" Is Not Binding

Even if the PRA had some bearing on this case, Trump's claims would fail. The information in the charged documents pertains to this Nation's and others' defense and weapons capabilities; vulnerabilities to military attack; nuclear programs; and plans for a response to a foreign attack. ECF No. 85 ¶ 3. And Trump received them from members of the intelligence community to further the execution of his duties as President. *Id.* ¶¶ 20-21. Thus, the documents were "created or received by the President . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). No conceivable argument exists that any of them qualifies as "documentary materials . . . of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(3). As such, they are indisputably "Presidential records," not "personal records" within the meaning of the statute.

Tellingly, Trump's motion to dismiss does not argue that these records are *in fact* "personal records" within the meaning of the PRA. Likewise, his motion does not assert (much less try to

---

[4] At trial, Trump may offer a defense that he did not act willfully because he *in fact* designated the documents as personal and *in fact* mistakenly believed that the PRA provided him with authorization to keep and withhold classified records from NARA and the grand jury. *See Bryan v. United States*, 524 U.S. 184, 191-92 (1998). Any such factual defense regarding his *mens rea* would, of course, require as-yet-unseen evidence to support it, but in any event, it would not affect the legal determination of whether his possession of classified records was unauthorized. Nor would it provide any basis for dismissing the Superseding Indictment.

show) that he designated these documents as personal records during his presidency.  Nor could he.  Not only did he return 15 boxes of documents to NARA in January 2022, *see* ECF No. 85 ¶¶ 38-49, refuting any suggestion that he viewed them all as "personal records," but he also stated at the time that "[t]he National Archives did not 'find' anything, they were given, upon request, Presidential Records in an ordinary and routine process to ensure the preservation of my legacy and in accordance with the Presidential Records Act."[5]

His reliance on the PRA therefore has no basis in the statute, the Superseding Indictment, or any real-world facts.  Instead, it is premised on two flawed contentions.  First, relying on a statement in an oral argument transcript from an inapposite case, Trump contends (ECF No. 327 at 4-6) that, because he "caused" the documents to be transported to Mar-a-Lago, ECF No. 85 ¶ 4, rather than the National Archives, the Court must presume that he designated the records as personal rather than presidential.[6]  Second, he contends (ECF No. 327 at 6-10) that if the Court treats the decision to spirit the boxes away as equivalent to a designation of the records as "personal," it must treat that decision as conclusive, even if it lacks any colorable legal basis.  Both contentions lack legal support and are fundamentally wrong.

### A.      A President Cannot Unilaterally Transform Presidential Records into Personal Records by Removing Them from the White House

The PRA directs that the President "shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance" of his official duties "are adequately documented and that such records are preserved and maintained as

---

[5] https://www.nbcnews.com/politics/donald-trump/white-house-records-taken-trump-contained-classified-information-natio-rcna16890 (quoting Trump statement).

[6] That purported presumption is crucial to his argument because Trump offers no facts to support it, perhaps recognizing that doing so would be  fatal to a motion to dismiss under Fed. R. Crim. 12.  *See United States v. deVegter*, 198 F.3d 1324, 1326-27 (11th Cir. 1999).

Presidential records."  44 U.S.C. § 2203(a).  That provision sets a controlling legal standard.
Nothing in the PRA remotely suggests that the President can lawfully convert presidential records
into personal ones simply by removing them from the White House at the end of his term.

      To reach a contrary conclusion, Trump relies on a statement made during oral argument
before the district court in *Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288 (D.D.C. 2012).  That
case stemmed from a decision made by President Clinton to "enlist[] historian Taylor Branch to
assist him in creating 'an oral history of his eight years in office.'"  *Id.* at 290 (quoting complaint).
President Clinton "planned to make first use of [the taped conversations] for his memoirs, then
eventually to release the transcripts at his presidential library."  Taylor Branch, *The Clinton Tapes:
Wrestling History with the President* 13 (Simon & Schuster 2009).

