**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

       Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA,**

       Defendants.

_____/

**GOVERNMENT'S OPPOSITION TO DEFENDANT DONALD J. TRUMP'S**
**MOTION TO DISMISS THE INDICTMENT BASED ON**
**SELECTIVE AND VINDICTIVE PROSECUTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.      Applicable Law ....................................................................................................... 3

      A.     Requirements of a Selective Prosecution Claim ......................................... 4

      B.     Requirements of a Vindictive Prosecution Claim ....................................... 5

II.     Trump Fails to Satisfy the First Prong of a Selective Prosecution Claim
      Because He Cannot Identify a Similarly Situated Comparator ............................... 5

      A.     Joseph R. Biden ......................................................................................... 5

      B.     Mike Pence ............................................................................................... 12

      C.     Bill Clinton ............................................................................................... 14

      D.     Hillary Clinton ......................................................................................... 15

      E.     James Comey ............................................................................................ 17

      F.     David Petraeus ......................................................................................... 18

      G.    Samuel "Sandy" Berger ........................................................................... 19

      H.    John Deutch ............................................................................................. 20

      I.     Deborah Birx ............................................................................................ 20

III.    Trump Fails to Satisfy the Second Prong of a Selective Prosecution Claim
      or Show Actual Vindictiveness ............................................................................ 21

CONCLUSION ................................................................................................................ 25

## INTRODUCTION

When Donald J. Trump left the White House in January 2021, he arranged for scores of boxes holding hundreds of highly classified documents to be sent to the Mar-a-Lago Club, where he had a personal residence.  These documents had been generated by members of the intelligence community and provided to Trump during his term in office, to facilitate the execution of his duties as President of the United States.  When those duties ended, so too did Trump's authorization to possess the documents.  They were not keepsakes, memorabilia, or trophies for him to keep and use as he pleased after his return to life as a private citizen.  They contained sensitive, highly classified information related to the national defense, and as such, the Espionage Act proscribed their retention in an unsecure location by a private citizen who lacked authorization to possess them.  And because they were presidential records, they belonged to the American people, and were to be preserved, retained, and safeguarded by the National Archives and Records Administration ("NARA"), as required by the Presidential Records Act.

Trump nevertheless knowingly possessed and willfully retained the classified documents.  That alone distinguishes his conduct from a litany of former government officials who have retained classified documents beyond their terms in office through inadvertence or carelessness, but then returned them upon their discovery.  But Trump's conduct went much further.  First, he used delay and obfuscation to stymie NARA's efforts to gain custody of the presidential records in his possession.  *See* ECF No. 85 ¶ 38.  Then, when pressed by the threat of referral to Congress and the Department of Justice, he ostensibly agreed to comply with NARA's requests but in fact engaged in deception, returning only a fraction of the documents in his possession while claiming that his production was complete.  *Id.* ¶¶ 38-48.  When NARA discovered that his production contained more than 100 documents with classification markings, it prudently alerted the

1

appropriate government authorities.  *Id.* ¶¶ 49-50.  The government then opened a criminal investigation, and a grand jury issued a subpoena to Trump for any remaining documents with classification markings.  *Id.* ¶¶ 51-53.  Rather than simply comply with the subpoena, he orchestrated a scheme to obstruct the criminal investigation and the continuing effort to recover the documents.  Among other things, the scheme included an effort to enlist his own attorney in the corrupt endeavor, suggesting that the attorney falsely tell the FBI and grand jury that Trump did not have any documents, and suggesting that his attorney hide or destroy documents rather than produce them to the government.  *Id.* ¶¶ 55-57, 66-67.  Separately, Trump enlisted his trusted body man, codefendant Waltine Nauta, in a scheme to deceive the attorney by moving boxes to conceal his continued possession of classified documents.  *Id.* ¶¶ 58-63.  As a result, Trump, through his attorney, again returned only a portion of the classified documents in his possession while falsely claiming that his production was complete.  *Id.* ¶¶ 64-73.  In June 2022, knowing that he had arranged for Nauta to move boxes to conceal them from Trump's attorney, and knowing that the government had subpoenaed the security video footage that would reveal that surreptitious box movement, Trump, now joined by Nauta and codefendant Carlos De Oliveira, attempted to have the IT manager at Mar-a-Lago delete the video footage.  *Id.* ¶¶ 74-87.

Trump contends (Mot. to Dismiss based on Selective and Vindictive Pros. ("Mot."))[1] that he has been subject to selective and vindictive prosecution.  But he has not identified anyone who has engaged in a remotely similar battery of criminal conduct and not been prosecuted as a result.  He has likewise failed to provide any evidence that his indictment was brought solely to retaliate against him for exercising his legal rights, rather than because he flagrantly and repeatedly broke the law.  The Attorney General appointed the Special Counsel to "underscore[] the Department's

---

[1] Trump's motion has not yet been docketed publicly or received an ECF number.

commitment to both independence and accountability in particularly sensitive matters" and to allow prosecutors "to make decisions indisputably guided only by the facts and the law."  Att'y Gen. Merrick B. Garland, Remarks on the Appointment of a Special Counsel (Nov. 18, 2022).[2] The Special Counsel has followed the facts and the law, while adhering to all Department regulations, including the prohibition on making a prosecutorial decision based on a defendant's "political association, activities, or beliefs," or "for the purpose of giving an advantage or disadvantage to any candidate or political party."  Justice Manual ("JM") § 9-27.260.  Trump fails to show otherwise, and his requests for dismissal or discovery based on selective and vindictive prosecution should be denied.

