UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-801010-CR-CANNON/REINHART

UNITED STATES OF AMERICA,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVIERA,

          **Defendants.**
_____/

**DEFENDANT WALTINE NAUTA'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR SELECTIVE AND VINDICTIVE PROSECUTION**

Defendant Waltine Nauta, by and through the undersigned counsel, and pursuant to Federal Rule of Criminal Procedure Rule 12(b)(3)(A)(iv), hereby respectfully requests this Court dismiss the Superseding Indictment.  *See* Superseding Ind. (July 27, 2023) (ECF No. 85).  For the reasons discussed herein, the decision of the Special Counsel's Office ("SCO") to prosecute Mr. Nauta was both selective and vindictive.  Alternatively, should the Court determine that more discovery is necessary to properly inquire as to Mr. Nauta's selective and vindictive prosecution claims, Mr. Nauta further requests that this Court compel the SCO to provide the necessary records related to these grounds for dismissal.  *See United States v. Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *15 (S.D. Fla. May 20, 2010).

**I.**    **BACKGROUND**

Mr. Nauta is a former U.S. Navy veteran who was stationed at the White House during the 45th Presidential Administration, where he served as a valet to Former President Donald J. Trump. Superseding Ind. at ¶ 9 (July 27, 2023) (ECF No. 85).  Following Former President Trump's administration and Mr. Nauta's service in the U.S. Navy, Mr. Nauta was hired by The Office of

1

Donald J. Trump as an executive assistant, where he serves as a "personal aide" or "body man." *Id.*

Throughout his presidency, former President Trump "gathered newspapers, press clippings, letters, notes, cards, photographs, official documents, and other materials in cardboard boxes that he kept at in the White House." *Id.* at ¶ 2. In those cardboard boxes, Former President Trump allegedly stored classified documents, among them containing information concerning to U.S. national defense whose "unauthorized disclosure…could put at risk the national security of the United States…". *Id.* at ¶ 3. Upon the conclusion of Former President Trump's tenure as President of the United States on January 20, 2021, Former President Trump moved from the White House to his personal residence at the Mar-a-Lago Club ("Mar-a-Lago") in West Palm Beach, Florida. *Id.* at ¶ 4. Former President Trump's move from the White House to Mar-a-Lago included the moving of "scores of cardboard boxes" alleged to have contained classified documents. *Id.* Between January 2021 and August 2022, the cardboard boxes from the White House purporting to have contained classified documents were stored in various locations at Mar-a-Lago. *Id.* at ¶ 5.

A. The Movement and Location of the Cardboard Boxes

These cardboard boxes were allegedly stored in the White and Gold Ballroom of Mar-a-Lago from Former President Trump's return in January 2021 until March 15, 2021, when Mr. Nauta alleged transferred the boxes from the White and Gold Ballroom to Mar-a-Lago's business center. *Id.* at ¶¶ 26-27. Thereafter, on April 5, 2021, two employees of the Office of Donald J. Trump discussed moving the boxes from the business center to the Lake Room of Mar-a-Lago, where the boxes were eventually moved to the Lake Room, where they were stored in a bathroom and a shower. *Id.* at ¶¶ 28-30. In May 2021, Former President Trump allegedly directed that a storage room on the ground floor of the Mar-a-Lago Club ("Storage Room") be cleaned out so that the boxes could be stored there; at the same time, the National Archives and Records

Administration ("NARA") requested that Former President Trump return the presidential records he allegedly kept beyond his presidency. *Id.* at ¶ 38. Beginning in June 2021, NARA warned various representatives of Former President Trump that if he did not return the presidential records alleged to be in his possession, NARA would refer to the Department of Justice. On June 24, 2021, the boxes from the Lake Room were allegedly moved to the Storage Room. *Id.* at ¶ 31. The Superseding Indictment alleges that more than 80 boxes were stored in the Storage Room of Mar-a-Lago. *Id.* at ¶ 31.

