# EXHIBIT 14

FD-302 (Rev. 5-8-10)                                                   - 1 of 12 -

UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION



Date of entry  02/06/2023

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**

This document contains information that is restricted to case participants.

On January 13, 2023, [Per. 10], date of birth (DOB) [redacted] social security account number [redacted], was interviewed by Federal Bureau of Investigation (FBI) [FBI 21A], [FBI 41] [redacted], and Department of Justice (DOJ) Attorney Michael Thakur. Also present during the interview was John IRVING, the attorney representing [Per. 10]. The interview took place at the FBI Miami Division West Palm Beach Resident Agency (WPBRA) located at 505 S. Flagler Drive, West Palm Beach, FL 33401. After being advised of the identities of the interviewing agents, the nature of the voluntary interview, and a Title 18 United States Code (USC) Section 1001 warning, [Per. 10] provided the following information:

[**AGENT NOTE**: Pursuant to DIOG 18.5.6.4.17.2.2, the start date & time of the audio recording was January 13, 2023 at 11:10:32 and the end time was 14:14:29. A recording device was placed inside the interview room for the duration of the interview. One or both of the interviewing agents maintained positive control of the device at all times to fully capture statements made. The documentation of the interview in this communication is not a verbatim account of all statements made, but rather to provide a summary of the interview based on observations made and information gleaned by interviewing agents. The original recording of the interview is maintained at WFO.]

The following is not meant to supplant the information captured on the referenced recording:

At the time of the interview, [Per. 10] was the [redacted] to Donald J. Trump (FPOTUS). Prior to becoming a staff member on the Trump Administration, [Per. 10] [redacted] [redacted] Following the end of the Trump Administration, [Per. 10] lived in

UNCLASSIFIED//FOUO

Investigation on  01/13/2023  at  West Palm Beach, Florida, United States (In Person)

File # [redacted]                                             Date drafted  01/17/2023

by  FBI 41 , FBI 21A [redacted]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U//FOUO) Interview of `Per. 10` , On 01/13/2023 , Page 2 of 12

`       ` and `              ` . `Per. 10` started working at Mar-A-Lago (MAL) in `       ` and went to Bedminster, NJ as part of `P. 10` official duties. `P. 10` reported to MAL sometime during the summer of `    `. `P. 10` had an undergraduate degree in `              ` .

`Per. 10` was promoted to `                                              `

At that time of the interview, the "front office" was staffed by `Per. 10` , `Per. 64` , and `Per. 35` , and FPOTUS' personal aides were Walt NAUTA and `Per. 11` . `P. 35` was a research assistant who focused on any news articles containing FPOTUS' name. SAVE AMERICA hired `P. 35` before the campaign was announced. `Per. 10` first met `P. 35` in `              ` . SAVE AMERICA hired `Per. 11` when they came back from Bedminster in the summer of `    ` . To `Per. 10` knowledge, `Per. 34` was `              ` the time of the interview.

[AGENT NOTE: Based on the investigation to date, FBI WFO assesses the "front office" is the 45 Office at MAL.]

`Per. 10` duties as FPOTUS' `              ` included making phone calls, managing paperwork, printing notes, managing the schedule, and managing the office. `Per. 10` scheduled the weekly 45 Office conference call (NFI) at the office. Prior to the FBI search of MAL, the employees invited to the weekly call were `Per. 10, Per. 34, Per. 49, Per. 69, Per. 26, Walt, Per. 71, Per. 3. Per. 59, Per. 57, Per. 58` , and `Per. 15` . These individuals did not necessarily attend every meeting. Since around time the campaign was announced, the office stopped having the weekly calls. `Per. 10` did not recall a time classified documents were discussed on the calls, but `P. 10` recalled `Per. 49` telling them not to speak about what was in the news publicly to the press or to gossip about it in the office. FPOTUS never attended the calls and `Per. 10` never spoke to FPOTUS about the boxes that were in the MAL storage room.

[AGENT NOTE: Based on the investigation to date, FBI WFO assesses `Per. 49` to be `Per. 49` , `Per. 69` to be `Per. 69` , `P. 26` to be `Per. 26` , Walt to be Walt NAUTA, `Per. 71` to be `Per. 71` , `Per. 3` to be `Per. 3` , `Per. 59` to be `Per. 59` , `Per. 57` to be `Per. 57` , `Per. 58` to be `Per. 58` , and `Per. 15` to be `Per. 15` .]

