UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 23-801010-CR-CANNON

UNITED STATES OF AMERICA,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

　　　　Defendants.
_____/

**DEFENDANT WALTINE NAUTA'S REPLY IN SUPPORT OF
HIS MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR
<u>SELECTIVE AND VINDICTIVE PROSECUTION</u>**

At the very first meeting with government counsel, Mr. Nauta's counsel was advised that they, "wouldn't want you to do anything to mess that up," referring to the fact that Mr. Nauta's counsel had been recommended for a judicial appointment by President Biden.  This in the context of a demand that Mr. Woodward convey to his client – whom he had yet to meet in person – the necessity of cooperating with the government against its investigation (and eventual prosecution) of a former President of the United States *for the first time in history.*  Despite this extraordinary posture, the response of the Special Counsel's Office ("SCO") confounds and ignores legal standards and factual bases for Mr. Nauta's claims for which he requests dismissal based on selective and vindictive prosecution.  That said, Mr. Nauta acknowledges additional discovery is necessary to fully assess his claim of vindictive, or in the alternative, selective prosecution.  *See United States v. Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *15 (S.D. Fla. May 20, 2010).

"Vindictiveness in this context means the desire to punish a person for exercising his rights." *United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).  "Actual vindictiveness by showing 'objectively that the prosecutor's charging decision was motivated by a desire to punish him. . .'" *United States v. Davis*, No. 8:14-cr-191-T-36TBM, 2015 U.S. Dist. LEXIS 13256, at *4 (M.D. Fla. Feb. 4, 2015) (citing *United States v. Goodwin*, 457 U.S. 368, 384 (1982)).  At the pre-trial stage, courts are instructed to evaluate the "'realistic likelihood of vindictiveness' in a particular factual situation . . . and to determine whether any facts make a presumption of vindictiveness proper." *Barner*, 441 F.3d at 1317 (cleaned up) ("[I]n a pre-trial situation, presumption of vindictiveness not applicable and defendant must come forward with objective evidence of actual vindictiveness." *Id.* at 1317-18.).  "A defendant can establish actual prosecutorial vindictiveness if he can show that the government's justification for a retaliatory action is pretextual." *United States v. Schneider*, 853 F. App'x 463, 469 (11th Cir. 2021).  "To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *Bonilla*, 2010 WL 11627259, at *5 (S.D. Fla. May 20, 2010) (cleaned up).

Alternatively, where a defendant lacks objective evidence in support of a vindictive prosecution claim, a defendant may compel such responsive discovery if it "offer[s] sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment"

1

and that '[a] showing of a colorable claim that is essential to compel discovery.'" *Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *15 (S.D. Fla. May 20, 2010) (cleaned up).

"In order to establish unconstitutional selective prosecution, the claimant must show [1] that the prosecution has a discriminatory effect and [2] that it was motivated by a discriminatory purpose." *United States v. Emmanuel*, 2007 WL 9705934, at *2 (S.D. Fla. July 3, 2007) (cleaned up). "The first prong, discriminatory effect, is demonstrated by a showing that similarly situated individuals were not prosecuted for the same crime." *Id.* (cleaned up). "[A] 'similarly situated' person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant." *Smith*, 231 F.3d at 810. "The second prong, discriminatory purpose, is demonstrated by a showing that the decision to prosecute was invidious or in bad faith." *Emmanuel*, 2007 WL 9705934, at *2 (cleaned up). In the alternative, "[a] defendant may obtain discovery in support of a selective prosecution claim where the defendant provides some evidence tending to show the existence of the essential elements of the defense." *Williams*, 684 F. App'x at 777 (cleaned up).

**I.      ARGUMENT**

   A.   <u>The Events Leading Up to Mr. Nauta's Indictment Demonstrate Discriminatory Purpose and Actual Vindictiveness</u>

Objective evidence of the SCO's actual vindictiveness is overwhelmingly present. Moreover, and in the very least, there is evidence to raise reasonable doubt with respect to the government's conduct in seeking the indictment, such that Mr. Nauta establishes that he has a "colorable claim that is essential to compel discovery." *Id.*

   i.   *There is Objective Evidence that the SCO Acted with Genuine Animus Toward Mr. Nauta and His Counsel*

