UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON(s)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.
_____/

## GOVERNMENT'S SURREPLY TO DEFENDANT WALTINE NAUTA'S MOTION TO DISMISS FOR SELECTIVE AND VINDICTIVE PROSECUTION

The Government's response to defendant Waltine Nauta's motion to dismiss based on selective and vindictive prosecution explained that Nauta's motion was meritless. Rather than answering the arguments in the Government's response, Nauta's reply resorted to new arguments and factual claims that were available to him when he filed his motion, but that he elected not to raise. In his initial motion, Nauta claimed that events surrounding his receipt of a target letter and his subsequent indictment showed that he was vindictively indicted for exercising his rights under the Fifth Amendment. The reply, by contrast, contends that the Government charged Nauta based on animus toward his attorney, Stanley Woodward, arising from interactions prosecutors had with Woodward in this case and in cases involving other clients. In his motion, Nauta identified two specific individuals as alleged comparators to try to demonstrate he was selectively prosecuted.

Nauta's reply, by contrast, newly cites the *Hur Report*,[1] and contends that the list of relevant comparators extends far beyond the two individuals specifically identified in his motion to a universe of (unnamed) staff members for other Presidents.

These entirely new claims are meritless. The animus claim is not only legally flawed—because the applicable legal standard requires a showing of animus toward a defendant, not his attorney—but is also based on false accusations that cannot go unanswered. There was never any threat or offer of a *quid pro quo*, explicit or implicit, to Woodward to secure Nauta's cooperation. It did not happen. All four prosecutors present at the meeting are clear that it did not happen, and no mention of the alleged conduct was made to any other prosecutor, court, or legal oversight body until attorneys for *Trump*—whose political action committee pays Nauta's legal fees—surfaced it almost ten months later in June 2023, after Trump and Nauta received target letters. Nauta's more generalized claims of a "campaign of harassment" against his attorney are equally specious, as discussed in detail below. And Nauta's new reliance on the *Hur Report* for his selective prosecution claim is likewise unavailing because it identifies no similarly situated comparator. The *Hur Report* does not mention anyone who engaged in the same collection of deceitful and obstructive conduct as Nauta. The Court should reject Nauta's arguments and deny his motion.

I.     **Vindictive Prosecution**

   A.     **Animus toward an attorney cannot predicate a vindictive prosecution claim.**

A defendant claiming vindictive prosecution must prove animus and causation: he must show that the prosecutor intended to punish him for exercising a legal right, and that the animus caused the prosecutor's actions (here the decision to obtain an indictment). *See United States v.*

---

[1] *See* Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* ("Hur Report").

*Barner*, 441 F.3d 1310, 1322 (11th Cir. 2006). Precedent addressing vindictive prosecution makes clear that a claim must allege genuine animus directed at the defendant, not someone else. *See, e.g.*, *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (requiring showing that "the prosecutor acted with genuine animus toward the defendant"); *United States v. Taylor*, 749 F.2d 1511, 1514 (11th Cir. 1985) (per curiam) ("A prosecutor's charging decision does not impose an improper 'penalty' on a defendant unless it results from the defendant's exercise of a protected legal right, as opposed to the prosecutor's normal assessment of the social interests to be vindicated by the prosecution."); *Barner*, 441 F.3d at 1322. Nauta cites no case suggesting that animus against a defense attorney can form the basis for a vindictive prosecution claim, and the Government has found none. In the only cases the Government located where a defendant made such a claim, the courts rejected it. *See United States v. Vincent*, No. 2:08-CR-252, 2008 U.S. Dist. LEXIS 90241, at *11 (D. Utah Nov. 5, 2008) ("Defendant has offered no justification for his argument that a claim of vindictive prosecution may be based upon animus towards defense counsel."); *United States v. Obie*, No. 1:18-CR-007, 2018 U.S. Dist. LEXIS 206781, at *10 (N.D. Ga. Dec. 6, 2018) (seeking disqualification of defense counsel not a basis for a vindictive prosecution claim); *see also United States v. Rasco*, No. CR408-100, 2010 U.S. Dist. LEXIS 52767, at *20 (S.D. Ga. May 27, 2010) (Government brief showing "disdain for the tactics" of counsel in responding to attacks on prosecutor's integrity not directed at defendant himself).

Nauta's argument fares no better to the extent he claims (Reply at 4) that the alleged coercive conduct toward Woodward was aimed at encouraging Nauta to cooperate. Not only are those allegations false, as discussed below, but as the Government explained in its initial opposition to Nauta's motion (Resp. at 11-12), prosecutors' advising an individual he will be prosecuted if he does not choose to cooperate does not make out a vindictive prosecution claim.

