**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

       Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, **and**
**CARLOS DE OLIVEIRA,**

       Defendants.

_____/

**GOVERNMENT'S OPPOSITION TO WALTINE NAUTA'S**
**MOTION TO SUPPRESS EVIDENCE**

## TABLE OF CONTENTS

I.      Factual Background ........................................................................................................ 1

    A.      The Nauta Warrants ........................................................................................... 1

    B.      The Warrant Affidavits ....................................................................................... 3

II.     Argument ...................................................................................................................... 7

    A.      Probable Cause .................................................................................................... 8

        1.      The Affidavits Established Probable Cause for All the Listed Offenses ............... 8

        2.      The Good-Faith Exception Forecloses Suppression .............................. 14

    B.      There Were No Materially Misleading Omissions in the Affidavits ......................... 14

    C.      Particularity and Overbreadth ..................................................................... 20

    D.      Execution of the Search Warrants Was Reasonable .................................. 22

    E.      No Due Process Violations ........................................................................... 23

III.    Conclusion ...................................................................................................................... 25

Defendant Waltine Nauta moves to suppress evidence obtained through the execution of court-authorized warrants to search his cell phones and electronic accounts. Waltine Nauta's Motion to Suppress Evidence ("Mot.").[1] Nauta identifies no material omissions or deficiencies in the warrants or the manner in which they were carried out that would remotely support a hearing or suppressing the evidence obtained through those warrants. To the contrary, the warrants were supported by probable cause and were executed appropriately. The findings of probable cause by the Chief Judge in the District of Columbia and the magistrate judge in this district were correct. In any event, those findings are entitled to deference and were relied on in good faith by the agents who executed the warrants. The suppression motion should be denied.

## I.      Factual Background

### A.      The Nauta Warrants

In October and November 2022, Magistrate Judge Bruce E. Reinhart issued warrants to search (1) Nauta's two Apple iPhone cell phones (Gov't Ex. 1); (2) Nauta's car in Florida for the limited purpose of seizing Nauta's two iPhones (Gov't Ex. 2); (3) Nauta's West Palm Beach apartment for the limited purpose of seizing Nauta's two iPhones (Gov't Ex. 3); (4) Nauta's work email account (Gov't Ex. 4); (5) Nauta's personal iCloud account, which was linked to both his iPhones (Gov't Ex. 5); and (6) Nauta's work iCloud account linked to his work phone (Gov't Ex. 6).[2] The same FBI special agent provided affidavits in support of each of these warrants (the "South Florida warrants").

---

[1] Nauta's motion has not yet been docketed publicly or received an ECF number. This response does not require redactions and therefore the Government files it on the public docket, but pursuant to the Court's order (ECF Nos. 320, 365), the Government will seek redactions to the ten Government exhibits cited in this response and will submit those exhibits to the Court by email.

[2] Because the FBI seized Nauta's two cell phones outside his residence based on warrant (1), warrants (2) and (3) were not executed and, accordingly, there is no evidence to suppress from those two warrants.

On February 6, 2023, Chief Judge Beryl Howell in the District of Columbia issued warrants for (7) Google location data for Nauta's Google account (Gov't Ex. 7), and (8) Verizon cellsite location data for Nauta's phones (Gov't Ex. 8).  A different FBI special agent provided affidavits in support of these warrants (the "D.C. warrants").[3]

To avoid intrusion into any potentially privileged material, the South Florida warrants contained the following filter protocol for potential attorney-client privilege:

> NAUTA has been represented by attorneys in this matter since at least in or around May 2022.  A Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice.  The Filter Team will have no future involvement in the investigation of this matter.  At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials.  The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review.  If at any time the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents can review the potentially privileged documents.  If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team.  If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to court for judicial review.

---

[3] There was nothing improper, as Nauta insinuates, about the Government obtaining the location warrants in D.C. after having obtained warrants for Nauta's phones and electronic accounts in the Southern District of Florida.  The Southern District of Florida was the proper venue to seek the phone warrants because Nauta's phones were physically located in West Palm Beach at the time, *see* Fed. R. Crim. P. 41(b)(1), and, for efficiency, the Government appropriately sought warrants for electronic accounts associated with those phones at the same time.  It was also appropriate to apply for the location data warrants in D.C. in February 2023.  At the time, a grand jury in D.C. was actively investigating obstruction of the grand jury's investigation by Nauta and others, and under the Stored Communications Act, venue existed for obtaining the warrants in any court having jurisdiction over the offenses being investigated.  *See* 18 U.S.C. § 2711(3)(A)(i).

Gov't Ex. 1 ¶ 64; Gov't Exs. 2 and 3 ¶ 65; Gov't Ex. 4 ¶ 62; Gov't Ex. 5 ¶ 80; Gov't Ex. 6 ¶ 79. The D.C. warrants did not contain a filter protocol because those warrants only sought location information, not the contents of electronic communications, and therefore would not yield privileged communications.

### B.    The Warrant Affidavits

The affidavits alleged the following facts supporting probable cause.  Unless otherwise noted, these facts were included in each of the Nauta warrants.

Nauta is an employee of defendant Donald J. Trump and had been a valet in the White House during Trump's administration.  Nauta previously held a high-level security clearance and received training in handling classified documents.  Gov't Exs. 1, 2, and 3 ¶ 10; Gov't Exs. 4, 5, and 6 ¶ 11; Gov't Exs. 7 and 8 ¶ 12.

