# EXHIBIT 1

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
(1) an Apple iPhone 12 Pro Max, IMEI ▮▮▮▮▮ associated
with phone number ▮▮▮▮ and (2) an Apple iPhone 13 Pro
Max, IMEI ▮▮▮▮ associated with phone number
▮▮▮▮

)
)
)
)
)
)

Case No. 22-mj-8547-BER

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

FILED BY ___ **TM** ___ D.C.

**Nov 28, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793(e) | Willful retention of national defense information |
| 18 U.S.C. § 2071 | Concealment or removal of government records |
| 18 U.S.C. § 1519 | Obstruction of federal investigation |
| 18 U.S.C. § 1001 | Material false statements |
| 18 U.S.C. § 1623 | Perjury |

The application is based on these facts:

See attached Affidavit of FBI Special Agent ▮ FBI 21A ▮

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

▮ FBI 21A ▮
_____
*Applicant's signature*

▮ FBI 21A ▮ Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Phone (WhatsApp) _____ *(specify reliable electronic means).*

Date: _____ 11/28/2022 _____

_____
*Judge's signature*

City and state:  West Palm Beach, Florida

Hon. Bruce E. Reinhart, U.S. Magistrate Judge
_____
*Printed name and title*

USA-00395340

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT**

I, ███FBI 21A███, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seize the following cellular phones: (1) an Apple iPhone 12 Pro Max, IMEI ███████, associated with phone number ███████ ("TARGET PHONE 1"); and (2) an Apple iPhone 13 Pro Max, IMEI ███████, associated with phone number ███████ ("TARGET PHONE 2") (collectively, the "TARGET PHONES") that are utilized by Waltine Nauta ("NAUTA"), as described in the following paragraphs and in Attachment A, for the items described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office counterintelligence division and have been since 2016. During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to counterintelligence and espionage investigations. I currently am assigned to investigate counterintelligence and espionage matters.  Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified National Defense Information ("NDI"), and with efforts to obstruct justice.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the TARGET PHONES, as described in Attachment A, contain evidence of violations of 18 U.S.C. § 793(e) (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C § 1519 (obstruction of federal investigation), 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), as further described in Attachment B.

## PROBABLE CAUSE

### *Background on Investigation*

5.      The FBI is investigating potential violations of 18 U.S.C. §§ 793(e), 2071, 1519, 1001, and 1623 related to the improper removal and storage of classified national defense information in unauthorized spaces, as well as the unlawful concealment or removal of government records and obstruction of its investigation.

6.      This investigation began as a result of a referral that the United States National Archives and Records Administration ("NARA") sent to the United States Department of Justice ("DOJ") on or about February 9, 2022 (hereinafter, the "NARA Referral").  The NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act ("PRA"), NARA received from the office of former President Donald J. Trump (hereinafter "FPOTUS"), via representatives, fifteen (15) boxes of records (hereinafter, the "FIFTEEN BOXES").  The FIFTEEN BOXES, which had been transported from a property owned by FPOTUS at 1100 S. Ocean Blvd., Palm Beach, Florida, a residence and club known as "Mar-a-Lago," were reported in the NARA Referral to contain, among other things, highly classified documents intermingled with other records.

2

Subject to Protective Order                                                         USA-00395342

7.     After an initial review of the NARA Referral, the FBI opened a criminal investigation to, among other things, identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space. The FBI's investigation established that documents bearing classification markings, which appear to contain NDI, were among the materials contained in the FIFTEEN BOXES and were stored at Mar-a-Lago in an unauthorized location.

8.     As further described below, on May 11, 2022, the Department of Justice ("DOJ") served a grand jury subpoena on counsel for the Office of the Former President (the "Office") seeking "any and all documents . . . bearing classification markings" in FPOTUS's and/or the Office's possession.  On June 3, 2022, FPOTUS's counsel provided DOJ with a package of 37 documents bearing classification markings at the Confidential, Secret, and Top Secret levels. Counsel for FPOTUS provided DOJ with a written certification, signed by another person who was acting as the custodian of records on behalf of the Office for purposes of the subpoena, indicating that "a diligent search was conducted," that the "search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena" seeking all documents with classification markings in the custody or control of FPOTUS and/or the Office, and that "any and all responsive documents" were being provided. Counsel for FPOTUS indicated that all responsive documents had been located in one storage room located on the ground floor at Mar-a-Lago (hereinafter, "the storage room.").

