# EXHIBIT 6

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with Apple DSID ████████<br>and Apple ID ████████@45office.com | )<br>)<br>)<br>)<br>)<br>) | Case No. 22-mj-8550-BER |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793(e) | Willful retention of national defense information |
| 18 U.S.C. § 2071 | Concealment or removal of government records |
| 18 U.S.C. § 1519 | Obstruction of federal investigation |
| 18 U.S.C. § 1001 | Material false statements |
| 18 U.S.C. § 1623 | Perjury |

The application is based on these facts:

See attached Affidavit of FBI Special Agent ██FBI 21A██

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

██FBI 21A██
*Applicant's  signature*

██FBI 21A██  Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Phone (WhatsApp)_____ *(specify reliable electronic means)*.

Date:  _____11/28/2022_____

*Judge's signature*

City and state:  _____West Palm Beach, Florida_____          Hon. Bruce E. Reinhart, U.S. Magistrate Judge
*Printed name and title*

FILED BY   *TM*   D.C.

**Nov 28, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

Subject to Protective Order                                                                USA-01291152

**AFFIDAVIT IN SUPPORT OF**
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, ▆▆FBI 21A▆▆ being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.     I make this affidavit in support of an application for a search warrant for information associated with Apple Destination Signaling Identifier (DSID) ▆▆▆, with Apple ID ▆▆▆@45office.com (the "TARGET ACCOUNT"), that is owned, maintained, controlled, or operated by Apple, Inc. (hereinafter "Apple"), a company headquartered at 1 Infinite Loop, Cupertino, California.  The TARGET ACCOUNT is used by Waltine Nauta ("NAUTA") and is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B..

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office counterintelligence division and have been since 2016. During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to counterintelligence and espionage investigations. I currently am assigned to investigate counterintelligence and espionage matters.  Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified National Defense Information ("NDI"), and with efforts to obstruct justice.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the TARGET ACCOUNT, as described in Attachment A, contain evidence of violations of 18 U.S.C. § 793(e) (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C § 1519 (obstruction of federal investigation), 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Background on Investigation

6.      The FBI is investigating potential violations of 18 U.S.C. §§ 793(e), 2071, 1519, 1001, and 1623 related to the improper removal and storage of classified national defense information in unauthorized spaces, as well as the unlawful concealment or removal of government records and obstruction of its investigation.

7.      This investigation began as a result of a referral that the United States National Archives and Records Administration ("NARA") sent to the United States Department of Justice

2

("DOJ") on or about February 9, 2022 (hereinafter, the "NARA Referral").  The NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act ("PRA"), NARA received from the office of former President Donald J. Trump (hereinafter "FPOTUS"), via representatives, fifteen (15) boxes of records (hereinafter, the "FIFTEEN BOXES").  The FIFTEEN BOXES, which had been transported from a property owned by FPOTUS at 1100 S. Ocean Blvd., Palm Beach, Florida, a residence and club known as "Mar-a-Lago," were reported in the NARA Referral to contain, among other things, highly classified documents intermingled with other records.

8.      After an initial review of the NARA Referral, the FBI opened a criminal investigation to, among other things, identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space. The FBI's investigation established that documents bearing classification markings, which appear to contain NDI, were among the materials contained in the FIFTEEN BOXES and were stored at Mar-a-Lago in an unauthorized location.

9.      As further described below, on May 11, 2022, the Department of Justice ("DOJ") served a grand jury subpoena on counsel for the Office of the Former President (the "Office") seeking "any and all documents . . . bearing classification markings" in FPOTUS's and/or the Office's possession.  On June 3, 2022, FPOTUS's counsel provided DOJ with a package of 37 documents bearing classification markings at the Confidential, Secret, and Top Secret levels. Counsel for FPOTUS provided DOJ with a written certification, signed by another person who was acting as the custodian of records on behalf of the Office for purposes of the subpoena, indicating that "a diligent search was conducted," that the "search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena" seeking

3

all documents with classification markings in the custody or control of FPOTUS and/or the Office, and that "any and all responsive documents" were being provided. Counsel for FPOTUS indicated that all responsive documents had been located in one storage room located on the ground floor at Mar-a-Lago (hereinafter, "the storage room.").

