# EXHIBIT 7

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH<br>████████@gmail.com THAT IS STORED AT<br>PREMISES CONTROLLED BY GOOGLE LLC | )<br>)<br>)     Case No. 23-SW- 32<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793(e) - Willful Retention of National Defense Information; 18 U.S.C. § 2071 - Concealment or Removal of Government Records; 18 U.S.C § 1519 - Obstruction of Federal Investigation; 18 U.S.C. § 1001 - Material False Statement; 18 U.S.C. § 1623 - Perjury. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

██████████ FBI 40 ██████████████

_____ FBI 40 _____   Special Agent
*Applicant's signature*

FBI 40  Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means)*.

Date:  2/6/2023
_____

_____
*Judge's signature*

City and state:    Washington, D.C. _____

Chief Judge Beryl A. Howell
United States Chief Judge
*Printed name and title*

USA-00944415

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ☑ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH | ) |
| ███████@gmail.com THAT IS STORED AT | ) |
| PREMISES CONTROLLED BY GOOGLE LLC | ) |

Case No.  23-SW- 32

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____February 17, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Chief Judge Beryl A. Howell_____ .
*(United States Chief Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   2/6/2023 at          10:10 AM          _____*Beryl A. Howell*_____
*Chief Judge's signature*

City and state:      _____Washington, D.C._____      _____Chief Judge Beryl A. Howell_____
**United States Chief Judge**

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SW- 32 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order                                                    USA-00944417

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information related to ███████@gmail.com (the "Account") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT B**

**Particular Things to be Seized**

I.    **Information to be disclosed by Google LLC and Google Payment Corporation ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period November 1, 2021 to present:

- **SUBSCRIBER AND ACCESS RECORDS:** All business records and subscriber information, in any form kept, pertaining to the account, including: full name; physical address; telephone numbers, including SMS recovery and alternate sign-in numbers; alternative and recovery email addresses, including those provided during registration; usernames, screennames and other identifiers; account status; account creation date; account registration IP address; length of service; records of session times and durations, including log-in IP addresses; methods of connecting; log files; subscriber change history; means and source of payment (including any credit or bank account number); and detailed billing records;

- **DEVICES:** All device information associated with the accounts, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

- **SERVICES:** All records and other information (including records of non-content user activity for each connection made to or from the Account(s), the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs) associated with the Accounts, including those related to the use of all Google services, including but not limited to the following Google services: Web & App Activity, Gmail, Android, Google Calendar, Location History, YouTube, Google My Maps, Google Voice, Google Hangouts, Tasks In Tingle, Google Payments, Project Fi, and Google Keep;

- **FORWARDING OR FETCHING ACCOUNTS:** All forwarding or fetching accounts relating to the Account(s);

1

    USA-00944419

- **BROWSING, SEARCH, and APPLICATION USE HISTORY:** All Internet search, browsing history, and application usage history, such as Web & App Activity, including: search terms; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; all text typed into the Google Chrome address bar or Google search bar, including URLs and IP addresses; all URLs or IP addresses clicked on; user settings; and all associated logs and change history;

- **PAYMENT:** All payment and transaction data associated with the account, such as Google Pay and Google Wallet, including: records of purchases, money transfers, and all other transactions; stored credit; gift and loyalty cards; associated payment cards, including any credit card or bank account number, PIN, associated bank, and other numbers; and all associated access and transaction logs, including IP address, time stamp, and change history;

- **LINKED ACCOUNTS:** For all Google Accounts that are linked to any of the accounts listed in Attachment A by cookies; recovery, secondary, forwarding; or alternate email address; Android ID; IMEI; or telephone number, including SMS recovery number or sign-in account number, provide:

  a.   Names (including subscriber names, user names, and screen names);

  b.   Addresses (including mailing addresses, service addresses, residential addresses, business addresses, and email addresses);

  c.   Local and long distance telephone connection records (including records of text messages sent and received), if applicable;

  d.   Records of session times and durations, if applicable;

  e.   Length of service (including start date) and types of service utilized;

  f.   Telephone or instrument numbers (including model type/numbers, phone numbers, IMSIs, IMEIs, MEIDs, UDIDs, MAC addresses, and advertising IDs);

  g.   Other subscriber numbers or identities, including any temporarily assigned network addresses (including the registration and session Internet Protocol ("IP") addresses with associated port numbers); and

  h.   Means and source of payment for such service (including any credit card or bank account number).

