**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

**Case No. 23-80101-CR**
**CANNON/REINHART**

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.

_____

**PRESIDENT TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON**
**PROSECUTORIAL MISCONDUCT AND DUE PROCESS VIOLATIONS**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................1

DISCUSSION .......................................................................................................................1

I.   The Prosecution Team Violated President Trump's Due Process Rights ...............................1

    A.   Applicable Law ..................................................................................................... 1

        1.   Due Process Limitations On Investigative Coordination................................. 1

        2.   PRA Special Access Requests ..................................................................... 2

    B.   Discussion ............................................................................................................ 3

        1.   NARA Worked With The Biden Administration To Deny President Trump's Due Process Rights ....................................................................................................... 4

        2.   Factual Disputes Must Be Resolved Through A Hearing................................ 13

II.   The Charges Must Be Dismissed Based On Pre-Indictment Delay ....................................14

    A.   Applicable Law ................................................................................................... 14

    B.   Discussion .......................................................................................................... 14

III.   The Special Counsel's Office Abused The Grand Jury Process ........................................17

    A.   Relevant Facts .................................................................................................... 17

    B.   Applicable Law ................................................................................................... 18

    C.   Discussion .......................................................................................................... 19

CONCLUSION....................................................................................................................22

## INTRODUCTION

President Donald J. Trump respectfully submits this motion seeking dismissal of the Superseding Indictment and/or suppression of the 15 Boxes on the basis of prosecutorial misconduct and violations of President Trump's due process rights during the investigation and in grand jury proceedings.[1]

## DISCUSSION

### I.   The Prosecution Team Violated President Trump's Due Process Rights

The Biden Administration and NARA coordinated with DOJ and the FBI, in violation of the Due Process Clause and the Presidential Records Act ("PRA"), in order to obtain the 15 Boxes for use in a politically motivated criminal investigation used to improperly target President Trump.[2]  Because the evidence produced to date makes out a *prima facie* case of these violations, further discovery and a hearing on these issues is necessary.  Following that hearing, the Court should dismiss the Superseding Indictment and/or suppress the 15 Boxes.

#### A.  Applicable Law

##### 1.  Due Process Limitations On Investigative Coordination

"A due process problem might arise in the context of parallel investigations if the two government arms collude in bad faith to deprive the defendant of his constitutional rights." *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021) (citations omitted); *see also United States v. Alexandre*, 2022 WL 16798756, at *2 (S.D.N.Y. 2022) (reasoning that "[t]he Fifth

---

[1] President Trump reserves the right to supplement this motion and file any other motions based on discovery provided as a result of the motions to compel.  *See* ECF No. 314.

[2] For purposes of this motion, President Trump respectfully incorporates by reference the Background Section and Part I of the Discussion Section from the Defendants' motions to compel discovery ("Compel Mot."), ECF No. 262, and Parts III.C and IV from the Defendants' reply in further support of the Compel Motion ("Compel Reply"), ECF No. 300.  "Compel Oppn." refers to the Special Counsel's Office's response to the Compel Motion.  ECF No. 277.

Amendment's Due Process Clause imposes constitutional limitations on . . . cooperation" between criminal and civil authorities).  The government violates a defendant's due process rights by "fail[ing] to advise the defendant in its civil proceeding that it contemplates his criminal prosecution." *United States v. Kordel*, 397 U.S. 1, 11-12 (1970).  Civil authorities cannot be used as "an information-gathering agency for other departments, including the Department of Justice." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 (1978).  "Following *Kordel* and *LaSalle National Bank*, courts have 'occasionally suppressed evidence or dismissed indictments on due process grounds where the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case.'"  *United States v. Rhodes*, 2019 WL 3162221, at *3 (S.D.N.Y. July 16, 2019) (quoting *United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008)).

## 2.  PRA Special Access Requests

A president may restrict access to Presidential Records following the end of his or her term for up to 12 years.  *See* 44 U.S.C. § 2204(a); 36 C.F.R. § 1270.40(a).  Third parties can make "Special Access Requests" relating to restricted Presidential Records pursuant to 44 U.S.C. § 2205(2).  According to NARA's regulations, upon receipt of a Special Access Request, the Archivist "promptly notifies" the incumbent President and the former President whose records are sought.  36 C.F.R. § 1270.44(c).  If the former president asserts a privilege over the requested records, NARA "consults" with the incumbent president to "determine whether the incumbent President will uphold the claim." *Id.* § 1270.44(f)(1).  "If the incumbent President does not uphold the claim asserted by the former President," the Archivist discloses the Presidential Records absent a court order. *Id.* § 1270.44(f)(3).