      After Branch published his book, a non-profit organization, Judicial Watch, sent a FOIA
request to the Clinton Library for access to the tapes.  *Judicial Watch*, 845 F. Supp. 2d at 292.  The
Supervisory Archivist for the Clinton Library responded that "the requested tapes 'are not
[P]residential records and therefore are not subject to request under the PRA and FOIA.'"  *Id.*
(quoting complaint).  When Judicial Watch appealed to NARA, the Deputy Archivist noted that
NARA had never had custody over the tapes.  *Id.* at 292-93.  The Deputy Archivist added that, to
the extent that the appeal asked NARA to "make a further determination that the materials in
question ought to be considered 'presidential records' within the meaning of the PRA, we decline
to do so."  *Id.* at 293 (quoting the letter).  The Deputy Archivist "'consider[ed] the nature of the
audio tapes, if they were created with the intent of their use as government materials, and whether
or not they were circulated within the Administration or relied on as policy documents.'"  *Id.*
Based on the available facts, the Deputy Archivist did "'not believe the materials in question fall

within the ambit of the PRA,'" and she was instead "'of the opinion that the audio tapes created by Taylor Branch are personal records of President Clinton as defined by the PRA.'" *Id.*

Judicial Watch then filed suit in district court under the Administrative Procedure Act, asking the court to, among other things, order NARA to "assume custody and control" over the tapes and "deposit [them] at the Clinton Library." *Id.* (quotation marks omitted). The district court dismissed the case, concluding that even if it agreed with Judicial Watch's "questionable characterization" of the recordings as presidential records, the court lacked the authority to compel NARA to exercise its discretion under the PRA to commence proceedings to recover the records. *Id.* at 302.

Trump relies on a statement made at a hearing in the case, in which the district court asked the government "[w]ho made the classification decision here?" *Judicial Watch, Inc. v. NARA*, No. 10-cv-1834, ECF No. 14, at 6 (D.D.C. Mar 5, 2012). The government attorney responded, "I think there are two classification decisions, only one of which the plaintiff is challenging. President Clinton initially classified the audiotapes as—*presumably classified the tapes as personal records by not transferring them to the archives at the conclusion of his administration*." *Id.* (emphasis added). The attorney added that if NARA disagreed with that classification, "then [NARA] can invoke their enforcement mechanism." *Id.* at 6-7.

Based on the italicized statement, Trump attempts to derive a rule that if a President fails to transfer materials to the Archives at the conclusion of his presidency, a court must conclude that the President designated the records as personal rather than presidential. ECF No. 327 at 5-6. That argument takes the oral-argument statement out of context and gives it a meaning it cannot bear. The tapes in question purported to be "the functional equivalent of a diary," 44 U.S.C. § 2201(3)(A), which the PRA explicitly regards as personal (provided the other conditions of the

statute are met).   In that context, the government's statement that President Clinton had

"presumably" classified them as personal was unsurprising.   At most, the comment reflected a

factual presumption by the attorney handling the hearing; it did not reflect, much less create, any

binding position of the DOJ or legal presumption under the PRA.   In any event, that comment has

no application to the very different context here.   The documents that Trump removed were

government-created classified records; Trump does not contend that they constitute the functional

equivalent of a diary; and they cannot qualify as "personal records" under any objective view.

**B.**   **Any Implied Designation of Records as "Personal" by a President Who Takes Them upon Leaving Office Is Not Immune from Judicial Review**

Trump asserts that the PRA "'precludes judicial review of the President's recordkeeping

practices and decisions,' including [his] decision to designate materials as Personal Records."   ECF

No. 327 at 6 (quoting *Armstrong I*, 924 F.2d at 291).   Neither *Armstrong I* nor any other decision

supports that categorical statement and, if it were accepted, it would render the PRA a nullity—

allowing a departing President by fiat to treat all Presidential records as personal records, thus

effectively reviving the very regime that the PRA was enacted to displace.