## ARGUMENT

### I.    Applicable Law[3]

The decision to bring charges in a case is subject to a "presumption of regularity," and, with rare exceptions, defendants and courts are precluded from "[e]xamining the basis of a prosecution" or "subjecting the prosecutor's motives and decisionmaking to outside inquiry." *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996); *see Wayte v. United States*, 470 U.S. 598, 607 (1985).  Those rare exceptions include cases violating the constitutional prohibitions on selective and vindictive prosecution.  Selective prosecution occurs when the decision to prosecute is "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (quotation marks omitted).  And vindictive prosecution occurs when a "charging decision" or other prosecutorial action is "motivated by a desire to punish [the

---

[2] https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-appointment-special-counsel.

[3] The applicable law has been set forth at greater length at ECF No. 337 at 3-6.

defendant] for doing something that the law plainly allowed him to do." *United States v. Goodwin*, 457 U.S. 368, 384 (1982).

To prove a claim of selective or vindictive prosecution, a defendant must establish each of the constituent elements (discussed below) by "clear and convincing evidence." *United States v. Smith*, 231 F.3d 800, 808 (11th Cir. 2000) (selective prosecution); *see United States v. Simbaqueba Bonilla*, No. 07-cr-20897, 2010 WL 11627259, at *4-5 (S.D. Fla. May 20, 2010) (vindictive prosecution). To obtain discovery on such a claim, a defendant must meet a "correspondingly rigorous standard," *Armstrong*, 517 U.S. at 468, that is "only slightly lower than for proving the claim itself," *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (quotation marks omitted); *see United States v. Bass*, 536 U.S. 862 (2002) (per curiam). That standard requires the defendant to make "a credible showing" to support his claim, by providing "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468, 470 (quotation marks omitted); *see United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021).

### A.       Requirements of a Selective Prosecution Claim

A selective prosecution claim has two prongs, requiring a defendant to "demonstrate [1] that the federal prosecutorial policy had a discriminatory effect and [2] that it was motivated by a discriminatory purpose." *Smith*, 231 F.3d at 808 (quotation marks omitted). The first prong requires a showing that "similarly situated individuals were not prosecuted," which means the defendant must identify a "comparator [who] committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *Id.* at 809-10. The second prong requires a showing that the prosecutorial decision

4

was in fact "motivated by a discriminatory purpose" on behalf of "the decisionmaker," *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (quotation marks omitted).

### B. Requirements of a Vindictive Prosecution Claim

A vindictive prosecution claim based (as here) on a theory of actual vindictiveness requires the defendant to demonstrate "that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *see United States v. Barner*, 441 F.3d 1310, 1322 (11th Cir. 2006) (citing *Wilson* and stating that the "elements of prosecutorial vindictiveness are animus plus causation").

## II. Trump Fails to Satisfy the First Prong of a Selective Prosecution Claim Because He Cannot Identify a Similarly Situated Comparator

To satisfy the first prong of his selective prosecution claim, Trump offers (Mot. at 2-13) nine individuals who he contends are similarly situated.  But while each of them, to varying degrees, bears a slight resemblance to this case, insofar as they involved the mishandling of classified documents, none is alleged to have willfully retained a vast trove of highly sensitive, confidential materials *and* repeatedly sought to thwart their lawful return *and* engaged in a multi-faceted scheme of deception and obstruction—a scheme that included not only Trump's own repeated efforts to stymie the investigation, but his recruitment and direction of his subordinates to join in the conspiracy.  *See Smith*, 231 F.3d at 811.  There is no one who is similarly situated.

### A. Joseph R. Biden

Trump first contends (Mot. at 2-5, 21) that his conduct, as alleged in the Superseding Indictment, is not meaningfully distinguishable from the conduct of Joseph R. Biden, as described in the *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware*

*Private Residence of President Joseph R. Biden, Jr.*, by Special Counsel Robert K. Hur ("*Hur Report*"), such that he and Biden should be viewed as similarly situated comparators.  That claim fails.  To be sure, there are superficial similarities between the two cases: both, for example, involve classified materials received by a Vice President or President during his term of office and then stored in cardboard boxes in an unsecured location thereafter, which "poses serious risks to national security."  *Hur Report* at 255; *see id.* at 180 (noting that, absent "a written waiver of the need-to-know requirement" or other "findings required by [Executive Order 13526]," the "possession of [classified] materials in unsecured spaces" is "unauthorized within the meaning of the Espionage Act").  Both also involve a recording capturing the discussion of classified information with a ghostwriter.  *Compare* ECF No. 85 ¶¶ 34-35 *with Hur Report* at 9-10.

But as the *Hur Report* recognizes, "several material distinctions between Mr. Trump's case and Mr. Biden's are clear." *Hur Report* at 11; *id.* at 250.  Two are particularly salient.  First, Trump, unlike Biden, is alleged to have engaged in extensive and repeated efforts to obstruct justice and thwart the return of documents bearing classification markings, which provides particularly strong evidence of willfulness and is a paradigmatic aggravating factor that prosecutors routinely rely on when making charging decisions.  This distinction precludes Trump from showing that the two men "committed the same basic crime in substantially the same manner."  *Smith*, 231 F.3d at 810.  Second, the evidence concerning the two men's intent—whether they knowingly possessed and willfully retained such documents—is starkly different, as reflected in the *Hur Report*'s conclusion that "the evidence falls short of establishing Mr. Biden's willful retention of the classified Afghanistan documents beyond a reasonable doubt," *Hur Report* at 204 (capitalization altered), which precludes Trump from showing that the evidence against Biden is "as strong or stronger than that against" Trump, *Smith*, 231 F.3d at 810.  Additional distinctions—relating to the volume,

6

sensitivity, and storage of the classified documents—further confirm that the two cases are not "nearly identical" and that there are "legitimate reasons for viewing them differently." *United States v. Brantley*, 803 F.3d 1265, 1272 (11th Cir. 2015).