On or about November 2021 and January 2022, Mr. Nauta and "Trump Employee 2" were alleged to have brought boxes from the Storage Room to Former President Trump's Mar-a-Lago residence, containing an entry room called, "Pine Hall," for Former President Trump's review. *Id.* at ¶ 39. Notably, on December 7, 2021, Mr. Nauta allegedly returned to the Storage Room to find that several of Former President Trump's boxes had fallen over and its contents spilled onto the floor of the Storage Room, including a document bearing classification label that read, "SECRET//REL TO USA, FVEY." *Id.* at ¶ 32. Mr. Nauta allegedly took two photographs of the fallen boxes and spilled documents and texted those photos to "Trump Employee 2," in which the classified marking was visible in one of those two photos. *Id.*

On or about December 29, 2021, and until January 17, 2022, Mr. Nauta, Trump Representative 1, and Trump Employee 2 allegedly conferred with one another with to coordinate Former President Trump's and Trump Employee 1's review of the documents in an effort to respond to the demand from NARA. *Id.* at ¶¶ 39-48. On January 17, 2022, Mr. Nauta and Trump Employee 2 allegedly gathered 15 boxes from Former President Trump's residence at Mar-a-Lago, loaded those 15 boxes into Mr. Nauta's car. *Id.* at ¶ 48. Thereafter, Mr. Nauta allegedly drove his car containing the 15 boxes to a commercial delivery truck for delivery to NARA. *Id.* NARA's

review of the contents of these 15 boxes allegedly revealed that 14 of those boxes contained "documents with classified markings." *Id.* at ¶ 29.

### B. The FBI and Federal Grand Jury Investigations

Following its review of the returned boxes, NARA referred the classified discovery of these boxes to the Department of Justice for further investigation on February 9, 2022, which the initiated the Federal Bureau of Investigation's ("FBI") criminal investigation into the matter on March 30, 2022. *Id.* at ¶ 50-51; *see also id.* at ¶ 7. On April 26, 2022, a federal grand jury opened an investigation into the same. *Id.* at ¶ 52. On May 11, 2022, the grand jury issued a subpoena to The Office of Donald J. Trump ("May 11 Subpoena") which sought the production of "all documents with classification markings in the possession, custody, or control of Trump or The Office of Donald J. Trump." *Id.* at ¶ 53. With counsel present, Mr. Nauta provided a voluntary interview with the FBI on May 26, 2022, in which they discussed the 15 boxes Former President Trump provided to NARA earlier that year. *Id.* at ¶ 110; *see also* Ex. 10 (FBI 302 of W. Nauta Interview on May 26, 2023) (Oct. 19, 2023). Mr. Nauta also testified before a federal grand jury in the District Court for the District of Columbia on June 21, 2022. *See generally* Ex. 11 (W. Nauta Grand Jury Tr.) (June 21, 2022) (USA-00809047). On August 8, 2022, the FBI executed a court-authorized search warrant to seize things from the Mar-a-Lago Club. Superseding Ind. at ¶ 97 (ECF No. 85) (July 27, 2023).

### C. Mr. Nauta's Participation in the Investigation Before Indictment

Mr. Nauta retained the undersigned defense counsel, Stanley Woodward on August 3, 2022, for representation regarding the ongoing federal grand jury investigation. On November 28, 2022, the FBI obtained a search and seizure warrant from a judge in the Southern District of Florida for two of Mr. Nauta's iPhones, commanding that the warrant be executed by December 12, 2022. *See* Exs. 1 and 10 (W. Nauta Search Warrant) (Nov. 28, 2022). On November 29, 2022, at

4

10:37AM, the FBI executed that search warrant for Mr. Nauta's phones. *See* Ex. 2 (FBI Receipt for Property as to W. Nauta) (Nov. 29, 2022). On November 29, 2022, at 10:40AM – curiously *after* the FBI executed the warrant against Mr. Nauta – Mr. Woodward was advised of its execution via an email from Mr. Michael Thakur, an Assistant United States Attorney for the Southern District of Florida. Ex. 3 at 2 (S. Woodward/M. Thakur Email Correspondence) (Nov. 29, 2022). Mr. Woodward promptly responded to Mr. Thakur and requested that the FBI hold off on searching Mr. Nauta's seized device until the parties could "agree on appropriate filter protocol for any applicable privileges" to be able to seek "appropriate temporary relief." *Id.* at 1.