`Per. 10` travelled to New York in June of 2022 and was in Bedminster "all summer." `Per. 10` responsibilities at Bedminster included managing the office, to include making calls, taking notes, and scheduling. `Per. 10` did

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of [Per. 10] , On 01/13/2023 , Page 3 of 12

not recall scheduling a meeting between FPOTUS and [Per. 70] and [P. 70] name did not sound familiar to [P. 10]. Likewise, [Per. 10] did not recall scheduling a meeting for [Per. 27] during the summer of 2022. [Per. 10] was not involved in scheduling during the summer of 2021.

[F21A, F41] showed [Per. 10] emails sent from [Per. 10] to [Per. 24] on August 22 and August 24, 2022. The purpose of the invitation in the email was for "all of the lawyers," approximately ten, to have a meeting at Bedminster. Among those invited were: [Per. 24, Per. 5, Per. 61] Kise, [Per. 60], and [Per. 18]. [Per. 10] did not recall a note from [Per. 5], but believed [Per. 5] spoke to the other attorneys (NFI) before [P. 10] contacted them. [Per. 10] did not recall if the attorneys told [P. 10] what would be discussed in the meeting.

[AGENT NOTE: Based on the investigation to date, FBI WFO assesses [Per. 5] to be [Per. 5], [redacted] to be [redacted], [Per. 61] to be [Per. 61], [redacted] to be [redacted], Kise to be Chris KISE, [Per. 60] to be [Per. 60] [redacted], and [Per. 18] to be [Per. 18].]

During the summer of 2022 while [Per. 10] was in Bedminster, FPOTUS travelled to MAL twice. FPOTUS' personal aides, NAUTA and [Per. 11], travelled with FPOTUS on these trips. [Per. 35] may have travelled, as well, but [Per. 10] did not recall. These two trips to MAL were for one night each. [Per. 10] believed FPOTUS returned to MAL during the summer because it was more convenient to be there while he was doing rallies. [Per. 10] did not travel with FPOTUS from Bedminster to MAL and believed she was in [redacted]. [Per. 10] had the dates of FPOTUS' summer 2022 trips to MAL on a schedule. [Per. 10] was not aware of a time during the summer of 2022 when FPOTUS or his aides accessed the storage room in the basement of MAL. [Per. 10] had no knowledge of FPOTUS ever going to the MAL basement storage room.

In 2021, [Per. 10], NAUTA, and [Per. 34] were in the basement storage room at MAL looking at gifts. [Per. 10] did not recall searching through boxes or removing boxes on that date. [Per. 10] knew which boxes contained gifts because those boxes were brown and were stored on one side of the storage room. Additionally, the boxes containing gifts had white paper labels on them that said "MAL Personal." These labels were similar to the label attached to the box on the table in the interview room. [Per. 10] did not remember the white Bankers boxes having labels, nor did [P. 10] recall a time where [P. 10] had to look through the white Bankers boxes.

[AGENT NOTE: The box on the table in the interview room was the box [Per. 60] [redacted] provided to the FBI at FBI WPBRA on January 5, 2023 ([redacted], 158).]

Continuation of FD-302 of (U//FOUO) Interview of [Per. 10]         , On  01/13/2023  , Page  4  of  12

"Room 1," the White House Management Office, printed and attached the white labels to boxes. Room 1 was located at the Eisenhower Executive Office Building. [Per. 10]                                                                      . 
managed the gift office at [        ], [        ] was the director of [    ] until [ ] was promoted to a "step above" the director. At that time, another male (FNU LNU) became the director and [                    ] was the deputy director. When the unknown male left [        ] two weeks prior to the "end of the White House," [           ] took over. [Per. 10] knew [      ] printed and attached the white labels on the boxes because [P. 10] helped finish the boxes when they were loaded on the trucks (NFI) at the Eisenhower Executive Office Building "at the very end." The boxes to be loaded onto the truck had two types of labels on them: "MAL Personal" and one that may have said "MAL Storage." The boxes labeled "MAL Storage" went to Extra Storage and [    ] saw boxes labeled "MAL Personal" at MAL.

[AGENT NOTE: Based on the investigation to date, FBI WFO assesses Extra Storage and Life Storage are the same facility located at 1520 Belvedere Road, West Palm Beach, FL 33406.]