Mr. Nauta has already raised the issue of the "attention grabbing development[s]" in this matter involving defense counsel before the Court and others, including the District Court for the District of Columbia. Defs.' Mot. to Compel at 53 (Jan. 16, 2024) (ECF No. 262) (citing Mem. Op., *In re Press Application for Unsealing of In re Grand Jury Subpoena*, No. 42-gj-67 (Nov. 29, 2023)). And the Court has previously addressed some of these issues surrounding defense counsel – most notably in its Order requiring sealed written submissions regarding "allegations raised by Stanley E. Woodward, counsel for Waltine Nauta, against Jay I Bratt, Counsel to the Special

2

Prosecutor, concerning statements made by Mr. Bratt to Mr. Woodward regarding a judicial application submitted by Mr. Woodward." Order at 1 (Aug. 7, 2023) (ECF No. 101). Specifically, the Order requested, "a complete and current account of the accuracy, substance, and status of the reported allegations," which was to include, "any pertinent written materials on the subject. . ." *Id.* at 1-2. Accordingly, counsel provided a written brief to the Court in accordance with the Order, in which it attached ten different exhibits (A through J) demonstrating misconduct of the SCO in relation to the investigation of the instant matter. *See* Br. (Aug. 14, 2023) (ECF No. 118). The exhibits substantively relating to the instant Motion are listed below with a summary of the content pertinent to the instant Motion:

1. <u>Exhibit A</u>. Letter to Chief Justice Boasberg of the District of Columbia from Stanley E. Woodward, Jr. dated June 7, 2023), detailing Mr. Woodward's August 24, 2022 meeting with Mr. Bratt in which Mr. Bratt suggested that Mr. Nauta's cooperation with the investigation would bear some effect on Mr. Woodward's pending Presidential nomination to the Superior Court for the District of Columbia. *Id.* at 3-4; *see also id.*, Ex. A at 1-4 (ECF No. 118-1)

2. <u>Exhibits B</u>. Defendants' Amended Motion for Materials for Disclosure of Grand Jury Materials, *In re Grand Jury*, No. 23-gj-10 (D.D.C. June 5, 2023) requesting that Chief Justice Boasberg "order the disclosure of certain grand jury materials identified by counsel as likely to reflect misconduct by the government before the grand jury." Br. at 3 (Aug. 14, 2023) (ECF No. 118). Relevantly, this request for disclosure discussed Mr. Woodward's meeting with the government on August 24, 2022, in which Mr. Bratt threatened Mr. Woodward's judicial application in exchange for failure to precisely comply with the investigation, in addition to Mr. Brett Reynold's – another SCO prosecutor – declination to reschedule grand jury appearances of Mr. Woodward's clients after Mr. Woodward explained the suffered a motor vehicle accident days before those witnesses were schedule to testify. *See* Br. at Ex. B at 5-20 (Aug. 14, 2023) (ECF No. 118-1).

3. <u>Exhibit C</u>. Government's *Ex Parte*, Sealed Opposition to Former President Trump's Motion to Disclosure Grand Jury Materials, *In re Grand Jury Subpoenas*, No. 23-gj-38 (D.D.C. June 15, 2023), in which the SCO described defense counsel claims as "not credible." Br. at 5 (Aug. 14, 2023) (ECF No. 118).

4. <u>Exhibit J</u>. Email correspondence dated October 14 – 18, 2022 between Mr. Woodward and government counsel discussing conditions for an attorney proffer, to which no reply was received. *See* Br. at Ex. J at 90-93 (Aug. 14, 2023) (ECF No. 118-1).

In addition to the foregoing, it is noteworthy that the government's *ex parte* opposition to the Defendants' Amended Motion for Disclosure of Grand Jury Materials (*In re Grand Jury*, No. 23-gj-10 (D.D.C. June 5, 2023), "does not refute the additional details of the [August 24, 2022] meeting recalled by defense counsel[,]" (Br. at 9 (Aug. 14, 2023) (ECF No. 118)); specifically, the

3

SCO recounts same framework regarding Mr. Bratt's discourse on Mr. Woodward's judicial nomination as posited in the Defendant's Motion, but diverges insofar as it gratuitously construes the meeting to be "intended as a professional compliment in light of the fact that Bratt had not worked with Woodward previously." *Id.* at Ex. C at 50 (Aug. 14, 2023) (ECF No. 118-1). Taken together, for the SCO to suggest that the "evidence falls far short of showing either 'animus plus causation' . . . or that the prosecutorial 'decisionmaker' was 'motivated by a discriminatory purpose,'" is blatantly factually false.