3

*See United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017). When a "party refused to cooperate, prosecution, based upon probable cause to believe the defendant committed the crime charged," is not vindictive. *United States v. Boss*, 652 F.2d 36, 38 (10th Cir. 1981); *see generally Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (1978) ("[T]his Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty," and it does not violate due process for a prosecutor to "openly present[] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution.").

      **B.**      **Prosecutors did not threaten or propose a *quid pro quo* to Nauta's attorney at their August 2022 meeting.**[2]

Nauta alleges that in August 2022, the very first time Woodward met prosecutor Jay Bratt, "Bratt threatened [ ] Woodward's judicial application in exchange" for Nauta's cooperation, Reply at 3, by saying that Bratt "wouldn't want [Woodward] to do anything to mess that up," *id.* at 1. That is false. Three other federal prosecutors attended the meeting and are clear that no such thing occurred. And Woodward's silence about the allegation until June 2023—when, soon after Trump and Nauta were served target letters notifying them that they were putative defendants, Trump attempted to leverage the allegation to persuade a court in the District of Columbia to disclose grand jury material—exposes it as a sham.

The prosecutors in this case had their first interaction with Woodward in mid-August 2022, shortly after Nauta retained Woodward as his lawyer. By that time, Nauta had been interviewed by the FBI in May 2022; had testified before the grand jury in June 2022; and had been informed

---

[2] The Government has previously addressed these allegations. ECF Nos. 115, 116; *see* ECF Nos. 101, 118. As recently noted, "[t]he Government does not object to the Court unsealing these docket entries," subject to redaction, "but until it does so," the portions of Nauta's reply brief that reference, summarize, and quote from these sealed filings "must be redacted." ECF No. 423 at 2.

4

that, based on security camera footage obtained in July 2022 indicating that he had misled the FBI and grand jury, he was a subject of the grand jury's investigation. After Woodward confirmed he represented Nauta, prosecutors invited him to meet to discuss his new client on August 24, 2022.

None of the prosecutors knew Woodward or had worked on a case involving Woodward before, so prior to the meeting, Bratt searched the internet to learn about him. Bratt found a web page indicating (he thought) that Woodward was on the District of Columbia Judicial Nomination Commission, which handles recommendations for nominations to the bench.[3] When Bratt and two other prosecutors met in person with Woodward on August 24—a fourth prosecutor participated by videoconference—Bratt introduced himself and mentioned that he was aware of the favorable reputation of Woodward's law partner, Stanley Brand, and noted Woodward's service on the Judicial Nomination Commission as an impressive credential. Woodward corrected Bratt and said he was not a member of the Commission, but instead that his name had been submitted to the White House by the Commission as a potential judicial nominee to the District of Columbia Superior Court. He did not mention that the recommendation had come in November 2020, roughly 21 months earlier. At no point did Bratt respond with anything that could be considered a threat or a suggestion of a *quid pro quo*.

After this exchange at the meeting's outset, the prosecutors and Woodward discussed Nauta's status as a subject of the investigation, Nauta's role in concealing evidence from the FBI and the grand jury, and prosecutors' interest in Nauta's possible cooperation. When the meeting ended, Woodward thanked prosecutors and said he would consult with his client and follow up.

---

[3] A Google search for "Stanley Woodward" reveals a link entitled "Stanley Woodward, Jr. / jnc - Judicial Nomination Commission." That link leads to a webpage with the prominent header "Judicial Nomination Commission," underneath which Woodward's biography appears. The webpage does not mention Woodward's eligibility for a judicial appointment. *See* Exhibit 1 (available at https://perma.cc/M8UK-4UTH).

No threat, suggestion, or anything resembling an offer to benefit Woodward through a judicial appointment was made at that meeting or at any time afterward, and the fiction that something untoward had occurred was not uttered to the Government or any court until nine months later.

Between May 19 and May 23, 2023, the Government sent Trump and Nauta, through their attorneys, letters informing them that they were targets of a grand jury investigation and inviting them to testify.  On June 4—on the eve of a meeting in which Trump's attorneys advocated to the Special Counsel and others in the Department of Justice that Trump not be charged—Trump filed a sealed motion seeking disclosure of grand jury material, in which he alleged that Bratt "threatened [Woodward] that he would lessen his odds of a judicial appointment if he failed to pressure [Nauta] to cooperate with" the Government's investigation.  ECF No. 115-1 at 1-14.  This accusation was never leveled before June 2023, and is implausible to say the least.  It rests on a tortured theory that a 30-year veteran federal prosecutor, with three other federal prosecutors watching, attempted to extort a defense attorney he had just met by threatening to contact the White House, in violation of Department Policy, in order to discourage the President from advancing a long-dormant nomination to the Superior Court bench, unless the attorney promised to secure the cooperation of a client who had just retained him.  Simply put, the accusation is false.