During his presidency, Trump used dozens of boxes to accumulate and store records in an informal filing system.  Gov't Exs. 1, 2, and 3 ¶ 12; Gov't Exs. 4, 5, and 6 ¶ 13; Gov't Exs. 7 and 8 ¶ 14.  At the end of his presidency in January 2021, around 85 to 95 of these boxes were removed from the White House and transported to Mar-a-Lago, Trump's residence in Palm Beach, Florida, where they were later placed in a storage room.  Gov't Exs. 1, 2, and 3 ¶¶ 14-17; Gov't Exs. 4, 5, and 6 ¶¶ 15-18; Gov't Exs. 7 and 8 ¶¶ 16-19.  Nauta was part of the team that packed items into boxes for Trump in his residence at the White House for the move to Mar-a-Lago at the end of Trump's presidency in January 2021.  Gov't Exs. 1, 2, and 3 ¶ 13; Gov't Exs. 4, 5, and 6 ¶ 14; Gov't Exs. 7 and 8 ¶ 5.  Throughout 2021, the National Archives and Records Administration ("NARA") had ongoing communications with Trump's representatives to obtain records from his administration.  Gov't Exs. 1, 2, and 3 ¶ 18; Gov't Exs. 4, 5, and 6 ¶ 19; Gov't Exs. 7 and 8 ¶ 20. Trump wanted to review his boxes before providing them to NARA, and employees (including

Nauta) brought two to four at a time to his personal residence in Mar-a-Lago for him to review. Gov't Exs. 1, 2, and 3 ¶¶ 18-19; Gov't Exs. 4, 5, and 6 ¶¶ 19-20; Gov't Exs. 7 and 8 ¶¶ 20-21. After the employees (including Nauta) brought about 15 to 17 boxes, Trump instructed them to stop, and on January 17, 2022, employees handed over 15 boxes to NARA.  Gov't Exs. 1, 2, and 3 ¶¶ 21-24; Gov't Exs. 4, 5, and 6 ¶¶ 22-25; Gov't Exs. 7 and 8 ¶¶ 23-26.  Trump indicated to his staff that the 15 boxes were the only boxes that would be going to NARA and that there were no more, and he instructed an employee to tell one of his lawyers there were no more boxes at Mar-a-Lago.  Gov't Exs. 1, 2, and 3 ¶¶ 23-25; Gov't Exs. 4, 5, and 6 ¶¶ 24-26; Gov't Exs. 7 and 8 ¶¶ 25-27.  But about 70 to 80 boxes remained in the storage room. Gov't Exs. 1, 2, and 3 ¶ 26; Gov't Exs. 4, 5, and 6 ¶ 27; Gov't Exs. 7 and 8 ¶ 28.

NARA reviewed the 15 boxes and found highly classified documents intermixed with other records.  Gov't Exs. 1, 2, and 3 ¶ 6; Gov't Exs. 4, 5, and 6 ¶ 7; Gov't Exs. 7 and 8 ¶ 8.  NARA's Office of the Inspector General sent a referral to the Department of Justice by email on February 9, 2022.  *Id*.  The FBI reviewed the 15 boxes and determined that 14 of the boxes contained a total of over 100 documents with classification markings.  Gov't Exs. 1, 2, and 3 ¶ 27; Gov't Exs. 4, 5, and 6 ¶ 28; Gov't Exs. 7 and 8 ¶ 29.  On May 11, 2022, an attorney for Trump accepted service of a grand jury subpoena for all documents with classification markings in the custody or control of Trump and/or his office.   Gov't Exs. 1, 2, and 3 ¶¶ 8, 28; Gov't Exs. 4, 5, and 6 ¶¶ 9, 29; Gov't Exs. 7 and 8 ¶ 10, 30.  On June 2, 2022, the lawyer went to Mar-a-Lago to search through the boxes in the storage room for responsive documents, and he collected documents from the boxes and placed them in a folder. Gov't Exs. 1, 2, and 3 ¶¶ 29, 36, 38; Gov't Exs. 4, 5, and 6 ¶¶ 30, 37, and 39; Gov't Exs. 7 and 8 ¶ 31, 38, and 40.  Prior to the attorney's June 2 search for responsive records in the storage room, between May 24 and June 1, 2022, Nauta moved approximately 64

boxes out of the storage room, and on June 2, shortly before the attorney went to the storage room to conduct his search, Nauta moved 25 to 30 boxes back into the storage room. Gov't Exs. 1, 2, and 3 ¶¶ 36-37; Gov't Exs. 4, 5, and 6 ¶¶ 37-38; Gov't Exs. 7 and 8 ¶ 38-39. On June 3, 2022, when the attorney gave the folder with the responsive documents to FBI agents, containing over three dozen documents with classification markings, the attorney also provided a certification (signed by another attorney for Trump) stating that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." Gov't Exs. 1, 2, and 3 ¶ 29; Gov't Exs. 4, 5, and 6 ¶ 30; Gov't Exs. 7 and 8 ¶ 31.

Nauta twice provided false or misleading information to federal investigators about his knowledge of the boxes. First, on May 26, 2022, Nauta gave a recorded, voluntary interview to the FBI. Gov't Exs. 1, 2, and 3 ¶ 39; Gov't Exs. 4, 5, and 6 ¶ 40; Gov't Exs. 7 and 8 ¶ 41. The agents explained to Nauta that the FBI was investigating the storage of classified documents at Mar-a-Lago and was particularly interested in where the boxes with classified documents (the 15 boxes provided to NARA in January 2022) had been located and whether they had been moved outside the storage room. *Id.* During the interview, Nauta—who had moved the boxes for weeks, two or three boxes at a time, from the storage room to Trump's residence for Trump to review— falsely stated that he first saw the boxes in Pine Hall, the anteroom to Trump's personal residential suite at Mar-a-Lago, on the day the truck arrived to pick up the NARA boxes from Mar-a-Lago, on January 17, 2022, and that he did not know where the boxes had come from prior to their being in Pine Hall. Gov't Exs. 1, 2, and 3 ¶ 40; Gov't Exs. 4, 5, and 6 ¶ 41; Gov't Exs. 7 and 8 ¶ 42. Second, on June 21, 2022, Nauta testified before a federal grand jury in D.C. and concealed from

the grand jury the large number of boxes he had removed from the storage room prior to June 2, 2022, when the attorney reviewed boxes in the storage room to comply with the grand jury subpoena. Gov't Exs. 1, 2, and 3 ¶ 42; Gov't Exs. 4, 5, and 6 ¶ 43; Gov't Exs. 7 and 8 ¶ 44. On August 8, 2022, the FBI executed a warrant to search Mar-a-Lago. Gov't Exs. 1, 2, and 3 ¶ 43; Gov't Exs. 4, 5, and 6 ¶ 44; Gov't Exs. 7 and 8 ¶ 46. The agents found over 100 documents bearing classification markings, in both the storage room and Trump's office. *Id*.