9.     After developing additional evidence that the June 3 production did not contain all of the documents with classification markings located at Mar-a-Lago, on August 8, 2022, the FBI executed a search and seizure warrant issued by a Magistrate Judge of the U.S. District Court for the Southern District of Florida. During the search, the FBI recovered from the storage room as

3

USA-00395343

well as FPOTUS's office at Mar-a-Lago over 100 documents bearing classification markings, which had not been produced on June 3. The documents appeared to contain NDI. The search also yielded apparent government and/or Presidential records subject to the Presidential Records Act, 44 U.S.C. § 2201.

### Background on NAUTA

10.     NAUTA began his career in the U.S. Navy in approximately 2001 and worked as a White House chef beginning in or around 2012. In 2017, NAUTA transitioned to work as a valet, or personal aide, for FPOTUS during FPOTUS's Presidential Administration (hereinafter "Administration"). During his time in the White House, NAUTA held a high security clearance and received training in the handling of classified information. In or around the summer of 2021, NAUTA retired from the military and went to work as a civilian for FPOTUS as his "body man" or assistant. According to publicly available information filed with the Federal Election Commission, the Save America PAC, a political action committee created by FPOTUS, paid NAUTA $149,167 between August 26, 2021, and August 30, 2022, which included $6,375 in "advance consulting" fees.

11.     NAUTA was involved in at least two key movements of FPOTUS's boxes at Mar-a-Lago: (1) in the weeks leading up to the provision of the FIFTEEN BOXES to NARA in January 2022, NAUTA and two other FPOTUS employees brought, at FPOTUS's request, the FIFTEEN BOXES from their location in a storage room at Mar-a-Lago to FPOTUS's residential entryway at Mar-a-Lago for FPOTUS's review; and (2) in the week before FPOTUS's representatives claimed on June 3 that they had conducted a diligent search for classified documents, NAUTA moved approximately 64 boxes out of the storage room at Mar-a-Lago and returned only about 25-30 prior to the review of the storage room for records responsive to the May 11 subpoena.  In June

4

USA-00395344

2022, as described further below, NAUTA testified before a grand jury and concealed from it this movement of a large number of boxes prior to the June 3 production of classified documents.

### *FPOTUS Stores Documents in Boxes*

12.



It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

13.     On June 21, 2022, NAUTA testified under oath before a federal grand jury sitting in the District of Columbia. Before the grand jury, NAUTA stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes. NAUTA was part of the team that packed items from FPOTUS residence at the White House for the move.

14.     According to WITNESS █ WITNESS █ subsequently learned that approximately eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS BOXES," were transported from the White House to the Mar-a-Lago but WITNESS █ did not know when this occurred. WITNESS █ described the FPOTUS BOXES as white and blue Bankers boxes and cardboard printer paper boxes with lids. WITNESS █ confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.

5

Subject to Protective Order



15.     On or about the afternoon of January 20, 2021, WITNESS ▪ observed several items, which may have contained some of the FPOTUS BOXES, being offloaded from Air Force One and transported to Mar-a-Lago.

16.     In late August or early September 2021, WITNESS ▪ observed the FPOTUS BOXES in the storage room at Mar-a-Lago, with no lock on the door. Sometime thereafter, WITNESS ▪ observed that locks were installed on the storage room door.  WITNESS ▪ described the storage room as being located on the ground floor, pool level, in a hallway with other offices and storage spaces. The door to the storage room was painted gold and had no other markings on it.

17.     In addition to the approximately eighty-five to ninety-five FPOTUS BOXES located in the storage room, there were also other boxes in the storage room with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

6

Subject to Protective Order                                                    USA-00395346

*Provision of the Fifteen Boxes to NARA*

18.     Over the course of 2021, NARA endeavored to obtain what appeared to be missing records subject to the Presidential Records Act (PRA), 44 U.S.C. § 2201. On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021, when NARA was informed twelve boxes were found and ready for retrieval at Mar-a-Lago. According to WITNESS █ after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. WITNESS █, NAUTA, and another FPOTUS employee collected the FIFTEEN BOXES closest to the door of the storage room and delivered them to FPOTUS.