10.     After developing additional evidence that the June 3 production did not contain all of the documents with classification markings located at Mar-a-Lago, on August 8, 2022, the FBI executed a search and seizure warrant issued by a Magistrate Judge of the U.S. District Court for the Southern District of Florida. During the search, the FBI recovered from the storage room as well as FPOTUS's office at Mar-a-Lago over 100 documents bearing classification markings, which had not been produced on June 3. The documents appeared to contain NDI. The search also yielded apparent government and/or Presidential records subject to the Presidential Records Act, 44 U.S.C. § 2201.

### *Background on NAUTA*

11.     NAUTA began his career in the U.S. Navy in approximately 2001 and worked as a White House chef beginning in or around 2012. In 2017, NAUTA transitioned to work as a valet, or personal aide, for FPOTUS during FPOTUS's Presidential Administration (hereinafter "Administration"). During his time in the White House, NAUTA held a high security clearance and received training in the handling of classified information. In or around the summer of 2021, NAUTA retired from the military and went to work as a civilian for FPOTUS as his "body man" or assistant. According to publicly available information filed with the Federal Election Commission, the Save America PAC, a political action committee created by FPOTUS, paid NAUTA $149,167 between August 26, 2021, and August 30, 2022, which included $6,375 in "advance consulting" fees.

Subject to Protective Order                                                                USA-01291156

12.     NAUTA was involved in at least two key movements of FPOTUS's boxes at Mar-a-Lago: (1) in the weeks leading up to the provision of the FIFTEEN BOXES to NARA in January 2022, NAUTA and two other FPOTUS employees brought, at FPOTUS's request, the FIFTEEN BOXES from their location in a storage room at Mar-a-Lago to FPOTUS's residential entryway at Mar-a-Lago for FPOTUS's review; and (2) in the week before FPOTUS's representatives claimed on June 3 that they had conducted a diligent search for classified documents, NAUTA moved approximately 64 boxes out of the storage room at Mar-a-Lago and returned only about 25-30 prior to the review of the storage room for records responsive to the May 11 subpoena.  In June 2022, as described further below, NAUTA testified before a grand jury and concealed from it this movement of a large number of boxes prior to the June 3 production of classified documents.

*FPOTUS Stores Documents in Boxes*

13.



It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

14.     On June 21, 2022, NAUTA testified under oath before a federal grand jury sitting in the District of Columbia. Before the grand jury, NAUTA stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes. NAUTA was part of the team that packed items from FPOTUS residence at the White House for the move.

5

15.     According to WITNESS █, WITNESS █ subsequently learned that approximately eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS BOXES," were transported from the White House to the Mar-a-Lago but WITNESS █ did not know when this occurred. WITNESS █ described the FPOTUS BOXES as white and blue Bankers boxes and cardboard printer paper boxes with lids. WITNESS █ confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.



16.     On or about the afternoon of January 20, 2021, WITNESS █ observed several items, which may have contained some of the FPOTUS BOXES, being offloaded from Air Force One and transported to Mar-a-Lago.

17.     In late August or early September 2021, WITNESS █ observed the FPOTUS BOXES in the storage room at Mar-a-Lago, with no lock on the door. Sometime thereafter, WITNESS █ observed that locks were installed on the storage room door.  WITNESS █ described

6

the storage room as being located on the ground floor, pool level, in a hallway with other offices and storage spaces. The door to the storage room was painted gold and had no other markings on it.

18.     In addition to the approximately eighty-five to ninety-five FPOTUS BOXES located in the storage room, there were also other boxes in the storage room with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

*Provision of the Fifteen Boxes to NARA*

19.     Over the course of 2021, NARA endeavored to obtain what appeared to be missing records subject to the Presidential Records Act (PRA), 44 U.S.C. § 2201. On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021, when NARA was informed twelve boxes were found and ready for retrieval at Mar-a-Lago. According to WITNESS ▉ after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. WITNESS ▉ NAUTA, and another FPOTUS employee collected the FIFTEEN BOXES closest to the door of the storage room and delivered them to FPOTUS.

20.     They carried the boxes from the storage room to the entryway of FPOTUS's personal residential suite at Mar-a-Lago. Between approximately January 1-17, 2022, WITNESS ▉ NAUTA, and the other FPOTUS employee placed two to four boxes at a time outside FPOTUS's personal suite. WITNESS ▉ believes that FPOTUS took the boxes into the residential suite and personally reviewed their contents.