- **LOCATION HISTORY:** All records indicating the location at which the account was active, such as Location History and Web & App Activity, including: GPS data; cell site/cell tower information; IP addresses; information associated with each location record,

2

including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, and inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car); and associated logs and user settings, including Timeline access logs and change history.

- **OTHER RECORDS:** All records and other information (not including the contents of communications) relating to the Accounts, including:

  1.  Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses; access and activity logs; deletion and change logs;

  2.  Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, email headers, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

  3.  Device records.

Google is hereby ordered to disclose the above information to the Government within 14 days of the issuance of this warrant.

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 793 (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C. § 1519 (obstruction of federal investigation); 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), during the period November 2021, through the present.

## III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by Google and determine which information is within the scope of the information to be seized

Subject to Protective Order                                                    USA-00944421

specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Google that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

4

Subject to Protective Order

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ████████@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 23-SW-<br><br>UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, ████ FBI 40 ████, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(I)(A) to require Google LLC and Google Payment Corporation (collectively, "Google") to disclose to the United States records and other information associated with ████@gmail.com ("**TARGET ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be disclosed by Google and searched by the United States is described in the following paragraphs and in Attachments A and B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office counterintelligence division and have been since 2021. During this time, I have received training at the FBI Academy located in at Quantico, Virginia, specific to counterintelligence and espionage investigations. I am currently assigned to investigate counterintelligence and espionage matters. Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified National Defense Information ("NDI"), and with efforts to obstruct justice.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

Subject to Protective Order

to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the information associated with the **TARGET ACCOUNT**, as described in Attachment A, will provide evidence of violations of 18 U.S.C. § 793(e) (willful retention of national defense information); 18 U.S.C. § 2071 (concealment or removal of government records); 18 U.S.C § 1519 (obstruction of federal investigation), 18 U.S.C. § 1001 (material false statement); or 18 U.S.C. § 1623 (perjury), as further described in Attachment B.

5.    For the purpose of this affidavit, the account information to be searched is capitalized and bolded (e.g., the **TARGET ACCOUNT**), and the name of the apparent user of the **TARGET ACCOUNT** is lowercase and bolded (i.e., **Walt Nauta**).

6.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred in part within the District of Columbia. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### Background on Investigation

7.    The FBI is investigating potential violations of 18 U.S.C. §§ 793(e), 2071, 1519, 1001, and 1623 related to the improper removal and storage of classified national defense information in unauthorized spaces, as well as the unlawful concealment or removal of government records and obstruction of its investigation.

8.    This investigation began as a result of a referral that the United States National Archives and Records Administration ("NARA") sent to the United States Department of Justice

2

("DOJ") on or about February 9, 2022 (hereinafter, the "NARA Referral"). The NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act ("PRA"), NARA received from the office of former President Donald J. Trump (hereinafter "FPOTUS"), via representatives, 15 boxes of records (hereinafter, the "15 boxes"). The 15 boxes, which had been transported from a property owned by FPOTUS at 1100 S. Ocean Blvd., Palm Beach, Florida, a residence and club known as "Mar-a-Lago," were reported in the NARA Referral to contain, among other things, highly classified documents intermingled with other records.

9.      After an initial review of the NARA Referral, the FBI opened a criminal investigation to, among other things, identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space. The FBI's investigation established that documents bearing classification markings, which appear to contain NDI, were among the materials contained in the 15 boxes and were stored at Mar-a-Lago in an unauthorized location.