### B. Discussion

NARA, the Biden Administration, and DOJ "collude[d] in bad faith" to deprive President Trump of his constitutional rights by using civil authorities to collect evidence for use in a criminal prosecution. *Goldstein*, 989 F.3d at 1202. Politically biased NARA officials violated the agency's regulations, and broke custom and practice dating back to the enactment of the PRA, by colluding with the Biden Administration to initiate a criminal investigation of President Trump rather than simply collecting the records that President Trump had designated as Presidential Records. The process began with the Archivist and a Biden Administration White House Official monitoring President Trump's exit from the White House as if they were FBI agents, and continued with NARA's "informal[]" contact with DOJ in September 2021. Compel Mot. Ex. 5 at USA-00383606; *see also United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005) ("To be parallel, by definition, the separate investigations should be like the side-by-side train tracks that never intersect.").

NARA officials coordinated with the Biden Administration and DOJ to conceal the timing of prosecutors' involvement, mislead President Trump's PRA representatives into believing that at most NARA was considering using civil recovery authorities, eviscerate lawful claims of executive privilege by President Trump, and evade the notice requirements of the PRA. *See Stringer*, 535 F.3d at 940 ("A government official must not 'affirmatively mislead' the subject of parallel civil and criminal investigations 'into believing that the investigation is exclusively civil in nature and will not lead to criminal charges.'" (citation omitted)); *see also United States v. Edwards*, 526 F.3d 747, 759 n.36 (11th Cir. 2008) ("In *Stringer*, the district court dismissed the defendants' securities fraud indictments because the United States Attorney had used the guise of an SEC investigation to conceal its interest in prosecuting the defendants.").

As a result of this misconduct, under the guise of NARA's civil and administrative authorities, the prosecution team collected evidence—including the 15 Boxes and statements by President Trump's PRA representatives—that they used to further the criminal investigation in an unfairly prejudicial and unlawful fashion.  As also discussed in President Trump's separate motion to suppress, the prosecution team did so in the misleading application for a warrant to raid Mar-a-Lago, and again in the motion to compel privileged disclosures by President Trump's attorneys that they filed in the District of Columbia.

"[T]he good-faith standard will not permit [NARA] to become an information-gathering agency for other departments, including the Department of Justice, regardless of the status of criminal cases."  *LaSalle Nat'l Bank*, 437 U.S. at 317; *see also Kordel*, 397 U.S. at 11-12 (reasoning that "fail[ure] to advise the defendant in its civil proceeding that it contemplates his criminal prosecution" can constitute "a violation of due process or a departure from proper standards in the administration of justice requiring the exercise of our supervisory power").  Accordingly, for the reasons set forth below, this misconduct requires suppression of the 15 Boxes and related statements by President Trump's PRA representatives, and dismissal of the charges.

### 1.  NARA Worked With The Biden Administration To Deny President Trump's Due Process Rights

On the day of President Biden's inauguration, Ferriero started to conspire with **Per. 40** from the White House Office of Records Management in connection with a politically biased effort to drive a criminal investigation of President Trump, rather than simply working with President Trump's PRA representatives to collect any outstanding Presidential Records.  NARA's biased objective is evident from the pushback Stern received when he suggested in May 2021 that things were progressing despite "chaotic" circumstances that are "always" present following "a one-term transition."  Compel Mot. Ex. 1 at USA-00383565.  Ferriero and **Per. 53** were not satisfied, with

Ferriero asserting that he was "out of patience" in early June 2021, despite Stern's May 2021 observation that collection would not be complete "for several months." *Id*.; Compel Mot. Ex. 2 at USA-00813152.

In communications to President Trump's PRA representatives, NARA suggested that any communications with DOJ only concerned the use of civil authorities to recover records rather than a criminal investigation. *E.g.*, Ex. 1. The PRA representatives' understanding of NARA's inquiries was necessarily informed by the conduct of DOJ and NARA in *Judicial Watch, Inc. v. NARA*, where no one—not even the court—believed that recourse to criminal investigative steps or a prosecution was possible to seize records lawfully possessed by President Clinton pursuant to an exercise of Article II authority before he left office. 845 F. Supp. 2d 288, 302 (D.D.C. 2012). The Special Counsel's Office has also embraced this reasonable interpretation of NARA's 2021 communications as being limited to the use of civil and administrative measures. *See* Compel Oppn. at 9 (arguing that the "statutory role of the Attorney General" is "to bring court actions to retrieve missing records, 44 U.S.C. 2905(a)"); *see also id.* at 5 (citing 44 U.S.C. § 2905).