*Armstrong I* involved a private action to prevent the President from erasing electronically

stored information at the end of a Presidency.   The court of appeals held only that "it is difficult to

conclude that Congress intended to allow courts, *at the behest of private citizens*, to rule on the

adequacy of the President's records management practices or overrule his records creation,

management, and disposal decisions."   *Armstrong I*, 924 F.2d at 290 (emphasis added); *see id.* at

291.   The court did not categorically rule out judicial review.   And two years later, in a subsequent

stage of the same case, the court of appeals explained that even in private actions, judicial review

remained available to ensure that the PRA would not become "a potential presidential *carte*

*blanche* to shield materials from the reach of the FOIA" by improperly designating records as

presidential records rather than agency records. *Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1292 (D.C. Cir. 1993) ("*Armstrong II*"). *Armstrong I*, the court explained, was limited to precluding judicial review "of the President's decisions concerning the creation, management, and disposal of presidential records *during his term in office.*" *Id.* at 1294 (emphasis added). The court allowed review of "guidelines outlining what is, and what is not, a 'presidential record' to ensure that materials that are not subject to the PRA are not treated as presidential records." *Id.*

Neither *Armstrong I* nor *Armstrong II* addressed judicial review of presidential decisions to designate particular records as "personal" or "presidential" records, and neither addressed a former President's actions. But the logic of *Armstrong II* that a President should not have *carte blanche* to improperly designate records and thus defeat Congress's purposes equally applies here. If Trump had *carte blanche* to call patently presidential records "personal records," a President could defeat the purpose of the PRA to ensure that presidential records remained public property, and not, as in pre-PRA practice, the personal property of individual Presidents.

The one court that considered whether a former President could have plenary control of decisions about presidential records rejected that proposition as wholly inconsistent with the structure and purpose of the PRA. In *American Historical Association v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995), President George H.W. Bush made an agreement with the Archivist that purported to give the outgoing President exclusive control over electronic records from his time in office. *Id.* at 1303. The district court held the agreement invalid. *Id.* at 1318-20. It noted that the PRA was designed to overcome pre-PRA practice under which "'Presidents exercised complete dominion and control over their presidential papers.'" *Id.* at 1306 (quoting *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992)). The court rejected the submission—resembling Trump's

position here—that all "discretionary Presidential decisions alleged to be in excess of statutory authority are nonreviewable." *Id.* at 1313 (quotation marks omitted). Rather, the court noted that *Armstrong II* permits review of "guidelines for categorizing Presidential records" and that it did "not necessarily foreclose judicial review of a decision to denominate certain materials 'personal records' of a former President." *Id.* at 1314. "Such judicial review may be available to ensure that Presidential records are not disposed of as personal records at the end of an Administration and that, instead, all Presidential records fall subject to the Archivist's 'affirmative duty to make such records available to the public.'" *Id.* (quoting 44 U.S.C. § 2203(g)(1) (emphasis omitted)).

If judicial review were not available, the court explained, a President could make an "eleventh hour agreement" that would allow him as a private citizen to control the disposition of "Presidential records following a term in office." *Id.* at 1315. "The PRA, however, was passed precisely in order to preclude former Presidents from disposing of Presidential records as they please." *Id.* Indeed, the court noted, it "borders on the absurd" to think that Congress enacted the PRA to prevent the disposal of presidential records at will, but simultaneously intended a former President's decisions to dispose of such records to "be immune from judicial review." *Id.*; *accord Citizens for Resp. & Ethics ("CREW") v. Cheney*, 593 F. Supp. 2d 194, 216 (D.D.C. 2009). The same principle applies here to prohibit Trump from disposing of presidential records as he pleases on his way out of the White House: it would be "absurd" to find that the PRA permits that result.

None of the other authorities that Trump cites supports his absolute preclusion-of-review theory. He acknowledges (ECF No. 327 at 9) that *Judicial Watch* did not reach that question. *See* 845 F. Supp. 2d at 298 (expressing doubts about whether former President Clinton's "retention of the audiotapes as personal is a matter that is subject to judicial review[,] [b]ut the Court need not decide this question"). And he cites cases that restrict private actions seeking judicial oversight of

ongoing White House records management practices, *CREW v. Trump*, 438 F. Supp. 3d 54, 61 (D.D.C. 2020); *see also CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019), but those decisions are inapposite here, where no private party is seeking to control ongoing White House practices. For similar reasons, Trump's reliance on DOJ submissions addressing claims for judicial review of "day-to-day White House records management decisions under the [PRA]" have no relevance here. ECF No. 327 at 7 (quotation marks omitted). Judicial review of the records' status here, based on Trump's eleventh-hour actions at the end of his presidency, affects no ongoing activities in the White House.