*Obstructive conduct.*  The investigation into Trump's retention of classified documents began in February 2022, following a protracted period in which he repeatedly resisted NARA's efforts to gain custody over presidential records in his possession, and then returned only a subset of those records—a subset that contained 197 documents bearing classification markings.  ECF No. 85 ¶¶ 7-8.  A federal grand jury issued a subpoena requiring Trump to turn over all documents in his custody or control with classification markings.  *Id.* ¶¶ 7, 53.  In response, Trump "endeavored to obstruct the FBI and grand jury investigations and conceal his continued retention of classified documents" in numerous ways.  *Id.* ¶ 7.  First, Trump "suggest[ed] that his attorney falsely represent to the FBI and grand jury that Trump did not have documents called for by the grand jury subpoena."  *Id.*  Second, Trump "direct[ed] defendant Waltine Nauta to move boxes of documents to conceal them from Trump's attorney, the FBI, and the grand jury."  *Id.*  Third, Trump "suggest[ed] that his attorney hide or destroy documents called for by the grand jury subpoena."  *Id.*  Fourth, Trump "provid[ed] to the FBI and grand jury just some of the documents called for by the grand jury subpoena, while claiming that he was cooperating fully."  *Id.*  Fifth, Trump "caus[ed] a certification to be submitted to the FBI and grand jury falsely representing that all documents called for by the grand jury subpoena had been produced—while knowing that, in fact, not all such documents had been produced."  *Id.*  And sixth, Trump "attempt[ed] to delete security footage at The Mar-a-Lago Club to conceal information from the FBI and grand jury."  *Id.*

These repeated and flagrant obstructive efforts find no analogue in the facts detailed in the *Hur Report*.  To the contrary, the *Hur Report* found that "Biden alerted authorities, turned in

classified documents to the National Archives and the Department of Justice in 2022 and 2023, consented to the search of multiple locations including in his homes, permitted the seizure and review of handwritten notebooks he believed to be his personal property, and in numerous other ways cooperated with the investigation." *Hur Report* at 250.

This key factual distinction—between defiance, deception, and obstruction, on the one hand, and cooperation, on the other—precludes Trump from showing that he and Biden "committed the same basic crime in substantially the same manner." *Smith*, 231 F.3d at 810; *see United States v. Sun Myung Moon*, 718 F.2d 1210, 1230 (2d Cir. 1983) (rejecting selective prosecution claim where, unlike the purported comparators, "this case also involved charges of perjury and obstruction of justice"). Indeed, by retaining a large quantity of highly sensitive materials *and* refusing to return them *and* taking affirmative steps to obstruct the investigation, Trump "in effect selected [himself] for prosecution." *Wayte*, 470 U.S. at 610 ("[T]hose prosecuted in effect selected themselves for prosecution by refusing to register [for the Selective Service] after being reported and warned by the Government."); *see also United States v. Heilman*, 614 F.2d 1133, 1138 (7th Cir. 1980) ("'Aggressively displaying one's antipathy to the . . . system or daring the government to enforce it does not create immunity from, or a defense to, prosecution.'" (quoting *United States v. Stout*, 601 F.2d 325, 328 (7th Cir. 1979) (ellipsis in *Heilman*)).

***Evidence of intent.*** In cases involving the unauthorized possession of documents and other material "relating to the national defense," the key investigative question is often whether the person "willfully retain[ed]" those sensitive materials. 18 U.S.C. § 793(e). That crucial question of intent is typically what "'separate[s] wrongful from innocent acts.'" *Ruan v. United States*, 597 U.S. 450, 458 (2022) (quoting *Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)).

The investigation into Trump's conduct uncovered powerful evidence that he willfully retained the documents charged in the indictment. Although much of that evidence must await trial, the Superseding Indictment alleges that Trump knew the contents of his boxes, having personally collected the materials in them during his Presidency and been "personally involved" in the process of packing them up at the end of his term in office and causing them to be transported to Mar-a-Lago.[4]  ECF No. 85 ¶¶ 25-27, 29, 31.  It further alleges that Trump, on two occasions after his Presidency, showed classified documents to individuals lacking security clearances while commenting on the classified status of the items.  *Id.* ¶¶ 35-36.  Moreover, Trump had reviewed the contents of the 15 boxes containing classified documents that he returned to NARA and knew that he was returning only a small portion of the documents in his possession.  *Id.* ¶¶ 38-49.  The evidence of obstruction, described above, also provides powerful evidence of willful retention, given that Trump engaged in deceptive and obstructive conduct precisely so that he could retain the classified documents that the grand jury had demanded.  After considering this evidence, consistent with the Principles of Federal Prosecution, the Government concluded it could prove Trump's criminal intent beyond a reasonable doubt at trial.  *See* JM § 9-27.220.

The *Hur Report* found the opposite as to Biden.  After an "extensive investigation" involving "173 interviews of 147 witness, including Mr. Biden himself," plus the collection of

---

[4] Trump has since provided additional evidence of his knowing possession and willful retention, publicly claiming that he took the documents with him "openly and transparently," https://truthsocial.com/@realDonaldTrump/posts/109423467465734907, and that he was "RIGHT" to do so, because he made sure to keep "[s]ecured documents in a secured place," https://truthsocial.com/@realDonaldTrump/posts/109686940059084385, thereby confirming that he knew that he had these documents and made the considered decision to retain them.  He has separately made the unsupported claim that, before leaving office, he decided to declassify the documents "by thinking about [them]."   https://www.foxnews.com/transcript/hannity-donald-trump-ny-ag-lawsuit-mar-lago-raid; *see also* https://truthsocial.com/@realDonaldTrump/posts/108917523934541907 ("Lucky I Declassified!").  If he persists in these declassification claims, that, too, would provide additional evidence that he knowingly possessed the documents.