Mr. Woodward did not again correspond with the government as it pertained to Mr. Nauta until May 8, 2023, when Mr. David Raskin, Assistant Special Counsel emailed Mr. Woodward. *See* Ex. 4 (S. Woodward/D. Raskin Email Correspondence) (May 8, 2023). In his email, Mr. Raskin states that it "[w]ould be good to chat [with Mr. Woodward]" and asked if Mr. Woodward would have time in the following day to "grab a coffee or something." *Id.* Mr. Woodward, under the impression that the encounter would be amicable insofar as its scope would pertain to Mr. Nauta's ongoing cooperation in the ongoing federal investigation, agreed to meet with Mr. Raskin. *See* Ex. 5 at 1 (S. Woodward/M. Thakur Email Correspondence) (May 9, 2023). On May 9, 2023, Mr. Woodward and Mr. Raskin met and discussed. As a follow-up to their meeting, Mr. Raskin emailed Mr. Woodward on May 22, 2023, in which he informed Mr. Woodward to expect a target letter as to Mr. Nauta, which Mr. Raskin noted was "[p]retty self-explanatory and consistent with [their] conversation." *Id.* On May 24, 2023, at 12:46AM, Mr. J.P. Cooney, Deputy Special Counsel, sent an email to Mr. Woodward attaching a target letter regarding the SCO's investigation into possible federal criminal violations of Mr. Nauta dated May 23, 2023. *See* Exs. 6 (S. Woodward/D. Raskin Email Correspondence (May 8-9 and 22, 2023) and 7 (W. Nauta SCO Target

5

Letter) (May 23, 2023). In particular, the target letter the investigation of Mr. Nauta focused on possible violations of 18 U.S.C. §§ 1001, 1512, and 1519. *See* Ex. 8 at 1 (W. Nauta SCO Target Letter) (May 23, 2023). On June 8, 2023, Messrs. Jay Bratt, Counselor to the Special Counsel) and David Harbach emailed Mr. Woodward the judicial summons for Mr. Nauta's initial arraignment scheduled for June 13, 2023 at 3:00pm. Ex. 9 at (S. Woodward/J. Bratt, D. Harbach Email Correspondence) (June 8-9, 2023).

D. <u>Indictment</u>

A federal grand jury in the Southern District of Florida indicted Mr. Nauta on June 8, 2023 (ECF No. 3), which was then superseded on July 27, 2023 (ECF No. 85). The Superseding Indictment alleges that Former President Trump and Messrs. Nauta and De Oliveira are alleged to have knowingly engaged in a conspiracy to obstruct justice in an effort for Former President Trump to keep the classified documents taken from the White House during his presidency and to hide and conceal those documents from a federal grand jury for their conduct after the May 11 Subpoena was issued. Superseding Ind. at ¶¶ 95-96. As it pertains to Mr. Nauta, the Superseding Indictment charges Mr. Nauta with the following: participating in a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k) (Count 33); withholding a document or record in violation of 18 U.S.C. §§ 1512(b)(2)(A) and 2 (Count 34); corruptly concealing a document in a federal investigation in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Count 35); concealing a document in a federal investigation in violation of 18 U.S.C. §§ 1519 and 2 (Count 36); participating in a scheme to conceal in violation of 18 U.S.C. §§ 1001(a)(2) and 2 (Count 37); making false statements and representation in violation of 18 U.S.C. § 1001(a)(2) (Count 39); altering, destroying, mutilating, or concealing an object in violation of 18 U.S.C. §§ 1515(b)(2)(B) and 2 (Count 40); corruptly altering, destroying, mutilating, or concealing a document, record, or other object in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Count 41). *See generally id.*

## II. LEGAL STANDARD

The Federal Rules of Criminal Procedure require that a defendant raising any defenses, objections, and requests regarding defects with respect to the initiation of his prosecution – including selective and/or vindictive prosecution – be brought before the court before trial. Fed. R. Crim. P. 12(b)(3)(A)(iv). Accordingly, "[t]he dismissal of an indictment on the ground of prosecutorial misconduct is a discretionary call which the Court of Appeals reviews for an abuse of discretion." *United States v. Kopp*, No. 6:17-cr-159-PGB-DCI, 2022 U.S. Dist. LEXIS 175175, at *13-14 (M.D. Fla. Sep. 23, 2022) citing *United States v. Jones*, 601 F.3d 1247, 1260 (11th Cir. 2010). Thus, where a defendant fails to raise this defense before trial, he waives the defense. Fed. R. Crim. P. 12(e).