[Per. 10] did not pack the boxes day-to-day because [Per. 10              ]. [Per. 10] did not know to whom employees at Room 1 would have spoken to in order to know which boxes to label as "MAL Personal." [Per. 10] was not sure if boxes related to FPOTUS that ultimately went to MAL came from the White House Management Office. [Per. 10] was not involved in labeling or packing boxes, but [P.10] helped load them on the truck from the loading dock at the Eisenhower Executive Office building "at the very end." [Per. 10] did not know if [Per. 34] was involved in any part of the box-labeling process. To [Per. 10] knowledge, NAUTA was not involved in labeling.

[Per. 10] recalled pallets going from GSA storage in Virginia to Florida, but did not recall the total number of pallets. [P.10] believed the Correspondence Director (NFI) managed getting Transition items down to Florida and was not sure what the items were, but heard other individuals say they came from the Transition Office. [Per. 10] did not recall when the items went to Florida, but believed it was some time in 2021. [Per. 10] believed one or two pallets went to Life Storage and one may have gone to MAL. The pallet that went to MAL had Bankers boxes and brown boxes on it, but no labels on the boxes stood out to [Per. 10] and [P. 10] did not recall anyone discussing the boxes' contents or why the pallet came to MAL.

[Per. 10] managed the Life Storage units so [P.10] frequently moved boxes with gifts in them from Life Storage to replenish the gift closet at MAL. Gifts

were stored in a gift closet in the 45 Office, but higher-priced gifts (e.g. keys, challenge coins, medallions, frames, sweatshirts) were stored in the basement storage room at MAL. In the summer of 2021, P.10 helped set up the gift closet with SAVE AMERICA items (e.g. t-shirts, hats, and gifts) so it would look like FPOTUS' closet at the White House. Per. 10 brought items to the gift closet from both MAL storage and Life Storage. Per. 10 did not remember seeing a blue leather box with a seal on top of it in the gift closet or anywhere else at any point.

When boxes were retrieved from a storage unit, they were either taken to MAL or the Flagler office. Per. 10 did not recall any large shipments of items for the 45 Office after the administration ended other than the aforementioned pallet. Per. 10 last went to the Life Storage facility in December of 2022 to take old pictures and items from the 45 Office there. At the time of this interview, Per. 10 had keys to approximately seven storage units at Life Storage: one unit on the first floor, five units on the second floor, and one on the third floor. Each unit has a separate key. Per. 57, Per. 58, and NAUTA also had keys to different units, but they did not have keys to all seven.

Among the records for the library stored at Life Storage were a record of all gifts, newspapers with stories about FPOTUS during his presidency, and things the White House Management Office set up for the library. To Per. 10 knowledge, U.S. Government records would not have been kept at Life Storage.

[**AGENT NOTE**: FBI WFO assesses "the library" refers to The Donald J. Trump Presidential Library.]

Per. 10 first saw boxes labeled "MAL Personal" in a "storage bathroom" near the top of the stairs at MAL during the summer of 2021. Per. 10 did not recall how many boxes marked "MAL Personal" were in the bathroom, but there were more than one. Most of the boxes were brown boxes with gifts in them. Per. 10 did not recall seeing Bankers boxes or other all white boxes in the storage bathroom. At the time the boxes were in the bathroom, the room was not used as a bathroom. At the time of this interview, however, the bathroom no longer had boxes in it and was being used as a bathroom. Per. 10 did not know when this transition took place and did not recall helping remove the boxes from the bathroom.

Per. 10 did not recall whether there were discussions about what kinds of items would go into the basement storage room at MAL when P.10 arrived at MAL in [redacted]. When Per. 10 arrived at MAL, the storage room did not have a lock on it. Per. 10 was inside the storage room before the lock was

added and observed Bankers boxes in the storage room at that time. However, [P. 10] did not know what was inside the boxes and did not observe labels on them. There were also brown boxes with "MAL Personal" labels in the storage room at that time.

[Per. 10] did not remember when a lock was placed on the storage room door, but MAL staff would have installed the lock. Prior to the installation of an actual lock, there was a "push-button" doorknob on the storage room door with a pinhole opening on the exterior knob. To "pop open" the door, an employee needed some kind of tool stronger than a paper clip. A MAL employee ███, whose name [Per. 10] believed started with a █ or someone else [Per. 63] opened the push-button doorknob for [Per. 10] when [P. 10] needed to access the storage room. The employee was ███ ███ The employee was not at MAL very long, but [Per. 10] did not know much about why █ left MAL or when.