For these reasons, Mr. Nauta is able to establish, through objective evidence, that the SCO acted with genuine animus toward defense counsel.

    ii.    *Mr. Nauta Was Prosecuted Because of the SCO's Genuine Animus*

The SCO's decision to prosecute Mr. Nauta was objectively correlated with a genuine animus by Mr. Bratt toward Mr. Woodward and the fact that under Mr. Woodward's counsel, Mr. Nauta refused to cooperate with Mr. Bratt's investigation. First, as evidenced during the August 24, 2022 meeting between Mr. Woodward and Mr. Bratt, Mr. Bratt attempted to coerce Mr. Nauta's compliance with the investigation by dangling potential favorability on Mr. Woodward's potential judicial nomination. Following this interaction with Mr. Woodward, the SCO launched a campaign of intimidation and harassment against Mr. Nauta's counsel the purpose of which can only have been to coerce Mr. Woodward to encourage Mr. Nauta's cooperation. Put differently, Mr. Woodward was presented with two options: Our way or the hard way.

For example, not long after the August 24 meeting with Mr. Bratt and his colleagues, the appearance of Mr. Nauta's colleague [Per. 24] was sought before the grand jury. Upon retaining Mr. Woodward – as [P24] explained in the grand jury – [redacted] – Mr. Bratt and his colleagues refused to accommodate Mr. Woodward's trial schedule – the first trial for seditious conspiracy in decades. Despite the fact that it would be months before any indictment in this (or any other district) would be sought, Mr. Bratt and his colleagues insisted upon [Per. 24's] immediate appearance before the grand jury, because Mr. Bratt and his colleagues explained, they were of the belief that [Per. 24] would shape [P24] testimony

4

based on the public reporting of their investigation. In other words, they accused [P 24] of being willing to lie to the grand jury.[1]

The improper efforts of Mr. Bratt and his colleagues did not end there. Once [Per. 24] appeared before the grand jury, [P24] lawfully asserted [P24] right not to testify under the Fifth Amendment. Mr. Bratt and his colleagues were incredulous, swiftly bringing a motion to compel [P 24] testimony despite [P24] Fifth Amendment assertion. The district court then overseeing the grand jury proceedings agreed that [Per. 24] had appropriately exercised his Fifth Amendment right not to testify, *and then invited* Mr. Bratt and his colleagues to immunize [Per. 24] so they could compel his testimony. Mr. Bratt did so, but improperly. He filed an immunity order lacking authorization of the U.S. Attorney overseeing the grand jury in question, and then, when this was called to his attention, withdrew the same (Mr. Bratt ultimately re-filed his immunity application, which the Court granted). As the Court is aware, defense counsel has requested these proceedings be transferred to the Court pursuant to Rule 6(e)(3)(G) of the Federal Rules of Criminal Procedure, which the SCO has refused.

Still not satisfied with the harassment Mr. Woodward had endured, Mr. Bratt and his colleagues also vindictively sought a motion to compel as against another of Mr. Woodward's clients, [Per. 13]. Specifically, despite extensive interaction with Mr. Bratt and his colleagues concerning responses to numerous grand jury subpoenas, Mr. Bratt and his colleagues surreptitiously filed a motion to compel *only* as against [Per. 13] claiming that Mr. Woodward had been dilatory in responding to the [Per. 13] subpoena. To the contrary, Mr. Woodward explained that he was endeavoring to create a forensic image of [Per. 13's] mobile devices so they could be permanently preserved, and that he would thereafter search those images for records responsive to the grand jury's subpoenas. Mr. Woodward also explained that the technology for conducting these forensic images remotely was untested and that given the importance of [█] [Per. 13] to the investigation of Mr. Bratt and his colleagues, he did not want to test it on [█] [Per. 13].

Ultimately, Mr. Bratt and his colleagues sought and received an order compelling [█] [Per. 13] compliance with the grand jury subpoena within days. Notably, their application for the

---

[1] Mr. Woodward sought an extension of time from the district court then presiding over the grand jury proceedings but was denied the same.

same came just days after Mr. Woodward suffered an accident requiring his humerus to be reconstructed (which occurred less than 24 hours before the birth of his child). Mr. Bratt and his colleagues, however, were wholly indifferent to Mr. Woodward's personal needs. Indeed, when Mr. Woodward advised a colleague of Mr. Bratt's that more time would be needed before another client of Mr. Woodward's could appear before the grand jury as a result of Mr. Woodward's accident *and* the birth of his child, Mr. Bratt's colleague responded with words to the effect of, "what excuse will you [Mr. Woodward] come up with next?"