C.      **Prosecutors did not harass Woodward or neglect his personal needs.**

Nauta's second new allegation—that the Government "harass[ed]" Woodward and was "wholly indifferent to [his] personal needs" (Reply at 5-6), merely because the Government insisted on the timely grand jury appearance of another Woodward client—is also false.

In September 2022, approximately two months before the Special Counsel was appointed, Woodward Client 1 was served with a subpoena to testify before the grand jury.  Woodward Client 1 requested a two-week extension, to which the Government consented.  After the extension was

6

granted, Woodward contacted prosecutors, explaining that he had been retained by Woodward Client 1, and requested an indefinite extension of his client's grand jury appearance because Woodward had just begun a lengthy jury trial in the District of Columbia. The Government refused the indefinite extension,[4] but offered various alternatives, including scheduling Woodward Client 1's grand jury appearance for afternoons when the trial was not in session, or a voluntary interview over a weekend. Woodward rejected these accommodations and filed a motion to quash the grand jury appearance. The Chief Judge in the District of Columbia denied the motion:

> [Woodward Client 1] requests a delay of some unspecified time period in his testimony because his counsel, Stanley Woodward, will be engaged in the *United States v. Rhodes* trial, Case No. 22-cr-15, scheduled to last several weeks, with no promises as to when his counsel will have time available. [Woodward Client 1] retained Mr. Woodward on the attorney's first day of jury selection in *Rhodes* when such circumstance made fully apparent that counsel would be unavailable during [his] scheduled grand jury testimony. In addition, the government has already demonstrated flexibility in meeting [his] scheduling needs . . . . This grand jury proceeding must be given the highest priority as the investigation involves national security, and [Woodward Client 1] cannot delay the investigation by refusing to engage with the government's proposals to proceed expeditiously. In communications with the government, his current counsel indicated that he expects the Rhodes trial to conclude "as soon as possible" because his wife is expected to give birth October 23, 2022—potentially posing yet another reason up [Woodward Client 1's] sleeve to delay the proceedings. Testifying before a grand jury is not a game of find-or-seek-a-better-time or catch-me-if-you-can, and a witness cannot indefinitely delay a proceeding based on his counsel's convenience, particularly when that counsel is a member of a law firm with multiple lawyers, who may be made available to provide legal advice when one lawyer in the firm is unavailable.

Minute Order (Oct. 11, 2022) (Exhibit 2).[5] There was nothing improper—much less harassing or vindictive—about the Government's unwillingness to agree to a lengthy, open-ended delay.

Nauta's contention (Reply at 6) that the Government was "wholly indifferent to Mr. Woodward's personal needs" after Woodward was involved in an accident is also false. A few

---

[4] The trial ended on November 29, two months after Woodward contacted prosecutors.

[5] The Government has obtained permission to disclose the minute order in this surreply.

7

days before Woodward Client 1's second scheduled grand jury date,[6] the Government learned that Woodward had been involved in an accident. A prosecutor e-mailed him to express sympathy: "I heard through the grapevine about your injury. I'm sorry to hear it and wish you a speedy recovery." Exhibit 3. Woodward thanked the prosecutor and said he would have a better sense of his availability after tests that week. In a call the next day, the prosecutor agreed to Woodward's request to delay Woodward Client 1's grand jury testimony to the following week: "Following up on our call earlier today, we have moved [Woodward Client 1]'s scheduled grand jury testimony to next Thursday, November 3 . . . . And again, our sympathies on your accident and very best wishes for a good prognosis and prompt recovery." *Id.* The Government demonstrated anything but "a campaign of intimidation and harassment against Nauta's counsel." Reply at 4.[7]

**D.    Prosecutors did not vindictively seek a motion to compel Woodward Client 2.**

Next, Nauta alleges (Reply at 5) that "Mr. Bratt and his colleagues also vindictively sought a motion to compel" compliance with a grand jury subpoena by another Woodward client, Woodward Client 2. No part of that assertion is true: neither Bratt nor his colleagues on the classified documents investigation sought a motion to compel that client, let alone vindictively.

---

[6] Woodward Client 1 first appeared before the grand jury on October 13, 2022, but invoked the Fifth Amendment and refused to answer questions. Thereafter, the Government compelled Woodward Client 1's testimony by granting him statutory immunity under 18 U.S.C. § 6003.