The South Florida warrant affidavits further explained that Nauta had encrypted messaging applications on both his personal and work cell phones and used both phones to communicate with colleagues and Trump; that he used his Gmail account, which was associated with his personal phone, as well as his work email to communicate with several colleagues; and that he was on an email distribution list with Trump's daily schedule.[4] Gov't Exs. 1, 2, and 3 ¶¶ 47-51; Gov't Ex. 4 ¶¶ 48-51; Gov't Exs. 5, 6 ¶¶ 48-52.

The D.C. warrant affidavits contained information obtained through execution of the South Florida warrants on Nauta's phones and additional evidence of Nauta's involvement in obstruction. Text messages from Nauta's phone showed that on the evening of June 24, 2022, the same day

---

[4] The Government has produced the search warrant materials to Nauta in discovery. However, the full version of the work iCloud warrant application (Gov't Ex. 6) was given to Nauta's counsel on March 1, 2024, after the Government noticed that this warrant was not mentioned in Nauta's motion, and after confirming with Nauta's counsel that he did not possess a full, unredacted copy of this warrant application. However, the property receipt associated with this warrant was produced to Nauta earlier, and the filtered, scoped returns from this warrant were also previously produced to Nauta. Moreover, in August 2023, Nauta's counsel was informed in a letter from a Government filter attorney that he was provided with an unredacted, unscoped copy of the production for this iCloud account. Finally, a redacted version of this warrant affidavit has been publicly available since August 2023. *See* 22-mj-8550, ECF No. 14 (Aug. 28, 2023). The iCloud warrant application was identical to the other South Florida warrants for purposes of the issues raised in this motion, and, as explained below, there is no basis to suppress evidence from any of the warrants.

that the Department of Justice had sent counsel for the Trump Organization a subpoena for Mar-a-Lago CCTV security footage and three days after Nauta had testified in the grand jury, Nauta had begun coordinating a secret trip to Mar-a-Lago for the next day (June 25). Gov't Exs. 7 and 8 ¶ 45. Nauta falsely told several people that he was going to Florida because he had a family emergency. *Id.* Instead, Nauta communicated with the Mar-a-Lago property manager, codefendant Carlos De Oliveira, and flew from New Jersey to Palm Beach, where—as shown on the subsequently obtained security footage and corroborated by text messages—Nauta and De Oliveira met at Mar-a-Lago the evening of June 25, 2022. *Id.* There, the two walked in the basement tunnels and entered the storage room area. Nauta appeared to be holding a cell phone in his hand, and De Oliveira gestured in the direction of CCTV cameras in the vicinity of the storage room. *Id.*

The D.C. warrant affidavits further explained that location information connected to Nauta's Google account and from his cell phone service provider would aid in the investigation by pinpointing where Nauta was at key points relevant to the case, including his whereabouts when he rendezvoused at Mar-a-Lago with De Oliveira the weekend of June 25 after Trump received the subpoena for CCTV footage that would show Nauta and De Oliveira moving boxes. Gov't Exs. 7 and 8 ¶¶ 55-56.

## II.    Argument

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. Nauta contends that (1) the warrant affidavits failed to establish probable cause for the searches authorized by the warrants, Mot. at 9-18; (2) the affidavits contained intentionally or recklessly false statements or misleading omissions

that were necessary to establishing probable cause, Mot. at 19-22; (3) the warrants failed to state the places to be searched and items to be seized with sufficient particularity, Mot. at 16-18; (4) agents went beyond the scope of the searches authorized by the warrants when executing the warrants, Mot. at 18-19; and (5) certain vaguely described due-process violations require suppression of the fruits of the warrants, Mot. at 22-23.  These arguments are without merit.

A.      **Probable Cause**

The affidavits submitted in support of the warrants to search Nauta's electronic devices and associated electronic records amply established probable cause for those searches.  But even if the warrants fell short in establishing probable cause, which they did not, the good-faith exception to the exclusionary rule would foreclose suppression of the evidence obtained through execution of the warrants.

1.      **The Affidavits Established Probable Cause for All the Listed Offenses**

"Probable cause exists 'if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched.'"  *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (quoting *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982)).  "The issuing magistrate is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained."  *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).  "A magistrate's decision that probable cause exists is conclusive absent arbitrariness."  *Betancourt*, 734 F.2d at 754.  "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.  A magistrate's determination of probable cause should be paid great deference by reviewing courts."