19.     They carried the boxes from the storage room to the entryway of FPOTUS's personal residential suite at Mar-a-Lago. Between approximately January 1-17, 2022, WITNESS █ NAUTA, and the other FPOTUS employee placed two to four boxes at a time outside FPOTUS's personal suite. WITNESS █ believes that FPOTUS took the boxes into the residential suite and personally reviewed their contents.

20.     WITNESS █ took a photograph of the storage room and provided it to FPOTUS sometime between January 1-17, 2022, to show FPOTUS the number of boxes that were in the storage room. The storage photo, which appears below and was later provided to the FBI by WITNESS █ captures approximately sixty-one of the FPOTUS BOXES located in the storage room:

7



21.     On January 17, 2022, the day of the scheduled NARA pick up, WITNESS ▮ saw all FIFTEEN BOXES in the hallway outside FPOTUS's residential suite, known as Pine Hall. NAUTA confirmed that the FIFTEEN BOXES were in the location described by WITNESS ▮

22.     NAUTA testified that he and WITNESS ▮ transferred the boxes from Pine Hall to NAUTA's car. From there, on January 17, 2022, WITNESS ▮ and NAUTA met the NARA contract driver and provided the driver with the FIFTEEN BOXES. NAUTA further testified that he had brought, at FPOTUS's request, additional boxes to Pine Hall after the January 2022 provision to NARA of the FIFTEEN BOXES.

23.     Even though there were far more FPOTUS BOXES than the FIFTEEN BOXES, FPOTUS did not review the remainder of the FPOTUS BOXES before the NARA pickup. According to NAUTA, the FIFTEEN BOXES were not selected from the FPOTUS BOXES for

8

Subject to Protective Order

USA-00395348

review in a systematic way. NAUTA testified before the grand jury that NAUTA would "just open the door, turn to my left, grab a box, and take it up." NAUTA confirmed that he was not instructed to take any particular boxes, and NAUTA answered affirmatively when asked if NAUTA would "just pick some off the top." When NAUTA was questioned why he did not bring for review more than what NAUTA approximated was 15 to 17 boxes, NAUTA testified that "once I started putting them in there – [FPOTUS] was like, okay, that's it." According to NAUTA, FPOTUS did not state why he did not want to review more boxes before the NARA pickup.

24.     According to WITNESS ▮ after providing the FIFTEEN BOXES to NARA, FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

25.     According to WITNESS ▮ around the time the FIFTEEN BOXES were provided to NARA, FPOTUS directed WITNESS ▮to convey to one of FPOTUS's lawyers, hereinafter "INDIVIDUAL 1," that there were no more boxes at Mar-a-Lago, which was an attempt to conceal from NARA that additional boxes remained at Mar-a-Lago.

26.     According to WITNESS ▮ however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS BOXES remained in the storage room as of approximately January 2022. WITNESS ▮did not know the contents of the remaining seventy to eighty FPOTUS BOXES, but believed they contained the same types of documents and records as the FIFTEEN BOXES that were provided to NARA.

27.     From May 16-18, 2022, FBI agents conducted a preliminary review of the FIFTEEN BOXES provided to NARA and identified over 100 documents with classification markings in fourteen of the FIFTEEN BOXES. Several of the documents also contained what appears to be FPOTUS's handwritten notes.

9

***Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents***

28.     On May 11, 2022, an attorney representing FPOTUS, "FPOTUS COUNSEL 1," agreed to accept service of a grand jury subpoena requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings." The return date of the subpoena was May 24, 2022.