21.     WITNESS ▉ took a photograph of the storage room and provided it to FPOTUS sometime between January 1-17, 2022, to show FPOTUS the number of boxes that were in the

7

storage room. The storage photo, which appears below and was later provided to the FBI by WITNESS ▮ captures approximately sixty-one of the FPOTUS BOXES located in the storage room:



22.     On January 17, 2022, the day of the scheduled NARA pick up, WITNESS ▮ saw all FIFTEEN BOXES in the hallway outside FPOTUS's residential suite, known as Pine Hall. NAUTA confirmed that the FIFTEEN BOXES were in the location described by WITNESS ▮.

23.     NAUTA testified that he and WITNESS ▮ transferred the boxes from Pine Hall to NAUTA's car. From there, on January 17, 2022, WITNESS ▮ and NAUTA met the NARA contract driver and provided the driver with the FIFTEEN BOXES. NAUTA further testified that he had brought, at FPOTUS's request, additional boxes to Pine Hall after the January 2022 provision to NARA of the FIFTEEN BOXES.

8

                    USA-01291160

24.      Even though there were far more FPOTUS BOXES than the FIFTEEN BOXES, FPOTUS did not review the remainder of the FPOTUS BOXES before the NARA pickup. According to NAUTA, the FIFTEEN BOXES were not selected from the FPOTUS BOXES for review in a systematic way. NAUTA testified before the grand jury that NAUTA would "just open the door, turn to my left, grab a box, and take it up." NAUTA confirmed that he was not instructed to take any particular boxes, and NAUTA answered affirmatively when asked if NAUTA would "just pick some off the top." When NAUTA was questioned why he did not bring for review more than what NAUTA approximated was 15 to 17 boxes, NAUTA testified that "once I started putting them in there – [FPOTUS] was like, okay, that's it." According to NAUTA, FPOTUS did not state why he did not want to review more boxes before the NARA pickup.

25.      According to WITNESS █, after providing the FIFTEEN BOXES to NARA, FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

26.      According to WITNESS █, around the time the FIFTEEN BOXES were provided to NARA, FPOTUS directed WITNESS █ to convey to one of FPOTUS's lawyers, hereinafter "INDIVIDUAL 1," that there were no more boxes at Mar-a-Lago, which was an attempt to conceal from NARA that additional boxes remained at Mar-a-Lago.

27.      According to WITNESS █, however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS BOXES remained in the storage room as of approximately January 2022. WITNESS █ did not know the contents of the remaining seventy to eighty FPOTUS BOXES, but believed they contained the same types of documents and records as the FIFTEEN BOXES that were provided to NARA.

28.      From May 16-18, 2022, FBI agents conducted a preliminary review of the FIFTEEN BOXES provided to NARA and identified over 100 documents with classification

9

markings in fourteen of the FIFTEEN BOXES. Several of the documents also contained what appears to be FPOTUS's handwritten notes.

***Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents***

29.    On May 11, 2022, an attorney representing FPOTUS, "FPOTUS COUNSEL 1," agreed to accept service of a grand jury subpoena requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings." The return date of the subpoena was May 24, 2022.

30.    After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS COUNSEL 1 contacted DOJ COUNSEL and requested that FBI agents meet him the following day to pick up responsive documents. On June 3, 2022, three FBI agents and DOJ COUNSEL arrived at Mar-a-Lago to accept receipt of the materials. In addition to FPOTUS COUNSEL 1, another individual, hereinafter "INDIVIDUAL 2," was also present as the custodian of records for FPOTUS's post-presidential office. The production included a single Redweld envelope, wrapped in tape, containing documents. FPOTUS COUNSEL 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the storage room. INDIVIDUAL 2 provided a Certification Letter, signed by INDIVIDUAL 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

Subject to Protective Order                                                                 USA-01291162

31.     During receipt of the production, FPOTUS COUNSEL 1 stated he was advised all the records that came from the White House were stored in the storage room at Mar-a-Lago and the boxes of records in the storage room were "the remaining repository" of records from the White House. FPOTUS COUNSEL 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ COUNSEL were permitted to see the storage room (although they were not permitted to look inside the boxes) and observed that approximately fifty to fifty-five boxes remained in the storage room. Considering that only FIFTEEN BOXES had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS BOXES that had been located in the storage room, it appeared that approximately fifteen to thirty of the FPOTUS BOXES had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the storage room, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

32.     While testifying before the grand jury, NAUTA stated that he did not know whether FPOTUS COUNSEL 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS COUNSEL1 go in there.