10.     As further described below, on May 11, 2022, the Department of Justice ("DOJ") served a grand jury subpoena on counsel for the Office of the Former President (the "Office") seeking "any and all documents . . . bearing classification markings" in FPOTUS's and/or the Office's possession. On June 3, 2022, FPOTUS's counsel provided DOJ with a package of 38 documents bearing classification markings at the Confidential, Secret, and Top Secret levels. Counsel for FPOTUS provided DOJ with a written certification, signed by another person who was acting as the custodian of records on behalf of the Office for purposes of the subpoena, indicating that "a diligent search was conducted," that the "search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena" seeking all documents with classification markings in the custody or control of FPOTUS and/or the Office, and that "any and all responsive documents" were being provided. Counsel for FPOTUS indicated

3

that all responsive documents had been located in one storage room located on the ground floor at Mar-a-Lago (hereinafter, "the storage room.").

11. After developing additional evidence that the June 3 production did not contain all of the documents with classification markings located at Mar-a-Lago, on August 8, 2022, the FBI executed a search and seizure warrant issued by a Magistrate Judge of the U.S. District Court for the Southern District of Florida. During the search, the FBI recovered from the storage room as well as FPOTUS's office at Mar-a-Lago over 100 documents bearing classification markings, which had not been produced on June 3. The documents appeared to contain NDI. The search also yielded apparent government and/or Presidential records subject to the Presidential Records Act, 44 U.S.C. § 2201.

### Background on Nauta

12. **Waltine Nauta** ("**Nauta**") began his career in the U.S. Navy in approximately 2001 and worked as a White House chef beginning in or around 2012. In 2017, **Nauta** transitioned to work as a valet, or personal aide, for FPOTUS during FPOTUS's Presidential Administration (hereinafter "Administration"). During his time in the White House, **Nauta** held a high security clearance and received training in the handling of classified information. In or around the summer of 2021, **Nauta** retired from the military and went to work as a civilian for FPOTUS as his "body man" or assistant. According to publicly available information filed with the Federal Election Commission, the Save America PAC, a political action committee created by FPOTUS, paid **Nauta** $149,167 between August 26, 2021, and August 30, 2022, which included $6,375 in "advance consulting" fees.

13. **Nauta** was involved in at least two key movements of FPOTUS's boxes at Mar-a-Lago: (1) in the weeks leading up to the provision of the 15 boxes to NARA in January 2022, **Nauta** and at least one other FPOTUS employee brought, at FPOTUS's request, the 15 boxes from

4

USA-00944426

their location in a storage room at Mar-a-Lago to FPOTUS's residential entryway at Mar-a-Lago for FPOTUS's review; and (2) in the week before FPOTUS's representatives claimed on June 3 that they had conducted a diligent search for classified documents, **Nauta** moved approximately 64 boxes out of the storage room at Mar-a-Lago and returned only about 25-30 prior to the review of the storage room for records responsive to the May 11 subpoena. In June 2022, as described further below, **Nauta** testified before a grand jury in the District of Columbia and provided inconsistent statements about the movement of a large number of boxes prior to the June 3 production of classified documents. Furthermore, on June 24, 2022, DOJ served a grand jury subpoena on the Trump Organization for certain surveillance video from Mar-a-Lago. That evening, **Nauta** made flight arrangements to travel from New Jersey to Palm Beach the next day. Text messages obtained by search warrant show that **Nauta** went to Mar-a-Lago the next day, June 25, 2022, and met with the Mar-a-Lago property manager. Surveillance video later obtained by a subsequent subpoena shows **Nauta** and the Mar-a-Lago property manager in the storage room area the evening of June 25, 2022, where it appears that the property manager is gesturing in the direction of the surveillance cameras.

### FPOTUS Stores Documents in Boxes



14.

It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

5

USA-00944427

Per. 34

15.     On June 21, 2022, **Nauta** testified under oath before a federal grand jury sitting in the District of Columbia. Before the grand jury, **Nauta** stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes. **Nauta** was part of the team that packed items from FPOTUS residence at the White House for the move.

16.     According to Per. 34 Per. 34 subsequently learned that approximately eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS boxes," were transported from the White House to the Mar-a-Lago but Per. 34 did not know when this occurred. Per. 34 described the FPOTUS boxes as white and blue Bankers boxes and cardboard printer paper boxes with lids. Per. 34 confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.



6

17.     On or about the afternoon of January 20, 2021, ▮Per. 34▮ observed several items, which may have contained some of the FPOTUS boxes, being offloaded from Air Force One and transported to Mar-a-Lago.