However, on August 30, 2021, Ferriero told Per. 40 that Ferriero planned to "talk to DOJ about next steps with the assumption that these documents have been destroyed." Ex. 2 at USA-00815835. Communications between NARA and DOJ concerning document destruction betrayed a criminal focus on, for example, 18 U.S.C. § 2071. That is why NARA-OIG later cited § 2071 in the February 9, 2022 sham referral. *See* Compel Mot. Ex. 18 at USA-00309424. Stern "informally reached out to DOJ counsel" by September 1, 2021, but NARA did not tell President Trump's representatives that the agency was communicating with *prosecutors*. Compel Mot. Ex. 5 at USA-00383606; *see also United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993) ("It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into

incriminating themselves during an audit when activities of an obviously criminal nature are under investigation.").  The Special Counsel's Office wrongfully claims that Stern's September 15, 2021 communication indicating that NARA "cannot go to DOJ while we are engaged in ongoing discussion with the White House and the Trump reps" serves to "gut[]" this argument.  Compel Oppn. at 8 (quoting Compel Mot. Ex. 7).  In fact, the September 1 email demonstrates that NARA had already contacted DOJ, and the September 15 email illustrates that even Stern fully understood that NARA was operating in an inappropriate and *ultra vires* fashion when dealing with President Trump—but the agency did not stop.

In addition to contacting DOJ, the Archivist and other NARA officials fed information to Per. 40, who updated the White House Staff Secretary and White House Counsel in August 2021. *See* Ex. 2 at USA-00815834.  At that point, Su asked to review "draft letters *before sent* to Congress/DOJ," making the Biden Administration's authoritative position in driving the criminal investigation clear.  *Id.* (emphasis added).  Consistent with Su's instruction, in October 2021, Stern proposed to provide a "draft letter to the Hill re social media records" to "WH Counsel" and to "time" the submission of the letter with the public release of "Trump social media records (which have descriptive notes that discuss these deficiencies), as well as [NARA's] release to the 1/6 Committee of responsive tweets on the day of January 6."  Compel Mot. Ex. 7 at USA- 00383681. Other than Su's instruction, there was no basis for White House Counsel to review the draft letter. Stern's indication in the email that he planned to "let the Trump reps know" about the planned submission to Congress further supports the problematic nature of this communication and does not in any way "undercut" it.  Compel Oppn. at 7-8.  Whereas Stern planned to provide only notice to President Trump, he disclosed the substance of the letter to White House Counsel, appeared

open to guidance about the letter's content, and wanted to "time" the releases in an effort to maximize prejudice to President Trump (and related adverse media coverage).

There was no valid basis for **Per. 53** and Stern to "consult[]" the White House Counsel's Office regarding the 15 Boxes and their contents in January 2022. *See* Compel Mot. Ex. 2 at USA-00813156.  NARA was seeking to work with the Biden Administration to add momentum to the criminal investigation and potential charges.  That is why the result of that meeting was additional contact by NARA with *criminal prosecutors*, including Bratt and Amundson, instead of civil attorneys at DOJ.  *See id.*  Su's direction to NARA to contact prosecutors puts the lie to the suggestion by the Special Counsel's Office that NARA's consultation with the Biden Administration was limited to that which was necessary to discuss **Per. 40**'s availability as a witness or gain access to his notes.  *See* Compel Oppn. at 6; *see also Scrushy*, 366 F. Supp. 2d at 1139 ("When a defendant does not know about the criminal investigation, the danger of prejudice increases." (citation omitted)).

Beginning in late-January 2022, at Su's instruction on behalf of the Biden Administration, NARA worked even more closely with DOJ.  According to a February 28 text message from **Per. 53** NARA's communications with the Biden Administration around this time were "consu[]med" by "discussions" concerning the 15 Boxes. Compel Mot. Ex. 22.  DOJ prosecutors and the FBI also mobilized prior to the sham referral from NARA-OIG.  *Compare* Compel Mot. Ex. 18 (Feb. 9, 2022, 5:07 pm sham referral), *with* Ex. 3 (Feb. 9, 2022, 3:05 pm Bratt email indicating that DOJ was "meeting with the FBI shortly").  The purpose of routing a pretextual referral through NARA-OIG when in fact NARA had been coordinating with the Biden Administration and DOJ since at least the fall of 2021 is apparent.  All involved wanted to be able to suggest to courts and the public—misleadingly, and in bad faith—that the Biden Administration

was not involved, that NARA was some sort of "victim," and that DOJ did not start a criminal investigation until it received a referral pursuant to the Inspector General Act from NARA-OIG.

For example, in an October 25, 2022, letter to the House Committee on Oversight and Reform, NARA claimed that NARA-OIG had "operate[d] independently of NARA." Ex. 4 at 15B000773. That is plainly false. DOJ and the Special Counsel's Office also made inaccurate and misleading representations regarding the initiation of the investigation in, for example, the application for a warrant to raid Mar-a-Lago, civil litigation relating to that raid before Your Honor and in the Eleventh Circuit, pretrial proceedings in this case, and even in opposition to the Defendants' Motion to compel discovery. *See, e.g.*, Compel Oppn. at 10-11.[3] As an illustration of the materiality of these misrepresentations regarding the initiation of the investigation, in December 2022, the Eleventh Circuit reasoned that DOJ "was alerted about the classified materials in February 2022," based on misrepresentations from DOJ counsel, when in fact the communications specific to the 15 Boxes had started the month before. *Trump v. United States*, 54 F.4th 689, 694 (11th Cir. 2022).