Finally, Trump's position that any presidential designation of records as "personal" is categorically off limits for judicial review cannot be reconciled with the statutory scheme—which he embraces—allowing NARA to request the Attorney General to initiate an action to recover presidential records. As *Judicial Watch* explained, the PRA permits NARA "to invoke the same enforcement mechanism embodied in the Federal Records Act, which begins with a request to the Attorney General to institute an action for the recovery of missing records." 845 F. Supp. 2d at 302 (citing 44 U.S.C. §§ 2112(c), 3106). The Government has previously brought a replevin action to recover missing presidential records. *Id.* (citing *United States v. McElvenny,* No. 02-3027, 2003 WL 1741422 (S.D.N.Y. Apr. 1, 2003) (seeking to recover a map that President Kennedy annotated during the Cuban Missile Crisis)). That authority necessarily allows a court to decide that missing presidential records belong to the United States.

On Trump's contrary reading, a departing President could unilaterally convert classified government records—containing the Nation's most closely guarded military, diplomatic, and national security secrets—into his private possessions, leaving the government with no judicial recourse to recover its own property and protect the Nation from the risk that the former President

may disclose these secrets to a foreign adversary, post them on the internet, or sell them to the highest bidder.  Even Trump shrinks from that conclusion; instead, he argues (inconsistently and incorrectly) that the PRA's civil recovery mechanism is the exclusive means to address a former President's unauthorized possession of presidential records.  ECF No. 327 at 10-13 (citing *Judicial Watch*, 845 F. Supp. 2d at 302).  The claim that NARA's civil remedies are exclusive of criminal enforcement is wrong, *see* Section III, *infra*, but here, the relevant point is that the concession that the government may sue to recover Presidential records fatally undermines Trump's claim that his misappropriation of government records is judicially unreviewable.

Accordingly, even if the Section 793(e) charges depended on whether the underlying documents were personal or Presidential—which they do not, *see* Section I, *supra*—the PRA does not require that obviously presidential records be treated as personal ones in this case, simply because Trump removed them from the White House at the end of his term in office.  That result "borders on the absurd."  *Am. Hist. Ass'n*, 876 F. Supp. at 1315.

## III.  The Investigation into Trump's Unauthorized Retention of Classified Records Was Valid and Trump's Contrary View Provides No Defense to Charges that He Obstructed the Investigation

Finally, Trump contends that NARA made an improper referral to DOJ on February 9, 2022, and that the FBI therefore had no basis to "predicate" an investigation of his unauthorized possession of classified government documents.  ECF No. 327 at 10-13.  He claims that, as a result, the obstruction and false-statement allegations in Counts 33-42 must be dismissed.  *Id.* at 11.  Each aspect of that argument is fundamentally wrong.  Nothing in the PRA preempts the application of federal criminal law or divests the Government of criminal investigative authorities, and in any event, an individual's claim that the Government lacked authority to investigate provides no defense to charges for obstructing its investigation.

**A.      NARA's Remedies Do Not Preempt Criminal Statutes or Investigative Authorities**

Trump contends that "[t]o the extent NARA seeks to recover properly designated Presidential Records from any third party, including a former president, the PRA provides the exclusive means for doing so, which is civil rather than criminal in nature." ECF No. 327 at 11. That claim is wrong. As Trump notes, the PRA provides the government with civil tools to recover Presidential records that are improperly in private hands. ECF No. 327 at 12. But nothing in that civil remedy precludes the application of criminal laws that govern overlapping conduct, such as Section 793. *See United States v. Arif*, 897 F.3d 1, 7-9 (1st Cir. 2018) (rejecting similar argument in the context of FTC regulation and the wire-fraud statute). NARA's civil remedy assists in recovering presidential records. Section 793(e), in contrast, addresses criminal threats to national security posed by the misuse by anyone of national defense information. The two statutory schemes serve different purposes, contain different enforcement mechanisms, and turn on different elements of proof. And Congress's expectation that NARA could refer criminal matters to DOJ in appropriate cases is reinforced by the statutory requirement that "each Inspector General shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C. § 404(d). NARA has an Inspector General, *see id.* § 415(a) & (b), and NARA, through its Inspector General, made a referral to DOJ in this case, ECF No. 85 ¶ 50.