"over seven million documents," *Hur Report* at 28-29, it concluded that "the evidence does not establish Mr. Biden's guilt beyond a reasonable doubt," *id.* at 1.   Trump mischaracterizes its findings by claiming that "Mr. Hur found that President Biden acted 'willfully.'"  Mot. at 21.  In fact, the *Hur Report* found that, while "[t]here is evidence that Mr. Biden willfully retained the classified Afghanistan documents," *Hur Report* at 201 (capitalization omitted), "[t]he evidence falls short of establishing Mr. Biden's willful retention of the classified Afghanistan documents beyond a reasonable doubt," *id.* at 204 (capitalization omitted), given the existence of "at least three defenses likely to create reasonable doubt as to such charges," *id.* at 204, which are each discussed at length, *id.* at 204-222.  *See also id.* at 250 ("Unlike the evidence involving Mr. Biden, the allegations set forth in the indictment of Mr. Trump, if proven, would clearly establish not only Mr. Trump's willfulness but also serious aggravating facts.").  Trump may dispute the *Hur Report*'s conclusions, but he should not be allowed to misrepresent them.  The clear differential in the strength of the evidence on the crucial element of intent precludes Trump from showing that the two men are similarly situated.  *Smith*, 231 F.3d at 811.

**Other relevant distinctions.**  Other distinctions—relating to the volume, sensitivity, and storage of the classified documents—confirm that conclusion.  "'[I]n determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors.'"  *United States v. Venable*, 666 F.3d 893, 901 (4th Cir. 2012) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)); *see United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008).  That examination "is not to be conducted in a mechanistic fashion," since "'[m]aking decisions based on the myriad of potentially relevant factors and their permutations require[s] the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities.'"  *Venable*, 666 F.3d at 901 (quoting *Olvis*, 97 F.3d at 744).

With regard to volume, for example, the *Hur Report* found that Biden possessed 88 documents bearing classification markings, including 18 marked Top Secret.  *See Hur Report* at Appendix A.  By contrast, Trump possessed 337 documents bearing classification markings, including 64 marked Top Secret.  *See* ECF No. 85 ¶¶ 49, 65, 90.

The *Hur Report* also noted that the documents for which charges were most plausible were all "now almost fifteen years old" and involved a single, completed conflict.  *Hur Report* at 219; *see id.* at 253.  By contrast, Trump possessed an array of sensitive documents that were presented to him during his term as President between 2017 and 2021, and they "included information regarding defense and weapons capabilities of both the United States and foreign countries; United States nuclear programs; potential vulnerabilities of the United States and its allies to military attack; and plans for possible retaliation in response to a foreign attack."  ECF No. 85 ¶ 3.

Finally, the *Hur Report* notes that the documents for which charges were most plausible "were found in a box in Mr. Biden's Delaware garage."  *Hur Report* at 3.  That was plainly an unsecured location, *see id.* at 180, and the storage of classified documents there "risked serious damage to America's national security," *id.* at 200.  Whatever risks are posed by storing documents in a private garage, however, are dwarfed by the risks of storing documents at "an active social club" with "hundreds of members" and "more than 150 full-time, part-time, and temporary employees," which, between January 2021 and August 2022, "hosted more than 150 social events, including weddings, movie premieres, and fundraisers that together drew tens of thousands of guests."  ECF No. 85 ¶¶ 5, 11-12.  Those risks are not mitigated by the presence of Secret Service agents, who were "not responsible for the protection of Trump's boxes or their contents," and did not even know that Trump "was storing boxes containing classified documents" there.  *Id.* ¶ 13; *accord Hur Report* at 241 n.930 ("It is not clear that the presence of Secret Service agents

materially enhances the level of protection afforded to classified materials. Agents we interviewed said they focus on the protection of persons, not documents, and they do not monitor the movement of or access to documents.").

Particularly when considered in the aggregate, the volume, sensitivity, and storage of the documents all point in the same direction—that Trump's conduct was more serious—thus confirming that the two cases are not "nearly identical" and that there are "legitimate reasons for viewing them differently." *Brantley*, 803 F.3d at 1272; *see Smith*, 231 F.3d at 812 ("The government can legitimately place a higher priority on prosecuting someone who commits an offense three, six or seven times, than someone who commits an offense once or twice . . . .").

In sum, Trump has not shown that Biden's conduct, as described in the *Hur Report*, makes him a similarly situated comparator for purposes of his selective prosecution claim. His request for dismissal or discovery on these grounds therefore fails at step one.[5]

## B.     Mike Pence

Trump next suggests (Mot. at 5-6, 22) that former Vice President Mike Pence engaged in conduct that was materially indistinguishable from that alleged in this case. According to publicly available information about Pence, the relevant facts do not remotely resemble the allegations against Trump. On January 16, 2023, and in the wake of press reports that classified documents had been found in President Biden's personal residence, Pence, acting "out of an abundance of caution," hired attorneys "with experience in handling classified documents" to search his personal

---

[5] The existence of the *Hur Report* also makes Trump's reliance on Biden as a basis for discovery particularly misplaced. This is not a case in which a defendant points to the absence of charges against a similarly situated comparator and asks the court to permit discovery to explore whether the disparate treatment was grounded in an improper purpose. Instead, this is a case in which an exhaustive report details precisely why the purported comparator was not prosecuted, foreclosing the need to discover the basis for that decision.