Prosecutors "must exercise their charging discretion within constitutional constraints, including those imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) (citations omitted). Moreover, the Due Process Clause aims to a prosecution decision "may not be based on an unjustifiable standard . . . or arbitrary classification." *Id.* In other words, "the decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,'…including the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up).

### A. Selective Prosecution

"In order to establish unconstitutional selective prosecution, the claimant must show [1] that the prosecution has a discriminatory effect and [2] that it was motivated by a discriminatory purpose." *United States v. Emmanuel*, 2007 WL 9705934, at *2 (S.D. Fla. July 3, 2007) (cleaned up). "The first prong, discriminatory effect, is demonstrated by a showing that similarly situated individuals were not prosecuted for the same crime." *Id.* (cleaned up). "[A] 'similarly situated'

7

person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant." *Smith*, 231 F.3d at 810. "The second prong, discriminatory purpose, is demonstrated by a showing that the decision to prosecute was invidious or in bad faith." *Emmanuel*, 2007 WL 9705934, at *2 (cleaned up). This includes prosecutions "predicated on a constitutionally impermissible motive, such as on the basis of race or religion, or in retaliation for her exercise of constitutional rights." *United States v. Ndiaye*, 434 F.3d 1270, 1288 (11th Cir. 2006). Relatedly, "[a] defendant may obtain discovery in support of a selective prosecution claim where the defendant provides some evidence tending to show the existence of the essential elements of the defense." *Williams*, 684 F. App'x at 777 (cleaned up).

    A.    <u>Vindictive Prosecution</u>

"The government violates a defendant's due process rights when it vindictively seeks to retaliate against him for exercising his legal rights." *United States v. Schneider*, 853 F. App'x 463, 469 (11th Cir. 2021). "Vindictiveness in this context means the desire to punish a person for exercising his rights." *United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006) citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982). In other words, a defendant establishes "actual vindictiveness by showing 'objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do.'" *United States v. Davis*, No. 8:14-cr-191-T-36TBM, 2015 U.S. Dist. LEXIS 13256, at *4 (M.D. Fla. Feb. 4, 2015) citing *United States v. Goodwin*, 457 U.S. 368, 384 (1982).

"A defendant can establish actual prosecutorial vindictiveness if he can show that the government's justification for a retaliatory action is pretextual." *Schneider*, 853 F. App'x at 469. "To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant

would not have been prosecuted but for that animus." *United States v. Simbaqueba Bonilla*, 2010 WL 11627259, at *5 (S.D. Fla. May 20, 2010) (cleaned up).  At the pre-trial stage, courts are instructed to evaluate the "'realistic likelihood of vindictiveness' in a particular factual situation…and to determine whether any facts make a presumption of vindictiveness proper." *United States v. Barner*, 441 F.3d 1310, 1317 (11th Cir. 2006) (cleaned up) ("[I]n a pre-trial situation, presumption of vindictiveness not applicable and defendant must come forward with objective evidence of actual vindictiveness." *Id.* at 1317-18.).

Alternatively, where a defendant lacks objective evidence in support of a vindictive prosecution claim, a defendant may compel such responsive discovery if it "offer[s] sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment" and that '[a] showing of a colorable claim that is essential to compel discovery.'" *Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *15 (S.D. Fla. May 20, 2010) (cleaned up).