People in the 45 Office told [Per. 10] the basement room was FPOTUS' locked storage. Around the fall of 2021, they "finally" bought and installed an actual locking door handle that required a key. [Per. 34] talked about getting the lock that was ultimately installed. MAL security (NFI) gave 45 Office staff a key to the basement storage room. [Per. 10] did not know whether this key was to the original lock they installed or for the lock that was installed later, but prior to the FBI search in August 2022, on a sliding rod on the door. Approximately one month prior to the interview, a new lock was added to the basement storage door, but [Per. 10] did not know what kind of lock it was or whether a single key could open multiple locks on the same door. [Per. 10] had all five copies of the key that opened the new lock on the basement storage door. [Per. 10] believed since [P. 10] had all keys to the new lock on the basement storage room and no one had asked [P. 10] to borrow them, no one had accessed the storage room since the new lock was installed.

At some point prior to the FBI search of MAL, [Per. 34] had a key to open the basement storage door. A month or two prior to the FBI search, people stopped going into the storage room and [Per. 34] may not have had a key during that time. [Per. 10] could "assume why now" people stopped going into the storage room, but [P. 10] did not know for sure. [Per. 10] believed MAL staff had a key to the original door lock that was installed on the storage room door, but [P. 10] was not certain.

[Per. 10] went into the basement storage room a handful of times to grab gifts and bring them to the office. The last time [Per. 10] was in the storage room was likely sometime in 2021. [Per. 10] did not remember how many locks were on the door, but [P. 10] recalled using one key to open the door. In the

UNCLASSIFIED//FOUO

Subject to Protective Order

USA-00817421

spring of 2022, [Per. 10] may have gone near the storage room in the MAL basement to retrieve flowers. Since then, [Per. 10] did not recall going down to the basement at all. [Per. 10] did not believe employees would have a reason to store their own personal items in the storage room at MAL. There were situations in which an employee might remove items from the basement storage room without FPOTUS directing them to do so. [Per. 10] had personally removed items from the room without being directed by FPOTUS and believed it was likely other employees had done the same. [Per. 10] never saw or heard anyone discuss an employee removing dozens of boxes from the basement storage room.

[Per. 10] probably would not remove dozens of boxes from the basement storage room at MAL without being asked to do so. A scenario in which one might do such a thing would be if one knew lawyers were coming to MAL to look at the boxes, but did not have enough room to spread out and review them in the storage room. In that case, one may have moved the boxes to another area so the lawyers could look at them. [Per. 10] never took boxes out of the storage room so they would not be there when lawyers arrived, nor was [P. 10] aware of anyone else doing so. [Per. 10] saw in the media that lawyers went into the basement storage room at MAL, but [P10] was not present when it happened. [Per. 10] went on vacation to [redacted] during the last week of May and into the first week of June, shortly after [Per. 10] [redacted]. After seeing news coverage of attorneys coming to MAL to review the boxes, [Per. 10] and [Per. 58] discussed the news story and whether it really happened, but [Per. 10] did not hear any gossip about the existence of other classified material at MAL.

[AGENT NOTE: [redacted Per. 10 redacted]. Thus, FBI WFO assesses [Per. 10] was referring to the last week of May 2022 and first week of June 2022. Additionally, based on the investigation so far, the FBI assesses [Per. 58] is [Per. 58].]

Most of the time [Per. 10] went to the storage room, [P10] retrieved gifts like special keys or medallions, stored there in brown boxes. [Per. 10] would bring these items back to the office. It would have been unusual for [P10] to bring them to Pine Hall since [P10] was not going to Pine Hall much at that time. [Per. 10] did not recall helping [Per. 34] or NAUTA move boxes from the basement storage room at MAL to Pine Hall, but believed it was possible [P10] could have helped. Although [Per. 10] did not recall personally bringing any boxes to Pine Hall or seeing others do so, several employees regularly brought items there at that time. These employees included [Per. 34] and [Per. 64] [redacted] and [redacted] NAUTA, [P.3], and [P.71].

[AGENT NOTE: Based on the investigation to date, FBI WFO assesses any references to [P. 3] are [Per. 3] and any references to [P. 71] are [Per. 71] .]