Throughout Mr. Woodward's interaction with Mr. Bratt and his colleagues, all of whom would join the SCO, the SCO continued its investigation of Mr. Nauta while he continued to be represented by Mr. Woodward. During this time, Mr. Woodward and the SCO continued discussions with respect to Mr. Nauta's role in the investigation, some of which continued to emulate genuine animus toward Mr. Woodward and his representation of Mr. Nauta. For instance, Mr. Woodward exchanged correspondence with the SCO to query whether the only manner through which the SCO would consider an attorney proffer would be through a voluntary interview by Mr. Nauta and indicated that if were, in fact, the case, that the "the posture within which [Mr. Nauta] would be providing the department with information" would "significantly change[.]" *See* Br. at Ex. J at 90-93 (Aug. 14, 2023) (ECF No. 118-1). Mr. Woodward did not receive a response to this inquiry. *See id.*; *see also* Br. at 7, n. 9 (Aug. 14, 2023) (ECF No. 118). A similar in-person conversation with a separate SCO attorney on May 23, 2023 occurred, during which it was indicated that no opportunity for proffer would be considered unless Mr. Nauta fully complied with the SCO's investigation. *See* Mot. at 10 (Feb. 22, 2024).

Again, it bears noting that Mr. Woodward has requested the SCO transfer to this Court its now-secret proceedings before the grand jury investigating the matter giving rise to the instant indictment. Either, the treatment of Mr. Woodward by Mr. Bratt and his colleagues was unique to Mr. Woodward such that the prosecution of Mr. Nauta can only be defined as vindictive, or such treatment was pervasive throughout the investigation giving rise to the instant indictment and *this* Court should have the opportunity to review those proceedings and decide whether the prosecution of Mr. Nauta and his co-defendants was selective.

B.  The SCO Incorrectly Declares That No Other Comparators Exist for Purposes of Mr. Nauta's Selective Prosecution Claim

The SCO contends that the conduct of the similarly situated witnesses in the investigation noted by Mr. Nauta in his Motion are "not remotely comparable" to the conduct for which Mr. Nauta is being prosecuted. Opp'n at 8 (Mar. 7, 2024). It is for this reason that the SCO contends that Mr. Nauta has not established the first prong of the selective prosecution standard – that is, that Mr. Nauta did not identify a "comparator [who] committed the same basic crime in substantially the same manner as the defendant[.]" *Smith*, 231 F.3d at 809-10. In particular, the SCO noted that the similarly situated individuals and their corollary conduct identified in Mr. Nauta's Motion – [Per. 10] (to whom they refer to as "Comparator 1" in their opposition) and [Per. 11] (in their opposition as "Comparator 2") – were "not remotely comparable." Opp'n at 8 (Mar. 7, 2024). This assertion of the SCO is preposterously narrow.

For instance, in his motion, Mr. Nauta did not limit the universe of comparators or similarly situated individuals to like [Per. 11] or [Per. 10], but rather only offered those individuals as examples of comparators. Nevertheless, the SCO focused its opposition on these two individuals, devoting a substantial portion of its response in opposition and over 100 pages of exhibits in an effort to counter Mr. Nauta's argument that he was selectively prosecuted where other similarly situated individuals – like [Per. 11] and [Per. 10] – were not. While focusing its response on these two individuals, the government ignores the painful reality that there exists a universe of other comparators who, unlike Mr. Nauta, were likewise never prosecuted.