[7] Woodward represented numerous individuals who testified before the grand jury in the classified documents investigation, as well as in the separate election-fraud investigation. According to Nauta, when Woodward made one of his multiple requests to put off a client's grand jury testimony, a prosecutor (who later joined the Special Counsel's Office) "responded with words to the effect of, 'what excuse will you . . . come up with next?'" Reply at 6. Even if those words were used, Nauta does not mention the larger context, including the email correspondence between the prosecutor and Woodward (noted above) in which the prosecutor accommodated Woodward and expressed sympathy for his mishap. And even if taken at face value, a lawyer's rhetorical question that, at worst, conveys frustration with opposing counsel's repeated delays hardly amounts to a violation of the constitutional rights of the opposing counsel's client.

In early November 2022, before the Special Counsel was appointed, as prosecutors were moving to ensure the grand jury appearance of Woodward Client 1 in the classified documents investigation, a separate team of prosecutors from the United States Attorney's Office for the District of Columbia were independently working to secure Woodward Client 2's compliance with a grand jury subpoena in a separate election-fraud investigation.  At the time, that investigation was being handled by an entirely separate team under a different supervisory chain, and Bratt had no role in it.[8]  Nothing in Nauta's reply brief shows that the prosecutors in the election-fraud investigation held animus toward Woodward or Nauta (who was not even a witness or subject in that case), but even if they did, such animus could not be imputed to this case.  *See United States v. Wilson*, 262 F.3d 305, 320 (4th Cir. 2001) (declining to "impute the improper motivation" from one United States Attorney's Office to another when a case was transferred).  Nauta's accusation that prosecutors vindictively moved to compel Woodward Client 2 is false, and his insinuation that the episode establishes animus toward Nauta is legally baseless.

**II.      Selective Prosecution**

As explained in the Government's response, Nauta bears a demanding burden to establish a selective prosecution claim.  Resp. at 7.  Among other things, he must identify a "nearly identical" comparator, *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015), who "committed the same basic crime in substantially the same manner," *United States v. Smith*, 231 F.3d 800, 809-10 (11th Cir. 2000).  Nauta does not come close to meeting the requisite threshold.  The two individuals Nauta identified in his motion to dismiss are not remotely like Nauta for

---

[8] In the classified documents investigation, Woodward Client 2 testified before the grand jury on December 1, 2022, but there was no motion to compel involved.  In the election-fraud investigation, Woodward Client 2 acceded to a court order to produce documents responsive to a grand jury subpoena by November 14, 2022—over two months after the subpoena was served—and testified before the grand jury on November 16, 2022, and May 2, 2023.

9

purposes of selective prosecution. Resp. at 7-9. Instead of responding to those arguments, Nauta pivots in his reply, citing "a universe of other comparators," Reply at 7, but without providing any names, let alone explaining how these unidentified individuals committed the same basic crime in substantially the same manner. For the first time, he cites the *Hur Report*, claiming that it "identifies other individuals, including but not limited to now President Biden's former and or current staff members and associates," who were similarly situated to Nauta. *Id.* at 8. But nowhere in the report is there described a person similarly situated to Nauta—who lied to and misled the FBI and the grand jury, surreptitiously hid boxes of documents after being told by the FBI that there was a federal investigation into them, and attempted to delete camera footage showing the movement of those boxes. If Nauta is obliquely referring to Biden's ghostwriter, he is not similarly situated. The ghostwriter initially deleted certain audio recordings, on his own initiative, before he was contacted by the FBI, but then volunteered to the FBI the fact that he had done so and provided the FBI with the devices from which the deleted recordings were recovered. *Hur Report* at 334-43. This and other evidence "support[ed] the conclusion that [the ghostwriter] acted with good faith and did not intend to impede, obstruct, or influence th[e] investigation," *id.* at 342, making his conduct readily distinguishable from Nauta's. His new arguments should be rejected.

### III. Conclusion

Nauta's motion to dismiss the Superseding Indictment for vindictive and selective prosecution should be denied in its entirety. The factual allegations on which he predicates his motion are false and, even if credited, provide no legal basis to support his claim. Neither discovery nor an evidentiary hearing is warranted to resolve the motion, and it should be denied.

                                    Respectfully submitted,

                                    JACK SMITH
                                    Special Counsel
                                    N.Y. Bar No. 2678084

By:    /s/ *David V. Harbach, II*
        David V. Harbach, II
        Assistant Special Counsel
        Special Bar ID #A5503068
        950 Pennsylvania Avenue, NW
        Washington, D.C. 20530

        Jay I. Bratt
        Counselor to the Special Counsel
        Special Bar ID #A5502946

        Michael E. Thakur
        Assistant Special Counsel
        Florida Bar No. 1011456

April 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically transmitted the foregoing document to counsel of record via CM/ECF.

/s/ *Michael E. Thakur*
Michael E. Thakur