*Gates*, 462 U.S. at 236 (quotation marks omitted).  The affidavits here established probable cause to conclude that evidence of each of the crimes listed in the warrants would be found in Nauta's electronic devices and associated electronic records.[5]

### a.     18 U.S.C. § 793(e) and 18 U.S.C. § 1519

The affidavits provided ample basis to conclude that evidence of unlawful retention of national defense information, in violation of 18 U.S.C. § 793(e), and evidence of efforts to impede or obstruct a federal criminal investigation, in violation of 18 U.S.C. § 1519, would be found in Nauta's electronic devices and associated electronic records.  Those affidavits described the large volume of documents with classified markings found at Mar-a-Lago; Trump's familiarity with the boxes; his requests to have them brought to the hall outside his residence for his review; and his efforts to retain the boxes by (a) falsely claiming that all of the boxes with presidential records had been given to NARA, and (b) misleading his attorney through Nauta's surreptitious box movement in the days prior to the attorney's review in the storage room.  The affidavits also depict Nauta's central role in the obstruction: the FBI informed Nauta during an interview on May 26, 2022, that there was an investigation of classified documents at Mar-a-Lago with a particular focus on the storage room and other locations where classified documents might be located.  Gov't Exs. 1, 2, and 3 ¶ 39; Gov't Exs. 4, 5, and 6 ¶ 40; Gov't Exs. 7 and 8 ¶ 41.  Within six days of that interview, Nauta went to the storage room and removed approximately 60 boxes, and accompanied Trump's attorney to the storage room on June 2 knowing that the attorney was there to review boxes, and

---

[5] Contrary to Nauta's assertion (Mot. at 3-4), the fact that the Superseding Indictment does not include charges of violating 18 U.S.C. § 2071 or 18 U.S.C. § 1623 does not mean that probable cause was lacking for those offenses.  *See, e.g.*, *United States v. Vann*, 336 F. App'x 944, 946 (11th Cir. 2009) (affirming denial of suppression where the defendant "was not indicted for the controlled buys conducted on April 21, 2007 and described in the officers' search warrant affidavit").  That is particularly true where, as here, his grand jury testimony occurred in a different district from where he was indicted.

knowing that he (Nauta) had removed at least thirty more boxes from the storage room than he had subsequently put in.  Gov't Exs. 1, 2, and 3 ¶ 36; Gov't Exs. 4, 5, and 6 ¶ 37; Gov't Exs. 7 and 8 ¶ 38.  The D.C. affidavits included additional evidence supporting probable cause, including evidence of Nauta's clandestine trip to Mar-a-Lago on the heels of Trump receiving a subpoena for CCTV footage at Mar-a-Lago that would reveal Nauta's surreptitious box movement.  Gov't Exs. 7 and 8 ¶ 45.

Nauta's claim that the affidavits "failed to show that national defense information was involved" is wrong.  Mot. at 12.  The affidavits noted that scores of documents with classification markings were stored at Mar-a-Lago, including documents at the highest classification levels with limited distribution.  *See* Gov't Exs. 1, 2, and 3 ¶ 6; Gov't Exs. 4, 5, and 6 ¶ 7; Gov't Exs. 7 and 8 ¶ 8.  As the affidavits explained, based on the affiant's training and experience in the counterintelligence division, documents with those classification markings would be expected to contain national defense information.  *See* Gov't Exs. 1, 2, and 3 ¶¶ 2, 43; Gov't Exs. 4, 5, and 6 ¶¶ 2, 44; Gov't Exs. 7 and 8 ¶¶ 2, 46.  *See United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation for issuing a search warrant.") (quotation marks omitted).  Those allegations were more than adequate to provide probable cause that documents with national defense information were stored at Mar-a-Lago.

Nauta's contention that the warrant needed to include evidence that Nauta himself violated Section 793, or any other offense listed in the warrant for that matter, is contrary to well-established law.  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436

U.S. 547, 556 (1978); *see also Haire v. Thomas*, 219 F. App'x 844, 846 (11th Cir. 2006) ("To issue the warrant the magistrate judge had to determine only that there was a 'fair probability' that Haire has evidence in his home relating to the underlying fraud. The evidence did not necessarily have to implicate Haire in the crime."). Therefore, for purposes of probable cause for the warrant, the affidavits only needed to establish that there was probable cause that evidence of the stated crimes, whether committed by Trump or Nauta, could be found in the property to be searched, *i.e.*, Nauta's phones and electronic accounts. The affidavits amply made that showing.

### b.    18 U.S.C. § 1001 and 18 U.S.C. § 1623

During his FBI interview, Nauta falsely claimed that he was not aware where Trump had stored boxes at Mar-a-Lago other than Pine Hall, the anteroom to Trump's residential suite at Mar-a-Lago, and that he had not seen such boxes prior to the day Nauta assisted in moving the boxes from Pine Hall to the NARA truck in January 2022, despite Nauta having moved boxes from the storage room to Pine Hall for Trump's review over the course of several weeks before NARA's pick-up. And when asked in the grand jury about his previous false statement, Nauta denied that it was false. Such false statements and concealment were material given that the investigation was attempting to determine where classified documents had been located after the end of the presidency, and in which rooms they remained at Mar-a-Lago after January 2022.

Further, the magistrate judge could consider the evasive and misleading nature of Nauta's answers in assessing probable cause, such as the fact that when asked in the grand jury about when he had removed boxes from the storage room, Nauta testified that "recently"—by which, in context, he meant "within the last month" prior to his June 21 testimony—he had removed a box of challenge coins from the storage room, never mentioning the scores of boxes he had removed

from the storage room in the few days prior to Trump's attorney's review of them on June 2. *See Gates*, 462 U.S. at 238-39 (viewing probable cause based on the "totality of circumstances").

Nauta's implausible argument that he did not know whether the 15 boxes in Pine Hall were the "same" boxes he had brought from the storage room before the NARA pick-up in January 2022 does not lead to the conclusion that the warrant lacked probable cause for his false statements or perjury. A defendant does not escape perjury "simply because the defendant can postulate unstated premises of the question that would make his answer literally true." *United States v. Hernandez*, 921 F.2d 1569, 1574-75 (11th Cir. 1991) (quotation marks omitted).

Finally, Nauta's claim (Mot. at 10) that the affidavit provides no corroboration of a witness's information about Trump's boxes is untrue. Nauta's own statements, *see* Gov't Exs. 1, 2, and 3 ¶¶ 21-23; Gov't Exs. 4, 5, and 6 ¶¶ 22-24; Gov't Exs. 7 and 8 ¶¶ 23-25, as well as a photo of the storage room that the witness provided, *see* Gov't Exs. 1, 2, and 3 ¶ 20; Gov't Exs. 4, 5, and 6 ¶ 21; Gov't Exs. 7 and 8 ¶ 22, support the reliability of the witness's first-hand account of Nauta's and Trump's actions regarding the boxes. Even if such corroboration were not provided, "independent police corroboration has never been treated as a requirement" in every case for probable cause in a search warrant. *United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999).