29.     After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS COUNSEL 1 contacted DOJ COUNSEL and requested that FBI agents meet him the following day to pick up responsive documents. On June 3, 2022, three FBI agents and DOJ COUNSEL arrived at Mar-a-Lago to accept receipt of the materials. In addition to FPOTUS COUNSEL 1, another individual, hereinafter "INDIVIDUAL 2," was also present as the custodian of records for FPOTUS's post-presidential office. The production included a single Redweld envelope, wrapped in tape, containing documents. FPOTUS COUNSEL 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the storage room. INDIVIDUAL 2 provided a Certification Letter, signed by INDIVIDUAL 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

30.     During receipt of the production, FPOTUS COUNSEL 1 stated he was advised all the records that came from the White House were stored in the storage room at Mar-a-Lago and the boxes of records in the storage room were "the remaining repository" of records from the White

10

House. FPOTUS COUNSEL 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ COUNSEL were permitted to see the storage room (although they were not permitted to look inside the boxes) and observed that approximately fifty to fifty-five boxes remained in the storage room. Considering that only FIFTEEN BOXES had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS BOXES that had been located in the storage room, it appeared that approximately fifteen to thirty of the FPOTUS BOXES had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the storage room, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

31.     While testifying before the grand jury, NAUTA stated that he did not know whether FPOTUS COUNSEL 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS COUNSEL1 go in there.

32.     A review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed 37 unique documents bearing classification markings, some of which bore classification markings at the highest levels. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also contained what appears to be FPOTUS's handwritten notes.

33.     When producing the documents, neither FPOTUS COUNSEL 1 nor INDIVIDUAL 2 asserted that FPOTUS had declassified the documents.[1] The documents being in a Redweld

---

[1] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national

11

envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.[2]

### *Surveillance Camera Footage Shows NAUTA removing boxes from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection with the Subpoena*

34.     On July 6, 2022, in response to a grand jury subpoena for surveillance video from internal cameras located on the ground floor (basement) and outside Pine Hall at Mar-a-Lago, representatives of the Trump Organization provided a hard drive to FBI agents. Upon review of the hard drive, the FBI determined that the drive contained video footage from four cameras in the basement hallway of Mar-a-Lago in which the door to the storage room is located. The footage on the drive begins on April 23, 2022, and ends on June 24, 2022. The recording feature of the cameras appears to be motion activated, so that footage is only captured when motion is detected within each camera's field of view.

35.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter anteroom) that leads to the storage room. The doorway to the anteroom itself is not visible in the camera view, as a refrigerator is directly

---

defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988). Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

[2] On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS COUNSEL 1 sent two letters to DOJ COUNSEL. In the second such letter, available at 22-mj-8332-BER (D.E. 125), FPOTUS COUNSEL 1 asked DOJ to consider a few "principles," which include FPOTUS COUNSEL 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS COUNSEL 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

Subject to Protective Order                                                                                          USA-00395352

between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the anteroom because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The anteroom, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the storage room. The anteroom provides the only entrance to the storage room; however, other offices can also be entered from the anteroom, so it might be possible for persons to enter the storage room from those other offices without being visible in the surveillance camera footage.

36.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, NAUTA is observed exiting the anteroom doorway with three boxes.

On May 30, 2022, four days after NAUTA's interview with the FBI during which the location of boxes was a significant subject of questioning, NAUTA is observed exiting the anteroom doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS BOXES. FBI did not observe this quantity of boxes being returned to the storage room through the anteroom entrance in its review of the footage.

On June 1, 2022, NAUTA is observed carrying eleven brown cardboard boxes out the anteroom entrance. One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, NAUTA is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS BOXES, into the entrance of the ANTEROOM. Approximately three and a half hours later, NAUTA is observed escorting FPOTUS COUNSEL 1 in through the entrance of the anteroom, and FPOTUS COUNSEL 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS COUNSEL 1 is escorted through the anteroom entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS COUNSEL 1 exit the ANTEROOM entrance moments later. FPOTUS COUNSEL 1 appeared to be carrying a Redweld envelope after exiting the anteroom.

Subject to Protective Order                                    USA-00395353

37.     According to FBI's review of video footage, and as detailed in the paragraph above, NAUTA can be observed removing approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returning 25-30 boxes to the storage room area on June 2, 2022. Notably, and as described above in paragraph 28, these boxes were removed following service of a grand jury subpoena but before FPOTUS COUNSEL 1's review of boxes in the storage room area to locate documents responsive to the subpoena.

38.     NAUTA testified to the grand jury that he was aware that FPOTUS COUNSEL 1 reviewed the boxes in the storage room on June 2. When asked about his role in assisting FPOTUS COUNSEL 1 with the review, NAUTA testified that he showed FPOTUS COUNSEL 1 where the storage room was, let him in, and then FPOTUS COUNSEL 1 told NAUTA to leave. NAUTA stated, "and that was it" for his role in assisting with the review.