33.     A review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed 37 unique documents bearing classification markings, some of which bore classification markings at the highest levels. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also contained what appears to be FPOTUS's handwritten notes.

11

34.     When producing the documents, neither FPOTUS COUNSEL 1 nor INDIVIDUAL 2 asserted that FPOTUS had declassified the documents.[1] The documents being in a Redweld envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.[2]

***Surveillance Camera Footage Shows NAUTA removing boxes from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection with the Subpoena***

35.     On July 6, 2022, in response to a grand jury subpoena for surveillance video from internal cameras located on the ground floor (basement) and outside Pine Hall at Mar-a-Lago, representatives of the Trump Organization provided a hard drive to FBI agents. Upon review of the hard drive, the FBI determined that the drive contained video footage from four cameras in the basement hallway of Mar-a-Lago in which the door to the storage room is located. The footage on the drive begins on April 23, 2022, and ends on June 24, 2022. The recording feature of the cameras appears to be motion activated, so that footage is only captured when motion is detected within each camera's field of view.

---

[1] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988). Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

[2] On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS COUNSEL 1 sent two letters to DOJ COUNSEL. In the second such letter, available at 22-mj-8332-BER (D.E. 125), FPOTUS COUNSEL 1 asked DOJ to consider a few "principles," which include FPOTUS COUNSEL 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS COUNSEL 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

Subject to Protective Order                                                                                          USA-01291164

36.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter anteroom) that leads to the storage room. The doorway to the anteroom itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the anteroom because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The anteroom, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the storage room. The anteroom provides the only entrance to the storage room; however, other offices can also be entered from the anteroom, so it might be possible for persons to enter the storage room from those other offices without being visible in the surveillance camera footage.

37.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, NAUTA is observed exiting the anteroom doorway with three boxes.

On May 30, 2022, four days after NAUTA's interview with the FBI during which the location of boxes was a significant subject of questioning, NAUTA is observed exiting the anteroom doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS BOXES. FBI did not observe this quantity of boxes being returned to the storage room through the anteroom entrance in its review of the footage.

On June 1, 2022, NAUTA is observed carrying eleven brown cardboard boxes out the anteroom entrance. One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, NAUTA is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS BOXES, into the entrance of the ANTEROOM. Approximately three and a half hours later, NAUTA is observed escorting FPOTUS COUNSEL 1 in through the entrance of the anteroom, and FPOTUS COUNSEL 1 is not observed leaving until approximately two and a half hours later.

13

Subject to Protective Order                                                      USA-01291165

On June 3, 2022, FPOTUS COUNSEL 1 is escorted through the anteroom entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS COUNSEL 1 exit the ANTEROOM entrance moments later. FPOTUS COUNSEL 1 appeared to be carrying a Redweld envelope after exiting the anteroom.

38.     According to FBI's review of video footage, and as detailed in the paragraph above, NAUTA can be observed removing approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returning 25-30 boxes to the storage room area on June 2, 2022. Notably, and as described above in paragraph 28, these boxes were removed following service of a grand jury subpoena but before FPOTUS COUNSEL 1's review of boxes in the storage room area to locate documents responsive to the subpoena.

39.     NAUTA testified to the grand jury that he was aware that FPOTUS COUNSEL 1 reviewed the boxes in the storage room on June 2. When asked about his role in assisting FPOTUS COUNSEL 1 with the review, NAUTA testified that he showed FPOTUS COUNSEL 1 where the storage room was, let him in, and then FPOTUS COUNSEL 1 told NAUTA to leave. NAUTA stated, "and that was it" for his role in assisting with the review.

### NAUTA concealed information during his FBI interview and Grand Jury testimony

40.     On May 26, 2022, the FBI interviewed NAUTA and explained that the FBI was conducting an investigation as to whether classified documents were stored at Mar-a-Lago and that the FBI was particularly interested in where the boxes with classified documents were located and whether they had been moved outside the storage room.