18.     In late August or early September 2021, ▮Per. 34▮ observed the FPOTUS boxes in the storage room at Mar-a-Lago, with no lock on the door. Sometime thereafter, ▮Per. 34▮ observed that locks were installed on the storage room door. ▮Per. 34▮ described the storage room as being located on the ground floor, pool level, in a hallway with other offices and storage spaces. The door to the storage room was painted gold and had no other markings on it.

19.     In addition to the approximately eighty-five to ninety-five FPOTUS boxes located in the storage room, there were also other boxes in the storage room with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

### Provision of the 15 Boxes to NARA

20.     Over the course of 2021, NARA endeavored to obtain what appeared to be missing records subject to the Presidential Records Act (PRA), 44 U.S.C. § 2201. On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021, when NARA was informed twelve boxes were found and ready for retrieval at Mar-a-Lago. According to ▮Per. 34▮, after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. ▮Per. 34▮ **Nauta**, and on occasion possibly another FPOTUS employee collected the 15 boxes closest to the door of the storage room and delivered them to FPOTUS.

21.     They carried the boxes from the storage room to the entryway of FPOTUS's personal residential suite at Mar-a-Lago. Between approximately November 2021 and January 2022, ▮Per. 34▮ **Nauta**, and the other FPOTUS employee placed two to four boxes at a time outside

7

FPOTUS's personal suite. Per. 34 believes that FPOTUS took the boxes into the residential suite and personally reviewed their contents.

22.   Per. 34 took a photograph of the storage room and provided it to FPOTUS in or around November 2021, to show FPOTUS the number of boxes that were in the storage room. The storage photo, which appears below and was later provided to the FBI by Per. 34 captures approximately sixty-one of the FPOTUS boxes located in the storage room:



23.   On January 17, 2022, the day of the scheduled NARA pick up, Per. 34 saw all 15 boxes in the hallway outside FPOTUS's residential suite, known as Pine Hall. **Nauta** confirmed that the 15 boxes were in the location described by Per. 34.

24.   **Nauta** testified that he and Per. 34 transferred the boxes from Pine Hall to **Nauta**'s car. From there, on January 17, 2022, Per. 34 and **Nauta** met the NARA contract driver and

8

Subject to Protective Order

Case 9:23-cr-80101-AMC  Document 517-7  Entered on FLSD Docket 05/02/2024  Page 18 of 34
Case 1:23-sw-00032-BAH *SEALED*  Document 4  Filed 02/06/23  Page 17 of 33

provided the driver with the 15 boxes. **Nauta** further testified that he had brought, at FPOTUS's request, additional boxes to Pine Hall after the January 2022 provision to NARA of the 15 boxes.

25.    Even though there were far more FPOTUS boxes than the 15 boxes, FPOTUS did not review the remainder of the FPOTUS boxes before the NARA pickup. According to **Nauta**, the 15 boxes were not selected from the FPOTUS boxes for review in a systematic way. **Nauta** testified before the grand jury that **Nauta** would "just open the door, turn to my left, grab a box, and take it up." **Nauta** confirmed that he was not instructed to take any particular boxes, and **Nauta** answered affirmatively when asked if **Nauta** would "just pick some off the top." When **Nauta** was questioned why he did not bring for review more than what **Nauta** approximated was 15 to 17 boxes, **Nauta** testified that "once I started putting them in there – [FPOTUS] was like, okay, that's it." According to **Nauta**, FPOTUS did not state why he did not want to review more boxes before the NARA pickup.

26.    According to Per. 34 after providing the 15 boxes to NARA, FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

27.    According to Per. 34 , around the time the 15 boxes were provided to NARA, FPOTUS directed Per. 34 to convey to one of FPOTUS's lawyers, hereinafter "Individual 1," that there were no more boxes at Mar-a-Lago, which was an attempt to conceal from NARA that additional boxes remained at Mar-a-Lago.

28.    According to Per. 34 , however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS boxes remained in the storage room as of approximately January 2022. Per. 34 did not know the contents of the remaining seventy to eighty FPOTUS boxes, but believed they contained the same types of documents and records as the 15 boxes that were provided to NARA.