Following the sham referral, NARA worked with DOJ and the FBI to avoid triggering notice obligations to President Trump. Per. 53 confirmed as much during his interview on

---

[3] *Accord Trump v. United States*, 2022 WL 4366684, at *1 (11th Cir. Sept. 21, 2022) (suggesting based on misrepresentations in the warrant application that NARA "sent a referral by email to the Department of Justice on February 9, 2022" based on review of the 15 Boxes); ECF No. 48 at 5, *Trump v. United States*, 22 Civ. 81294 (S.D. Fla. Aug. 30, 2022) (defining the "NARA Referral" as a February 9, 2022 email from the "Special Agent in Charge of NARA's Office of the Inspector General sent a referral . . . to the Department of Justice"); 9/12/23 Tr. at 13 (Court: "I do have a question. This case, the criminal investigation began when, Mr. Bratt?" // Bratt: "So the referral from NARA came in early February of 2022.").

February 11, 2022, and NARA voluntarily provided DOJ with over 250 pages of email correspondence on February 15.  *See* Compel Mot. Ex. 2 at USA-00813152.[4]

On February 24, NARA provided DOJ and the FBI with an inventory describing the contents of the 15 Boxes.  *See* Compel Mot. Ex. 20.  The Special Counsel's Office claims that it was "entirely consistent with the PRA" for NARA to provide "general descriptions and documents" relating to the 15 Boxes "without going through the statute's notice provisions." Compel Oppn. at 11-12.  But that is not what NARA told Congress.  In a February 18, 2022, letter to the House Committee on Oversight and Reform, NARA asserted that "any request for information" regarding the 15 Boxes would have to be made pursuant to 44 U.S.C. § 2205(2)(C), which would have triggered an obligation to notify President Trump.  Ex. 5.  Later in 2022, NARA even refused to provide the inventory to President Trump's representatives.  *See* Ex. 6.  Stern indicated that "[t]he Special Counsel has advised us not to make the inventory available to you at this time, in order to avoid any potential interference with their ongoing criminal investigation," *id.*, which violated the PRA and NARA's own regulations.  *See* 44 U.S.C. § 2205(3); 36 C.F.R. § 1270.44(a)(4).

The Special Counsel's Office has claimed that these coordinated steps to avoid providing notice to President Trump are "standard in any case."  Compel Oppn. at 11.  However, that is wrong, and this was not "any case."  Like NARA's refusal to provide the index of the 15 Boxes to President Trump's representatives, NARA's efforts with the Biden Administration, DOJ, and the FBI to circumvent notice obligations violated the PRA and NARA regulations.  *See* 44 U.S.C. § 2205(2); 36 C.F.R. § 1270.44(c) (NARA committing to "promptly notif[y]" the president whose

---

[4] The file produced in discovery at USA-00383563 is labeled "EMAILS_NARA-███████ Per. 53 ██████_VOLUNTARY-PRODUCTION_15FEB22.pdf."

records are sought); *see also United States v. Gertner*, 65 F.3d 963, 971 (1st Cir. 1995) ("We take no pleasure in upholding a finding that government actors constructed a pretext to avoid due compliance with statutorily prescribed requirements.").

NARA's May 2022 coordination with the Biden Administration and DOJ to reject President Trump's executive privilege claim was a further violation of due process and serves as additional evidence of the unlawful coordination between these entities. *See* Compel Mot. Ex. 24. The May 10, 2022 letter by acting Archivist Debra Steidel Wall, declaring that NARA would provide DOJ and the FBI access to the 15 Boxes pursuant to 44 U.S.C. § 2205(2)(B), reflected a remarkable abuse of that PRA provision's focus on the "current business" of the Biden Administration. Wall's assertion was tantamount to an admission that President Biden considered his "current business" to be attacking his chief political rival, which was of course consistent with the Biden Administration's leak to the *New York Times*, just one month before, that President Biden's believed President Trump "should be prosecuted." Compel Mot. Ex. 62. Wall also claimed that rushed decisions were required by quoting Bratt's assertion that there was an urgent need for an "assessment of the potential damage" by the Intelligence Community relating to the 15 Boxes. Compel Mot. Ex. 24 at 3. As no "assessment" matching that description has been produced in discovery, it appears that this was just another part of the pretext.