Because the PRA and the criminal authorities at issue in this case do not conflict, the PRA does not impliedly repeal the Government's criminal authorities. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) ("[A]bsent a clearly expressed congressional intention, [a]n implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute.") (quotation

marks and ellipses omitted); *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1225 (11th Cir. 2014) ("[W]hen Congress passes two statutes that may touch on the same subject, we give effect to both unless doing so would be impossible."). The Government had a legitimate basis for its criminal investigation into Trump's potential violations of law, fully justifying the use of grand jury subpoenas and a court-ordered search warrant. ECF No. 85 ¶¶ 49-53, 88-90; *see also* Gov't Ex. 1 to Mot. to Suppress Response, *Search Warrant Affidavit* ¶ 79 (attesting to probable cause to believe that "evidence, contraband, fruits of crime or other items illegally possessed in violation of 18 U.S.C. §§ 793(e), 2071, or 1519 will be found at [Mar-a-Lago]").

Trump cites no authority holding that an exclusive scheme of *civil* remedies restricts the authority of the United States to bring *criminal* prosecutions under general provisions of the federal criminal code. He notes that the Supreme Court stated in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 148-49 (1980), that "[t]he Federal Records Act establishes one remedy for the improper removal of a record from the agency"—"a system of administrative standards and enforcement." ECF No. 327 at 12. But the context of that statement was whether "a private right of action can be implied" in the Federal Records Act. 445 U.S. at 148. The Court answered that question "no." *Id.* at 148-50. Nothing in *Kissinger* required the Court to address whether the Government can investigate the potential commission of federal crimes when a federal record is unlawfully in the hands of a non-federal party. Nor is Trump assisted by DOJ's brief in *Judicial Watch* stating that "[t]his administrative enforcement scheme is exclusive" and "courts may not order the recovery or retrieval of records that may have been removed or destroyed." ECF No. 327 at 13 (quoting Def. Ex. 2 at 4). *Judicial Watch* did not involve the use of criminal process to investigate possible criminal offenses; the case involved only *NARA*'s remedies, and that was the topic DOJ's brief discussed. *See* Def. Ex. 2 at 13 ("This administrative enforcement scheme

is the exclusive method by which NARA can recover records under the PRA.").  DOJ's similar statement at oral argument in *Judicial Watch*, *see* ECF No. 327 at 13, nowhere disavows separate criminal investigative powers, which were not at issue in that case.  Likewise, the statement in *Judicial Watch* that NARA did not regard itself as empowered to seize records from a former President, 845 F. Supp. 2d at 302-03, says nothing about whether a *grand jury* can subpoena records and whether the *FBI* can execute a search warrant in a criminal investigation relating to presidential records.

### B.    Trump Had No Right to Lie and Obstruct the FBI's Investigation

If Trump believed he had a valid legal basis for challenging the Government's investigation, he could have moved to quash the grand jury subpoena, and he can move to suppress the fruits of the search warrant (as he has).  But his PRA-based claims gave him no license to obstruct the Government's investigation through lies and concealment.