home.  Letter from Greg Jacob to NARA (Jan. 18, 2023).[6]  After those attorneys found "a small number of documents that could contain sensitive or classified information," Pence "immediately secured those documents in a locked safe" and "directed" that his representatives collaborate with NARA to "ensure their prompt and secure return."  *Id.*  The FBI retrieved the documents on January 19, 2023, the day after Pence's representative alerted NARA.  Letter from Greg Jacob to NARA (Jan. 22, 2023).[7]  "[R]oughly 12 classified documents" were found by Pence's attorneys, "includ[ing] materials described as background briefing memos that were prepared for Pence's foreign trips," and for which the classification markings were reportedly "on the 'lower level.'"[8]  Four days later, Pence's representative "personally deliver[ed]" to NARA four boxes found in Pence's home that appeared to contain materials from Pence's Vice Presidency.  Letter from Greg Jacob to NARA (Jan. 22, 2023).  Pence also agreed to an FBI search of his home, which took place on February 10, 2023, and uncovered one "document with classified markings" and "six additional pages without such markings" (quotation marks omitted).[9]  On June 1, 2023, the Department of Justice notified Pence that it would not pursue criminal charges in connection with the discovery of the classified documents.[10]

Those facts bear no salient similarities to the allegations against Trump.  Acting on his own initiative to identify any improper retention of official records, Pence retained counsel specially

---

[6] https://www.archives.gov/files/foia/greg-jacob.01-18-2023-ltr-to-archives.re-pence-pra-records.pdf.

[7] https://www.archives.gov/files/foia/greg-jacob.01-22-2023-ltr-to-archives-re-pence-pra-records.pdf.

[8] https://www.cnn.com/2023/01/25/politics/pence-classified-documents-briefing-memos-foreign-trips/index.html.

[9] https://www.cnn.com/2023/02/10/politics/mike-pence-house-fbi-search/index.html.

[10] https://www.pbs.org/newshour/politics/justice-department-wont-bring-charges-over-classified-documents-found-at-pences-home.

trained in the handling of classified materials to search his property; secured classified documents once they were found; promptly alerted NARA about the discovery and directed his representatives to work with NARA to return the documents; arranged for his representative to promptly return four boxes of records; and consented to a search of his personal home less than a month after his initial discovery of classified materials.  Apparently fewer than 15 documents bearing classified markings were found, and the majority (if not all) of those appear not to have carried a high level of classification.  Pence is therefore not similarly situated to Trump.  *See Smith*, 231 F.3d at 809.

### C.      Bill Clinton

Trump next names (Mot. at 6-7, 22-23) former President Bill Clinton as another alleged comparator for his selective prosecution claim.  As discussed in the Government's response (ECF No. 373 at 14-16) to Trump's motion to dismiss based on the Presidential Records Act, Clinton "enlisted historian Taylor Branch to assist him in creating 'an oral history of his eight years in office.'"  *Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 290 (D.D.C. 2012).  Clinton intended that project to be an oral "diary."  *See* Taylor Branch, *The Clinton Tapes: Wrestling History with the President* 36 (Simon & Schuster 2009) 1, 36.  And when Judicial Watch sought access to the resulting tapes years after Clinton's presidency ended, NARA responded by noting in part that it did not have custody of the tapes and did not believe that they fell "'within the ambit of the PRA,'" after considering "'the nature of the audio tapes, if they were created with the intent of their use as government materials, and whether or not they were circulated within the Administration or relied on as policy documents.'"  *Judicial Watch*, 845 F. Supp. 2d at 293; *see* 44 U.S.C. § 2201(3)(A) (defining "personal records" to include "diaries, journals or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business").  The district court dismissed

14

Judicial Watch's suit, brought under the Administrative Procedure Act, concluding that even if it agreed with Judicial Watch's "questionable characterization" of the recordings as presidential records, the court did not have the authority to compel NARA to exercise its discretion under the PRA to commence proceedings to recover the records. 845 F. Supp. 2d at 302.

Trump speculates (Mot. at 6-7) that, because the tapes "captured a verbatim record of President Clinton *being* President," including by discussing foreign policy, *see id.* at 290 & n.1, they may have contained information "relating to the national defense," within the meaning of Section 793(e). But Clinton's taped diaries are far different from the reams of highly classified documents that Trump is charged with retaining, and there is no suggestion that Clinton engaged in similar obstructive acts. He is not a similarly situated comparator.

### D.   Hillary Clinton

Trump next suggests (Mot. at 7-10) that Former Secretary of State Hillary Clinton is a similarly situated comparator for purposes of his selective prosecution motion. As detailed in a June 2018 Report by the DOJ Office of the Inspector General (DOJ-OIG), Clinton, while serving as Secretary of State, "used private email servers . . . to conduct official State Department business." DOJ-OIG, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* (June 2018) ("DOJ-OIG Review"), at 37. After receiving a referral from the Intelligence Community Inspector General, the FBI opened a criminal investigation to "determine the extent of classified information on former Secretary Clinton's private server, who was responsible for introducing the information into an unclassified system, and why it was placed there." *Id.* at 40.[11]

---

[11] In his 2016 campaign, Trump called for charges to be brought against Clinton for this conduct, emphasizing that "We can't have someone in the Oval Office who doesn't understand the

After reviewing the evidence uncovered in the investigation, "prosecutors analyzed the conduct of former Secretary Clinton . . . under five statutes," including 18 U.S.C. §§ 793(d), (e), and (f), but "concluded that there was not a basis to prosecute former Secretary Clinton, her senior aides, or others under any of these statutes." *Id.* at 254.  That conclusion followed from several "critical" findings, including that "[n]one of the emails contained clear classification markings"; "[o]nly three email chains contained any classification markings of any kind," and somewhat ambiguous ones at that; "[t]here was no evidence that . . . former Secretary Clinton believed or [was] aware at the time that the emails contained classified information"; "[t]he emails in question were sent to other government officials" and there was no evidence "that any individual ever contemporaneously conveyed" concerns about her email practices to her; and "[t]here was no evidence that Clinton . . . had knowledge that classified information would be communicated or retained on" her private servers or email account.  *Id.* at 255.