### III. <u>ARGUMENT</u>

#### A. <u>Mr. Nauta's Due Process Rights Were Violated When the SCO Retaliated Against the Exercise of His Fifth Amendment Rights</u>

Mr. Nauta has consistently cooperated with the prosecution's investigation of the instant proceedings at least three times – first on May 26, 2022, through a voluntary interview with the FBI; his testimony before a D.C. federal grand jury on June 21, 2022; and in handing over two iPhones to federal authorities in response to the FBI's November 29, 2022 search and seizure warrant.  *See* Exs. 1, 10, and 11.  While Mr. Nauta declined the prosecution's request to testify before an additional federal grand jury [cite], and such construction that his declination was anything other than cooperative would be wholly inaccurate.  Mr. Nauta does not deny that "in the context of a grand jury inquiry . . . the public . . . has a right to every man's evidence." *United States v. Doe (In re Grand Jury Subpoena Duces Tecum)*, 670 F.3d 1335, 1341 (11th Cir. 2012)

9

(cleaned up) (emphasis added). This "right to evidence" nevertheless makes exceptions for "persons protected by a constitutional, common-law, or statutory privilege." "The Fifth Amendment provides, however, that *no person shall be compelled in any criminal case to be a witness against himself.*" *Id.* (emphasis added). Accordingly, Mr. Nauta's declination to testify before a federal grand jury should only be lawful assertion of his Fifth Amendment rights to which he is *guaranteed by right* under the U.S. Constitution.

    i.    *The Special Counsel Acted with Genuine Animus Toward Mr. Nauta*

In seeking to establish that he is subject to vindictive prosecution, Mr. Nauta must first demonstrate that there was objective evidence that the SCO acted with "genuine animus" toward Mr. Nauta. *See Simbaqueba Bonilla*, 2010 WL 11627259, at *5. At their May 9, 2023 informal meeting – whose invitation was posited to Mr. Woodward as a coffee chat – Mr. Raskin nevertheless represented to Mr. Woodward that the prosecution would not accept anything less than Mr. Nauta's full cooperation in the investigation; in particular, Mr. Raskin declined any such proposition to proffer by Mr. Woodward. Moreover, their discussion was exclusively concerned inquiries as to potential violations of 18 U.S.C. § 1001 concerning alleged false statements to a federal grand jury made by Mr. Nauta.

    ii.    *The Special Counsel Would Not Have Prosecuted Mr. Nauta But For Their Genuine Animus*

Second, Mr. Nauta but for that animus, he would have otherwise not been prosecuted in order to establish that his prosecution is vindictive. *See Simbaqueba Bonilla*, 2010 WL 11627259, at *5. Mr. Woodward did not hear from the SCO with regard to Mr. Nauta since his May 9, 2022 meeting with Mr. Raskin until May 22, 2023, when he was contacted by Mr. Raskin, who advised him of a forthcoming target letter for Mr. Nauta. *See* Ex. 5 (S. Woodward/M. Thakur Email Correspondence) (May 9, 2023). Notably, the target letter addressed more than the potential

10

violation § 1001 Mr. Woodward and Mr. Raskin discussing on May 9 – in addition to § 1001, the target letter included inquiries into potential violations of 18 U.S.C. § 1512 and 1519.

### B. Mr. Nauta Was Selectively Prosecuted

Mr. Nauta joins in Defendant Former President Trump's selective prosecution claim for the reasons stated in his motion and for the reasons stated in *supra*. *See Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *12 n.9 (S.D. Fla. May 20, 2010) citing *United States v. Lamberti*, 847 F. 2d 1531, 1535 n. 12 (11th Cir. 1988) ("[t]here is some authority to indicate that 'personal vindictiveness on the part of a prosecutor or…may suffice to satisfy the second element of [a selective prosecution claim].'").

The Superseding Indictment charges Mr. Nauta, along with his co-defendants, Former President Trump and Mr. Carlos De Oliviera, for their alleged conspiracy to obstruct justice in alleged violation of 18 U.S.C. § 1512(k), through their violations of §§ 1512(b)(2)(A), 1512(b)(2)(B), 1512(c)(1), and 2. Superseding Ind. at ¶ 95 (July 27, 2023) (ECF No. 85). In support of the conspiracy as to the § 1512(b)(2) charges, the Superseding Indictment alleges that Former President Trump and Messrs. Nauta and De Oliviera conspired to the following: suggesting that Trump Attorney 1 falsely represent to the FBI and the grand jury that Former President Trump did not have any documents responsive to the May 11 Subpoena; moved the boxes to conceal them from Trump Attorney 1, the FBI, and the grand jury; suggesting that Trump Attorney 1 hide or destroy documents responsive to the May 11 Subpoena; providing the FBI and the grand jury with only some of the documents called for by the May 11 Subpoena, while Former President Trump claimed he was fully cooperating; causing false certifications to the FBI and grand jury to represent that "all documents with classification markings" had been provided to them, when they were not; making false and misleading statements to the FBI; and attempting to delete security camera footage from the Mar-a-Lago Club to conceal the footage from the FBI and grand jury. *Id.* at ¶ 97.