[Per. 71] had seen FPOTUS' bedroom in pictures and from Pine Hall, but did not recall being inside the bedroom. [Per. 10] went to Pine Hall occasionally prior to becoming [redacted]. [Per. 10] would sometimes help [Per. 34] and deliver FPOTUS' schedule to Pine Hall. [Per. 10] recalled an instance when [P10] brought FPOTUS a document to sign. He brought it into his suite while [P10] waited in Pine Hall. [Per. 10] did not recall seeing Bankers boxes in Pine Hall.

In reference to the box on the table in the interview room (SCAN BOX), [Per. 10] identified writing on a blue sticky note that read "DO NOT TOUCH/ DO NOT Remove" as [Per. 10] handwriting. [Per. 10] added the blue sticky note to SCAN BOX because when [Per. 34] asked [Per. 10] to scan the pages inside it sometime in 2021, [Per. 34] told [P10] to keep SCAN BOX close and [Per. 10] did not want anyone to touch it. The white label on SCAN BOX, which used to say "Attention [Per. 34] below "MAL Personal" would have been printed by [redacted]. [Per. 10] did not know what the green sticker on SCAN BOX meant or who would have affixed it, nor did [P10] remember seeing other boxes with a green sticker. [Per. 10] likewise did not know who wrote "Dailys Season 1 [Per. 34] [redacted]" on SCAN BOX.

[Per. 10] became aware of SCAN BOX in approximately September of 2021 when [Per. 34] asked [Per. 10] to scan its contents. At that time, SCAN BOX was stored under [Per. 34] desk in the 45 Office. SCAN BOX contained the only record of FPOTUS' schedule while he was President at the White House. [Per. 34] asked [Per. 10] to scan the pages inside SCAN BOX in order to get an electronic copy for their records. [Per. 10] believed the record was for use by the speechwriters so they could understand what FPOTUS said on a given date.

[Per. 10] took SCAN BOX to the tennis cottage, a single room approximately the size of one bedroom, to complete the scan project. At that time, [Per. 10] worked in the tennis cottage along with [Per. 58] and [Per. 3] . The correspondence operation, tables, and office supplies were inside the tennis cottage, as well. [Per. 15] and [Per. 71] had access to the tennis cottage at that time. [Per. 10] did not think there was a lock on the tennis cottage and did not recall needing a key to enter it, but [Per. 58] was usually there first. [Per. 10] identified the location of the tennis cottage on a map of MAL on [FBI 21A] cellular phone.

It took [Per. 10] approximately one week to complete the scan project. [P10]

began scanning the pages in September 2021 and completed the task in October 2021. [P.10] used the Adobe Scan application on [P.10] personal cell phone for this tasking. [Per. 34] did not ask [Per. 10] to use the Adobe Scan application, but it was the easiest way to perform the task since they did not have a big enough "computer printer that scanned." To complete the scan project, [Per. 10] used the Adobe Cloud account [P.10] created when [P10] started at the 45 Office around [redacted]. [P10] created the account so [P10] could scan the personal notes FPOTUS wrote to his friends. [Per. 34] mailed FPOTUS' notes to his friends and [Per. 10] scanned them to have a record of what was mailed. [Per. 10] used [P10] personal email account, [Per. 10], to create the Adobe Cloud account. [Per. 10] personally paid the fee associated with the Adobe Cloud and believed the office would reimburse [P10] for it, but [P10] never submitted the reimbursement. In addition to FPOTUS' notes and the contents of SCAN BOX, [Per. 10] scanned [Per. 10] with the Adobe Scan application.

[Per. 10] believed the application used [P10] phone camera to capture an image of a piece of paper and make it a PDF without saving the image to [P10] phone. [Per. 10] scanned the contents of SCAN BOX in 100-page sections, which [P10] then merged into larger PDFs containing all schedules for a given year. Some PDFs were seven hundred or eight hundred pages. Since the maximum PDF size was one thousand pages, at least one year was broken up across two different PDFs (e.g. "2018 part one, 2018 part two"). When the files became too big to combine inside of the app, [Per. 10] downloaded them to [P10] laptop to complete the merge.

[Per. 10] did not know who owned the laptop [P10] used to complete the merge, but [Per. 10] did not purchase it. A couple of months into [Per. 10] work, prior to starting the scan project, [Per. 10] personal laptop was having issues so [P10] asked [Per. 34] if [P10] could have another laptop. After this laptop was turned over to the FBI, [Per. 10] reviewed [P10] Office365 account on a new laptop and could not access anything from SCAN BOX.