Concomitantly, Mr. Nauta adopts Former President Trump's Motion to Dismiss Based on Selective or Vindictive Prosecution, in which he argues that were at least an additional nine individuals identified by name who were never prosecuted. *See* Mot. (Feb. 22, 2024).[2] But that is not all. History teaches us there were more. As detailed in his motion, Former President Trump is not the first U.S. president to have allegedly maintained possession of purportedly classified documents after the expiration of his term of office. *Id.* at 1-13. Nor is he the first to have allegedly delayed turning over supposed presidential records to the government. *Id.* He is, however, the first former president to have been selectively and vindictively prosecuted for what is otherwise

---

[2] Former President Trump's Motion was filed directly with the Court via email on February 22, 2024 and has not yet been made available on the public docket as of the date of the instant filing.

lawful conduct. *Id.* at 1. Just as every other former president other than Former President Trump has not been prosecuted, their former and current staff members, unlike Mr. Nauta, were also not prosecuted. *Id.* at 1-13. The SCO, ignoring historical precedent, has nonetheless unlawfully and unconstitutionally selected Mr. Nauta as a target for prosecution. A fair reading of the recently released Hur Report[3] identifies other individuals, including but not limited to now President Biden's former and or current staff members and associates, who were at a minimum similarly situated to, and or comparators of Mr. Nauta. *Id.* at 1-13. They, however, unlike Mr. Nauta, have not been and will never be prosecuted. *See* Hur Report.

### C. Mr. Nauta is Entitled to Discovery to Permit Him to Further Evaluate His Claims of Selective and/or Vindictive Prosecution

The SCO argues that because the instant proceedings are in the pre-trial stages, there is no presumption of vindictiveness at this juncture. Opp'n at 12 (Mar. 7, 2024). This Circuit, however, has left open the question of whether a presumption of vindictiveness may apply in a pre-trial setting. *See Barner*, 441 F.3d at 1318. Ultimately, courts have been instructed to contemplate the "'realistic likelihood of vindictiveness' in a particular factual situation. . . and to determine whether any facts make a presumption of vindictiveness proper." *Id.* at 1317. Mr. Nauta, along with his co-defendants, has previously requested the Court to compel the production of "all correspondence and/or communications concerning counsel" with relation to the issues and events described *supra* to further investigate any such claims for selective and/or vindictive prosecution. Mot. at 53-55 (Jan. 16, 2024) (ECF No. 262). The Defendants' Motion to Compel was unresolved by the Court's deadline to file pretrial motions on February 22, 2024, and remains unresolved and without a scheduled hearing as of the date of this Motion. *See* Order (Nov. 10, 2023) (ECF No. 215). As such, in the absence of the necessary discovery in aid of claims of selective and/or vindictive prosecution, in tandem with an effort to comply with the February 22, 2024 pretrial motions deadline, Mr. Nauta had no other choice but to file his Motion with the facts currently in his possession.

Nevertheless, even pending an order on the requests detailed in the Defendants' Motion to Compel, Mr. Nauta is in possession of facts to support, and, as earlier detailed, established that

---

[3] *See* U.S. Dep't of Justice Special Counsel's Office, Report on the Investigation into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr. (Feb. 5, 2024) *available at* https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf. ("Hur Report").

8

those facts demonstrate a realistic likelihood of vindictiveness exists in order to evaluate whether a presumption of vindictiveness is proper here. Additionally, even if Mr. Nauta's requests as listed in the Defendants' Motion to Compel are not fulfilled under that vehicle, the foregoing evidence certainly raises reasonable doubt that the SCO acted properly in seeking his indictment and further establishes a colorable claim such that discovery on the matter must be compelled. *See Bonilla*, No. 07-20897-CR, 2010 U.S. Dist. LEXIS 164174, at *15 (S.D. Fla. May 20, 2010) (cleaned up).

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment against Mr. Nauta for the SCO's selective and vindictive prosecution of him or, in the alternative, compel relevant discovery to enable Mr. Nauta to appropriately address these claims.

[SIGNATURE NEXT PAGE]

Date: March 24, 2024                                  Respectfully submitted,

                                                            *s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (*pro hac vice*)
Brand Woodward Law, LP
400 Fifth Street NW, Suite 350
Washington, D.C. 20001
202.996.7447 (telephone)
202.996.0113 (facsimile)
stanley@brandwoodwardlaw.com

                                                            *s/ Sasha Dadan*
Sasha Dadan, Esq. (Fla. Bar No. 109069)
Dadan Law Firm, PLLC
201 S. 2nd Street, Suite 202
Fort Pierce, Florida 34950
772.579.2771 (telephone)
772.264.5766 (facsimile)
sasha@dadanlawfirm.com

*Counsel for Defendant Waltine Nauta*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2024, I electronically submitted the foregoing via electronic mail, to counsel of record.

<i>s/ Sasha Dadan</i>