### c.       18 U.S.C. § 2071

Under 18 U.S.C. § 2071, "[w]hoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, *or in any public office*, or with any judicial or public officer of the United States," commits a federal criminal offense. 18 U.S.C. § 2071(a)

(emphasis added).  The allegations in the affidavits amply established that Trump, aided by Nauta, concealed and removed sensitive government documents and presidential records that had been filed or deposited in a public office.

Without citing to any case or authority, Nauta claims that the statute "only applies to record custodians at the officer level" and suggests that it would be "unconstitutional" to apply the law to a former President.  Mot. at 4-5.  A possible defense, including a claim that the "statute is unconstitutional," does not undermine probable cause that a statute was violated, *Manners v. Cannella*, 891 F.3d 959, 972 (11th Cir. 2018), but in any event, Nauta's arguments about 18 U.S.C. § 2071 are mistaken.  As a district court concluded in a case charging the former National Security Advisor and a member of the National Security Council ("NSC") in a conspiracy to violate 18 U.S.C. § 2071 by altering sensitive NSC documents:

> There is no warrant for supposing, and no legislative history suggesting, that Congress meant to subject to punishment under section 2071 only those who are the custodians of records in the technical sense, such as clerks or librarians, but to permit others working in a government agency who have access to sensitive documents to destroy or alter them with impunity.  The obvious purpose of the statute is to prohibit the impairment of sensitive government documents by those officials who have access to and control over them, and no court has ever held to the contrary.

*United States v. Poindexter*, 725 F. Supp. 13, 20 (D.D.C. Oct. 24, 1989); *see also Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951) (upholding 18 U.S.C. § 793 and 18 U.S.C. § 2071 convictions of a Department of Justice employee who had concealed and removed highly secret FBI reports located in Department of Justice offices not accessible to the public).  Moreover, in "reject[ing] defendant's argument that application of section 2071 to NSC documents would intrude upon the constitutionally-based doctrine of executive privilege," the court in *Pointdexter* determined that the "statute, of course, applies only to the unlawful destruction or removal of official records, and as such it does not impact the functioning of the Presidency."  725 F. Supp.

20 n.7 (emphasis omitted); *see also id.* at 20 n.8 (noting that the purpose of the Presidential Records Act of 1978 was "to establish *public* ownership of records created by future Presidents *and their staff* in the course of discharging their official duties").  Nauta's legal challenges do not undermine probable cause in the affidavits.

### 2.    The Good-Faith Exception Forecloses Suppression

Even if the warrant affidavits failed to establish probable cause, which they did not, the good-faith exception to the exclusionary rule would foreclose suppression.  *See United States v. Leon*, 468 U.S. 897, 922 (1984).  When a defendant seeks suppression based on a claim that the warrant affidavit failed to establish probable cause, suppression is warranted only if the "warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *United States v. McCall*, 84 F.4th 1317, 1325 (11th Cir. 2023) (quotation marks omitted).  "To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence."  *Id.* (quotation marks omitted).  The "officer's judgment must be more than just mistaken—it must be so plainly incompetent that no officer of reasonable competence would have requested the warrant."  *Id.*  Those circumstances are not remotely present here.

### B.    There Were No Materially Misleading Omissions in the Affidavits

"There is . . . a presumption of validity with respect to the affidavit supporting the search warrant," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), but a defendant may, in "limited" circumstances, *id.* at 167, attack the validity of a warrant affidavit if the defendant (1) after a hearing, demonstrates by a preponderance of the evidence that the affiant made intentionally false or recklessly misleading statements, and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," *id.* at 156.  To obtain a

hearing to try to substantiate claims of intentional or reckless falsity in a warrant affidavit, the defendant must make a "substantial preliminary showing." *Id.* at 155, 170. The allegations of deliberate falsehood or reckless disregard for the truth must be "more than conclusory" and should be "accompanied by an offer of proof" and "a statement of supporting reasons." *Id.* at 171. "Allegations of negligence or innocent mistake are insufficient." *Id.* And even "if these requirements are met," a hearing is still not warranted "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-72.

In addition to affirmative false statements, *Franks* may also apply to omissions, but only if they are intentionally or recklessly misleading and also material to a finding of probable cause. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990), and scrutinizing an affidavit for "omission[s] potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quotation marks omitted). Accordingly, a defendant must make a substantial preliminary showing that an omission was deliberately or recklessly misleading, not "made negligently or because of an innocent mistake." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019). And the omission must be material, which means that "inclusion of the omitted facts would have prevented a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (quotation marks omitted); *see United States v. Maxi*, 886 F.3d 1318, 1331–32 (11th Cir. 2018).

Nauta makes several baseless allegations of omission that are either flatly untrue, turn out not to be omitted from the affidavits, or do not detract from or have relevance to probable cause.

1.  Nauta claims that the D.C. search warrant affidavits "omitted that multiple prior warrant executions as to Nauta yielded no inculpatory evidence as to any purported crimes." Mot. at 11, 12.  But the evidence contradicts this erroneous claim: the South Florida warrants did, in fact, yield inculpatory evidence, and that evidence was included in the affidavits submitted in support of the D.C. warrants.  *See* Gov't Exs. 7 and 8 ¶¶ 13 and 45.  Specifically, a day after the Department of Justice sent a subpoena to a Trump representative on June 24, 2022, for CCTV footage at Mar-a-Lago, Nauta made a secret trip to Mar-a-Lago after falsely telling several people that he was going to Florida for family reasons.  At Mar-a-Lago, Nauta met with codefendant Carlos De Oliveira, and together they toured the basement area of Mar-a-Lago, where De Oliveira gestured in the direction of the CCTV cameras near the storage room.  More evidence will be presented at trial, but at a minimum, there was a reasonable basis to believe that additional obstruction had occurred.