### NAUTA concealed information during his FBI interview and Grand Jury testimony

39.     On May 26, 2022, the FBI interviewed NAUTA and explained that the FBI was conducting an investigation as to whether classified documents were stored at Mar-a-Lago and that the FBI was particularly interested in where the boxes with classified documents were located and whether they had been moved outside the storage room.

40.     NAUTA's answers about his knowledge of the boxes were inconsistent. During the interview, NAUTA claimed that the first time NAUTA saw the boxes was when NAUTA moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. Less than a month later, when NAUTA testified before the grand jury, however, he stated he had actually moved them weeks prior from the storage room at Mar-a-Lago to Pine Hall for FPOTUS's review of them. Further, in NAUTA's interview with the FBI on May 26, he had stated that he did not know where the boxes had come from prior to being located in

14

USA-00395354

Pine Hall. Testifying under oath before the grand jury, NAUTA claimed he had said this because he was not sure whether the boxes in Pine Hall were the same boxes that he had moved from the storage room. NAUTA thereafter admitted, however, that he was not aware of anyone moving any other such boxes to Pine Hall.

41.     When NAUTA was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony on June 21, NAUTA said that to his knowledge, there were remaining boxes. NAUTA at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." NAUTA then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the storage room).

42.     Furthermore, during his grand jury testimony, NAUTA was asked to identify the occasions on which he had entered the storage room after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the storage room at FPOTUS's behest. When asked if he had removed anything from the storage room at any time, NAUTA testified that "recently," meaning "within the last month" prior to his June 21 testimony, he removed a box of challenge coins from the storage room and took them to FPOTUS's office. He did not identify any other occasion on which he had removed anything from the storage room and did not inform the grand jury that, within the month prior to his grand jury appearance, NAUTA had removed approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returned 25-30 boxes to the storage room area on June 2, 2022.

***Execution of Search Warrant at Mar-a-Lago and Movement of Boxes After June 3***

15

43.     On August 8, 2022, the FBI executed a search warrant at Mar-a-Lago authorized by the Honorable Bruce E. Reinhart, U.S. Magistrate Judge in the Southern District of Florida. *See* 22-mj-83332-BER.   The search yielded over 100 unique documents bearing classification markings, with some indicating the highest levels of classification and extremely limited distribution, found in both the storage room and FPOTUS's office at Mar-a-Lago. Based on my training and experience, I know that documents classified at these levels typically contain NDI.

44.     During the search, FBI agents found approximately 70 to 80 boxes in the storage room. Accordingly, at some point between June 3, when the FBI observed approximately 50 to 55 boxes in the storage room, and August 8, someone had moved approximately 15 to 30 boxes into the storage room.

45.     WITNESS ▮ has indicated that after the June 3 production, FPOTUS traveled back to Mar-a-Lago twice during the summer before the search warrant was executed on August 8. According to WITNESS ▮ it was unusual for FPOTUS to return to Mar-a-Lago during the summer, when he usually stayed at his properties at Bedminster, New Jersey or Trump Tower in New York City. To WITNESS ▮ knowledge, FPOTUS had not returned to Mar-a-Lago the previous summer. During one of the return trips, WITNESS ▮ asked NAUTA why FPOTUS was back at Mar-a-Lago and, based on NAUTA's response, WITNESS ▮ understood NAUTA and FPOTUS were there to "check on things." Based on the cryptic nature of the response and the unusual nature of the trips, WITNESS ▮ believed that NAUTA was referring to the movement of FPOTUS boxes.

46.     When asked recently about NAUTA's motivation regarding his actions in this investigation, WITNESS ▮ assessed that NAUTA was motivated by "loyalty" to FPOTUS.