41.     NAUTA's answers about his knowledge of the boxes were inconsistent. During the interview, NAUTA claimed that the first time NAUTA saw the boxes was when NAUTA moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. Less than a month later, when NAUTA testified before the grand jury,

14

USA-01291166

however, he stated he had actually moved them weeks prior from the storage room at Mar-a-Lago to Pine Hall for FPOTUS's review of them. Further, in NAUTA's interview with the FBI on May 26, he had stated that he did not know where the boxes had come from prior to being located in Pine Hall. Testifying under oath before the grand jury, NAUTA claimed he had said this because he was not sure whether the boxes in Pine Hall were the same boxes that he had moved from the storage room. NAUTA thereafter admitted, however, that he was not aware of anyone moving any other such boxes to Pine Hall.

42.     When NAUTA was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony on June 21, NAUTA said that to his knowledge, there were remaining boxes. NAUTA at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." NAUTA then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the storage room).

43.     Furthermore, during his grand jury testimony, NAUTA was asked to identify the occasions on which he had entered the storage room after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the storage room at FPOTUS's behest. When asked if he had removed anything from the storage room at any time, NAUTA testified that "recently," meaning "within the last month" prior to his June 21 testimony, he removed a box of challenge coins from the storage room and took them to FPOTUS's office. He did not identify any other occasion on which he had removed anything from the storage room and did not inform the grand jury that, within the month prior to his grand jury appearance, NAUTA

15

USA-01291167

had removed approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returned 25-30 boxes to the storage room area on June 2, 2022.

### *Execution of Search Warrant at Mar-a-Lago and Movement of Boxes After June 3*

44.    On August 8, 2022, the FBI executed a search warrant at Mar-a-Lago authorized by the Honorable Bruce E. Reinhart, U.S. Magistrate Judge in the Southern District of Florida. *See* 22-mj-83332-BER.   The search yielded over 100 unique documents bearing classification markings, with some indicating the highest levels of classification and extremely limited distribution, found in both the storage room and FPOTUS's office at Mar-a-Lago. Based on my training and experience, I know that documents classified at these levels typically contain NDI.

45.    During the search, FBI agents found approximately 70 to 80 boxes in the storage room. Accordingly, at some point between June 3, when the FBI observed approximately 50 to 55 boxes in the storage room, and August 8, someone had moved approximately 15 to 30 boxes into the storage room.

46.    WITNESS ▉ has indicated that after the June 3 production, FPOTUS traveled back to Mar-a-Lago twice during the summer before the search warrant was executed on August 8. According to WITNESS ▉ it was unusual for FPOTUS to return to Mar-a-Lago during the summer, when he usually stayed at his properties at Bedminster, New Jersey or Trump Tower in New York City. To WITNESS ▉ s knowledge, FPOTUS had not returned to Mar-a-Lago the previous summer. During one of the return trips, WITNESS ▉ asked NAUTA why FPOTUS was back at Mar-a-Lago and, based on NAUTA's response, WITNESS ▉ understood NAUTA and FPOTUS were there to "check on things." Based on the cryptic nature of the response and the unusual nature of the trips, WITNESS ▉ believed that NAUTA was referring to the movement of FPOTUS boxes.

16

                                                           USA-01291168

47.     When asked recently about NAUTA's motivation regarding his actions in this investigation, WITNESS ▉ assessed that NAUTA was motivated by "loyalty" to FPOTUS.

### The TARGET ACCOUNT

48.     Apple records confirm that the TARGET ACCOUNT has DSID 20554275476, with Apple ID ▉▉▉▉@45office.com, and is associated with phone number ▉▉▉▉. Verizon records confirm that phone number ▉▉▉▉ has been effective since at least May 21, 2021. Verizon records also show that the phone associated with phone number ▉▉▉▉ is an iPhone 12 Pro Max. The subscriber of that phone is listed as "▉▉▉▉▉▉" and the business name is listed as "▉▉▉▉" at ▉▉▉▉▉▉, ▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

49.     WITNESS ▉ indicated to the FBI that ▉▉▉▉ is NAUTA's work cellular phone number and that WITNESS ▉ has regularly communicated with NAUTA on work-related matters on the phone number associated with the TARGET ACCOUNT. According to WITNESS ▉, when NAUTA was hired to work for FPOTUS in the summer of 2021, he used his personal phone number, identified as ▉▉▉▉, to communicate regularly regarding work with FPOTUS and others until he was given a work phone with phone number ▉▉▉▉, in late summer/early fall, approximately a month after he began working for FPOTUS. Toll records show that since January 2022, phone number ▉▉▉▉ contacted FPOTUS's known cell phone number at least once (on July 13, 2022). Additionally, between February 2022 and August 2022, there were at least 17 calls between ▉▉▉▉ and ▉▉▉▉, possibly because of

17

forwarded calls. From February 2022 through August 2022, there were approximately 12 text messages between ▆▆▆▆ and ▆▆▆▆.