9

29.     From May 16-18, 2022, FBI agents conducted a preliminary review of the 15 boxes provided to NARA and identified over 190 documents with classification markings in fourteen of the 15 boxes. Several of the documents also contained what appears to be FPOTUS's handwritten notes.

**Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents**

30.     On May 11, 2022, an attorney representing FPOTUS, "FPOTUS Counsel 1," agreed to accept service of a grand jury subpoena requesting "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings." The return date of the subpoena was May 24, 2022.

31.     After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS Counsel 1 contacted DOJ Counsel and requested that FBI agents meet him the following day to pick up responsive documents. On June 3, 2022, three FBI agents and DOJ Counsel arrived at Mar-a-Lago to accept receipt of the materials. In addition to FPOTUS Counsel 1, another individual, hereinafter "Individual 2," was also present as the custodian of records for FPOTUS's post-presidential office. The production included a single Redweld envelope, wrapped in tape, containing documents. FPOTUS Counsel 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the storage room. Individual 2 provided a Certification Letter, signed by Individual 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

10

32.     During receipt of the production, FPOTUS Counsel 1 stated he was advised all the records that came from the White House were stored in the storage room at Mar-a-Lago and the boxes of records in the storage room were "the remaining repository" of records from the White House. FPOTUS Counsel 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ Counsel were permitted to see the storage room (although they were not permitted to look inside the boxes) and observed that approximately fifty to fifty-five boxes remained in the storage room. Considering that only 15 boxes had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS boxes that had been located in the storage room, it appeared that approximately fifteen to thirty of the FPOTUS boxes had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the storage room, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

33.     While testifying before the grand jury, **Nauta** stated that he did not know whether FPOTUS Counsel 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS Counsel 1 go in there.

34.     A review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed 38 unique documents bearing classification markings, some of which bore classification markings at the highest levels. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also contained what appears to be FPOTUS's handwritten notes.

Subject to Protective Order

USA-00944433

35.     When producing the documents, neither FPOTUS Counsel 1 nor Individual 2 asserted that FPOTUS had declassified the documents.[1] The documents being in a Redweld envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.[2]

**Surveillance Camera Footage Shows Nauta removing boxes from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection with the Subpoena**

36.     On July 6, 2022, in response to a June 24 grand jury subpoena for surveillance video from internal cameras located on the ground floor (basement) and outside Pine Hall at Mar-a-Lago, representatives of the Trump Organization provided a hard drive to FBI agents. Upon review of the hard drive, the FBI determined that the drive contained video footage from four cameras in the basement hallway of Mar-a-Lago in which the door to the storage room is located. The footage on the drive begins on April 23, 2022, and ends on June 24, 2022. The recording feature of the cameras appears to be motion activated, so that footage is only captured when motion is detected within each camera's field of view.

37.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter anteroom) that leads to the storage room.

---

[1] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988). Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

[2] On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS Counsel 1 sent two letters to DOJ Counsel. In the second such letter, available at 22-mj-8332-BER (D.E. 125), FPOTUS Counsel 1 asked DOJ to consider a few "principles," which include FPOTUS Counsel 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS Counsel 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

12

Subject to Protective Order

USA-00944434

The doorway to the anteroom itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the anteroom because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The anteroom, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the storage room. The anteroom provides the only entrance to the storage room; however, other offices can also be entered from the anteroom, so it might be possible for persons to enter the storage room from those other offices without being visible in the surveillance camera footage.

38.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, **Nauta** is observed exiting the anteroom doorway with three boxes.

On May 30, 2022, four days after **Nauta**'s interview with the FBI during which the location of boxes was a significant subject of questioning, **Nauta** is observed exiting the anteroom doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS boxes. FBI did not observe this quantity of boxes being returned to the storage room through the anteroom entrance in its review of the footage.