There was no valid basis for the Biden Administration to "defer[]" a substantive evaluation of President Trump's executive privilege to NARA. Compel Mot. Ex. 24 at 3. NARA lacked historical and legal competencies necessary to resolve the issue. In *Public Citizen v. Burke*, the government argued that the Archivist was not well-positioned to address the executive privilege. *See* 843 F.2d 1473, 1479 (D.C. Cir.1988) ("The Archivist may well not be particularly qualified *by himself* to evaluate former President Nixon's claims of executive privilege."). There, DOJ's

Office of Legal Counsel took the position that a post-presidential claim of executive privilege by President Nixon "cannot be disputed by the Archivist." *Id.*; *see also id.* at 1478 ("The OLC memorandum acknowledges, indeed insists, that in the event there were to be disagreement between an incumbent President and former President Nixon as to whether documents should be disclosed (the disagreement could involve the incumbent President favoring either disclosure or non-disclosure) the Archivist would be obliged to follow the direction of the incumbent.").  In this case, NARA appears to have relied on guidance from "Counsel to the President" and DOJ's Office of Legal Counsel, which departed from the OLC memorandum in *Burke* to advise that NARA should reject President Trump's claim.  *See* Compel Mot. Ex. 24 at 3-4.

At least one Supreme Court Justice disagrees with the NARA's biased conclusion.  *See Trump v. Thompson*, 142 S. Ct. 680 (2022) (Kavanaugh, J., statement respecting denial of application) ("A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim.  Concluding otherwise would eviscerate the executive privilege for Presidential communications.").  And this is not the only instance of DOJ seeking to circumvent President Trump's executive privilege.  *See In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, 2024 WL 158766, at *1 (D.C. Cir. Jan. 16, 2024) (Rao, J., statement respecting the denial of rehearing en banc) ("The Special Counsel's approach obscured and bypassed any assertion of executive privilege and dodged the careful balance Congress struck in the Presidential Records Act.").

*      *      *

The government cannot "manipulate[] . . . simultaneous investigations for its own purposes."  *Scrushy*, 366 F. Supp. 2d at 1140.  NARA abused its civil and administrative authorities

11

to work with the Biden Administration, DOJ, and the FBI to collect information and evidence—including, most notably, the 15 Boxes—for use in a criminal prosecution.  NARA's politically-motivated malicious intent is demonstrated by Ferriero's August 2022 social media post congratulating his former agency for its role in the Mar-a-Lago raid:



NARA's facilitation of the abuse of President Trump's due process rights included NARA's failure to disclose to President Trump the agency's fall 2021 communications with DOJ; the sham referral by NARA-OIG in February 2022 to mislead the courts, President Trump, and others; steps to evade PRA notice requirements relating to access to information concerning the 15 Boxes by DOJ and the FBI; and the May 2022 letter improperly rejecting of President Trump's executive privilege claim with respect to the 15 Boxes based on biased guidance from the Biden Administration and DOJ.  *See Stringer*, 535 F.3d at 937 (noting that "[d]istrict courts have occasionally . . . dismissed indictments on due process grounds where the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case").

NARA's intentional disregard of its governing regulations in connection with these abuses is an additional circumstance that counsels in favor of dismissal.  *See United States v. Cotton*, 760 F. Supp. 2d 116, 130 (D.D.C. 2011) ("Where defendants face felony charges and prison sentences . . . , as is the case here, adherence to the procedural requirements of the APA is . . . critical."); *see*

*also United States v. Ross*, 848 F.3d 1129, 1131 (D.C. Cir. 2017) (vacating conviction based on "the Attorney General's APA violations"); *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989) ("[A] criminal prosecution founded on an agency rule should be held to the strict letter of the APA.").  Suppression of the 15 Boxes is also appropriate because the Office may not use evidence acquired by NARA in connection with civil or administrative records-recovery efforts where "such use would violate his constitutional rights or depart from the proper administration of criminal justice." *Scrushy*, 366 F. Supp. at 1138 (quoting *United States v. Teyibo*, 877 F. Supp. 846, 855 (S.D.N.Y. 1995)).

### 2.  Factual Disputes Must Be Resolved Through A Hearing

Any disputed issues relating to this due process motion must be resolved through a hearing and related fact-finding. *See, e.g.*, *Kordel*, 397 U.S. at 6 (noting "extensive evidentiary hearing"); *Gertner*, 65 F.3d at 970 ("Determining [an agency's] purpose in conducting an investigation is, like most motive-oriented explorations, a predominantly factbound enterprise."); *Grunewald*, 987 F.2d at 534 (noting that "[t]he district court held a post-trial hearing on the issue and considered the evidence before it"); *United States v. Teyibo*, 877 F. Supp. 846, 856 (S.D.N.Y. 1995) (discussing "evidence presented at the Hearing").  It is not enough for the Special Counsel's Office to oppose this motion, as the Office opposed the Defendants' motions to compel discovery, by relying on unsworn assertions in a brief.  Because the Office disputes that the White House and NARA are part of the prosecution team for discovery purposes, the Office is in no position to make even unsworn factual representations to the Court on these issues.  They have not collected and reviewed the relevant documents, email communications, and text messages, and therefore cannot be certain about the extent of the improper coordination and underlying bias that drove these actions.  This posture illustrates the imperative of resolving the motions to compel discovery before addressing the merits of the Defendants' other pretrial motions.