The Supreme Court long ago rejected the contention that a legal objection to the validity of a proceeding would preclude prosecution under 18 U.S.C. § 1001 for making a false statement in that proceeding.  In *Bryson v. United States,* 396 U.S. 64 (1969), the defendant was convicted of making a false statement in violation of Section 1001 in an affidavit denying affiliation with the Communist Party, which he had filed with the National Labor Relations Board under Section 9(h) of the National Labor Relations Act.  *Id.* at 65-66.  He later contended that Section 9(h) was constitutionally invalid and that he could not be convicted under Section 1001 for making false statements in response to questions "that the Government had no right to ask."  *Id.* at 66.  The Court held that the constitutionality of Section 9(h) was "legally irrelevant to the validity of petitioner's conviction under § 1001."  *Id.* at 68.  It relied on *Dennis v. United States*, 384 U.S. 855 (1966), which held that "'[t]he governing principle is that a claim of unconstitutionality will not

23

be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit.'" *Bryson,* 396 U.S. at 68 (quoting *Dennis*, 384 U.S. at 867). The *Dennis* Court explained that "[o]ne who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." 384 U.S. at 867.

     *Bryson* confirmed that legal objections to the government's right to ask questions do not justify lying in response. 396 U.S. at 70. The Court recognized that Section 1001 requires that "the false statement be made 'in any matter within the jurisdiction of any department or agency of the United States,'" but it ruled that a constitutional challenge to the agency's power to ask questions is no defense. *Id.* at 70-71. "Our legal system provides methods for challenging the Government's right to ask questions," the Court explained; "lying is not one of them." *Id.* at 72. Accordingly, "one who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." *United States v. Knox*, 396 U.S. 77, 79 (1969); *see also United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023) ("Many decisions of the Supreme Court hold that false statements may be punished even when the government is not entitled to demand answers.").

     As in *Bryson*, *Dennis*, and *Knox*, Trump's claim that the government's investigation was impermissible does not allow him to obtain dismissal of charges of conspiring to obstruct and obstructing a federal grand jury (Counts 33-35, 37-38, 40) and an FBI investigation (Count 36, 37-38) (*see* ECF No. 85 ¶¶ 95-96, 99, 101, 103, 105, 107, 114). The FBI had legal authority to investigate any possible violations of federal criminal law arising from Trump's conduct, as detailed in the Superseding Indictment. *See* 28 U.S.C. §§ 509-510, 531; 28 C.F.R. § 0.85(a). So too did the grand jury. *United States v. R. Enters.*, 498 U.S. 292, 297 (1991) ("[T]he grand jury can investigate merely on suspicion that the law is being violated, or even just because it wants

assurance that it is not.")  (quotation marks omitted).  Trump does not get a free pass for his alleged obstruction offenses based on his legal claim that those entities lacked authority to investigate.

Trump relies on a series of inapposite cases in arguing that any flaws in the FBI's basis for investigating allowed him to lie to the government, conceal records, and obstruct the grand jury's investigation.  ECF No. 327 at 11.  Those cases address requirements to *prove* violations of the charged offenses: *United States v. Beach*, 80 F.4th 1245, 1256-57 (11th Cir. 2023), addresses the requirement to prove a nexus to an official investigation under 18 U.S.C. § 1512(a)(2)(A); *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008), holds that the fair-warning requirement of due process is satisfied when a person knowingly makes a false entry in a document with intent to impede or influence an FBI investigation under 18 U.S.C. § 1219; and *United States v. Blankenship*, 382 F.3d 1110, 1136-40 (11th Cir. 2004)), addresses the requirement to prove that a false statement or concealment took place in a matter within federal "jurisdiction" under 18 U.S.C. § 1001. The Government must *prove* those elements at trial; they impose no restriction on the Government's authority to investigate.   Accordingly, Trump's PRA-exclusivity argument, even if it had merit (which it does not), cannot support his argument to dismiss the allegations of crimes that he committed to obstruct the Government's investigation.

## CONCLUSION

The motion to dismiss the Superseding Indictment based on the PRA should be denied.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:      /s/ *Jay I. Bratt*
         Jay I. Bratt
         Counselor to the Special Counsel
         Special Bar ID #A5502946
         950 Pennsylvania Avenue, N.W.
         Washington, D.C. 20530

         David V. Harbach, II
         Assistant Special Counsel
         Special Bar ID #A5503068

         Cecil W. VanDevender
         Assistant Special Counsel
         Special Bar ID #A5503075

March 7, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *Jay I. Bratt*
Jay I. Bratt