Agents and prosecutors also investigated the deletion of 31,830 emails that Clinton's attorneys had not produced to the State Department, deeming them "personal in nature." *Id.* at 72.  After producing the work-related emails to the State Department, Clinton's attorneys asked an employee of "the company that managed Clinton's server [] to remove the emails from their own laptops and modify the server's email retention period so that emails older than 60 days would not be retained."  *Id.*  The employee used a commercially available program called BleachBit to remove Clinton's emails from the attorneys' laptops, but he initially neglected to change the server's email retention policy.  *Id.* at 78-79.  The employee "realized his mistake in March 2015," after learning of a congressional subpoena for the unproduced emails.  *Id.*  At that point, "he 'had

---

meaning of the word confidential or classified," and promising, "In my administration I'm going to enforce all laws concerning the protection of classified information.  No one will be above the law."  ECF No. 85 ¶ 23.

an "oh shit" moment' and wiped" the archived emails from the company's server using BleachBit, although the FBI was later able to recover some of the deleted emails. *Id.* The employee spoke to investigators and prosecutors under an immunity agreement and explained that he had deleted the emails of his own volition without being directed by (or even informing) Clinton or her attorneys. *Id.* at 107. "In sum, [the employee] took responsibility for the deletions, without implicating Clinton or her attorneys," and the investigators and prosecutors who attended his interview found his statements to be credible. *Id.*

In short, Clinton did not "commit[] the same basic crime in substantially the same manner" as Trump, *Smith*, 231 F.3d at 810, and the evidence against her was not "as strong or stronger than that against" Trump, *id.* at 811. He cannot show that she is a similarly situated comparator.[12]

### E.      James Comey

Trump next invokes (Mot. at 10-11, 23) former FBI Director James Comey as a putatively similarly situated comparator. According to the DOJ-OIG, Comey, while serving as the FBI Director, authored seven memoranda addressing separate interactions with Trump between January and April 2017, when Trump was President-Elect or President. DOJ-OIG, *Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda* 1 (August 2019). Comey believed that two of the memos (Memo 1 and Memo 3) contained classified information, and he

---

[12] As with the *Hur Report*, *see supra* n.1, the existence of the DOJ-OIG Review makes Trump's reliance on Hillary Clinton as a comparator a particularly poor basis for seeking discovery. The DOJ-OIG Review "analyzed the Department's decision to decline to prosecute former Secretary Clinton . . . to determine whether the declination decision was based on improper considerations, including political bias." DOJ-OIG Review at 260-61. In doing so, DOJ-OIG "found that the prosecutors' decision was based on their assessment of the facts, the law, and past Department practice," and it "did not identify evidence of bias or improper considerations." *Id.* As such, there is no basis for Trump to request discovery to determine whether the different prosecutorial decisions were grounded in bias or improper considerations.

treated them accordingly. *Id.* at 17-19, 22-23. He took four other memos (Memos 2, 4, 6, 7) home with him, believing that they contained no classified information, *id.* at 28, and that they constituted "personal documents" similar to a diary or a "personal aide-mémoire" because they contained his recollection of meetings with Trump. *Id.* at 52. Shortly after Trump removed Comey as FBI Director on May 9, 2017, Comey shared these four memos with his personal attorney. *Id.* at 37. Comey also sent to a friend a copy of Memo 4, which documented a conversation in which Trump said that "he 'hope[d]' Comey could 'see [his] way clear to letting'" National Security Advisor Mike Flynn "'go,'" which Comey understood to be an attempt by Trump to "request[] that [the FBI] drop any investigation of Flynn in connection with false statements about his conversations with the Russian ambassador in December.'" *Id.* at 24. Following a classification review that determined that portions of four of the memos (Memos 1, 2, 3, and 7) contained information classified as secret or confidential, *id.* at 1, 10-12, Comey and the attorney returned the memoranda to the FBI, *id.* at 48-51. Those facts do not include the type of allegedly obstructive behavior, culpable mental state, or volume of highly sensitive documents at issue here.

### F.    David Petraeus

Trump next offers (Mot. at 11, 23) former Army four-star general and CIA Director David Petraeus as a comparator. While in Afghanistan, Petraeus "maintained bound, five-by-eight-inch notebooks that contained his daily schedule and classified and unclassified notes he took during official meetings, conferences, and briefings." Def. Ex. 8 at 9. Petraeus later allowed his biographer to review these notebooks, which "contained national defense information, including Top Secret//SCI and code word information." *Id.* at 9-11. After he resigned as CIA director, "the FBI executed a court-authorized search warrant at" Petraeus's home and seized the notebooks. *Id.* at 12. Petraeus later falsely denied that he had provided classified information to his biographer

or allowed her to review his notebooks.  *Id.* at 13.  The government advised Petraeus that they were considering felony charges against him, but he ultimately pleaded guilty to an information charging him with violating 18 U.S.C. § 1924.  *Id.*; *see* Adam Goldman, *How David Petraeus Avoided Felony Charges and Possible Prison Time*, Wash. Post (Jan. 25, 2016).[13]

There are many distinctions between Petraeus's notebook possession and Trump's conduct, which involves the willful possession of hundreds of classified documents and a multi-faceted scheme to obstruct justice, involving a false certification to the grand jury and attempts to destroy evidence.  And far from supporting Trump's selective prosecution claim, the Petraeus example shows that the Department of Justice has previously found it appropriate to investigate (including through the use of search warrants), prosecute, and consider felony charges against, high-ranking government officials who improperly retain or disclose classified information.