11

To prevail on a claim for selective prosecution, Mr. Nauta must demonstrate that the charges against him had a discriminatory effect on him – that is, that other individuals that were engaged in the same type of conduct as Mr. Nauta were not prosecuted for that conduct. *See Emmanuel*, 2007 WL 9705934, at *2 (S.D. Fla. July 3, 2007). Secondly, Mr. Nauta must demonstrate that the decision to prosecute was rooted in a discriminatory purpose – that is, the prosecution decision was rooted in "invidious or in bad faith[,]" – that is, the decision to prosecute was "predicated on a constitutionally impermissible motive, such as…retaliation for her exercise of constitutional rights." *Ndiaye*, 434 F.3d at 1288.

    *iii.*    *The Charges Against Mr. Nauta Are Discriminatory*

The allegations in the Superseding Indictment irrevocably reveal that the charges against Mr. Nauta depend heavily on the temporal nexus between Mr. Nauta's conduct in moving the boxes and the NARA demand and the May 2022 grand jury investigation. Moreover, the current discovery in the present case also reveals that several individuals were involved in the same type of conduct – moving the boxes – in the same or similar time, manner, and place as Mr. Nauta, but they themselves were not criminally investigated themselves for that conduct – nor is defense counsel for Mr. Nauta aware of any pending criminal charges against these individuals.



In [P.11] grand jury testimony, [Per. 11], a personal valet for Former President Trump, and in [P. 10] interview with the FBI, [Per. 10] an executive assistant to [Per. 34] note that that [REDACTED] [Per. 11] Grand Jury Tr. at 95:03-101:03 (USA-00804190); [Per. 10] FBI Interview Tr. at 160:02 (USA-00817429). [Per. 10] [Per. 11] to bring a "scan box," [REDACTED] to [P.11] personal car from the 45 Office [REDACTED] [Per. 11] Grand Jury Tr. at 95:03-101:03 (USA-00804190);



Per. 10 FBI 302 at 10 (USA-00817416). The scan box remained in Per. 11 car overnight. Per. 10 FBI 302 at 10 (USA-00817416). After Per. 11 put the scan box in P. 11 car, Per. 10 realized that "the lawyers had never seen [the scan box]"; upon this realization, Per. 10 Per. 11 to return the box back to the 45 Office, which P. 11 did. Per. 11 Grand Jury Tr. at 99:08 (USA-00804190) at 99:08; Per. 10 FBI 302 at 10 (USA-00817416). Per. 11 testifies that at the time

. Per. 11 Grand Jury Tr. at 97:07 (USA-00804190). Similarly, Per. 10 was unaware of the fact that the 45 Office was subject to additional search by the lawyers. Per. 10 FBI 302 at 10 (USA-00817416).

.

Keeping consistent with the SCO's assertion that whether Per. 11 or Per. 10 knew whether the scan box did or did not contain classified documents when they conspired to moved that box is irrelevant for the purposes of charging violations of 18 U.S.C. § 1512(c)(1).

## CONCLUSION

For the reasons discussed herein, the Court should dismiss the charges alleged against Mr. Nauta because he has been selectively and vindictively prosecuted; or, in the alternative, compel the Special Counsel's Office to produce additional evidence to support these claims.

Dated: February 22, 2024

Respectfully submitted,

*s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (*pro hac vice*)

Brand Woodward Law, LP
400 Fifth Street NW, Suite 350
Washington, DC 20010
202.996.7447 (telephone)
202.996.0113 (facsimile)
stanley@brandwoodwardlaw.com

*s/ Sasha Dadan*
Sasha Dadan, Esq. (Fla. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*

14

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2024, I electronically submitted the foregoing, via electronic mail, to counsel of record.

Respectfully submitted,

*s/ Sasha Dadan*
Sasha Dadan, Esq. (Fl. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*