[Per. 10] believed the scans were saved to the Adobe Cloud through the application. Unless [Per. 10] shared the contents of [P10] Adobe Cloud account with someone else or they had [P10] password, [P10] did not think anyone else could access the contents of the account. [Per. 10] emailed links to the uploaded scans to [Per. 34]. [Per. 10] sent the first set of links to [Per. 34] on September 23 or 24, 2021 and sent the last set of links around October 4, 2021. To [Per. 10] knowledge, [Per. 10] was the only person who still had access to the scans, but [P10] did not know what [Per. 34] did with the links [Per. 10] sent. [Per. 10] emailed [Per. 10] links, as well, so [P10] could save the scans onto [P10] laptop. These links were still active at the time of the interview. [Per. 10] did not save the scans anywhere other than the Adobe Cloud

and laptop, but knew [Per. 60] saved a copy to a thumb drive to turn over to the FBI. Other than [Per. 60] when [P60] created the thumb drive, no one used or accessed [Per. 10] laptop. [Per. 60] did not recall seeing any classification labels while [P.10] was scanning the pages in SCAN BOX. No one else in the tennis cottage looked at the pages while [Per. 10] was scanning. To [Per. 10] knowledge, SCAN BOX was the only box scanned and no one else at MAL or the 45 Office scanned boxes. [Per. 10] never spoke to FPOTUS about the scan project.

After [Per. 10] completed the scan project, SCAN BOX remained under [P10] desk in the tennis cottage until they moved to the Flagler office in approximately November of 2021. To [Per. 10] knowledge, no one looked through or opened SCAN BOX while it was under [Per. 10] desk at the tennis cottage. After moving to Flagler, the SCAN BOX was stored under [Per. 10] desk (at Flagler), where it remained until [Per. 10] moved to MAL in [___] of [___]. [Per. 10] brought SCAN BOX with [___] to MAL and stored it under [P.10] new desk at MAL, [___] [Per. 34] [___].

In December of 2022, approximately a week before the mid-December search, [Per. 10] and others, including [Per. 11] and NAUTA, cleaned the 45 Office. The office looked messy and "they" (NFI) discussed what value they provided in their new jobs and positions. There were complaints about staff being in the office all day without food or snacks, so they tried to turn a storage bathroom into a snack room. They also cleaned up FPOTUS' gift closet to make it look "more presidential." SCAN BOX looked messy under [Per. 10] desk and since [Per. 34] [_____], [Per. 10] did not think it was that "dire" so [P10] decided the box could go to the "library unit" at Life Storage. SCAN BOX was placed in the trunk of [Per. 11] personal car where it remained overnight for one night. Prior to SCAN BOX going to Life Storage, [Per. 10] realized the lawyers had never seen SCAN BOX and [Per. 10] wanted to make sure it was "good," so they decided not to put it in storage and brought it back to the office. [Per. 10] did not know the attorneys were coming to search the office when they cleaned it, but [P10] knew attorneys had searched the storage units and the Flagler office. [Per. 10] did not want it to seem like they were moving things when people were coming in to do searches for "this investigation." [Per. 10] did not know where SCAN BOX was kept prior to MAL and, to [P10] knowledge, SCAN BOX never went to Bedminster.

When they were cleaning the office, SCAN BOX was moved from under [Per. 10] desk to a gift closet in the 45 Office. "The box went from under [Per. 34] desk to the tennis cottage, tennis cottage to Flagler, Flagler to under [P10] desk, under my desk to the closet, which is still in the office." To [Per. 10] knowledge, FPOTUS never asked to look at anything from SCAN BOX after his

presidency.

[Per. 10] was present the day SCAN BOX was found in December of 2022. [Per. 10] met the lawyers the morning of the search to let them into the office, but [P10] subsequently left because [P10] did not want to be there during the search. The attorneys did not search electronic devices that day. [Per. 10] did not recall the attorneys asking [P10] questions about SCAN BOX, but [P10] believed [P10] heard about the discovery of SCAN BOX later during the day of the December search. Later that month, [Per. 10] was told the attorneys would return to make a scan of SCAN BOX and [Per. 10] said [P10] already had a copy.