2.  Contrary to Nauta's assertions (Mot. at 7, 21), the affidavits accurately described the context of Nauta's FBI interview and grand jury appearance.  Nauta was interviewed by the FBI on May 26, 2022, in the presence of his attorney (a prior attorney, not his current attorney) at an FBI office, where he was warned by the agents about the federal crime of making false statements, in violation of 18 U.S.C. § 1001, and told that the FBI was investigating classified documents that had been improperly located at Mar-a-Lago.  In no sense was this, as described by Nauta, an "informal conversation." Mot. at 7, 21.  And the transcript of the interview, included as an exhibit to Nauta's motion, shows that the FBI asked Nauta multiple questions about the 15 boxes provided to NARA, where those boxes had been stored at Mar-a-Lago, who moved them to the vestibule of the former President's residence, and whether any other boxes were stored at Mar-

a-Lago, and Nauta repeatedly dissembled.[6]  And Nauta's later attempts to try to explain away some

of these statements before the grand jury were equally implausible.[7]

       3.    Nauta claims that the FBI special agent who swore to Nauta's South Florida

warrants made a false statement in an unrelated complaint affidavit in an unrelated case against a

January 6 Capitol rioter and that this should have been disclosed to an "issuing magistrate."  Mot.

at 6 n.3.  The complaint affidavit in the January 6 case stated that "at least one federal police officer

died as a result of the injuries he sustained."  *United States v. Allan*, 21-cr-64, ECF No. 1 ¶ 18

(D.D.C. Jan. 20, 2021).  Months after this affidavit, a medical examiner determined that the officer

had died of natural causes from strokes occurring hours after the officer's confrontation with the

---

    [6] *See, e.g.*, Gov't Ex. 9 at 30 (Question: "Is there any other place [other than the vestibule of the former President's residence] that the President could have kept boxes?" Answer: "Not—not to my knowledge."); *id.* at 31-32 (Question: "Okay, but as far as you know, no rooms have held or did hold, like, boxes similar to what you brought, brought onto the truck [to NARA]." Answer: "As far as I know, no."); *id.* at 34 ("If we wanted to find out, hey are there like, were these boxes stored somewhere, like who would be the person to—to ask about?" Answer: "I wouldn't know."); *id.* at 47 (Question: "We were talking about a year, so can—can you guess where they [the 15 boxes] could have been or where they could have come from?" Answer: "I don't want to guess. I just, I just, my answer is I don't know."); *id.* at 49 (Question: "But even within Mar-a-Lago . . . is there a place where boxes could be stored?" Answer: "There's many storage units that I haven't, you know, I assume that I haven't even, that could be places that aren't even storage units that I . . . You know? There's a lot of doors on Mar-a-Lago."); *id.* at 52 (Question: "So, you . . . had no idea how they [the 15 boxes] got there [in the vestibule of the former President's residence] before?" Answer: "No.").

    [7] *See* Ex. 10 at 56-57 (Question: "Did you tell the FBI that the first time you had ever seen any of the boxes was when you moved them from Pine Hall to the moving truck?" Answer: "Yes." Question: "But it's your testimony before the grand jury today that in fact, you moved boxes up from the basement to Pine Hall, right?" Answer: "Weeks prior, yes." Answer: "So sir, I have to ask; why would you have told the FBI that the first time you saw them was much later, when in fact, you saw them weeks prior?" Answer: "They had asked me if I had saw those boxes in Pine Hall. That's what I understood what they were asking at the time." Question: "And when you told the FBI that you didn't know where the boxes in Pine Hall came from, that actually turns out not to be true, right?" Answer: "Well, I mean, that could have been the boxes that I brought up, or they could have been boxes from wherever they were inside his room." Question: "But to your knowledge, you've been the only one who's taken boxes from the storage room in the basement to Pine Hall in the residence, right?" Answer: "To my knowledge and from what I understand, the boxes that I moved, yes.").

mob, but the examiner concluded that "all that transpired played a role in his condition."[8]  Nauta provides no evidence to suggest the statement in the January 6 complaint affidavit was intentionally deceptive, much less that its omission from the affidavits in *this* case had an impact on probable cause.

4.   Nauta contends that the affidavits "hid the partisan political influence brought to bear on NARA."  Mot. at 19.  As the Government has explained in opposing the defendants' motion to compel discovery (ECF No. 277) and Trump's motion to dismiss the indictment or suppress evidence on due-process grounds (filed by email today), there is no evidence to support their conspiratorial claims that purported bias at NARA affected this criminal investigation.  And for purpose of this motion to suppress, Nauta fails to show that the affiants knew of or recklessly omitted these unsupported claims from the affidavits, let alone explain how his fictive allegations of bias would detract from probable cause shown here.  *See United States v. Taylor*, No. 14-CR-0303, 2015 WL 5923580, at *2 (S.D. Ala. Oct. 12, 2015) ("[T]he Eleventh Circuit and other courts have cast a dim view on the argument that omission of details about [an informant]'s criminal history and potential biases triggers a *Franks* remedy.").

5.   Nauta falsely claims (Mot. at 20) that the affidavits omitted the fact that the subpoena was addressed to the Office of former President Trump.  But in fact, the affidavit expressly stated: "on May 11, 2022, the Department of Justice ('DOJ') served a grand jury subpoena on counsel for the Office of the Former President (the 'Office') seeking 'any and all documents . . . bearing classification markings' in FPOTUS's and/or the Office's possession." Gov't Exs. 1, 2, and 3 ¶ 8; Gov't Exs. 4, 5, and 6 ¶ 9; Gov't Exs. 7 and 8 ¶ 10.