16

### The TARGET PHONES

47.      TARGET PHONE 1, associated with phone number ███████, is NAUTA's work cellular phone and TARGET PHONE 2, associated with phone number ███████, is NAUTA's personal cellular phone. Verizon records confirm that the phone number associated with TARGET PHONE 1 has been effective since at least May 21, 2021. Verizon records also show that TARGET PHONE 1 is an iPhone 12 Pro Max. The subscriber of TARGET PHONE 1 is listed as ███████ and the business name is listed as ███████ at ███████



Apple records list ███████, the phone number associated with TARGET PHONE 2, as the telephone number associated with NAUTA's Apple iCloud account, with ███████@gmail.com as the email address associated with that iCloud account. Apple records also show that TARGET PHONE 2, an iPhone 13 Pro Max, is the device associated with NAUTA's iCloud account as of May 29, 2022.

48.      WITNESS ██ indicated to the FBI that ███████, the phone number associated with TARGET PHONE 2, is NAUTA's personal number and when NAUTA was hired to work for FPOTUS in the summer of 2021, he used his personal phone number to communicate regularly regarding work with FPOTUS and others until he was given a work phone with phone number ███████, the same number associated with TARGET PHONE 1, in late summer/early fall, approximately a month after he began working for FPOTUS. Toll records show that since January 2022, phone number ███████ contacted FPOTUS's known cell phone number at least once

17

(on July 13, 2022). Additionally, between February 2022 and August 2022, there were at least 17 calls between ██████████ and ██████████ possibly because of forwarded calls. From February 2022 through August 2022, there were approximately 12 text messages between ██ ████████ and ████████.

49.     WITNESS ██ stated that NAUTA has a work email address, ████@45office.com that he uses and that WITNESS █ has used to communicate with him. WITNESS █ further indicated to the FBI that WITNESS █ and a few other FPOTUS employees, possible including NAUTA, are on an e-mail distribution list that contains the daily schedule of FPOTUS. In my training and experience, a person whose employer provides a work cellular phone often is able to access his work emails from his phone, and accordingly have saved work messages on his work phone. Therefore, it is likely that relevant emails that NAUTA sent or received from his ████@45office.com email account are on TARGET PHONE 1. Additionally, based on records received from Google pursuant to a court-authorized order under 18 U.S.C. § 2703(d), NAUTA corresponded with several 45 Office colleagues using his ████@gmail.com email address. Between February 28, 2021, and July 29, 2022, there were three emails sent to WITNESS ████ email address from ████@gmail.com. During that time, there were 8 emails sent from ████@gmail.com to three other 45 Office colleagues at their 45 Office email addresses and 24 emails to NAUTA himself at his work email address, ████@45office.com. In turn, NAUTA received 33 emails at the ████@gmail.com email address from various 45 Office email addresses, including 5 from NAUTA's ████@45office.com email. In my training and experience, a person using an iPhone often accesses and saves email on their phone. Therefore, it likely that relevant emails would also be located within TARGET PHONE 2.

18

Subject to Protective Order                                                                  USA-00395358

50.     On September 30, 2022, open-source research revealed that the phone number associated with TARGET PHONE 2 was registered with WhatsApp, an encrypted communication application. Open-source research also confirmed that the phone number associated with TARGET PHONE 1 was registered with both WhatsApp and Signal, another encrypted communication application. Accordingly, there may be stored communications through WhatsApp or Signal on the TARGET PHONES that pertain to this investigation.

51.     Based upon this investigation, I believe that there may be stored communications within the TARGET PHONES that contain evidence detailing the removal of FPOTUS boxes, which likely contained classified information and NDI, from the White House to Mar-a-Lago and from the storage room at Mar-a-Lago. Furthermore, I believe there may be stored communications in the TARGET PHONES detailing efforts to mislead law enforcement. Finally, the data from the TARGET PHONES would also provide location information about NAUTA's movements that could indicate when and where he moved boxes, such as if he moved the boxes to a storage facility or other location outside of Mar-a-Lago. Apple has location services that could be used to determine where a user traveled with the user's phone.

52.     The search warrant will be served within the Southern District of Florida. Recent FBI surveillance has confirmed that NAUTA is currently located in the Southern District of Florida: yesterday afternoon, November 27, 2022, FBI observed NAUTA parking his car at his residence's parking garage. NAUTA resides at ███████████████ West Palm Beach, FL ███. He drives a white Audi sport utility vehicle with Florida Tag ████████ and VIN ████████████████.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

53.     Based on my knowledge, training, and experience, I know that cellular telephones

19

can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the TARGET PHONES. This information can sometimes be recovered with forensics tools.