50.    WITNESS ▆ stated that NAUTA has a work email address, ▆▆▆@45office.com that he uses and that WITNESS ▆ has used to communicate with him. WITNESS ▆ further indicated to the FBI that WITNESS ▆ and a few other FPOTUS employees, possible including NAUTA, are on an e-mail distribution list that contains the daily schedule of FPOTUS. Additionally, based on records received from Google pursuant to a court-authorized order under 18 U.S.C. § 2703(d), NAUTA regularly communicated with 45 Office staff using email. Moreover, NAUTA sent 24 emails to himself from his ▆▆▆@gmail.com address to the TARGET ACCOUNT email address. In turn, there were five emails sent from the TARGET ACCOUNT email address to NAUTA's ▆▆▆@45office.com email. In my training and experience, a person whose employer provides a work cellular phone often is able to access his work emails from his phone, and accordingly have saved work messages on his work phone. Therefore, it is likely that relevant emails that NAUTA sent or received from his ▆▆▆@45office.com email account are on the TARGET ACCOUNT.

51.    Open-source research confirmed that the phone number associated with the TARGET ACCOUNT was registered with both WhatsApp and Signal, another encrypted communication application. Accordingly, there may be stored communications through WhatsApp or Signal on the TARGET ACCOUNT that pertain to this investigation.

52.    Based upon this investigation, I believe that there may be stored communications within the TARGET ACCOUNT that contain evidence detailing the removal of FPOTUS boxes, which likely contained classified information and NDI, from the White House to Mar-a-Lago and from the storage room at Mar-a-Lago. Furthermore, I believe there may be stored communications

18

in the TARGET ACCOUNT detailing efforts to mislead law enforcement. Finally, the data from the TARGET ACCOUNT would also provide location information about NAUTA's movements that could indicate when and where he moved boxes, such as if he moved the boxes to a storage facility or other location outside of Mar-a-Lago. As indicated below, Apple has location services that could be used to determine where a user traveled with the user's phone.

### INFORMATION REGARDING APPLE[3]

53.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

54.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").   As described in further detail below, the services include email, instant messaging, and file storage:

55.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

56.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

---

[3] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

19

57.     iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

58.     iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

59.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

60.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

61.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

20

Subject to Protective Order                                          USA-01291172

62.     App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

63.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

64.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

65.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on

Subject to Protective Order                                                                USA-01291173

Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

66.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

67.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications

22

                    USA-01291174

between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

68.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

69.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

70.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience,

23

instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

71.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

72.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

73.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity,

24

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

74.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **REVIEW OF THE INFORMATION PURSUANT TO THE WARRANT**

75.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service of a search warrant issued under § 2703, or for the collection or production of responsive records.  Accordingly, the warrant requested herein will be transmitted to Apple, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 14 days from the date of service.  Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts in the governments control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section II of Attachment B to the proposed warrant.

76.     In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the TARGET ACCOUNT.  This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly using keyword searches, I know that keyword searches and similar methods are

Subject to Protective Order                                                          USA-01291177

typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that a law enforcement officer is likely to search for.

Subject to Protective Order                                                                    USA-01291178

**REQUEST FOR NON-DISCLOSURE AND SEALING**

77.     The United States request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss aspects of an ongoing criminal investigation that are neither public nor known to the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

78.     The United States further requests that pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), Apple be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for a period of one year.  The United States submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation. Such a disclosure would give the subscribers an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution.

**FILTER PROCEDURES**

79.     NAUTA has been represented by attorneys in this matter since at least in or around May 2022. A Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. The Filter Team will have no future involvement in the investigation of this matter. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its

27

review. If at any time the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents can review the potentially privileged documents. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to court for judicial review.

## CONCLUSION

80.      Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

FBI 21A

Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (WhatsApp) this _28_ day of November, 2022

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

28

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to  information associated with Apple Destination Signaling Identifier (DSID) ███████ with  Apple  ID ███████@45office.com,  that  is  owned,  maintained, controlled, or operated by Apple Inc., a company headquartered at 1 Infinite Loop, Cupertino, CA 95014.