On June 1, 2022, **Nauta** is observed carrying eleven brown cardboard boxes out the anteroom entrance. One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, **Nauta** is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS boxes, into the entrance of the anteroom. Approximately three and a half hours later, **Nauta** is observed escorting FPOTUS Counsel 1 in through the entrance of the anteroom, and FPOTUS Counsel 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS Counsel 1 is escorted through the anteroom entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS Counsel 1 exit the anteroom entrance moments later. FPOTUS Counsel 1 appeared to be carrying a Redweld envelope after exiting the anteroom.

13

39. According to FBI's review of video footage, and as detailed in the paragraph above, **Nauta** can be observed removing approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returning 25-30 boxes to the storage room area on June 2, 2022. Notably, and as described above, these boxes were removed following service of a grand jury subpoena but before FPOTUS Counsel 1's review of boxes in the storage room area to locate documents responsive to the subpoena.

40. **Nauta** testified to the grand jury that he was aware that FPOTUS Counsel 1 reviewed the boxes in the storage room on June 2. When asked about his role in assisting FPOTUS Counsel 1 with the review, **Nauta** testified that he showed FPOTUS Counsel 1 where the storage room was, let him in, and then FPOTUS Counsel 1 told **Nauta** to leave. **Nauta** stated, "and that was it" for his role in assisting with the review.

**NAUTA provided inconsistent statements during his FBI interview and Grand Jury testimony**

41. On May 26, 2022, the FBI interviewed **Nauta** and explained that the FBI was conducting an investigation as to whether classified documents were stored at Mar-a-Lago and that the FBI was particularly interested in where the boxes with classified documents were located and whether they had been moved outside the storage room.

42. **Nauta**'s answers about his knowledge of the boxes were inconsistent. During the interview, **Nauta** claimed that the first time **Nauta** saw the boxes was when **Nauta** moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. Less than a month later, when **Nauta** testified before the grand jury, however, he stated he had actually moved them weeks prior from the storage room at Mar-a-Lago to Pine Hall for FPOTUS's review of them. Further, in **Nauta**'s interview with the FBI on May 26, he had stated that he did not know where the boxes had come from prior to being located in Pine

14

USA-00944436

Hall. Testifying under oath before the grand jury, **Nauta** claimed he had said this because he was not sure whether the boxes in Pine Hall were the same boxes that he had moved from the storage room. **Nauta** thereafter admitted, however, that he was not aware of anyone moving any other such boxes to Pine Hall.

43.     When **Nauta** was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony on June 21, **Nauta** said that to his knowledge, there were remaining boxes. **Nauta** at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." **Nauta** then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the storage room).

44.     Furthermore, during his grand jury testimony, **Nauta** was asked to identify the occasions on which he had entered the storage room after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the storage room at FPOTUS's behest. When asked if he had removed anything from the storage room at any time, Nauta testified that "recently," meaning "within the last month" prior to his June 21 testimony, he removed a box of challenge coins from the storage room and took them to FPOTUS's office. He did not inform the grand jury that, within the month prior to his grand jury appearance, **Nauta** had removed approximately 64 boxes from the storage room area between May 24 and June 1, 2022, but only returned 25-30 boxes to the storage room area on June 2, 2022.

**Nauta Trip to Mar-a-Lago on June 25**

45.     As noted above, on June 24, 2022, DOJ served a grand jury subpoena on the Trump Organization for certain surveillance video from Mar-a-Lago. That evening, **Nauta** made flight arrangements to travel from New Jersey to Palm Beach the next day, falsely informing multiple

15

individuals that he was traveling to Florida for family reasons. Text messages sent from his 45 Office work cell phone, obtained by search warrant, show that **Nauta** contacted the Mar-a-Lago property manager to meet with him on June 25, 2022. Surveillance video later obtained by a subsequent subpoena shows **Nauta** and the Mar-a-Lago property manager in the Mar-a-Lago storage room area the evening of June 25, 2022, where it appears that the property manager is gesturing in the direction of the surveillance cameras. On the surveillance video, **Nauta** appears to be holding his cell phone in his hand. Within minutes of **Nauta** exiting the storage room area, **Nauta** uses his 45 office work cell phone to contact a Secret Service agent and that Secret Service agent sent **Nauta** a text message, "Walking over."