II.     **The Charges Must Be Dismissed Based On Pre-Indictment Delay**

The Special Counsel's Office timed the charges in this case to maximize the likelihood that the prosecution would interfere with President Trump's ability to continue with his winning campaign for the Republican Party's nomination and to defeat President Biden.  This improper purpose violates the Due Process Clause.  As a result, the charges must be dismissed.

A.  **Applicable Law**

"[T]he Due Process Clause can bar an indictment even when the indictment is brought within the limitation period."  *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996); *see also* Fed. R. Crim. P. 48(b)(1).  A "two-prong test" governs this due process issue: "First, the defendant must show that the delay caused actual prejudice to his defense; and second, the defendant must prove that the delay was a product of deliberate design by the government to gain a tactical advantage."  *United States v. LeQuire*, 943 F.2d 1554, 1560 (11th Cir. 1991) (cleaned up).  With respect to the second prong, the Defendants are "not obligated to prove bad faith on the government's part."  *United States v. Gayden*, 977 F.3d 1146, 1150 (11th Cir. 2020).  "The critical element is that the government makes a judgment about how it can best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, an indictment is delayed."  *Id.* (cleaned up).  "[I]ntentional government acts designed to obtain a tactical advantage which only *incidentally* cause delay have never been ruled out as a potential basis for due process violations."  *Foxman*, 87 F.3d at 1223 n.2.

B.  **Discussion**

By August 2022, DOJ had collected the vast majority of the evidence that the Special Counsel's Office plans to use if there is a trial in this case.  Instead of filing those charges where venue existed, the prosecutors delayed through improper grand jury proceedings in the District of

Columbia while the Office built the D.C. Case.  Approximately 10 months later, the Office filed

the June 8, 2023 Indictment in this case, which was followed by the July 27, 2023 Superseding

Indictment and the August 1, 2023 Indictment in the D.C. Case.  The Office timed the filing of

these charges to interfere with President Trump's ability to participate in the 2024 election and to

defend himself in this case.

All pre-indictment delay is to some extent prejudicial against criminal defendants.  *See*

*United States v. Marion*, 404 U.S. 307, 324 (1971) ("Actual prejudice to the defense of a criminal

case may result from the shortest and most necessary delay.").  However, the timing in this case

"violates those fundamental conceptions of justice which lie at the base of our civil and political

institutions, and which define the community's sense of fair play and decency."  *United States v.*

*Lovasco*, 431 U.S. 783, 790 (1977) (cleaned up).  It also violates the Justice Manual, which

prohibits federal prosecutors from taking "Actions that May Have an Impact on an Election."

Justice Manual § 9-85.500.

> Federal prosecutors and agents may never select the timing of any action, including
> investigative steps, criminal charges, or statements, for the purpose of affecting any
> election, or for the purpose of giving an advantage or disadvantage to any candidate or
> political party. Such a purpose is inconsistent with the Department's mission and with the
> Principles of Federal Prosecution.

*Id.*; *see also* 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations,

procedures, practices and policies of the Department of Justice.").  The FBI treated these principles

as nearly dispositive during the investigation of Hillary Clinton.  *See* Horowitz OIG Report at 128

("Comey and others at the FBI were primarily motivated in the debate over obtaining the culling

testimony and laptops by a desire to credibly complete the investigation and to do so sufficiently

in advance of the election to not be perceived as political.").[5]  Consistent with Justice Manual § 9-85.500, the Horowitz OIG Report observed that "[s]everal Department officials described a general principle of avoiding interference in elections rather than a specific time period before an election during which overt investigative steps are prohibited."  *Id.* at 18.

The improper actions by the Special Counsel's Office sought a "tactical advantage" for President Biden on the campaign trail and for the prosecutors in the courtroom.  The Office tried to saddle President Trump with an unprecedented and unworkable schedule that would deprive the American people of his candidacy and prevent him from mounting a complete defense against the complex, flawed charges in this case and in D.C.  The wholly improper nature of the Office's efforts to rush this case to trial ahead of the 2024 election is illustrated by the fact that they sought to require the filing of pretrial motions—based on over one million pages of discovery—less than two months after the Indictment was filed, and initially requested a trial date of December 11, 2023, which would have interfered with President Trump's successful efforts in the Iowa Republican Presidential Caucus in mid-January 2024.  ECF No. 34 at 3-4.  The Court properly rejected those requests, but they are indicative of the Office's motivations.

Finally, "[w]hether the government acted with the intent to gain a tactical advantage is a question of fact."  *United States v. Horton*, 270 F. App'x 783, 786 (11th Cir. 2008).  Thus, as in *Horton*, discovery and a hearing on the purpose of the pre-Indictment delay by the Special Counsel's Office is necessary to resolve this motion.  This is yet another reason why the issues

---

[5] Office of the Inspector General, U.S. Department of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election (June 2018) (the "Horowitz OIG Report"), *available at* https://www.justice.gov/file/1071991/download.  *Accord* Horowitz OIG Report (describing "sense of urgency to complete the Midyear investigation" and quoting notes from FBI meeting stating "FBI desires to wrap up in weeks, not months").

raised in the pending motions to compel discovery are critically important to a fair adjudication of the Defendants' rights.