## G.     Samuel "Sandy" Berger

Trump next lists (Mot. at 12, 23) former National Security Advisor Sandy Berger as a similarly situated comparator.  In 2003, Berger visited NARA's office to review presidential records from the Clinton administration.  Def. Ex. 9 at 1-2.  Over the course of two visits, Berger removed five "copies of versions of the same [classified] document," storing them at his office, "which he knew was a location that was not authorized for the storage of classified documents," and later shredding and discarding three of the copies.  *Id.*  When NARA first approached him, Berger "initially . . . did not tell NARA that he had taken the documents."  *Id.*  Later that night, however, Berger "told NARA that he had accidentally misfiled the documents and had found two."  *Id.*  The next day, Berger returned the two documents that had not been destroyed.  *Id.*  For this

---

[13] Section 1924 was a misdemeanor offense until January 19, 2018, when then-President Trump signed into law Pub. L. 115-118, Title II, § 202, which increased the maximum penalty from one year to five years.  132 Stat. 19.

conduct, Berger pleaded guilty to an information charging him with violating 18 U.S.C. § 1924. *Id.* Berger's conduct was vastly less egregious than Trump's, and the fact that it resulted in criminal charges (resolved via guilty plea) undercuts his claim of selective prosecution.

### H.    John Deutch

Trump next relies (Mot. at 12-13, 23) on the example of former CIA director John Deutch, who used unclassified computers to process his journal, which contained classified information, resulting in investigations by the Inspectors General of the CIA and the Department of Defense. Def Exs. 10, 11.  Although this conduct "was extremely risky in that a computer 'hacker' could have gained on-line access to Dr. Deutch's computer," Def. Ex. 11 at 2, a forensic examination found "'no clear evidence' that a compromise had occurred," Def. Ex. 10 at 33.  Deutch reportedly had agreed to plead guilty to violating 18 U.S.C. § 1924, but he received a presidential pardon before the plea was entered.  *See* Bill Miller & Walter Pincus, *Deutch Had Signed Plea Agreement, Sources Say*, Wash. Post (Jan. 23, 2001).  Trump's willful retention of hundreds of classified documents and his obstruction of justice plainly distinguish his conduct from Deutch's.  And again, the fact that prosecutors were prepared to obtain a criminal conviction against a high-ranking government official for conduct vastly less egregious than Trump's belies his narrative that there is something suspicious or improper about the charges here.

### I.    Deborah Birx

Finally, Trump relies (Mot. at 13) on documents produced in discovery to speculate that Deborah Birx, who served as the White House Coronavirus Response Coordinator during Trump's administration, could be a similarly situated comparator.  But those documents merely note that NARA retrieved "PRA materials from Dr. Birx," Def. Ex. 12, and then "found a classified document in the mix" while scanning those materials, Def. Ex. 13.  There is no indication that Birx

even knew that she possessed the classified document she returned to NARA, much less that she ever willfully retained it, thwarted NARA's efforts to collect it, or attempted to obstruct justice.

* * *

In sum, Trump has failed to identify any person who qualifies as a similarly situated comparator.  His request for discovery or dismissal on the basis of selective prosecution can and should be denied on this basis alone.  *See Cannon*, 987 F.3d at 939.

### III.    Trump Fails to Satisfy the Second Prong of a Selective Prosecution Claim or Show Actual Vindictiveness

To both satisfy the second prong of his selective prosecution claim and establish a claim of actual vindictiveness, Trump relies on a newspaper article and a series of public statements.  In his view, these materials show, "[w]ith respect to selective prosecution," that "this case has been brought based on impermissible considerations relating to President Trump's candidacy and First Amendment-protected speech relating to his campaign."  Mot. at 16.  They likewise show, he insists, that "[t]he prosecution is 'vindictive' because it has been brought in an effort to punish President Trump for exercising those rights on behalf of the American people."  *Id.*  The materials on which he relies show no such thing.

Notably, Trump does not contend that the Special Counsel himself was motivated by improper considerations, which would normally be fatal to his claims, as they require a showing of improper purpose on behalf of the prosecutorial decisionmaker, *see Jordan*, 635 F.3d at 1188.  To avoid this problem, Trump sketches out a theory in which the Special Counsel "'was prevailed upon to bring the charges by another'—evidently referring to Biden—"with animus such that the prosecutor could be considered a 'stalking horse.'"  Mot. at 18 (quoting *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000)); *see* ECF No. 300 at 5 (referring to "the Biden Administration's

use of [the Special Counsel] as a puppet").  That conspiratorial narrative of bias and abuse has no basis in evidence, let alone the sort of clear, objective evidence required here.

Trump's "stalking horse" theory apparently rests on the following "evidence."  First, "[i]n April 2022, the Biden Administration leaked to the *New York Times* President Biden's view that President Trump 'should be prosecuted' and his instruction that Attorney General Garland should 'take decisive action.'"  Mot. at 17 (quoting ECF No. 262-1 at Def. Ex. 62).  Then, in September 2022, following the execution of the search warrant at Mar-a-Lago, Biden "characterized the circumstances" surrounding Trump's possession of classified documents "as 'totally irresponsible,' ask[ing] '[h]ow that could possibly happen[?],' and express[ing] concern about '[w]hat data was in there that may compromise sources and methods?'"  *Id.* at 17-18 (citing *Hur Report* at 7).  Then, seven months later, Biden, in remarks that (according to Trump) "were plainly timed based on rumors of President Trump's candidacy," "declared . . . that he was 'making sure' President Trump 'will not take power' and 'does not become the next President again.'"  *Id.* at 18.