[Per. 10] believed she had a Top Secret clearance when [P.10] was an employee at the White House. [P.10] recalled sitting in a PowerPoint briefing by the security office when [P10] was granted the clearance. Although [Per. 10] did not specifically recall being trained on recognizing classification labels and handling classified material properly, [P10] believed [P10] probably received such training. The training [P10] received was not recurring. When [Per. 10] left the White House, [P10] was given forms and "a little speech." [Per. 10] did not recall seeing classification labels on any papers in SCAN BOX and never saw papers with classification labels on them after FPOTUS' administration. [Per. 10] never heard about FPOTUS having "invasion plans" or showing a document with classification markings. After the FBI searched MAL in August of 2022, [Per. 10] received guidance from [P10] leadership (NFI) to "not talk to the media." [P10] did not recall any discussions about employees looking through their own files for additional classified documents or any direction to report seeing classified documents. [Per. 10] and coworkers discussed declassification as a concept in the office, but did not discuss the declassification of specific documents. These discussions were primarily venting frustration about what was discussed in the media about declassification.

[Per. 10] was shown several photographs obtained from CCTV footage of MAL during the investigation. In the first few photographs, [Per. 10] identified [Per. 64] , [Per. 10] , and [Per. 35] . [Per. 10] likewise identified a man pulling a cart in the MAL tunnel as [Per. 63] who was [redacted] at MAL. [Per. 63]
[redacted] In a photograph of two individuals with boxes in the MAL tunnel, [Per. 10] identified NAUTA and assumed the other person was Carlos DE OLIVEIRA who worked all over the property.

In another photograph, [Per. 10] identified [Per. 10] and NAUTA with boxes near the entrance to the 45 Office and assumed they were packing things to move to Bedminster, but was not sure. [Per. 10] shipped items to Bedminster for

set up of the 45 Office, including Sharpies and "jumbos" (pictures). [Per. 10] did not know why NAUTA was in another photograph with boxes near the MAL basement storage area. At the 45 Office, NAUTA was close to [Per. 10], [Per. 11], and [Per. 49]. [Per. 10] and [Per. 11] hung out with NAUTA after work. [Per. 10] did not know who NAUTA was close to in his personal life or whether he was seeing anyone over the past year. [Per. 10] did not recognize the name [Per. 56]. NAUTA's duties were the same they had always been and, to [Per. 10] knowledge, he did not have any new duties at the time of this interview.

At the time of the interview, [Per. 10] spoke to FPOTUS every day, but he did not know [P10] was at this interview with the FBI. [Per. 49], [Per. 10], and [Per. 10] former attorney, [           ], all knew [P10] was interviewed by the FBI. [Per. 49] did not ask [Per. 10] why [P10] was going to speak with the FBI, but asked about [P10] lawyer. [Per. 10] assumed [Per. 49] and [Per. 5] spoke to IRVING and had [P5] contact [Per. 10]. [Per. 49] did not tell [Per. 10] which attorney [P10] should use, but [Per. 49] recommended [Per. 10] select an attorney who had been involved with "these types of things" before. [Per. 5] had never been [Per. 10] attorney, but told [Per. 10] [P5] was looking for other attorneys for [P10] to consider. [Per. 10] did not receive any advice from [Per. 5] about speaking to the FBI or anyone else related to the case. [Per. 10] assumed [P10] had a retainer agreement with [         ] and signed "the same types of things" with [ ] that [P10] signed with IRVING. [Per. 10] believed [    ] represented [Per. 10] rather than SAVE AMERICA. [Per. 10] had not heard of a situation in which a coworker had an attorney without a retainer agreement or had an attorney who represented SAVE AMERICA versus the employee.

Since [                                    Per. 10], no one coached [P10] on how to answer questions or told [P10] not to cooperate with the FBI. No one at the SAVE AMERICA PAC spoke to [Per. 10] about the investigation. [Per. 49] never told [Per. 10] what to say or not to say and [P49] never asked [Per. 10] what was discussed in [Per. 10              ] [Per. 10] was not aware of anyone else discussing their interviews with the FBI with [P.49] and no one else asked [Per. 10] about the content of [P10] FBI interview. [P.49] never told office employees not to cooperate with the government. Additionally, [P.49] never told employees not to answer questions from an agent or prosecutor.

Physical copies of the handwritten interview notes, photographs and printouts shown to [Per. 10], and a working copy of the audio recording will be maintained in the attached 1A.