---

[8] https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

6.      Nauta alleges that the Government "hid" an "apparent refusal to interview President Trump."  Mot. at 21.   Nauta offers no support for his claim, but in any event, there is no reason to believe that the non-interview of one subject of an investigation ahead of a court-authorized search of *another* subject's devices and accounts would have any bearing on the probable cause contained in the affidavits.

7.      Nauta claims that the D.C. affidavits "failed to acknowledge that [the Mar-a-Lago IT Director] had unequivocally denied any impropriety in Nauta's June 2022 trip to Mar-a-Lago."  Mot. at 21.  But the first time the Government questioned the IT Director about Nauta's 2022 trip was during the IT Director's March 2023 grand jury testimony, one month *after* the last Nauta warrant was issued.[9]  Accordingly, the Court need not look further regarding this claim.[10]

8.      Nauta also suggests (Mot. at 9) that the affidavits should have mentioned that a Trump Organization attorney had requested that the Trump Organization's Director of Security preserve the CCTV footage after receiving the subpoena for the footage.  But any such request by an uncharged Trump Organization attorney does not undermine probable cause to believe that Nauta and his coconspirators had engaged in separate bad-faith attempts to delete the footage immediately after the subpoena was received.

---

[9] The FBI interviewed the IT Director in late January 2023, but the interviewing agent at that point was not aware of text messages between Nauta and the IT Director and therefore no questions were asked about Nauta's June 2022 trip.

[10] In grand jury testimony after the Nauta warrants, the IT Director denied knowing about the nature of Nauta's June 2022 trip, but his denials were suspect and turned out to be false.  As the Court is aware from prior litigation, the IT Director (referred to in the Superseding Indictment as "Trump Employee 4") provided false denials in testimony before the grand jury at a time when he was represented by Nauta's counsel, whose legal fees were paid by Trump's political action committee.  Trump Employee 4 provided to the Government the facts set forth in the Superseding Indictment immediately after switching to new, conflict-free counsel.  *See, e.g.,* ECF No. 129 at 2-5.

9.      In a single sentence without elaboration or explanation, Nauta also claims that the affidavit "hid information" about purported political bias on the part of counsel for a witness in the investigation.  Mot. at 21.  He offers no support for the notion that any such information, even if true, should be included in a search warrant affidavit, much less that its omission would undermine probable cause.

10.      Nauta's "adopt[ion]" of the arguments in Trump's motion to suppress is also unavailing.  Mot. at 22.  None of the arguments in Trump's motion has merit, as addressed in the Government's response to Trump's motion, and Nauta does not explain how any of Trump's arguments undermine probable cause in the warrants to search Nauta's phones and electronic accounts.

### C.      Particularity and Overbreadth

A warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority."  *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985) (quotation marks omitted).  And a warrant describes the things to be seized with sufficient particularity "when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  *Betancourt*, 734 F.2d at 754-55.  Neither "elaborate specificity" nor "technical perfection" is necessary. *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011) (quotation marks omitted).  "It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized" and the nature of the investigation.  *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir. 1982).  "Cloud or data-based warrants with a sufficiently tailored time-based limitation can undermine any claim

that they are the 'internet-era version of a 'general warrant.'" *United States v. McCall*, 84 F.4th

1317, 1328 (11th Cir. 2023) (quoting *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017)).

The warrants identified the items to be seized as documents and records that reflected

violations of 18 U.S.C. § 793, § 2071, § 1519, § 1001, and § 1623, and involving Nauta and any

coconspirator, since January 2021 (for the South Florida warrants) and since November 2021 (for

the D.C. location warrants). The South Florida warrants that involved contents of electronic

communications (Gov't Exs. 1, 4, 5, and 6) further specified in Attachment B the information to

be seized as follows:

(a)   Communications, records, documents, and other files regarding the access
      to or movement or location of any boxes or records;

(b)   Information, including communications in any form, regarding the retrieval,
      storage, or transmission of national defense information or classified
      material;

(c)   Information, including communications in any form, regarding any
      government and/or Presidential records created between January 20, 2017,
      and January 20, 2021;

(d)   Any evidence of the knowing alteration, destruction, or concealment of any
      government and/or Presidential records, or of any documents with
      classification markings;

(e)   Communications, records, documents, and other files regarding the source
      and nature of any monetary transactions;

(f)   Evidence indicating how and when the [TARGET PHONES or account]
      were accessed or used to determine the context of phone access, use, and
      events relating to the crimes under investigation and to the phone user;

(g)   Evidence establishing the motive, capability, or willingness to commit the
      above referenced crimes, including but not limited to evidence indicating
      the phone user's state of mind as it relates to the crimes under investigation;

(h)   The identity of the person(s) who communicated with the account user
      about matters relating to violations of the above-referenced crimes,
      including records that help reveal their whereabouts.

This detailed description, combined with the warrants' temporal limitations, provided

ample direction to searchers and readily satisfied the Fourth Amendment's particularity

requirements. *See McCall*, 84 F.4th at 1328. But even assuming these descriptions fell short,

which they did not, the good faith exception to the exclusionary rule forecloses suppression.

Insufficient particularity in a warrant can lead to suppression only when the warrant is "so facially deficient," *i.e.*, so lacking in particularity, that "the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see Blake*, 868 F.3d at 975 (warrant lacked particularity but good-faith exception foreclosed suppression). Nothing like that happened here. Whatever Nauta's criticisms of the warrant's particularity or overbreadth, it was "objectively reasonable" for agents to rely on the warrant. *United States v. Travers*, 233 F.3d 1329, 1329 (11th Cir. 2000) (quotation marks omitted). The warrant affidavits here are certainly "not so facially deficient . . . that the executing officers could not have reasonably presumed [them] to be valid." *Id.* at 1330 (quotation marks omitted).