54.     There is probable cause to believe that things that were once stored on the TARGET PHONES may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a device/computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media-in particular device/computers' internal hard drives-contain electronic evidence of how a device/computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because

20

Subject to Protective Order                                                                                      USA-00395360

special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

   55. Based on my knowledge, training, and experience, I know that cellular telephones can store forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET PHONES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file. Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

21

Subject to Protective Order                  USA-00395361

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device to illegally solicit another to commit a crime of violence, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

56.   *Nature of examination*. Based on the foregoing, and consistent with Rule

22

                    USA-00395362

41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET PHONES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. In order to access the phone, it may be necessary to use NAUTA's fingerprint or facial recognition, to unlock the phone. Accordingly, we request the authority to compel NAUTA to provide the necessary means to access the TARGET PHONES.

57.     Based on my training and experience and on information I have learned from other agents, evidence of who was using a cellphone and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  For example, such evidence could help determine whether NAUTA was the only person using the TARGET PHONES.  In addition, information about the dates on which NAUTA used the TARGET PHONES could be relevant to proving various elements of the crimes under investigation, as described above.

58.     The stored communications and files contained in the TARGET PHONES may provide direct evidence of the offenses under investigation.  For example, text messages, instant messages, emails, and voicemails could be direct or indirect evidence of who communicated with NAUTA about moving boxes before or after the June production and whether anyone communicated with NAUTA about his testimony to the Grand Jury.  Photos, videos, and other documents could show evidence of NAUTA's movement of boxes that was withheld from the Grand Jury.

Subject to Protective Order                                                      USA-00395363

59.     In addition, the user's account activity, logs, stored electronic communications, and other data on the TARGET PHONES, can indicate who has used or controlled the phone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

60.     Other information connected in the TARGET PHONES may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal evidence of the crimes under investigation or services used to communicate with others.  Though your affiant knows that NAUTA uses WhatsApp to communicate, the full range of apps that NAUTA may use to communicate with persons relevant to this investigation remains unknown.  Searching the TARGET PHONES will help determine whether NAUTA downloaded other apps that could be used for communication.

61.     Therefore, the TARGET PHONES are likely to contain communications and information.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

24

Subject to Protective Order                                                                                    USA-00395364

62.     *Unlocking the TARGET PHONES with biometric features.* The warrant I am applying for would permit law enforcement to obtain from NAUTA physical biometric features (such as fingerprint, thumbprint, or facial characteristics) to unlock the TARGET PHONES. I seek this authority based on the following:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Apple devices and is called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-

25

facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

       d.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

       e.     The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

       f.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

26

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s) found at the premises; and/or (2) hold the device(s) found at the premises in front of the face to those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

27

## REQUEST FOR SEALING

63.     The United States request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss aspects of an ongoing criminal investigation that are neither public nor known to the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## FILTER PROCEDURES

64.     NAUTA has been represented by attorneys in this matter since at least in or around May 2022. A Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. The Filter Team will have no future involvement in the investigation of this matter. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If at any time the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents can review the potentially privileged documents. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel for the privilege holder or a court order before providing these potentially protected materials to the

28

Prosecution Team. If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to court for judicial review.

### **CONCLUSION**

65.    Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

FBI 21A

Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (WhatsApp) this _28_ day of November, 2022

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

29

## **ATTACHMENT A**

### **Property to Be Searched**

The TARGET PHONES are (1) an Apple iPhone 12 Pro Max, IMEI ████████████, associated with phone number ████████ ("TARGET PHONE 1"); and (2) an Apple iPhone 13 Pro Max, IMEI ████████████ associated with phone number ████████ ("TARGET PHONE 2").