USA-01291181

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, Inc ("the Provider"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to the Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile

1

                                                    USA-01291182

Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.       The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.       The contents of all instant messages associated with the account including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.       The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud

2

                                                                    USA-01291183

Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All search history or web history;

i.      All records pertaining to the types of service used;

j.      All usernames associated with or sharing a login IP address or browser cookie with the account;

k.      All cookies, including third-party cookies, associated with the user;

l.      All records that are associated with the machine cookies associated with the user;

m.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

3

n.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

4

Subject to Protective Order                                                                                    USA-01291185

II.    **Information to be seized by the government**

All information described above in Section I that constitutes contraband, fruits, evidence, and/or instrumentalities of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury) involving Waltine Nauta and any co-conspirator, since January 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Communications, records, documents, and other files regarding the access to or movement or location of any boxes or records;

(b) Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

(c) Information, including communications in any form, regarding any government and/or Presidential records created between January 20, 2017, and January 20, 2021;

(d) Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential records, or of any documents with classification markings;

(e) Communications, records, documents, and other files regarding the source and nature of any monetary transactions;

(f) Evidence indicating how and when the account was accessed or used to determine the context of account access, use, and events relating to the crimes under investigation and to the account owner;

5

(g) Evidence establishing the motive, capability, or willingness to commit the above-referenced crimes, including but not limited to evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(h) The identity of the person(s) who communicated with the account user about matters relating to violations of the above-referenced crimes, including records that help reveal their whereabouts.

6

Subject to Protective Order

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with Apple DSID ████████<br>and Apple ID ████████@45office.com | )<br>)<br>)<br>)<br>)<br>) |

Case No.   22-mj-8550-BER

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ December 12, 2022 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     11/28/22  19:34          _____
                                                  *Judge's signature*

City and state:      West Palm Beach, FL          Hon. Bruce E. Reinhart, U.S. Magistrate Judge
                                                  *Printed name and title*

Subject to Protective Order

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>   22-mj-8550-BER | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order                                                                                       USA-01291189

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to  information associated with Apple Destination Signaling Identifier (DSID) ███████████  with  Apple  ID  ████████@45office.com,  that  is  owned,  maintained, controlled, or operated by Apple Inc., a company headquartered at 1 Infinite Loop, Cupertino, CA 95014.

Subject to Protective Order                                                                USA-01291190

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, Inc ("the Provider"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to the Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile

1

                                                    USA-01291191

Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud

2

Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.        All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.        All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.        All search history or web history;

i.        All records pertaining to the types of service used;

j.        All usernames associated with or sharing a login IP address or browser cookie with the account;

k.        All cookies, including third-party cookies, associated with the user;

l.        All records that are associated with the machine cookies associated with the user;

m.        All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

Subject to Protective Order                                                                              USA-01291193

n.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

4

Subject to Protective Order                                                    USA-01291194

## II.    Information to be seized by the government

All information described above in Section I that constitutes contraband, fruits, evidence, and/or instrumentalities of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury) involving Waltine Nauta and any co-conspirator, since January 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Communications, records, documents, and other files regarding the access to or movement or location of any boxes or records;

(b) Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

(c) Information, including communications in any form, regarding any government and/or Presidential records created between January 20, 2017, and January 20, 2021;

(d) Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential records, or of any documents with classification markings;

(e) Communications, records, documents, and other files regarding the source and nature of any monetary transactions;

(f) Evidence indicating how and when the account was accessed or used to determine the context of account access, use, and events relating to the crimes under investigation and to the account owner;

5

    USA-01291195

(g) Evidence establishing the motive, capability, or willingness to commit the above-referenced crimes, including but not limited to evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(h) The identity of the person(s) who communicated with the account user about matters relating to violations of the above-referenced crimes, including records that help reveal their whereabouts.

6

Subject to Protective Order

USA-01291196

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>22-mj-8550-BER | Date and time warrant executed:<br>November 29, 2022  12:11 PM | Copy of warrant and inventory left with:<br>Apple Inc. |

| Inventory made in the presence of :<br>N/A |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

On December 1, 2022, Apple Inc., provided a single, encrypted file.

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: Dec 13, 2022

FBI 21A

_____ *ure*

FBI 21A / Special Agent - FBI

*Printed name and title*

Subject to Protective Order