### Execution of Search Warrant at Mar-a-Lago and Movement of Boxes After June 3

46.     On August 8, 2022, the FBI executed a search warrant at Mar-a-Lago authorized by the Honorable Bruce E. Reinhart, U.S. Magistrate Judge in the Southern District of Florida. *See* 22-mj-83332-BER.   The search yielded over 100 unique documents bearing classification markings, with some indicating the highest levels of classification and extremely limited distribution, found in both the storage room and FPOTUS's office at Mar-a-Lago. Based on my training and experience, I know that documents classified at these levels typically contain NDI.

47.     During the search, FBI agents found approximately 70 to 80 boxes in the storage room. Accordingly, at some point between June 3, when the FBI observed approximately 50 to 55 boxes in the storage room, and August 8, someone had moved approximately 15 to 30 boxes into the storage room.

48.     Per. 34 has indicated that after the June 3 production, FPOTUS traveled back to Mar-a-Lago twice during the summer before the search warrant was executed on August 8. According to Per. 34 it was unusual for FPOTUS to return to Mar-a-Lago during the summer, when he usually stayed at his properties at Bedminster, New Jersey or Trump Tower in New York

16

City. To 's knowledge, FPOTUS had not returned to Mar-a-Lago the previous summer. During one of the return trips, Per. 34 asked **Nauta** why FPOTUS was back at Mar-a-Lago and, based on NAUTA's response, Per. 34 understood **Nauta** and FPOTUS were there to "check on things." Based on the cryptic nature of the response and the unusual nature of the trips, Per. 34 believed that **Nauta** was referring to the movement of FPOTUS boxes.

49.     When asked about **Nauta**'s motivation regarding his actions in this investigation, Per. 34 assessed that **Nauta** was motivated by "loyalty" to FPOTUS.

17



52.     On or about January 6, 2023, FPOTUS Counsel 2 informed DOJ Counsel that in the process of retrieving the box that had contained the documents with classification markings, he discovered that ██████████ , possessed a laptop that contains PDF scans of the contents of that FPOTUS box, including the documents with classified markings. He stated that █P. 10█ had scanned the documents in 2021. FPOTUS Counsel 2 indicated at first that this was █Per. 10█ personal laptop but then clarified that the laptop was issued by the Save America PAC to █P. 10█ . FPOTUS Counsel 2 further stated that he had on his own, without consulting DOJ first, made a thumb drive of the PDF scans on █Per. 10█ laptop and that he would turn that over to the FBI. On or about January 6, the FBI retrieved the thumb drive from FPOTUS Counsel 2. DOJ then obtained a search warrant to search both the thumb drive and █Per. 10█ laptop.

### The TARGET ACCOUNT

53.     Apple records show that **Nauta** has an iCloud account, with ████@gmail.com as the email address associated with that iCloud account (the **TARGET ACCOUNT**). **Nauta** appears to use the **TARGET ACCOUNT** from both his work cell phone, associated with phone number ████ , and his personal cell phone, associated with ████ . Following a warrant executed for the search and seizure of both **Nauta**'s work and personal cell phones, the FBI was able observe that the **TARGET ACCOUNT** was accessed on both the work cell phone

18

USA-00944440

and personal cell phone. Verizon records confirm that the phone number associated with the work

cell phone has been effective since at least May 21, 2021. The subscriber of the work cell phone

is listed as ████████████ and the business name is listed as ███████████ at ██████████



Apple records list ██████████, the phone number associated with the personal cell phone, as the

telephone number associated with the **TARGET ACCOUNT**. Apple records also show that an

iPhone 13 Pro Max, which was **Nauta**'s personal phone, was the device associated with **Nauta**'s

iCloud account as of May 29, 2022.

54.   ████ Per. 34 ████ indicated to the FBI that ██████████ is **Nauta**'s personal number and

when **Nauta** was hired to work for FPOTUS in the summer of 2021, he used his personal phone

number to communicate regularly regarding work with FPOTUS and others until he was given a

work phone with phone number ██████████ in late summer/early fall, approximately a month

after he began working for FPOTUS. Toll records show that since January 2022, phone number

██████████ contacted FPOTUS's known cell phone number at least once (on July 13, 2022).