### III.     The Special Counsel's Office Abused The Grand Jury Process

The Special Counsel's Office engaged in prosecutorial misconduct that warrants dismissal by presenting evidence to a grand jury in the District of Columbia despite an obvious lack of venue—in effect, forum shopping at a courthouse they deemed friendly as they simultaneously presented a false narrative concerning events around the 2020 election.  The Office also abused the grand jury process during those proceedings by, for example, engaging in abusive and improper questioning of one of President Trump's former attorneys and issuing a pretextual subpoena to NARA.  For the reasons set forth below, the appropriate remedy for these abuses is dismissal of the Superseding Indictment.

#### A.  Relevant Facts

In spring 2022, DOJ issued subpoenas on behalf of a grand jury in the District of Columbia, including a May 10, 2022, subpoena to NARA [Ex. 7] and a May 11, 2022, subpoena to the Office of Donald J. Trump [Ex. 8].  However, in an internal email on May 19, 2022, an FBI agent wrote that one of the issues "To Determine" in connection with the investigation of President Trump was "If Venue will be established."  Ex. 9 at USA-00940263.  Despite that deficiency, on June 24, 2022, DOJ issued a grand jury subpoena for CCTV footage to the Trump Organization.  Ex. 10.

On January 23, 2023, the Special Counsel's Office and FBI appear to have issued a pretextual grand jury subpoena, numbered 42-64, to NARA.  *See* Compel Mot. Ex. 55, 56; *see also* Compel Mot. Ex. 54 (Nov. 2022 FBI "Request for Information" memorandum to NARA seeking information regarding declassification decisions, training records, and non-disclosure agreements).  During a January 26, 2023, call regarding the subpoena, the Office, FBI, and NARA

discussed "compliance considerations" and NARA's "accommodation processes." Compel Mot. Ex. 55 at USA-00941292.

On May 4, 2023, the Special Counsel's Office and the FBI met again with NARA regarding the grand jury subpoena numbered 42-64. *See* Compel Mot. Ex. 57. NARA's General Counsel, Stern, "provided" the Office with 81 unclassified documents that NARA had deemed "responsive to the subpoena." *Id.* However, the Office "flagged" only 15 of those documents "for potential production" after "further review" during the meeting. *Id.*; *see also* Compel Mot. Ex. 58 ("15/81 flagged for use/NARA GJ production.").

The Special Counsel's Office transitioned to a grand jury in the Southern District of Florida beginning on May 11, 2023. In connection with the first Indictment on June 8, 2023, ECF No. 3, the Office offered summary testimony from FBI agents on May 11, May 17-18, May 24-25, May 31, and June 7-8. Prior to the filing of the Superseding Indictment on July 27, 2023, ECF No. 85, the Office offered summary testimony from FBI agents on July 20 and July 27.

### B. Applicable Law

"[U]nder the constitutional scheme, the grand jury is not and should not be captive to any of the three branches." *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) (cleaned up). "The grand jury is a preconstitutional institution, given constitutional stature by the Fifth Amendment but not relegated by the Constitution to a position within any of the three branches of the government." *Id.*

Courts have authority to "redress abuses by either the grand jury or a U.S. Attorney." *United States v. Eisenberg*, 711 F.2d 959, 965 (11th Cir. 1983); *see also id.* ("The district court can provide relief after indictment to the petitioners to protect their constitutional right to a fair trial, just as it protects defendants' other constitutional rights."); *United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985) ("Federal courts may exercise their supervisory powers to

remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials.").  Thus, "[d]ismissal of an indictment under a court's supervisory power may . . . be warranted where there is a showing of certain types of prosecutorial misconduct," *United States v. Holt*, 2012 WL 12952706, at *3 (S.D. Fla. 2012), and prejudice results, *United States v. Graham*, 80 F.4th 1314, 1318 (11th Cir. 2023).  "[C]ourts generally consider two things to evaluate potential prejudice: whether it is established that the violation substantially influenced the grand jury's decision to indict and whether there is grave doubt that the decision to indict was free from the substantial influence of such violations."  *Id.* (cleaned up).

### C.  Discussion

The Special Counsel's Office engaged in misconduct by using a grand jury in the District of Columbia in an abusive manner to investigate matters that occurred in this District.