In sum, Trump appears to contend that it was President Biden who actually made the decision to seek the charges in this case; that Biden did so solely for unconstitutional reasons; and that this decision was somehow foisted on the Special Counsel through a newspaper article, a press conference, and an interview that each preceded the Special Counsel's appointment.  That theory finds no support in evidence or logic.  Indeed, the very sources Trump relies on undercut his claim.

The April 2022 newspaper article, for example, is unrelated to this case, and discusses prosecutions arising out of the January 6, 2021 assault on the Capitol.  But even if taken at face value, the article undermines any claim that Biden was involved in investigative and prosecutorial decisions.  The article emphasizes that the Attorney General "and the career prosecutors working on the case felt only the pressure 'to do the right thing,' which meant that they 'follow the facts

and the law wherever they may lead'"; that "Justice Department officials do not keep Mr. Biden abreast of any investigation"; that Biden and the Attorney General "have less contact than some previous presidents and attorneys general, particularly Mr. Trump and his last attorney general, William P. Barr"; that Biden "came to his job as president with a classical, post-Watergate view of the department—that it was not there to be a political appendage"; and that when Biden had previously stated publicly that other defendants should be prosecuted, the Department had responded by noting that it "'will make its own independent decisions in all prosecutions based solely on the facts and the law.  Period.  Full stop.'" ECF No. 262-1 at Def. Ex. 62.  The article undermines the claim that Biden used the press to direct a not-yet-appointed Special Counsel to seek an indictment approximately a year later based in part on events that had not yet occurred.

Trump's contention (Mot. at 17-18) that Biden sought to influence the course of this investigation through comments made during a September 2022 interview is likewise unavailing. In that interview, Biden was asked about his reaction to seeing a public photograph from the search of Mar-a-Lago in August 2022.[14]  After describing his reaction, Biden explained that he had not been briefed on the documents "found at Mar-a-Lago"; that he had not been notified "ahead of time" of the execution of the search warrant; and that he had "not asked for the specifics of those documents because I don't want to get myself in the middle of whether or not the Justice Department should move or not move on certain actions they could take," since "I agreed I would not tell them what to do and not, in fact, engage in telling them how to prosecute or not."  *Id.* Those statements again undermine Trump's baseless claim that Biden has directed the prosecutorial decisionmaking in this case.

---

[14] https://www.cbsnews.com/news/president-joe-biden-60-minutes-interview-transcript-2022-09-18/.

The same is true of the November 2022 press conference upon which Trump relies.  Mot. at 18.  There, Biden described discussions at a G7 summit in which foreign leaders had expressed concerns, in light of the events of January 6, 2021 whether the United States was a "stable" democracy where "rules and the institutions matter."[15]  A reporter asked Biden how he would "reassure" allies that Trump would not "once again take power in the United States," and he responded, "Well, we just have to demonstrate that he will not take power by—if we—if he does run.  I'm making sure he, under legitimate efforts of our Constitution, does not become the next President again."  *Id.*  No fair reading of that exchange could construe it as evidence that Biden was directing the Special Counsel (who had still not yet been appointed) to bring charges in this case, or any other case, let alone that the Special Counsel sought an indictment as a result.

Trump's effort (Mot. at 18) to find impropriety in a recent interview by the Attorney General likewise fails.  There, the Attorney General emphasized that the Department of Justice "follows the facts and the law wherever they lead"; that "politics is not a part of our determination, since it would be improper"; and that the Department has followed the regulations providing prosecutorial independence to the Special Counsels he had appointed.[16]  When asked whether "the federal cases against Trump should have been brought sooner," he responded, "The prosecutor has urged speedy trials, with which I agree," and it is "now in the hands of the judicial system."  *Id.*

In sum, Trump has not presented evidence substantiating his "stalking horse" theory and has fallen woefully short of the requirements for supporting a finding of discriminatory purpose. He presents no evidence whatsoever tending to show that Biden's comments about him had any

---

[15]  https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/11/09/remarks-by-president-biden-in-press-conference-8/.

[16]  *See video at* https://www.cnn.com/2024/01/19/politics/merrick-garland-trump-speedy-trial/index.html.

bearing on the Special Counsel's decision to seek charges, much less that the Special Counsel is a "stalking horse." *See United States v. Avenatti*, 433 F. Supp. 3d 552, 574-75 (S.D.N.Y. 2020) ("Acknowledging the animosity between Avenatti and President Trump, Avenatti has not proffered evidence suggesting that this prosecution was initiated at President Trump's behest . . . ."). Indeed, the evidence that he has presented undercuts his claims, as it repeatedly emphasizes that the prosecutorial decisions made by the Department generally—and the Special Counsel specifically—have been made on the basis of the facts and the law. The Attorney General appointed the Special Counsel to ensure prosecutorial independence. The Special Counsel and the career prosecutors in his Office have faithfully carried out their duties in this case, and the indictment is the result of a thorough and impartial investigation guided by the facts and law.

## CONCLUSION

Trump has failed to make a showing sufficient to entitle him even to discovery, much less dismissal, on his claims of selective and vindictive prosecution. His motion should be denied.


Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:    /s/ *Jay I. Bratt*
Jay I. Bratt
Counselor to the Special Counsel
Special Bar ID #A5502946
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

David V. Harbach, II
Assistant Special Counsel
Special Bar ID #A5503068

John M. Pellettieri
Assistant Special Counsel
Special Bar ID #A5503076

Cecil W. VanDevender
Assistant Special Counsel
Special Bar ID#5503075

March 7, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *Jay I. Bratt*
Jay I. Bratt