### D.     Execution of the Search Warrants Was Reasonable

Nauta suggests (Mot. at 18-19) that the execution of the search of digital evidence took too long and was impermissibly broad in scope, but he proffers nothing to substantiate his allegation, much less demonstrate the "flagrant disregard" of the terms of the warrant required to prevail on such a claim. *See Wuagneux*, 683 F.2d at 1354. Nauta points to no part of the filtered, scoped production given to him that exceeds the scope of the warrant, and even if he had, that alone would be insufficient to mandate suppression. *Id.* ("[A]bsent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized.") (quotation marks omitted); *United States v. Maali*, 346 F. Supp. 2d 1226, 1254 (M.D. Fla. 2004) ("[A]ny finding of flagrant disregard in this case must be founded upon something other than the sheer volume of documents seized or the fact that some items outside the scope of the warrants were taken.").

The South Florida warrants were executed in November 2022, and the review of the digital evidence was accomplished within six months. And considering the time it took to receive the

returns from the providers, filter the returns for attorney-client privilege, and review the substantial amount of data contained (there were over 200,000 Nauta communications), there was nothing unreasonable about the time the search took.  Indeed, document reviews of a much longer duration have been found to be reasonable.  *See, e.g.*, *United States v. Jarman*, 847 F.3d 259, 266-67 (5th Cir. 2017) (review lasting 23 months was not unreasonable); *United States v. Lee*, No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at *4 (N.D. Ga. Sept. 25, 2015) (review lasting more than three years did not signify unreasonableness).

### E.    No Due Process Violations

Nauta alleges a mix of what he claims are "due process violations."  Mot. at 2.  He does not cite any legal authority, let alone explain why these purported violations should entitle him to legal relief.  Regardless, Nauta's claims are factually unfounded.

1.    Nauta contends that the grand jury "was improperly invoked and exceeded jurisdiction." Mot. at 22.  But there was nothing improper about the initiation of the grand jury in the District of Columbia, as explained more fully in the Government's response to Trump's motions to dismiss based on prosecutorial misconduct and due process violations (filed by email today).  In short, when the Government started the grand jury investigation in the District of Columbia, it could not know the full scope of the evidence that would be gathered, but from the outset, the investigation encompassed conduct that spanned the District of Columbia and the Southern District of Florida, and the investigation uncovered evidence of federal offenses in both districts.  And although the Government ultimately decided to bring charges in Florida, there was nothing inappropriate about that: the Government's charging decisions must be reached "at the conclusion of the grand jury's labors, not at the beginning," *Blair v. United States*, 250 U.S. 273,

282 (1919), and "hindsight is not the proper perspective for discerning the limits of a grand jury's investigative power," *United States v. Paxson*, 861 F.2d 730, 733 (D.C. Cir. 1988).

      2.  Nauta wrongly alleges (Mot. at 22) that there were attorney-client communications used to obtain the Nauta search warrants. In fact, no search warrant affidavit in this case relied on any attorney-client privileged communication, and Nauta fails to cite to any portion of any Nauta affidavit to support or clarify his allegation. As explained further below, a filter process was used so that the case team never received any potentially privileged Nauta communications.

      Nor does Nauta's reference to Trump's motion regarding crime-fraud communications help his suppression motion. The last Nauta search warrant was obtained in February 2023, more than one month *before* the Chief Judge in the District of Columbia issued the order regarding the crime-fraud exception as to Trump's attorneys and ordering the disclosure of evidence to the Government. It was thus impossible for the Government to have used any of Trump's communications with his attorneys in Nauta's warrant affidavits.

      3.  As described above, Nauta's South Florida warrant affidavits all contained a filter protocol to address potential attorney-client privileged communications contained in the search warrant returns.[11] The filter process, which was conducted by a different filter team than the one that was in place for the execution of the search at Mar-a-Lago, was appropriate here for the search of a non-attorney's electronic accounts for potentially privileged material. Where records "are already in the government's possession as the result of the execution of a search warrant . . . the use of a filter team to review them is respectful of, rather than injurious to, the protection of privilege." *In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable*

---

[11] As mentioned, the location warrants for Google and Verizon did not include a filter protocol because the Government was seeking only location data, not content evidence.

*Elec. Means*, 11 F.4th 1235, 1250 (11th Cir. 2021) (quotation marks omitted); *see id.* at 1250 n.10 (noting that its conclusion about the sufficiency of the protocol in the case was specific to the circumstances involving an attorney's office and that the court was not "prejudge[ing] other filter protocols").

In his request for a sprawling hearing (Mot. at 23-24), Nauta lobs various attacks on the filter protocol, but he provides nothing to substantiate them.[12]  To the contrary, by all indications, the filter protocol functioned as intended: Nauta has received all of the evidence that made it to the case team through the filter protocol (and the filter team also provided Nauta all the unfiltered evidence from the warrants), and he has not claimed that the case team received any privileged communications.  Nauta's vague assertions, without reference to any legal authorities, are not sufficient to raise a suppression claim.  *See United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented.").

## III.    Conclusion

For the foregoing reasons, Nauta's motion should be denied in its entirety, and no evidentiary hearing is required to address the issues he raises.

---

[12] Nauta claims, for example, that "the same U.S. Attorney's office [was used] as the filter team," Mot. at 23-24, but his claim is wrong.  And in any event, there is no requirement that a participant in an established filter process be assigned from a separate U.S. Attorney's Office.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:    /s/ *Jay I. Bratt*
Jay I. Bratt
Counselor to the Special Counsel
Special Bar ID #A5502946
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

David V. Harbach, II
Assistant Special Counsel
Special Bar ID #A5503068

Michael E. Thakur
Assistant Special Counsel
Florida Bar No. 1011456

March 7, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

*/s/ David V. Harbach, II*
David V. Harbach, II