## ATTACHMENT B

### Particular Things to be Seized

I.     The TARGET PHONES and the following information contained in the TARGET PHONES, specified in Attachment A, that constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury) involving Waltine Nauta ("Nauta") and any co-conspirator, since January 2021, about the following matters:

(a)     Communications, records, documents, and other files regarding the access to or movement or location of any boxes or records;

(b)     Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

(c)     Information, including communications in any form, regarding any government and/or Presidential records created between January 20, 2017, and January 20, 2021;

(d)     Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential records, or of any documents with classification markings;

(e)     Communications, records, documents, and other files regarding the source and nature of any monetary transactions;

(f)     Evidence indicating how and when the TARGET PHONES were accessed or used to determine the context of phone access, use, and events relating to the crimes under investigation and to the phone user;

1

(g)      Evidence establishing the motive, capability, or willingness to commit the above-referenced crimes, including but not limited to evidence indicating the phone user's state of mind as it relates to the crimes under investigation;

(h)      The identity of the person(s) who communicated with the account user about matters relating to violations of the above-referenced crimes, including records that help reveal their whereabouts.

II.      During the execution of the seizure of the TARGET PHONES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Nauta and anyone else who is found with the TARGET PHONES  and reasonably believed by law enforcement to be a user of the devices, to the fingerprint scanner of the devices (TARGET PHONES); and/or (2) hold the device in front of the face of Nauta and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2

USA-00395372

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   22-mj-8547-BER |
| (1) an Apple iPhone 12 Pro Max, IMEI ▮▮▮▮ associated with | ) | |
| phone number ▮▮▮▮ and (2) an Apple iPhone 13 Pro Max, IMEI | ) | |
| ▮▮▮▮, associated with phone number ▮▮▮▮ | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ December 12, 2022 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   11/28/22    19:29                    *Bruce Reinhart*
                                                              *Judge's signature*

City and state:      West Palm Beach, FL                     Hon. Bruce E. Reinhart, U.S. Magistrate Judge
                                                              *Printed name and title*

Subject to Protective Order                                                 USA-00395373

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  22-mj-8547-BER | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order

USA-00395374

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

The TARGET PHONES are (1) an Apple iPhone 12 Pro Max, IMEI ███████████, associated with phone number ███████ ("TARGET PHONE 1"); and (2) an Apple iPhone 13 Pro Max, IMEI ███████████ associated with phone number ████████ ("TARGET PHONE 2").

Subject to Protective Order                                                                USA-00395375

## ATTACHMENT B

### Particular Things to be Seized

I.      The TARGET PHONES and the following information contained in the TARGET PHONES, specified in Attachment A, that constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury) involving Waltine Nauta ("Nauta") and any co-conspirator, since January 2021, about the following matters:

(a)     Communications, records, documents, and other files regarding the access to or movement or location of any boxes or records;

(b)      Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

(c)      Information, including communications in any form, regarding any government and/or Presidential records created between January 20, 2017, and January 20, 2021;

(d)     Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential records, or of any documents with classification markings;

(e)     Communications, records, documents, and other files regarding the source and nature of any monetary transactions;

(f)      Evidence indicating how and when the TARGET PHONES were accessed or used to determine the context of phone access, use, and events relating to the crimes under investigation and to the phone user;

1

Subject to Protective Order                                    USA-00395376

(g)      Evidence establishing the motive, capability, or willingness to commit the above-referenced crimes, including but not limited to evidence indicating the phone user's state of mind as it relates to the crimes under investigation;

(h)      The identity of the person(s) who communicated with the account user about matters relating to violations of the above-referenced crimes, including records that help reveal their whereabouts.

II.      During the execution of the seizure of the TARGET PHONES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Nauta and anyone else who is found with the TARGET PHONES and reasonably believed by law enforcement to be a user of the devices, to the fingerprint scanner of the devices (TARGET PHONES); and/or (2) hold the device in front of the face of Nauta and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2

Subject to Protective Order

USA-00395377

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>22-mj-8547-BER | Date and time warrant executed:<br>11/29/2022  10:37am | Copy of warrant and inventory left with:<br>Waltine Nauta |
| Inventory made in the presence of :<br>Waltine Nauta | | |

Inventory of the property taken and name of any person(s) seized:

(1) Apple iPhone 12 Pro Max, IMEI ███████

(1) Apple iPhone 13 Pro Max, IMEI ███████

**RECEIVED**
By BruceReinhart at 4:37 pm, Nov 29, 2022

FILED BY _____ TM _____ D.C.

Nov 29, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm BeaCH

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 11/29/2022

FBI 21A ███████
*Executing officer's signature*

FBI 21A ███████ / Special Agent
*Printed name and title*

Subject to Protective Order

USA-00395378