Additionally, between February 2022 and August 2022, there were at least 17 calls between ████

█████ and ██████████, possibly because of forwarded calls. From February 2022 through

August 2022, there were approximately 12 text messages between ██████████ and ██████

████.

### Location Information

55.   There is probable cause to believe that the location information will constitute

evidence of the Target Offenses. Since individuals typically use and carry their cell phones, or

19

otherwise have their cell phones in close proximity, location information for the phones likely means location information for the individuals whose phones they are. The location of **Nauta** is material to the investigation, for many reasons. Location information could be pivotal in determining where and with whom **Nauta** met during the relevant time periods.

56.    For example, cell site location information may further corroborate that **Nauta** entered the storage room area in November 2021 through January 2022 to bring FPOTUS boxes to the FPOTUS residence. Cell site location information may also show other instances in which **Nauta** went to the storage area and where he went immediately after, which would tend to indicate where he moved the FPOTUS boxes. **Nauta** had testified in the grand jury on June 21, 2022, that FPOTUS boxes remained in FPOTUS's residence at that time. No FPOTUS boxes were found in FPOTUS's residence on the day the search was executed on August 8, 2022. Accordingly, cell site location data might help establish whether and when **Nauta** accessed FPOTUS's residence after June 21, 2022, including providing information about **Nauta**'s whereabouts during the weekend of June 25, 2022; the two trips that FPOTUS and **Nauta** made to Mar-a-Lago in July 2022; and

██████████████████████████████████████████████████

Such cell site data could further lead to evidence regarding whom **Nauta** met with during those periods.

### Background Concerning Google

57.    Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, and other services. Many of these free services offer additional functionality if the user signs into their Google Account.

20

58.     In addition, Google offers an operating system for mobile devices, including cellular phones, known as Android.  Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers.  Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

59.     Google advertises its services as "One Account.  All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public.  In addition, Google keeps certain records indicating ownership and usage of the Google Account across services.

60.     Google LLC allows subscribers to obtain email accounts at the domain name gmail.com, like the email account listed in Attachment A.  That gmail.com email address will be the log-in username for access to the Google Account. However, it should be noted that this search warrant does not seek the content of **Nauta**'s emails.

61.     Gmail can be accessed through a web browser or a mobile application.  Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user.  Subscribers obtain an account by registering with Google LLC.  During the registration process, Google LLC asks subscribers to provide basic personal information, including the user's full name, telephone number, birthday, and gender.  If a user is paying for services, the user must also provide a physical address and means and source of payment.  Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information.

21

62.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system.  Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account.  In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

63.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control.  Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

64.     Google collects and retains data about the location at which Google Account services are accessed from any mobile device.  This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device.  According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in

22

New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another.

65.    In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

66.    Based on my training and experience, it is common for individuals who engage in criminal activities to conduct Internet searches—in particular, Google searches—in support of their operations. The results of the requested search warrant may provide information indicating the Account searched for locations near Mar-a-Lago.

67.    Based on my training and experience, individuals involved in the Subject Offenses use methods to obfuscate their activity. The account activity, logs, and other data retained by Google for the Account can indicate who has used or controlled the Account.

68.    Information maintained by the email provider, such as the IP addresses from which users access the email account, the time and date of that access, and location history can show how and when the account was accessed or used. With this information, investigators can understand the chronological and geographic context of the email account access and use, and the geographic location of the account user at a particular time, relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Further, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.

23

Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

69.      Based on my training and experience, I know that criminals may delete information saved to their digital devices, such as computers, to hide their criminal activities.  However, that information may be saved by the service provider.  For example, I know that Google can store a record of a customer's browser or search history if the user is logged into their Google account. While a customer may clear their local search history, that information may still be stored on Google servers.

24

## REQUEST FOR SEALING

71. The United States request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss aspects of an ongoing criminal investigation that are neither public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

72. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Per. 40

Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on Feb. 6, 2023 at 10:10 AM.

HONORABLE BERYL A. HOWELL
CHIEF UNITED STATES DISTRICT JUDGE

25

USA-00944447