Justice Manual § 9-11.121, titled "Venue Limitations," states that "[a] case should not be presented to a grand jury in a district unless venue for the offense lies in that district."  *See* 28 C.F.R. § 600.7(a).  By May 2022, however, DOJ and the FBI recognized that there was a real problem regarding whether "Venue will be established" for the investigation.  Ex. 9 at USA-00940263.  Apparently, venue was not established, as they brought no charges in the District of Columbia.  However, prior to beginning to present evidence to a grand jury in this District in May 2023, DOJ and the Special Counsel's Office spent a year relying on the D.C. grand jury's subpoena authority, presenting testimony from agents and fact witnesses to that grand jury, and litigating related issues in the District of Columbia—including the breach of President Trump's relationships with his attorneys.  The May 2022 email strongly suggests that the prosecutors were aware that proceeding in that manner was improper, but that they ignored the deficiency in order to avail themselves of a forum they apparently regarded as more receptive to their unlawful approach.

The prosecutors compounded that misconduct through other violations.  First, during grand jury testimony in the District of Columbia on December 22, 2022, Senior Assistant Special Counsel Julie Edelstein asked one of President Trump's former attorneys (1) whether he was "aware that a client can waive" the attorney-client privilege, and (2) "if the former President's so cooperative, why hasn't he allowed you to share his conversations with the Grand Jury today?" Ex. 11 at USA-00809212.  Judge Howell found that these questions, and "repeated[] attempt[s] to elicit testimony protected by the attorney-client privilege" were "'improper.'"  Ex. 12 at 47 n.13 (quoting Beale, *Grand Jury Law & Practice* § 9:2 (2d ed. 2022)); *see also* Justice Manual § 9-11.010 ("In dealing with the grand jury, the prosecutor must always conduct himself or herself as an officer of the court whose function is to ensure that justice is done. . . . [T]he prosecutor must be scrupulously fair to all witnesses and must do nothing to inflame or otherwise improperly influence the grand jurors.").

Second, on February 16, 2023, ████████████████ Per. 44 ████ into grand jury proceedings in the District of Columbia, in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.  *See* Ex. 13.  A district judge in the District of Columbia issued an order relating to the violation, *see id.*, but the Special Counsel's Office has declined to produce the *ex parte* submission that led to that order.  *See* Ex. 14 ¶ 37; *see also* Ex. 15 at ¶ 37.

Last, but not least, the Special Counsel's Office abused the grand jury by issuing one or more subpoenas to NARA.  Contrary to the Office's claim, NARA did not "require[] a grand jury subpoena," at least not before the prosecution team started to try to cover NARA's tracks.  Compel Oppn. at 39.  NARA started to provide information to DOJ voluntarily in September 2021.  *See* Compel Mot. Ex. 5 at USA-00383606.  At the direction of the White House Counsel's Office, NARA's communications with DOJ escalated in January 2022 following recovery of the 15 Boxes.

*Id.* Ex. 2 at USA-00813156.  Following the sham referral by NARA-OIG on February 9, 2022, `Per. 53` voluntarily participated in an interview by DOJ and the FBI on February 11.  *Id.*  On February 15, NARA turned over to DOJ, also voluntarily, hundreds of pages of email correspondence relating to President Trump.

The January 23, 2023, grand jury subpoena numbered 42-64 was intended to suggest investigative distance between DOJ and NARA that did not exist.  As explained in the Defendants' motions to compel, the Special Counsel's Office has refused to provide necessary and discoverable details concerning this topic.  *See* Compel Mot. at 34-38.  However, the FBI's report relating to the May 4, 2023, meeting between the Office and NARA establishes that the prosecutors manipulated the process to "leave evidence in the hands of a third party to avoid disclosure." *United States v. McGowan*, 552 F. App'x 950, 953 (11th Cir. 2014); *see also* Compel Mot. Ex. 57 (FBI report).  Once NARA had decided that 81 documents were responsive to the grand jury subpoena, it was not for the Office to determine which of those documents was "of interest" for "potential production."  Compel Mot. Ex. 57; *cf. DiBernardo*, 775 F.2d at 1477 ("Although it may be guided by the prosecutor, the grand jury alone determines the course of any investigation."); *see also* Justice Manual § 9-11.010 ("The prosecutor must recognize that the grand jury is an independent body . . . .").  The authorities governing the grand jury process "do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office."  *United States v. O'Kane*, 439 F. Supp. 211, 214 (S.D. Fla. 1977) (cleaned up).  Accordingly, the Office abused Rule 6 and President Trump's rights by issuing a subpoena to provide cover for a situation that involved coordinated

efforts by DOJ and NARA to cull evidence that they liked and try to hide evidence that did not suit them.

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that, following necessary fact-finding, the Court must dismiss the Superseding Indictment or, at minimum, suppress the 15 Boxes.

Dated: February 22, 2024                            Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher M. Kise, certify that on February 22, 2024, I filed the foregoing document and served it on the Special Counsel's Office via email, or CM/ECF to the extent possible, as required by the Court's February 20, 2024 Order.  ECF No. 320.

<u>*/s/ Christopher M. Kise*</u>
Christopher M. Kise