# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN RE GRAND JURY SUBPOENA GJ 42-17 and GJ 42-69 |

Case No. 23-gj-10 (BAH)

Chief Judge Beryl A. Howell

**UNDER SEAL**

**EX PARTE TO GOVERNMENT ONLY**

**MEMORANDUM OPINION**

In November 2022 and January 2023, a grand jury sitting in this District issued

subpoenas for testimony and documents to ███ Per. 18 ███ and ███████, respectively,

both of whom have served as attorneys for former president Donald J. Trump and his post-

presidential office, as part of an investigation into whether the former president orchestrated a

scheme unlawfully to retain and hide from the government documents bearing classification

markings. In January 2023, Per. 18 appeared before the grand jury and declined to respond to

certain questions by invoking attorney-client privilege and the work product doctrine, pursuant to

directions by former president Trump and Per. 18 own independent claim of opinion work-

product protection. He also produced a privilege log listing documents responsive to the

subpoena that he withheld on these bases. ███ has not appeared before the grand jury. Instead,

through counsel, she informed the government that she intended to adhere to the former

president's instructions to withhold one document and decline to answer certain questions on the

basis of attorney-client privilege and the work-product doctrine. The government now moves to

compel both witnesses' withheld testimony and documents because the attorneys' client, the

former president, used their services to further a criminal scheme.

For the reasons explained below, the government's motion is granted in part and denied

in part.

1

Subject to Protective Order

USA-01288836

## I.    BACKGROUND

Summarized below is factual and procedural background relevant to consideration of the instant motion, with factual information distilled from a sworn affidavit supporting a search warrant issued in the Southern District of Florida, sworn grand jury testimony, and video, documentary, email and text evidence obtained by the government over the course of this investigation.

### A.    The Former President's Document Retention System

According to several witnesses interviewed by the Federal Bureau of Investigation ("FBI"), during the former president's administration, his record-keeping system utilized "Bankers boxes," a type of white and blue cardboard box with a separate lid, to store records and review them at his convenience. *See* Gov't's *Ex Parte* Mem. in Supp. of Mot. Compel ("Gov't's *Ex Parte* Mem."), Ex. 1, Aff. of FBI Special Agent in Supp. Appl. Under Rule 41 for Search & Seizure Warrant at Mar-a-Lago (S.D. Fla. Aug. 5, 2022) ("MAL Warrant Aff.") ¶¶ 26–31, 32 (photograph of "FPOTUS [Former President of the United States] aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House"), ECF No. 2. The witnesses referenced are described as a representative of the former president, "WITNESS ▮ *id.* ¶ 26; a former employee of the former president, "WITNESS ▮ *id.* ¶ 27; two current employees of the former president, "WITNESS ▮ and "WITNESS 5," *id.* ¶¶ 28, 31; and a current employee of Mar-a-Lago, "WITNESS ▮ *id.* ¶ 30.[1] The former president's boxes commingled unclassified documents—including schedules, daily task lists, newspapers, memoranda, briefing books, economic reports, draft press statements, and draft letters—with classified documents—

---

[1]    The witnesses described in the MAL Warrant Affidavit as WITNESSES ▮ and ▮ remain unidentified to this Court, but WITNESS ▮ is ▮▮▮▮▮ Per. 34 ▮▮▮▮▮, and WITNESS 5 is Waltine Nauta, the former president's "body man" and personal aide, who was interviewed by the FBI on May 26, 2022, and later testified before the grand jury on June 21, 2022. *See* Gov't's *Ex Parte* Mem. at 9 & n.7; *id.*, Ex. 24, Transcript of Waltine Nauta Grand Jury Testimony (June 21, 2022) ("Nauta GJ Tr.") at 3, ECF No. 2. Other witness numbers mentioned in this opinion do not appear in the MAL Warrant Affidavit.

2

USA-01288837

including daily briefing books that contained classified information, decision memo packages with classified material attached, talking points for State Department calls that were classified, and other documents bearing classification markings. *Id.* ¶¶ 28–29.

According to WITNESS ▊ WITNESS ▊ and WITNESS 5, at the end of the Trump Administration in January 2021, approximately 85 to 95 Bankers boxes were moved from the White House to Mar-a-Lago, the former president's residence in Palm Beach, Florida. *Id.* ¶¶ 30– 33. WITNESS 5, who accompanies the former president in case he "needs something," Gov't's *Ex Parte* Mem., Ex. 7, Transcript of Witness 5 FBI Interview (May 26, 2022) ("Witness 5 FBI Interview") at 7, 11, ECF No. 2, described that period as "literally chaos" as he recalled "packing all the personal items" in the White House with another colleague while "everyone else was just shoving everything in a box," *id.* at 40.

Several months later, in May 2021, WITNESS ▊ was aware that the former president directed his staff to locate a permanent storage location for the boxes, and in late August or early September 2021, boxes were kept in an unlocked storage room on the ground floor of Mar-a-Lago. MAL Warrant Aff. ¶ 34. WITNESS ▊ described that room being in a hallway with other offices and storage spaces, behind an unmarked door, and accessible by several staircases. *Id.* ¶ 35. Also kept in that storage room were boxes containing challenge coins, garment bags, and memorabilia from Mar-a-Lago, including photograph frames, other décor items, and "gifts from the White House deemed too valuable to store off-site." *Id.* ¶¶ 36–37. WITNESS ▊ observed that a lock was eventually installed on the storage room door. *Id.* ¶ 34.

## B. January 2022 Production of Documents and National Archives and Records Administration's Referral to U.S. Department of Justice

The Presidential Records Act requires, "[u]pon the conclusion of a President's term of office, . . . [that] the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President. 44 U.S.C. §

3

Subject to Protective Order

USA-01288838

$2203(g)(1)$. Pursuant to that authority, the National Archives and Records Administration ("NARA") communicated with the former president's staff throughout 2021 to coordinate the transfer of presidential records previously or still missing from NARA following the end of the Trump Administration. *See* Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn B. Maloney at 1 (Feb. 18, 2022), https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-letter.02.18.2022.pdf; *see also* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran ("Wall Letter") at 1 (May 10, 2022), https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf; MAL Warrant Aff. ¶ 25. Specifically, NARA made its initial request for missing records around May 6, 2021, and continued making requests until late December 2021, when NARA was informed that twelve boxes with missing materials were available for retrieval from Mar-a-Lago. *Id.* ¶ 39.

According to WITNESS █, the former president "wanted to review the boxes before providing them to NARA," so WITNESS █ WITNESS 5, and another employee of the former president collected, over time, a total of around fifteen boxes from the storage room and delivered them to the entryway of former president's personal residential suite at Mar-a-Lago, an anteroom known as Pine Hall. *Id.* From November 2021 to mid-January 2022, these three individuals brought two to four boxes at a time from the storage room and placed them just outside the former president's suite; WITNESS █ believed that the former president would then review those boxes' contents. *Id.* ¶¶ 39, 40; Gov't's *Ex Parte* Mem., Ex. 2, Texts between WITNESS █ and WITNESS 5 sent in Nov. 2021 ("WITNESS █ and WITNESS 5 Texts"), ECF No. 2.[2] After receiving fifteen to seventeen boxes from the storage room, the former president

---

[2]     On November 25, 2021, for example, WITNESS █ texted WITNESS 5 that she had "delivered some [boxes], but I think he may need more. Could you ask if he'd like more in pine hall?" to which Witness 5 replied

4

instructed WITNESS ▮ WITNESS 5, and the other employee to stop, stating, "that's it." MAL Warrant Aff. ¶ 42.[3]

NARA scheduled to retrieve the boxes from the former president's possession on January 17, 2022. *Id.* ¶ 39. That day, WITNESS ▮ observed fifteen boxes in Pine Hall, which WITNESS ▮ and WITNESS 5 transferred to WITNESS 5's car and then delivered to the NARA contract driver. *Id.* ¶¶ 39, 41. Following that delivery, the former president informed his staff that the fifteen boxes were the only ones going to NARA and "there are no more," according to WITNESS ▮ *Id.* ¶ 43. Around that time, the former president also directed WITNESS ▮ to inform one of the former president's lawyers that there were no more boxes at Mar-a-Lago. *Id.* ¶ 44.

All the while, the former president was aware that more boxes were in the storage room that he had not reviewed. In November 2021, the former president was shown a photo of boxes stacked to the ceiling in the storage room, numbering far more than fifteen boxes. Gov't's *Ex Parte* Mem., Ex. 2, WITNESS ▮ and WITNESS 5 Texts; *see also* MAL Warrant Aff. ¶ 46 (reproducing the photo). In fact, approximately 70 to 80 boxes remained in the storage room following the delivery of the fifteen boxes to NARA. *Id.* ¶ 45.

Upon receipt of the fifteen boxes, NARA reviewed their contents and uncovered "items marked as classified national security information, up to the level of Top Secret and including Sensitive Compartmented Information and Special Access Program materials," Wall Letter at 1, which were "unproperly [*sic*] identified," and interspersed with non-classified items, including

---

the same day that "[h]e has one he's working on in pine hall[.] Knocked out 2 boxes yesterday." Gov't's *Ex Parte* Mem., Ex. 2, WITNESS ▮ and WITNESS 5 Texts.

[3]     In an interview with the FBI on May 26, 2022, WITNESS 5 engaged in patent dissembling. He denied ever having seen the boxes before delivering them to NARA on January 17, 2022, *see* WITNESS 5 FBI Interview at 25, 35; claimed not to know where the former president kept the boxes, *id.* at 17, 27, 36, 41; and denied knowing how the boxes got to Pine Hall. *Id.* at 3 (continuation of interview) (Q: "But you have no idea how those boxes got there or where they were before and you [*sic*]." WITNESS 5: "No.").

5

"newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records," MAL Warrant Aff. ¶ 24. NARA notified the Department of Justice ("DOJ") about the discovery of classified documents, and DOJ requested that NARA provide access to the fifteen boxes for further investigation. Wall Letter at 1.

NARA alerted the former president, through counsel, of its intent to provide such access, but the former president objected, seeking additional time to review the boxes for any information protected by executive privilege. *Id.* at 2–4. After careful consideration and consultation with various agencies, NARA denied the former president's request, stating that the question of whether a former president "could successfully assert a claim of executive privilege to prevent an Executive Branch agency from having access to Presidential records for the performance of valid executive functions . . . in this case is not a close one." *Id.* at 3. NARA then informed the former president that it would provide the boxes to the FBI beginning on May 12, 2022. *Id.* at 4. According to the government, the former president "did not seek legal relief" following that decision. Gov't's *Ex Parte* Mem. at 6.

## C.     Issuance of, and Response to, May 11, 2022 Grand Jury Subpoena

After receipt of NARA's referral, the government's subsequent investigation raised "concerns that additional documents with classification markings were in the possession of the former President or his post-presidential office." Gov't's Mot. Compel ("Gov't's Mot.") at 4, ECF No. 1. Consequently, a grand jury in this District issued a subpoena on May 11, 2022 to the custodian of records for the Office of Donald J. Trump ("the Office"). Gov't's Mot., Ex. 2, Subpoena to Testify Before a Grand Jury (May 11, 2022) ("May 2022 Subpoena"), ECF No. 1. The Office is statutorily authorized under the Former President's Act, which states that every former president may establish an office at a location of his choosing, with staff paid for by the

6

government, and extra funds made available "to pay fees of an independent contractor who is not

a member of the staff of the office of a former President for the review of Presidential records of

a former President in connection with the transfer of such records to the National Archives and

Records Administration or a Presidential Library without regard to the limitation on staff

compensation set forth herein." 3 U.S.C. § 102 note (b) (selection, compensation, and status of

office staff to former presidents). A custodian of the Office would serve that statutory role.

Ensuring compliance with the May 2022 Subpoena has been slow-going, prompting the

government to seek and execute a search warrant at Mar-a-Lago, additional government motions

regarding inadequate compliance, repeat visits to this Court, and new searches conducted and

updated certifications filed, with the compliance effort dragging into mid-December 2022, when

additional classified documents were recovered from a closet in the Office's designated space at

Mar-a-Lago. Key events in this compliance saga are summarized below.

### 1.  *May 11, 2022 Grand Jury Subpoena*

The subpoena required the following documents be produced by May 24, 2022:

> Any and all documents or writings in the custody or control of
> Donald J. Trump and/or the Office of Donald J. Trump bearing
> classification markings, including but not limited to the following:
> Top Secret, Secret, Confidential, Top Secret/SI-G/
> NOFORN/ORCON, Top Secret/SI-G/NOFORN, Top Secret/HCS-
> O/NOFORN/ORCON, Top Secret/HCS-O/NOFORN, Top
> Secret/HCS-P/NOFORN/ORCON, Top Secret/HCS-P/NOFORN,
> Top Secret/TK/NOFORN/ORCON, Top Secret/TK/NOFORN,
> Secret/NOFORN, Confidential/NOFORN, TS, TS/SAP, TS/SI-
> G/NF/OC, TS/SI-G/NF, TS/HCS-O/NF/OC, TS/HCS-O/NF,
> TS/HCS-P/NF/OC, TS/HCS-P/NF, TS/HCS-P/SI-G, TS/HCS-
> P/SI/TK, TS/TK/NF/OC, TS/TK/NF, S/NF, S/FRD, S/NATO, S/SI,
> C, and C/NF.

May 2022 Subpoena at 1. In short, the subpoena demands production of documents with

classification markings, regardless of any claim by the Office or the former president that the

latter declassified documents before leaving office. The subpoena contains no geographic

7

limitation and therefore makes responsive all documents possessed by the Office or the former president that bear classification markings, including those potentially stored at Mar-a-Lago or elsewhere in their possession.

On May 11, 2022, the subpoena was served on counsel to the former president and the Office, **Per. 18**, who confirmed authority to receive it. Gov't's Mot., Ex. 3, Letter from Jay Bratt, DOJ, to **Per. 18**, counsel to the former president and the Office (May 11, 2022) ("May 2022 Bratt Letter"), ECF No. 1; *see also* Gov't's *Ex Parte* Mem., Ex. 6, Transcript of **Per. 18** Grand Jury Testimony (Jan. 12, 2023) ("**Per. 18** GJ Tr.") at 13, ECF No. 2 (**Per. 18** confirming his representation). In lieu of personally appearing to produce responsive documents on May 24, 2022, the government offered that compliance with the subpoena could be accomplished "by providing any responsive documents to the FBI at the place of their location," leaving the FBI with the responsibility to ensure that "the agents retrieving the documents" had the proper clearances and training on the appropriate handling of classified documents. May 2022 Bratt Letter. Should this alternative method of compliance with the grand jury subpoena be used, the government directed that "[t]he custodian . . . provide a sworn certification that the documents represent all responsive records [and] [i]f there are no responsive documents, the custodian would provide a sworn certification to that effect." *Id.* The alternative method of subpoena compliance offered by the government—namely, FBI agents picking up any responsive classified documents and a custodian's certification—was the method the Office later adopted on June 3, 2022. *See infra* Part I.C.5.

Through subsequent correspondence, the Office requested additional time to respond to the subpoena, stating that classified documents "that were once in the White House" were "unknowingly included among the boxes brought to Mar-a-Lago by the movers" and then transferred to NARA, and stressing that "President Trump readily and voluntarily agreed" to

8

Subject to Protective Order

USA-01288843

transfer boxes to NARA in communications that were "friendly, open, and straightforward" and part of "a voluntary and open process." MAL Warrant Aff., Ex. 1, Letter from Per. 18

, counsel to the former president and the Office, to Jay Bratt, DOJ (May 25, 2022), at 1.[4] The government granted the extension request, giving respondent fourteen additional days to comply with the subpoena, until June 7, 2022. Gov't Mot., Ex. 4, Letter from Jay Bratt to Per. 18

(June 2, 2022) at 1–2, ECF No. 1.

> **2.** ***Movement of Boxes Out of the Storage Room Before*** Per. 18 ***Search***

Per. 18 and two other attorneys for the former president, and Per. 5

, jointly worked on this matter. Per. 18 GJ Tr. at 27–28.



. Per. 18 initially spoke with the former

president about the subpoena the day he received it, on May 11, 2022. *Id.* at 30, 32. He then scheduled to meet with the former president and on May 23, 2022, to discuss the subpoena further. *Id.* at 34, 37–38.

---

[4] Per. 18 letter went on "to note a few bedrock principles," regarding, *inter alia*, "[a]ny attempt to impose criminal liability on a President or former President" for handling of classified documents and to request that this defensively-framed letter be presented "to any judicial officer who is asked to rule on any motion pertaining to this investigation, or any application made in connection with any investigative request concerning this investigation," and as "exculpatory evidence to a grand jury." MAL Warrant, Ex. 1, Letter from Per. 18 , counsel to the former president and the Office, to Jay Bratt, DOJ (May 25, 2022), at 3. The government has acceded to this request made on behalf of former president Trump and his Office, and the May 25, 2022 letter has been presented both to the magistrate judge issuing the MAL Warrant, as well as to this Court.

9

Subject to Protective Order

USA-01288844

███████████████████████████████████████████

███████████████████████████

Between the May 23, 2022 counsel meeting with the former president and the June 2, 2022 search conducted by **Per. 18**, employees of the former president moved approximately 64 boxes from the storage room to the former president's personal suite and returned only 25 to 30 boxes to the storage room. MAL Warrant Aff. ¶ 66. On May 24, 2022, the day after the counsel meeting with the former president, an assistant emailed the former president's staff and the U.S. Secret Service informing them of a change in the former president's travel schedule: He would delay his scheduled departure from Mar-a-Lago to Bedminster, New Jersey from May 28, 2022, to June 5, 2022. *See* WITNESS 5 FBI Interview at 54 (testifying to the change in the former president's departure date); Gov't's *Ex Parte* Mem., Ex. 8, Email from WITNESS █ (May 24, 2022, at 7:18 p.m.), ECF No. 2.

Security camera footage reveals that box movement began on May 22, 2022, the day before **Per. 18** and ███ 's meeting with the former president; cameras capturing a partial view of the hallway outside of the Mar-a-Lago storage room show WITNESS 5 moving a box from the storage room. *See* Gov't's *Ex Parte* Mem. at 8; Transcript of Sealed Hearing (March 9, 2023) ("March 9, 2023 Hr'g Tr.") at 44:4–6 (government counsel noting, *ex parte*, that "you can't actually see [people] enter" the storage room "because of where the cameras are located"). Then, on May 24, 2022, the day after the meeting, WITNESS 5 moved three boxes from the storage room to the former president's suite. MAL Warrant Aff. ¶ 66. At some point that same day, WITNESS 5 also brought some boxes to the 45 Office within Mar-a-Lago, which WITNESS █ who works for the former president's Office, assumed were intended "to move to

10

Subject to Protective Order

USA-01288845

Bedminster." Gov't's *Ex Parte* Mem., Ex. 9, Transcript of WITNESS ▮ FBI Interview (Jan. 13, 2023) ("WITNESS ▮ Interview Tr.") at 172–74, ECF No. 2.[5]

WITNESS 5 was interviewed by the FBI on May 26, 2022 regarding "the location of boxes at Mar-a-Lago," Gov't's *Ex Parte* Mem. at 9, and four days later and within an hour of speaking with the former president by phone, WITNESS 5 moved approximately 50 boxes from the storage room to the former president's suite, MAL Warrant Aff. ¶ 66; *see also* Gov't's *Ex Parte* Mem. at 10 n.8 (noting a phone call, on May 30, 2022 at 9:08 a.m., between WITNESS 5 and the former president; a phone call shortly thereafter, at 9:29 a.m., between the former president and **Per. 5** and security camera footage less than thirty minutes later, at 9:54 a.m., showing WITNESS 5 moving boxes from the storage room). On June 1, 2022, WITNESS 5 moved eleven boxes from the storage room, one of which appeared to contain papers. MAL Warrant Aff. ¶ 66. In WITNESS 5's words in a text to **Per. 30**, the former president wished to review the boxes and "pick from them." Gov't's *Ex Parte* Mem., Ex. 11, Texts between WITNESS 5 and **Per. 30** (May 30, 2022), ECF No. 2. Then on June 2, 2022, WITNESS 5 and WITNESS ▮ a Mar-a-Lago property manager, moved approximately 25 to 30 boxes from the former president's residential suite to the storage room, MAL Warrant Aff. ¶ 66; Gov't's *Ex Parte* Mem., Ex. 12, Transcript of WITNESS ▮ Grand Jury Testimony (Jan. 20, 2023) ("WITNESS ▮ GJ Tr.") at 52–55, 66–68, ECF No. 2, leaving unaccounted for about 34 to 39 previously moved boxes.[6]

---

[5]     WITNESS ▮ is **Per. 10** at the Office of Donald J. Trump. *See* Aff. of FBI Special Agent in Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 11, Case No. 23-sw-7, ECF No. 1.

[6]     WITNESS ▮ is Carlos de Oliveira, a Mar-a-Lago employee. *See* Gov't's *Ex Parte* Mem., Ex. 12, Transcript of Carlos de Oliveira Grand Jury Testimony (Jan. 20, 2023) ("WITNESS ▮ GJ Tr.") at 106–07, ECF No. 2.

11

Subject to Protective Order

USA-01288846

Despite contrary evidence, WITNESS 5 told FBI investigators, on May 26, 2022, repeatedly that he had no knowledge of various locations of responsive records, nor any boxes in which they were kept, and that he was not aware of who would know that information. *See* WITNESS 5 FBI Interview at 24–25 (stating that he did not know where the former president could have kept boxes and listing other individuals who may know that information), 27 (repeating that he "wouldn't know" where boxes would be stored), 37–38 (claiming not to know from where boxes located in Pine Hall would have come), 41 (same). WITNESS ▮ swore to the same, despite prior knowledge. *See* WITNESS ▮ GJ Tr. at 66–68 (The government: "Sir, would [you] ever move the former president's boxes without his permission?" WITNESS ▮ "I was never told to move any boxes."). During his subsequent grand jury testimony on June 21, 2022, when asked if he had moved items from the storage room at any time, WITNESS 5 replied that "within the last month" he moved a box of "challenge coins" from the storage room to the former president's office, *see* Gov't's *Ex Parte* Mem., Ex. 24, Transcript of WITNESS 5 Grand Jury Testimony (June 21, 2022) ("WITNESS 5 GJ Tr.") at 35–42, ECF No. 2, omitting any mention of the movement of boxes from the end of May to early June 2022.

**3.** *June 2, 2022 Search of Storage Room*



12

Subject to Protective Order

USA-01288847



13

USA-01288848

4. **Per. 12** *Agrees to Serve as Custodian of Records and Preparation of Custodian's Certification*

14

Subject to Protective Order

USA-01288849

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██ After speaking with Per. 12 Per. 18 informed the FBI that he found documents responsive
to the subpoena and he scheduled for the FBI's retrieval of the documents the next day, June 3,
2022. Per. 18 GJ Tr. at 152–53.

15

USA-01288850

5. **The Office's June 3, 2022 Production of Documents**

Subject to Protective Order

USA-01288851



Three FBI agents and a DOJ attorney arrived at Mar-a-Lago to accept receipt of responsive materials. MAL Warrant Aff. ¶ 55. At the meeting with the government officials, `Per. 18` and `Per. 12` provided the government with the sealed Redweld of responsive documents found by `Per. 18` and the signed certification, which stated, in relevant part, "Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: [1] A diligent search was conducted of the boxes that were moved from the White House to Florida; . . . [2] This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; . . . [3] Any and all responsive documents accompany this certification; and . . . [4] No copy, written notation, or reproduction of any kind was retained as to any responsive document." Gov't's *Ex Parte* Mem., Ex. 13, Certification ("June 3, 2022 Certification"), ECF No. 2.

. At the meeting with the DOJ official and FBI agents, `Per. 18` stated that the documents were found in boxes inside a storage room in the basement of Mar-a-Lago, and that the boxes in this storage room were the

17

USA-01288852

"remaining repository" of records from the White House. MAL Warrant Aff. ¶¶ 55–56;



Per. 18 GJ Tr. 172.

Per. 12 GJ Tr. at 110–11.

The former president also spoke with the government at the June 3 meeting at Mar-a-Lago before departing that day for Bedminster. Per. 18 GJ Tr. at 164–65; Per. 12 GJ Tr. at 118–21, 123, 128.

Per. 18 GJ Tr. at 166; Per. 12 GJ Tr. at 122.

Per. 18 led the government officials to the storage room and permitted them to look inside the room but not to look inside any boxes stored inside. Per. 18 GJ Tr. at 166–67, 175–76; Per. 12 GJ Tr. at 123; MAL Warrant Aff. ¶ 56. The government estimated seeing 50 to 55 boxes inside the storage room, MAL Warrant Aff. ¶ 56, and Per. 18

Per. 18 GJ Tr. at 95.

According to the FBI's subsequent review, the sealed Redweld contained 38 unique documents with classification markings, including those marked "TOP SECRET," "SECRET," and "CONFIDENTIAL" and documents with markings indicating that they contained information subject to additional compartmentalization and caveats. MAL Warrant Aff. ¶ 58.

18

USA-01288853

**D.      The June 24, 2022 Grand Jury Subpoena**

On June 24, 2022, the grand jury issued a subpoena to the Trump Organization,

addressed to the custodian of records, seeking testimony and the production of "[a]ny and all

surveillance records, videos, images, photographs and/or CCTV from internal cameras located

on [the] ground floor (basement) and outside the room known as 'Pine Hall'" at Mar-a-Lago.

Gov't's *Ex Parte* Mem., Ex. 14, Subpoena to Testify Before a Grand Jury (June 24, 2022) ("June

2022 Subpoena"), ECF No. 2. The government had transmitted a draft version of the subpoena

to the Chief Legal Officer of the Trump Organization two days earlier, on June 22, 2022, *see*

*also id.*, Ex. 15, Email from Jay Bratt, DOJ, to

n (June 22, 2022, at 11:38 a.m.), ECF No. 2 (transmitting a draft of the June 2022

subpoena to counsel for the Trump Organization), who then emailed Per. 18 that day, *see*

Per. 18 *Ex Parte* Suppl. Resp. to Court's March 11, 2023 Min. Order, Exhibit B, Third

Revised Privilege Log (" Per. 18 Privilege Log") at 25, ECF No. 16-2.

On June 23, 2022, the following day, Per. 18 coordinated with an assistant of the

former president and WITNESS 5 to schedule a phone call with the former president the next

day. Gov't's *Ex Parte* Mem., Ex. 17, Emails between        Per. 18       , WITNESS   and

WITNESS 5 (June 23, 2022), ECF No. 2. The former president and Per. 18 then spoke on the

phone on June 24, 2022, at 1:25 p.m. for approximately nine minutes. Gov't's *Ex Parte* Mem. at

17.

19

Subject to Protective Order

USA-01288854

Shortly after the call, WITNESS 5 rearranged his travel schedule, choosing to fly to

Florida on June 25, 2022, instead of Illinois with the former president as previously scheduled.

*See* Gov't's *Ex Parte* Mem., Ex. 18, Email from [Per. 15], Office of Donald J. Trump,

Regarding the Former President's Daily Schedule for June 25, 2022 (June 24, 2022, 5:16 p.m.),

ECF No. 2 (showing that the former president was scheduled to travel from Bedminster to

Mendon, Illinois with WITNESS 5 on June 25, 2022, at 4:10 p.m.); *id.*, Ex. 19, Email from

JetBlue Reservations to WITNESS 5 (June 28, 2022, 9:29 p.m.), ECF No. 2 (showing WITNESS

5's flight reservations from New York to West Palm Beach, Florida on June 25, 2022, and from

West Palm Beach to Newark, New Jersey on June 28, 2022). WITNESS 5 told colleagues that

the change of plans was due to a family emergency, *id.*, Ex. 21, Texts between WITNESS 5 and

[Per. 15] (June 24, 2022), ECF No. 2; *id.*, Ex. 22, Texts between WITNESS 5 and

(June 24–25, 2022), ECF No. 2; however, he later described the trip as work-related

when seeking travel reimbursement, *id.*, Ex. 20, Texts between WITNESS 5 and

(June 24, 2022, 9:26 p.m.), ECF No. 2 ("Hi        I have to fly out tonight for work. I can't

book a flight through the portal, can I do it on my personal then give you the receipt for

reimbursement?").

At 4:10 p.m. on June 25, 2022, WITNESS 5 texted WITNESS ▮ stating that he had

landed in Florida and requesting that WITNESS ▮ meet him at Mar-a-Lago at around 5:15 p.m.

that day, to which WITNESS ▮ agreed. *Id.*, Ex. 23, Texts between WITNESS 5 and WITNESS

▮ (June 25, 2022), ECF No. 2. Security camera footage shows WITNESS 5 and WITNESS ▮

entering the area near the Mar-a-Lago storage room at 5:50 p.m. for approximately 30–40

seconds on June 25, 2022. Gov't's *Ex Parte* Mem. at 17.

Then, in response to the June 24, 2022 subpoena, on July 6, 2022, the Trump

Organization provided the government with a hard drive, which stored "video footage from four

20

                                     USA-01288855

cameras in the basement hallway of [Mar-a-Lago] in which the door to the STORAGE ROOM is located" spanning from April 23, 2022 to June 24, 2022. MAL Warrant Aff. ¶ 64.[8] The government's review of the footage revealed WITNESS 5 moving 64 boxes out of the anteroom leading to the storage room from May 24, 2022, to June 1, 2022, then moving 25 to 30 boxes into the anteroom on June 2, 2022. *Id.* ¶ 66. █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

### E.    Search Warrant Issued by the Southern District of Florida

Following the June 3, 2022 meeting between the government, Per. 18 and Per. 12 the government's investigation revealed a need to search Mar-a-Lago for any retained documents with classification markings that were responsive to the May 2022 Subpoena but were not provided to the government. Gov't Mot. at 6; *see, e.g., supra* Part I.C.2 (describing witness accounts of boxes moved from the storage room shortly before Per. 18 review). Specifically, despite Per. 18 assurance that any responsive records would be in the storage room and the certification attesting that all responsive records were being turned over on June 3, 2022, the government uncovered video evidence of what appeared to be efforts to conceal and remove records from the storage room prior to Per. 18 search, raising concern about potential obstruction of the government's investigation. *See* Gov't Mot. at 6; *see also, e.g.*, Part I.D

---

[8]    The video footage produced in response to the June 24, 2022, subpoena ended on June 24, 2022, and the government obtained later video footage in response to subsequent legal process. Transcript of Sealed Hearing (Mar. 9, 2023) at 45–46.

21

(describing the video footage showing boxes moved from the storage room before [Per. 18]
review).

These developments of counsel's representations and the certification being

demonstrably, at best, incorrect and unreliable, or, at worst, intentional misrepresentations,

prompted the government, on August 5, 2022, to apply for a warrant to search and seize records

responsive to the May 2022 Subpoena at Mar-a-Lago, which warrant was granted the same day

by a magistrate judge in the U.S. District Court for the Southern District of Florida, upon finding

that probable cause existed to believe that evidence of violations of 18 U.S.C. § 793 (gathering,

transmitting, or losing of national defense information), 18 U.S.C. § 2071 (concealment,

removal, or mutilation generally of government records), and 18 U.S.C. § 1519 (destruction,

alteration, or falsification of records in federal investigations), would be on the property. Gov't's

Mot., Ex. 1, Redacted Aff. of FBI in Supp. Appl. Under Rule 41 for Search & Seizure Warrant

(S.D. Fla. Aug. 5, 2022) ("Redacted MAL Warrant Aff.") ¶ 6, ECF No. 1; *see generally* MAL

Warrant Aff.

In executing the warrant on August 8, 2022, FBI seized thirteen boxes or containers that

included over 100 unique documents with classification markings—ranging from

"CONFIDENTIAL" to "TOP SECRET" levels with additional sensitive compartments signaling

very limited distribution—all responsive to the May 2022 Subpoena. Gov't's Mot. at 7.

Specifically, FBI agents found 76 documents with classification markings in the Mar-a-Lago

storage room, despite [Per. 18] statements and [Per. 12] certification that no such documents

were retained at that location. *Id.* Within the storage room, they discovered 73 boxes in total—

exceeding the estimates by [Per. 18] and FBI agents ████████ and 50–55 boxes, respectively,

located in the same room two months earlier, on June 3, 2022. Gov't's *Ex Parte* Mem. at 19 &

n.14. In addition, agents recovered documents with classification markings in the nonpublic,

22

Subject to Protective Order

USA-01288857

more intimate locations within the former president's private residence at Mar-a-Lago—inside his desk and closet in his personal office. *Id.*



## F. Government's Motion to Compel Full Compliance with May 2022 Subpoena

The seizure of documents with classification markings from Mar-a-Lago revealed that the Office did not comply fully with the May 2022 Subpoena. Fearing that additional responsive records may exist beyond those uncovered through execution of the search warrant, the government contacted the Office, on September 15, 2022, offering another opportunity to provide responsive documents or certify that none remained in either the Office's or the former president's possession. *In re Grand Jury Subpoena*, Case No. 22-gj-40, Memorandum Opinion at 3 (Nov. 9, 2022), ECF No. 16 ("Nov. 2022 Mem. Op.") (opinion regarding the Court's grant of the government's motion to compel the Office to comply with the May 2022 grand jury subpoena). The Office refused either to conduct another search for responsive records or provide the requested certification, citing that the act of producing the documents violated its Fifth Amendment privilege against self-incrimination and challenging the validity of the subpoena's terms and scope. *Id.* Consequently, on October 4, 2022, the government filed a Motion to Compel Compliance with the Grand Jury Subpoena, arguing that the Fifth Amendment privilege against self-incrimination does not apply to the Office, a collective entity, and to the act of

23

Subject to Protective Order

USA-01288858

producing government-owned documents, and that nothing about the subpoena is faulty. *Id.* at
11–12. The parties briefed the matter and appeared for a sealed hearing on the motion on
October 27, 2022. *Id.* at 12–13.

Minutes before the hearing began, respondent's counsel circulated to the government and
the Court a last-minute, undocketed declaration from Timothy C. Parlatore, presumably counsel
for the Office (although his exact representation was unclear from the declaration), dated
October 26, 2022. *Id.* at 13; *see In re Grand Jury Subpoena*, No. 22-gj-40, Declaration of
Timothy C. Parlatore, Esq. ("Parlatore Decl."), ECF No. 9. After reiterating statements from
respondent's opposition, the Parlatore Declaration, for the first time, advised that just two days
before the scheduled hearing, "[o]n October 25, 2022, a search authorized by President Donald J.
Trump was undertaken on the premises at Bedminster" by "elite" but unnamed "professionals[,]
who have military training and experience as well as prior experience searching for sensitive
documents and contraband" in national security matters, "supervised by legal counsel."
Parlatore Decl. at 2. At the hearing, counsel for respondent, James Trusty, identified himself as
the counsel referenced in the Parlatore Declaration as supervising the Bedminster search and he
then elaborated on the search team's efforts to find responsive documents. *In re Grand Jury
Subpoena*, No. 22-gj-40, Transcript of Sealed Hearing (Oct. 27, 2022) ("Oct. 2022 Hr'g Tr.") at
74:14–81:2. Additionally, respondent's counsel argued, *inter alia*, that the former president may
unilaterally deem documents with classification markings generated by federal government
agencies to be declassified and to be his personal property, and that unilateral action by the
former president is sufficient to render those documents no longer the property of the federal
government—an argument presented for the first time in opposition to the government's motion
when made orally at the hearing. *See id.* at 68:23–71:2.

24

Subject to Protective Order

USA-01288859

For its part, the government explained that the Office's proposal for the government to withdraw the motion to compel in exchange for the chance to observe the Office's search for responsive documents at the former president's Bedminster, New Jersey golf club was rejected as unacceptable. The proffered search was limited only to "a specific location within a property, that is, the office at Bedminster . . . one of a number of the former President's properties," without mention of whether this was the former president's personal office or a satellite location for the Office of Donald J. Trump. *Id.* at 29:10–20. In addition, the Office's offer did not include the submission of a sworn certification describing the search, which was necessary in the government's view given the "deficiencies" of the June 3, 2022 production and certification. *Id.* at 30:10–31:3. The government also articulated at the hearing what a fulsome certification would entail, namely "a declaration submitted by a custodian who had personal knowledge of the search that was conducted" in response to the subpoena. *Id.* at 23:9–13. The government added that the certification should "make clear that a diligent search was done at all locations where responsive documents to the subpoena may expect to be found," *id.* at 23:14–18, listing the specific locations searched, not limited to a single location or room, *id.* at 24:18–25. It should also certify that respondent retained no copies of the responsive documents. *Id.* at 24:14–17.

In view of the Office's newly raised arguments at the hearing, the Court permitted the parties to submit any supplemental briefing responding to or supporting those arguments, which had not been addressed in prior briefing. *See* Nov. 2022 Mem. Op. at 14. In an *ex parte* submission, the government provided certain evidence supporting concerns that responsive documents likely remained in the Office's possession, contrary to ▮Per. 18▮ statements and ▮Per. 12▮ certification on June 3, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's *Ex Parte* Suppl. Filing, ECF No. 12 (discussing information also outlined in *supra* Parts I.C–D). In comparison, the Office used the supplemental submission to complain bitterly about

25

Subject to Protective Order

USA-01288860

being given the opportunity to explain its arguments and reasoning, and simply ducked addressing any relevant case law to bolster new arguments asserted at the hearing or oppose any of the government's supplemental arguments. *See* Nov. 2022 Mem. Op. at 32.

After review of the parties' briefing and arguments presented at the hearing, the Court granted the government's motion to compel on November 9, 2022, holding that the May 2022 grand jury subpoena was valid and enforceable, no Fifth Amendment privilege applied to block the Office's custodian of records from complying with the subpoena, citing *Braswell v. United States*, 487 U.S. 99 (1988), and "a custodian with first-hand knowledge of the Office's diligent and comprehensive efforts to locate responsive documents and with the ability to certify that no additional responsive records remain in the Office's possession, must comply with the subpoena." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Order Granting Gov't's Mot. Compel Compliance Grand Jury Subpoena at 2 ("Nov. 2022 Order"), ECF No. 15. The November 2022 Order directed that, by November 18, 2022, the Office provide the government with a new certification and that a custodian be made available to appear before the grand jury. *Id.* at 2–3.

**G.      The Office's Efforts to Comply with the Court's November 2022 Order**

Following the Court's November 2022 Order to comply fully with the May 2022 Subpoena, the Office took another 37 days, an additional Order of this Court, and another sealed hearing in its apparent efforts to comply. Those efforts are described below.

**1.      *November 15, 2022 Status Report***

On November 15, 2022, Parlatore—the individual who provided the surprise declaration at the October 2022 sealed hearing—filed a status report on behalf of the Office describing the Office's efforts to search for all documents responsive to the subpoena and, indeed, discovering two additional responsive records in an Office off-site, leased storage unit. *See In re Grand Jury*

26

Subject to Protective Order

USA-01288861

*Subpoena*, Case No. 22-gj-40, Status Report on the Court's Order (Nov. 15, 2022) ("Nov. 2022 Status Report") ¶ 12, ECF No. 19. ███████████████████████

███████████████████████████████████████████ the November

2022 Report stated that the Office "identified five locations to search for potentially responsive documents": (1) the Office located at Mar-a-Lago along with the former president's residence at the same location; (2) the former president's private golf resort at Bedminster; (3) seven General Services Administration ("GSA") rental storage units in a commercial facility in West Palm Beach, Florida; (4) the Office's GSA-leased office space in West Palm Beach, Florida—a separate location than Mar-a-Lago; and (5) areas used by the former president in Trump Tower in New York City. *Id.* ¶ 4. It also described how the Office "assembled a team" of former DOJ employees "who possess security clearances and extensive training and experience in Sensitive Site Exploitation" to conduct searches for responsive documents at Bedminster, Trump Tower, the West Palm Beach GSA office, and the GSA storage units. *Id.* ¶¶ 5–6. Notably, the Office determined that Mar-a-Lago need not be searched again following the FBI execution of the August 5, 2022, search warrant. *Id.* As of November 15, 2022, the Office's search team, supervised by James Trusty, another attorney for the Office, searched Bedminster on October 25, 2022, the GSA storage units on November 14–15, 2022, and the GSA-leased office location on November 15, 2022, *id.* ¶¶ 6, 8–16, and found in a GSA-leased storage unit "[t]wo documents . . . which appear to be potentially responsive to the subpoena . . . in a box that appears to have been packed and shipped by GSA," *id.* ¶¶ 12. The report concluded that only Trump Tower remained to be searched by the team. *Id.* at 17.

### 2. *November 23, 2022 Revised Certification*

On November 17, 2022, on the eve of the Office's deadline to submit a final certification, the Office requested eleven additional days to complete a search of Trump Tower. *See In re*

27

USA-01288862

*Grand Jury Subpoena*, Case No. 22-gj-40, Resp't's Mot. Extension of Time (Nov. 17, 2022) at 1, ECF No. 20. The Office claimed that more time was needed to "bring the searchers and supervising attorney together at the additional search location" and to account for the intervening Thanksgiving holiday. *Id.* Opposing any extension, the government argued that, in the nearly six months that had passed since the Office received the May 2022 subpoena, the Office had multiple opportunities to comply and the two responsive documents found by the Office, as disclosed in the November 2022 Status Report, "underscores the critical need for prompt compliance with the subpoena and the Court's order" and illustrates "the national security risks present if documents bearing classification markings are stored in unsecure locations." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's Resp. in Opp'n Mot. for Extension at 1 (Nov. 18, 2022), ECF No. 21. The government requested that, if any extension were granted, the Office be required to submit another update on the status of compliance. *Id.* at 1–2.

The Office's extension request was granted in part and denied in part. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Nov. 18, 2022). Finding the Office's request to be "grossly excessive," given the six-month delay in responding to the May 2022 Subpoena, the two-month period since the government's filing of its motion to compel, and the "unacceptable" risk to national security of storing classified documents outside of appropriately secured conditions, plus the "obvious concern" that the Office's Nov. 2022 Status Report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena"—a requirement of both the May 2022 Subpoena and the Court's November 2022 Order—the Office was given only five, rather than the requested eleven, additional days to comply in full, until November 23, 2022. *Id.* The Office was directed to report on the status of compliance that day, and to arrange for the "prompt

28

USA-01288863

delivery of the materials to the government, which delivery must occur as soon as practicable upon the discovery of any materials—national holiday notwithstanding." *Id.*

On November 23, 2022, Parlatore submitted a "Certification on Behalf of Respondent," pursuant to the Court's Orders issued on November 9, 2022, and November 18, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Certification on Behalf of Respondent ("Nov. 23, 2022 Certification") (Nov. 23, 2022), ECF No. 22. Parlatore submitted the certification as an attorney for "President Donald J. Trump" with "personal knowledge of [the Office's] efforts with regard to the [May 2022] Subpoena." *Id.* ¶¶ 1–4. He did not claim to be a custodian of records for the Office.

Largely reiterating the information in the November 15, 2022 Status Report, the November 23, 2022 Certification stated that Parlatore's search team, led by Trusty, completed searches of Bedminster, the seven GSA-leased storage units in Florida, the GSA-leased office of the Office of Donald J. Trump in Florida, and Trump Tower. *Id.* ¶ 8. It confirmed that Mar-a-Lago was not searched pursuant to the Court's November 2022 Order given the government's August 8, 2022 search warrant execution. *Id.* ¶ 15. Adding to the details provided in the earlier November 2022 Status Report, the new certification summarized the contents of each storage unit—which contained furniture, clothing, gifts, photos, and documents—and detailed that the two documents responsive to the subpoena were found in Unit 2083. *Id.* ¶ 22. Those documents had "red 'Secret' covers" and "were secured in double-wrapped, sealed envelopes and kept within the locked unit until being turned over to FBI agents at approximately 6:00 a.m. on November 16, 2022," the morning after their discovery. *Id.* Also newly reported in the November 23, 2022 Certification was information about the search of Trump Tower, conducted on November 21, 2022. *Id.* ¶ 28. Due to a "scheduling conflict," Parlatore himself supervised that search instead of Trusty, which included searching the former president's office and his

29

USA-01288864

personal residence, and no records responsive to the subpoena or the Court's Order were found. *Id.* ¶¶ 29–34.

The certification concluded with a section titled "Role of Certificant," explaining that the Office was under no obligation to use a custodian of records and, to the extent a custodian was used, that custodian was ▮ **Per. 12** ▮. *See id.* ¶¶ 35–41. Specifically, the certification stated that "nothing in the Former President's Act," the statute providing for the GSA-funded office space for former presidents, "requires that a custodian of records be designated," *id.* ¶ 35, and instead the Act merely "permit[s]" the Office to retain an independent contractor to coordinate with NARA on the transfer of presidential records, and that the Office had not retained such a contractor, *id.* ¶ 36 (emphasis omitted). Nonetheless, **Per. 12** ▮▮▮▮▮ "for purposes of testimony and documents subject to subpoena #GJ20222042790054" and had been "made available to the Government for interview and testimony," *id.* ¶ 37, which had been scheduled for December 1, 2022, *id.* ¶ 40. As of November 23, 2022, the Office "ha[d] no full-time custodian of records" and so the certification made by "an individual with personal knowledge of the searches and documents in the custody and control of the Respondent fulfills that role." *Id.* ¶ 39. Parlatore then offered to testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary." *Id.* ¶ 40; *accord id.* ¶ 41.

No additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-

30

Subject to Protective Order

product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification.

### 3. *Government's Motion for an Order to Show Cause and Subsequent Hearing*

Seven days after service of the revised certification, the government moved for an Order requiring the Office "to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9, 2022 Order." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's Mot. Order to Show Cause at 1 (Dec. 2, 2022), ECF No. 23. The government argued that the Office "blatantly ignored the Court's clear and explicit instructions regarding what is required in a custodial certification and who should serve as the custodian." *Id.* In particular, according to the government, the Office still had not (1) produced a custodian of records to attest to the Office's efforts responding to the subpoena, and instead provided "an attorney claiming not to waive privilege;" (2) attested to searching for responsive documents "wherever located" as required by the May 2022 Subpoena, and instead only searched certain locations; (3) provided sufficient details regarding the searches, instead offering only "disparate levels of detail on the search locations and methodology employed at each location;" and (4) produced a custodian to testify before the grand jury, instead stating that no further testimony was necessary and offering Parlatore's testimony without mention of whether he would testify to anything not expressly stated in the November 23, 2022 Certification. *Id.* at 4. Given that the Office had already delayed full compliance with the May 2022 subpoena for seven months, the government argued that any further delay to the investigation amounted to "deliberate lack of compliance with the [May 2022] Subpoena" and supported a holding of contempt. *Id.* at 5.

The government's motion to show cause why the Office should not be held in contempt was granted, along with a scheduling order for briefing and a sealed hearing on the motion on December 9, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Dec. 2,

31

Subject to Protective Order

2022). The Office defended the steps taken to comply with the Court's November 2022 Order, which steps included conducting searches of certain locations the Office identified and submission of a certification from "a supervisory attorney with personal knowledge of the searchers, locations, and methods" as to these efforts. *In re Grand Jury Subpoena*, Case No. 22-gj-40, Resp't's Opp'n Mot. for Order to Show Cause at 2–3, 7–8 (Dec. 6, 2022), ECF No. 24. Further, the Office indicated that the supervisory attorney, Parlatore, Per. 12

were both available to testify, *id.* at 4, 8–9, while complaining that the government did not "articulate[] exactly what would constitute full compliance" and chose not to weigh in on which locations still needed to be searched, instead deferring to the Office's determination of locations to be searched, *id.* at 6.

At the December 9, 2022, sealed hearing, both parties clarified the tasks yet to be done to constitute full compliance with the May 2022 Subpoena. *See generally In re Grand Jury Subpoena*, Case No. 22-gj-40, Transcript of Sealed Hearing (Dec. 9, 2022) ("Dec. 2022 Hr'g Tr."). [9] After much back-and-forth between the parties regarding what had and had not been provided by the Office thus far, the Court ascertained the following terms for the Office's full compliance: (1) Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Per. 12 to prepare to sign the June 3, 2022 certification, the

---

[9]     The Court did not issue a contempt citation against the Office at that time, given the productive discussion about expectations for additional searches and the contents of a certification for compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations. *See* Dec. 2022 Hr'g Tr. at 2–9; *see also id.* at 9 (Government counsel: "[T]oday you want us to see where the areas of agreement and disagreement are. And if another hearing is necessary, you'll hold one, but perhaps we can come to a way forward that doesn't involve contempt proceedings. You view this as a motion for an order to show cause rather than contempt proceedings itself?" The Court: "Correct. That's how I view it.").

32

USA-01288867

identities of the search-team members, and those members' exact search methodologies, *id.* at 12–13, 22, 31–32, 34–35, 38; (2) the revised certification as well as Parlatore's grand jury testimony would discuss accommodations the Office made for the "shell game," as coined by the government, whereby documents could be moved between locations based on scheduled dates for searches of those locations, to avoid detection of those responsive records, *id.* at 14–15, 37; and (3) Parlatore, or any individual put forward to the grand jury regarding the May 2022 subpoena, need not be labeled a "custodian" as long as they possess all the required first-hand information, *id.* at 18–19. The Court suggested that the Office add Mar-a-Lago to the list of locations to be searched again, *id.* at 37–38 (Court, to counsel for the former president: "I think it would be incumbent on you to do another diligent search of Mar-a-Lago just to make sure.").

The scope of information the government sought had one clear sticking point. The government made clear that Parlatore, or any other witness made available to testify about the conduct of the search for responsive documents, might be asked questions about the content of direct conversations with the former president. *See, e.g., id.* at 24 (The Court: "[A]re you going to be asking about direct conversations with the former President and about where he may or may not have put or seen or took with him classified marked records?" The government: "I think those are fair questions to ask of a purported custodian."), 25 (The Court: "[T]his one piece of information about what Donald J. Trump told the certifier or declarant, that's going to be a difficult pillar to support a whole contempt finding." The government: "I think we would have to make that decision based on what other information we are able to obtain in the grand jury."), 31 (Respondent's counsel: "[Parlatore] is willing to . . . testify in the grand jury and address each of the items that you have identified today. If a question comes up with regard to specific conversations with [Parlatore's] client, President Trump, that may involve a different issue.").

33

Subject to Protective Order

USA-01288868

The parties acknowledged the potential need for additional litigation regarding counsel testifying to conversations with the former president. *See id.* at 25, 31.

The hearing concluded with issuance of an Order requiring the Office to supplement the November 23, 2022 Certification by December 16, 2022, with all additional details discussed at the hearing. *Id.* at 47; *see also In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Dec. 9, 2022) (directing the Office to submit the supplemental certification by December 16, 2022, by 5 p.m.).

### 4. *December 16, 2022 Revised Certification*

The Office filed its final Certification of Compliance on December 16, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Certification of Compliance (Dec. 16, 2022) ("Dec. 16, 2022 Certification"), ECF No. 34. The certification, sworn by Parlatore on behalf of the Office, details the June 2, 2022 search of the Mar-a-Lago storage room, *id.* ¶¶14–18, the locations and methods of other searches conducted, including the expertise of the two former-government agents hired to perform the searches at Bedminster, GSA-leased storage units, GSA-leased office space, and Trump Tower, *id.* ¶¶ 20, 25–47, and noted that an additional search of Mar-a-Lago was conducted on December 15–16, 2022, including searching the living quarters of the former president and his family, the former president's office, and the storage room, *id.* ¶¶ 48–50.[10] Attached to the certification were 49 pages of reports summarizing the searches

---

[10] In subsequent litigation, during a holiday period, from December 21, 2022 to January 4, 2023, the Court denied the Office's request to supplement the existing Protective Order to permit the Office to keep secret the full names of the two members of the search team. *See generally In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Sealed Mot. for Supplemental Protective Order (Dec. 21, 2022), ECF No. 28; *In re Grand Jury Subpoena*, No. 22-gj-40, Order Denying Resp't's Mot. for Supplemental Protective Order (Dec. 29, 2022), ECF No. 30. The Court further denied the Office's motion to reconsider that ruling, *In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Mot. for Reconsideration (Dec. 30, 2022), ECF No. 31; *In re Grand Jury Subpoena*, No. 22-gj-40, Memorandum Opinion & Order Denying Resp't's Mot. for Reconsideration (Jan. 4, 2023), ECF No. 35, and pursuant to that Order, the Office provided a Notice of Compliance on January 4, 2023, confirming the disclosure of the searchers' full identities to the government that day, *In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Notice of Compliance (Jan. 5, 2023), ECF No. 37.

34

Subject to Protective Order

conducted, including the dates of the searches; the exact search locations including rooms,

offices, and pieces of furniture; individuals present for the search; all search methods down to

whether both sides of documents were examined and whether sealed items were opened and

analyzed; and whether responsive records were uncovered. *See generally* Dec. 16, 2022

Certification, Exs. A–D, ECF Nos. 34-1–34-4. The reports note that no responsive records were

found at Bedminster and in the GSA-leased spaces other than the two previously uncovered

documents from a GSA-leased storage unit and provided to the government in November 2022.

*See* Dec. 16, 2022 Certification, Ex. A at 1 (no responsive records found at Bedminster); *id.*, Ex.

B at 6 (regarding GSA-leased storage units and office space, only two responsive documents

found in total from those two locations); *id.*, Ex. C at 1–6 (no responsive records found at Trump

Tower).

Remarkably, the report regarding the Mar-a-Lago search, conducted on December 15–16,

2023, uncovered four more responsive records. *See id.*, Ex. D at 1–15 (four responsive records

found at Mar-a-Lago on December 15–16, 2022). The certification misleadingly refers to these

documents as "low-level ministerial documents" without any explicit mention whether they had

classification markings, indicating only that one document includes "an explanation that it was

no longer deemed 'classified' if not connected to the attachment, and this document had no

attachment." *Id.* ¶ 49. To be clear, the four documents were responsive to the May 2022

subpoena: "On or about December 15, 2022," the former president's counsel informed the

government that "a box containing four documents or partial documents, totaling six pages, with

classification markings were found in a closet" of the Office's designated space at Mar-a-Lago

and "[t]hose documents contained markings at the Secret level." Aff. of FBI Special Agent in

Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 54, Case No. 23-sw-7, ECF No. 1.

35

Subject to Protective Order

USA-01288870

The Office provided the entire box in which the four responsive records were located to the FBI on approximately January 5, 2023, in compliance with another subpoena. *Id.*[11] That was still not the end of the production of responsive records. In complying with the subpoena to produce that box, the Office also provided the FBI with two additional documents responsive to the May 2022 subpoena: "one empty folder and another mostly empty folder marked 'Classified Evening Summary'" that were found in the former president's bedroom at Mar-a-Lago. *Id.*

**H.      Per. 18 Grand Jury Testimony**

On January 12, 2023, Per. 18 testified before the grand jury in response to a subpoena. *See generally* Per. 18 GJ Tr. He also produced over 300 documents to the government as requested by the subpoena, *id.* at 12, as well as a privilege log detailing documents withheld from the government based on attorney-client privilege and the work-product doctrine, *see generally* Per. 18 Privilege Log, ECF No. 16-2. During Per. 18 nearly six-hour testimony, the government identified the following six topics over which Per. 18 asserted privilege:

(1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮;

(2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮;

(3) the identities of individuals involved in selecting Per. 12 ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮, the reasons for Per. 12 selection, and communications (with Per. 12 and others) related to Per. 12 selection;

(4) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮;

(5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

---

[11]      Relatedly, on January 6, 2023, the former president's counsel informed the government that, in 2021, WITNESS ▮ scanned the contents of the box—produced on January 5, 2023, and previously containing classified documents—onto a laptop in her possession owned by the Save America Political Action Committee ("PAC"), a PAC formed by the former president in 2020. *See* Aff. of FBI Special Agent in Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 55, Case No. 23-sw-7. The former president's counsel saved those scans onto a thumb drive and provided the thumb drive to the government that day.

36

Subject to Protective Order

USA-01288871

(6) what ▮Per. 18▮ discussed with the former President in a phone call on June 24.

Gov't's *Ex Parte* Mem. at 20–21; *see also id.* at 21–24 (providing more details about each topic). Those topics include ▮Per. 18▮ own understanding animating his actions, individuals with whom he spoke to inform his understanding and the factual bases on which to advise his clients, and direct communications with the former president about the May 2022 subpoena and subpoena compliance efforts. *See id.*

### I.    Grand Jury Subpoena Issued to ▮▮

On January 25, 2023, the government issued a grand jury subpoena to ▮▮ for testimony and documents relevant to her representation of the former president and the Office in response to the May 2022 subpoena. *See supra* Part I.C.2. ▮▮ informed the government, through counsel, that the former president will invoke attorney-client privilege over her testimony and that she will withhold testimony based on that privilege. Gov't's Mot. at 8. ▮▮ did not comply with the subpoena by its February 9, 2023, return date, *see* Former President Donald J. Trump's Sealed Opp'n to Gov't's Sealed Mot. Compel ("Resp't's Opp'n") at 4–5, ECF No. 6, and informed the government that she would withhold one responsive document, Gov't's Reply at 6, ECF No. 7.

### J.    Procedural History

Following the witnesses' refusal to comply in full with their subpoenas for testimony and records, the government filed the instant Motion to Compel, ECF No. 1. Along with the motion, the government simultaneously requested a protective order authorizing limited disclosure and imposing protection for the purpose of guarding grand jury litigation and secrecy, under Federal Rule of Criminal Procedure 6(e) and Local Criminal Rule 6.1. Gov't's Sealed Mem. Regarding

Subject to Protective Order                                    USA-01288872

Mot. Compel Filings & Mot. for Order Authorizing Limited Disclosure and Imposing Protection, ECF No. 1-1. The Court issued the protective order that day. *See* Order Authorizing Limited Disclosure, Imposing Protection, and Entering Briefing Schedule ("Protective Order"), ECF No. 3.[12]

On February 21, 2023, Per. 18 and the former president filed separate oppositions to the motion to compel, both requesting a hearing on the motion, *see* Sealed Resp. of ▮ Per. 18 to Gov't's Sealed Mot. Compel (" Per. 18 Opp'n"), ECF No. 5; Resp't's Opp'n, which request was granted with a hearing held on March 9, 2023. In advance of the hearing, the Court ordered additional briefing by Per. 18 to identify which documents he withheld on the basis of opinion work product and the degree to which such opinion work product is severable from any fact work product in the documents, as well as to clarify why the "Revised Privilege Log" submitted as Exhibit A to his opposition was approximately half the size of the privilege log he provided the government in January. Court's Min. Order (March 4, 2023). The government was directed to supplement the record with the subpoena issued to Per. 18 as well as to clarify its position on (1) the application of the crime-fraud exception to Per. 18 own opinion work product and (2) whether Per. 18 "Revised Privilege Log" comprised the full extent of the documents sought by the government. *Id.* On March 6, 2023, Per. 18 and the government filed separate responses to the Court's Minute Order. Sealed Resp. of Per. 18 ▮ to Court's March 4, 2023 Min. Order (" Per. 18 Resp."), ECF No. 8; Gov't's Sealed Resp. to Court's Request for Clarification ("Gov't's Resp."), ECF No. 9; Gov't's Sealed *Ex*

---

[12] The Protective Order permits the government to serve on Per. 18 ▮ the former president, and the Office, through counsel, the Protective Order, the government's motion to compel, and proposed order granting the motion to compel. Protective Order ¶¶ 1–2. The Protective Order forbids the parties from disclosing to the public "the existence of this proceeding, any papers or orders filed in this proceeding, or the substance of anything occurring in this proceeding." *Id.* ¶ 4. The Order also restricts attorneys of record from disclosing this proceeding, and related papers and orders, to anyone other than their clients and individuals necessary to litigate the issues presented, and any further disclosure requires a court order. *Id.* ¶ 5.

38

Subject to Protective Order

USA-01288873

*Parte* Suppl. to Resp. to Court's Request for Clarification ("Gov't *Ex Parte* Suppl. Resp."),
ECF No. 10.

    Counsel for ███ Per. 18 ███ former President Trump, and the government attended a sealed
hearing on March 9, 2023. The nearly three-hour hearing, though largely adversarial, also
included a series of *ex parte* arguments: (1) from the government, in the presence of counsel for
the former president, but without ███ Per. 18 ███ or his counsel; (2) from the government alone, and
(3) from ███ Per. 18 ███ counsel, in the presence of counsel for the former president, but without the
government. At the conclusion of the hearing, the Court issued an oral ruling finding that the
government had satisfied its evidentiary burden set out in *United States v. Zolin*, 491 U.S. 554
(1989), permitting the Court to review ███ Per. 18 ███ withheld documents *in camera*.

    After the hearing, the Court ordered additional briefing by all three parties before the
Court, *see* Court's Min. Order (March 9, 2023), as follows: (1) the government was ordered to
file supplemental briefing setting out the elements of each of the criminal violations alleged to
serve as the basis for application of the crime-fraud exception to the attorney client privilege; (2)
the former president was ordered to clarify the legal basis for his invocation of the attorney-client
privilege in response to questions seeking purely logistical information about ███ Per. 18 ███ search
in response to the May 2022 Subpoena and to supplement the record with the transcript of
attorney Timothy Parlatore's December 22, 2022 grand jury testimony, which is quoted in the
former president's opposition; and (3) ███ Per. 18 ███ was ordered to provide for *in camera* review the
withheld documents listed on his January 11, 2023-dated privilege log. *Id.* The parties complied
on March 10, 2023. Gov't Suppl. *Ex Parte* Mem. Supp. Mot. Compel ("Gov't March 10,
2023 *Ex Parte* Suppl. Mem."); Former President Donald J. Trump's Sealed Suppl. Opp'n to
Gov't Mot. Compel ("Resp't's Suppl. Mem."), ECF No. 12; Sealed *Ex Parte* Suppl. Filing of
███ Per. 18 ███ Resp. Court's March 9, 2023 Min. Order ("███ Per. 18 ███ March 10, 2023 *Ex*

39

Subject to Protective Order USA-01288874

*Parte* Suppl. Mem."), ECF No. 14. Finally, at the Court's direction, `Per. 18` filed an updated

privilege log, formatted to permit the Court to determine which claims corresponded to which

documents submitted for *in camera* review. Court's Min. Order (March 11, 2023); Sealed *Ex*

*Parte* Suppl. Filing of `Per. 18` Resp. Court's March 11, 2023 Min. Order

(" `Per. 18` March 12, 2023 *Ex Parte* Suppl. Mem."), ECF No. 16.

The government's motion is now ripe for review.

## II.    APPLICABLE LEGAL PRINCIPLES

"Nowhere is the public's claim to each person's evidence stronger than in the context of a

valid grand jury subpoena." *In re Sealed Case ("In re Sealed Case (1982)")*, 676 F.2d 793, 806

(D.C. Cir. 1982). "Only a very limited number of recognized privileges provide legitimate grounds

for refusing to comply with a grand jury subpoena, and each of these is firmly anchored in a

specific source—the Constitution, a statute, or the common law." *Id.* The attorney-client privilege

and work-product doctrine are two such grounds, but such "exceptions to the demand for every

man's evidence are not lightly created nor expansively construed, for they are in derogation of the

search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also Federal Trade*

*Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1269 (D.C. Cir. 2018) (Pillard, J.,

concurring) (noting that the "attorney-client privilege must be strictly confined within the

narrowest possible limits consistent with the logic of its principle" (quoting *In re Lindsey*, 158

F.3d 1263, 1272 (D.C. Cir. 1998))); *United States v. Zubaydah*, 142 S. Ct. 959, 994 n.12 (2022)

(Gorsuch, J. dissenting) (observing that privileges generally "should be recognized only within the

narrowest limits defined by [the] principle[s]" animating them (internal quotation marks omitted)).

The attorney-client privilege protects communications between attorneys and their

clients. It is "the oldest of the privileges for confidential communications known to the common

law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v.*

40

Subject to Protective Order                                                                USA-01288875

*United States*, 449 U.S. 383, 389 (1981)). As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389). Thus, the privilege covers a communication "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.).

The work-product doctrine protects a different category of materials: only "documents and tangible things that are prepared in anticipation of litigation" by a party or its representative, including the party's attorney. *United States v. Deloitte LLP*, 610 F.3d 129, 135 (D.C. Cir. 2010) (quoting FED. R. CIV. P. 26(b)(3)(A)). Unlike the attorney-client privilege, which is held only by the client, "the work product privilege protects both the attorney-client relationship and a complex of individual interests particular to attorneys that their clients may not share," *In re Sealed Case (1982)*, 676 F.2d at 809, and resultantly, work product's protection "belongs to the lawyer as well as the client." *Id.* at 812, n.75. The doctrine emerged as a common law privilege in the civil litigation context, *see generally Hickman v. Taylor*, 329 U.S. 495 (1947), and has been extended to apply to criminal matters, *see United States v. Nobles*, 422 U.S. 225, 236–38 (1975), with codification in both the federal civil and criminal procedural rules, *see* FED. R. CIV. P. 26(b)(3) and FED. R. CRIM. P. 16(b)(2). The D.C. Circuit has not clarified whether FED. R. CIV. P. 26(b)(3)—which by its own terms applies to discovery—creates the substance of the work-product doctrine in the context of grand jury subpoenas, but "[b]ecause of [the] apparent identity between the common law standard and that of Rule 26(b)(3), it appears to make little difference" where the work product doctrine in this context is substantively rooted. *In re Sealed*

41

Subject to Protective Order

USA-01288876

*Case ("In re Sealed Case (August 1997)")*, 124 F.3d 230, 236 n.7 (D.C. Cir. 1997), *rev'd on other grounds by Swidler & Berlin v. United States*, 524 U.S. 399 (1998); *see also In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 185 (2d Cir. 2007) (explaining that neither rule "is a perfect fit in the grand jury context").

"[T]he showing of need required to discover another party's work product depends on whether the materials at issue constitute 'fact' work product or 'opinion' work product." *United States v. Clemens*, 793 F. Supp. 2d 236, 244 (D.D.C. 2011). Opinion work product, comprising written materials prepared by counsel that reflect the attorney's "mental impressions, conclusions, opinions, or legal theories," is "virtually undiscoverable," *Deloitte*, 610 F.3d at 135 (quoting *Dir., Off. Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997)). In contrast, "[t]o the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely shifts the standard presumption in favor of discovery and requires the party seeking discovery to show 'adequate reasons' why the work product should be subject to discovery." *In re Sealed Case (1982)*, 676 F.2d at 809.

The crime-fraud exception at issue here pierces the shields of both the attorney-client privilege and work-product doctrine upon the proper showing that "a privileged relationship [was] used to further a crime, fraud, or other fundamental misconduct." *Id.* at 807. "Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case ("In re Sealed Case (1985)")*, 754 F.2d 395, 399 (D.C. Cir. 1985)). "To establish the exception . . . the court must consider whether the client 'made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act,' and establish that the client actually 'carried out the crime or fraud.'" *In re Sealed Case ("In re Sealed Case (2000)")*, 223 F.3d 775, 778 (D.C. Cir. 2000) (quoting *In re Sealed Case ("In re Sealed Case*

42

Subject to Protective Order

USA-01288877

*(March 1997)")*, 107 F.3d 46, 49 (D.C. Cir. 1997)). "To establish the exception to the work-

product privilege, courts ask a slightly different question, focusing on the client's general

purpose in consulting the lawyer rather than on his intent regarding the particular

communication: 'Did the client consult the lawyer or use the material for the purpose of

committing a crime or fraud?'" *In re Sealed Case (2000)*, 223 F.3d at 778 (quoting *In re Sealed*

*Case (March 1997)*, 107 F.3d at 51).

     To satisfy its burden of proof as to the crime-fraud exception, the government must offer

"evidence that if believed by the trier of fact would establish the elements of an ongoing or

imminent crime or fraud." *In re Grand Jury*, 475 F.3d at 1305 (quotation marks omitted). It

"need not prove the existence of a crime or fraud beyond a reasonable doubt." *In re Sealed Case*

*(1985)*, 754 F.2d at 399. Instead, the D.C. Circuit has "described the required showing in terms

of establishing a 'prima facie' case," *In re Sealed Case (March 1997)*, 107 F.3d at 49 (tracing

this "formulation . . . to the Supreme Court's opinion" in *Clark v. United States*, 289 U.S. 1, 14

(1933)). "The determination that a prima facie showing has been made lies within the sound

discretion of the district court," *In re Sealed Case (1985)*, 754 F.2d at 399, which must

"independently explain what facts would support th[e] conclusion" that the crime-fraud

exception applies. *Chevron Corp. v. Weinberg Grp.*, 682 F.3d 96, 97 (D.C. Cir. 2012).

     While recognizing that "*in camera, ex parte* submissions generally deprive one party to a

proceeding of a full opportunity to be heard on an issue," *In re Sealed Case No. 98-3077*, 151

F.3d 1059, 1075 (D.C. Cir. 1998) (quotation marks omitted), the D.C. Circuit has approved the

use of that process "to determine the propriety of a grand jury subpoena or the existence of a

crime-fraud exception to the attorney-client privilege when such proceedings are necessary to

ensure the secrecy of ongoing grand jury proceedings," *id; see also Zolin*, 491 U.S. at 556

43

Subject to Protective Order

USA-01288878

(holding that *in camera* review may be used to probe crime-fraud challenges to attorney-client privilege).

## III.   DISCUSSION

The government contends that the application of the crime-fraud exception prevents

Per. 18 and [redacted] from standing on the attorney-client privilege or work product doctrine to withhold testimony and documents regarding the lawyers' efforts, taken on behalf of the former president, to comply with a grand jury subpoena commanding the production of all documents with classification markings in the former President's or office of the former President's possession. According to the government, Per. 18 and [redacted] client, former President Trump, "engaged in a crime, fraud, or other fundamental misconduct and communicated and consulted with Per. 18 and [redacted] on these six topics in furtherance of that conduct," vitiating any claims of attorney-client privilege or work-product doctrine protection. Gov't's Mot. at 9. The former president urges that no crimes were contemplated, and that his consultations with lawyers in seeking to comply with a grand jury subpoena "simply are not, in and of themselves, evidence that they are in furtherance of any crime." Resp't's Opp'n at 11. Per. 18 for his part, additionally argues that, because he has asserted his own claim to work-product protection, and because the government has not argued that Per. 18 was complicit in the alleged crimes of his client, his work product cannot be pierced by the operation of the crime-fraud exception. *See* Per. 18 Opp'n at 2.

This discussion proceeds in four parts. The first part clarifies the nature of this proceeding by addressing—and rejecting—Trump's argument that he has a due process right to review the government's *ex parte* submission in support of its motion to compel. Second, before addressing the thrust of the parties' briefings as to the application of the crime-fraud exception, the threshold inquiry is considered of whether the withheld documents and testimony should be

44

Subject to Protective Order

USA-01288879

considered privileged at all. Next, the focus turns to the heart of the dispute: whether the crime-fraud exception applies to pierce the privileged communications and work-product subject to the government's November 21, 2022 and January 25, 2023 subpoenas to Per. 18 and ████ respectively, given the nature of the prima facie burden that the government must satisfy to invoke the crime-fraud exception. As part of this analysis, the first prong of the crime-fraud exception is examined to conclude that the government has sufficiently demonstrated that former President Trump's apparent actions or omissions in response to the May 11, 2022 grand jury subpoena may trigger criminal culpability, followed by consideration of the exception's second prong requiring a nexus between the privileged communications or work product and the previous prong's criminal conduct, and a finding that this second prong is also satisfied as to the withheld testimony and most of the withheld documents. Finally, because the government presently agrees not to seek to compel production of attorney opinion work product, the final part defines the proper scope of that doctrine as applied to the withheld testimony and documents.

## A.  Due Process and *Ex Parte* Proceedings

As a threshold matter, Trump contends that his inability to review the government's *ex parte* submission in support of its motion to vitiate his claims of attorney-client privilege and work-product protection is unfair, urging that "[c]onstitutional due process requires that President Trump and the Office receive notice of the facts the Government relies upon to make its extraordinary request." Resp't's Opp'n at 11. To be sure, *in camera, ex parte* submissions "'generally deprive one party to a proceeding of a full opportunity to be heard on an issue' . . . and thus should only be used where a compelling interest exists," but the D.C. Circuit has held that proceedings attendant to ongoing grand jury investigations—where secrecy is paramount—satisfy that high bar. *In re Sealed Case No. 98-3077*, 151 F.3d at 1075 (quoting *In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)).

45

USA-01288880

The grand jury is an institution separate from the courts and government prosecutors—"a
constitutional fixture in its own right," *United States v. Williams*, 504 U.S. 36, 47 (1992)
(internal quotation marks omitted)—that depends on secrecy in order to "serv[e] as a kind of
buffer or referee between the Government and the people," *id.* Among the reasons for the grand
jury's need for secrecy are the following:

> First, if preindictment proceedings were made public, many prospective witnesses would
> be hesitant to come forward voluntarily, knowing that those against whom they testify
> would be aware of that testimony. Moreover, witnesses who appeared before the grand
> jury would be less likely to testify fully and frankly, as they would be open to retribution
> as well as to inducements. There also would be the risk that those about to be indicted
> would flee, or would try to influence individual grand jurors to vote against indictment.

*Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 219 (1979). As a result, courts have
consistently held that submissions in support of motions to apply the crime-fraud exception in
the context of a grand jury subpoena are appropriately filed *ex parte*. *See In re Grand Jury
Subpoena, Judith Miller*, 438 F.3d 1141, 1179–80 (D.C. Cir. 2006) (Tatel, J., concurring) ("In
this circuit . . . we have approved the use of '*in camera, ex parte* proceedings to determine the
propriety of a grand jury subpoena or the existence of a crime-fraud exception to the attorney-
client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury
proceedings.'" (quoting *In re Sealed Case No. 98-3077*, 151 F.3d at 1075); *In re Grand Jury
Subpoena*, 223 F.3d 213, 217–19 (3d Cir. 2000); *In re John Doe, Inc.*, 13 F.3d 633, 635–36 (2d
Cir. 1994); *In re Grand Jury Proceedings*, 33 F.3d 342, 352–53 (4th Cir. 1994).

Having reviewed the government's *ex parte* memorandum and exhibits submitted in
support of its motion, the Court is satisfied that maintenance of secrecy is necessary to safeguard
the grand jury's ongoing investigation. The former president's citation to *United States v. Rezaq*
is inapposite as this case merely stands for the undisputed principle that "[e]x parte
communications between a district court and the prosecution in a criminal case are greatly
discouraged," 899 F. Supp. 697, 707 (D.D.C. 1995). At present, *there is no criminal case*—only

46

Subject to Protective Order

a grand jury proceeding, which "is not an adversary hearing where guilt or innocence is adjudicated but an *ex parte* investigation to determine if there is probable cause to believe a crime has been committed." *In re Grand Jury Subpoena*, 223 F.3d at 216. Should the government proceed by asking the grand jury to return an indictment and should the grand jury decide to return an indictment and a criminal prosecution ensue, the bar for any evidence to be presented *ex parte* will be far higher, in accordance with the principle articulated in *Rezaq*. Nor does the former president's status as a former president or presidential candidate earn him across-the-board special treatment, *see* Resp't's Opp'n at 9—an argument advanced by the former president that appears to be more offensive to the rule of law than the use of *ex parte* proceedings. To be sure, courts sometimes make particularized accommodations for sitting presidents based on carefully balancing the principle that the "President . . . does not stand exempt from the general provisions of the constitution" against the need to safeguard the "President's ability to perform his vital functions." *See generally Trump v. Vance*, 140 S. Ct. 2412 (2020) (internal quotation marks omitted). This does not amount to a carte-blanche entitlement to exceptional treatment.[13]

Doubling-down on his status as the former president, the former president accuses the government of a "common goal of damaging the political viability of one person, President Donald J. Trump," who is "a major political opponent of the current president," and characterizes the pending motion as asking the Court "to ignore that context and receive an *ex*

---

[13]     The former president further urges that the government's *ex parte* submissions not be relied upon because, in the examination before the grand jury of another of the former president's attorneys, Timothy Parlatore, a prosecutor repeatedly attempted to elicit testimony protected by the attorney-client privilege and, at one point, asked why the former president would not waive his privilege if he really were "so cooperative." Resp't's Suppl. Mem. at 2. The former president is correct that "[i]f a witness exercises some right or privilege, it is generally agreed that it is improper to suggest that adverse inferences should be drawn." SARAH SUN BEALE, GRAND JURY LAW & PRACTICE § 9:2 (2d ed. 2022). The relationship between this single exchange with a different lawyer before the grand jury and the instant matter is attenuated, however, and does not justify the former president's request for unfettered access to the government's *ex parte* submission.

47

Subject to Protective Order

USA-01288882

*parte* submission from the Government as gospel." Resp't's Opp'n at 9–10. This argument is long on theatrics and short on substance. Taking an assertion "as gospel" is generally understood as accepting it as true on the basis of *faith*, without other factual evidence as support. That is a far cry from what is occurring here. The government's *ex parte* submission consists of documentary and sworn testimony, the normal forms of evidence, and any inferences to be drawn from that evidence are not based on faith or speculation, as the former president fears, but stem from reason, context, and facts. The former president expresses concern about being personally targeted by the executive branch in the course of this investigation, but the design of the criminal justice system sets out checks and balances, including the roles of the grand jury and this Court, two institutions that sit outside of the executive branch. Moreover, the government has provided ample insight into its theory supporting the application of the crime-fraud exception—that the subject communications may reveal a deliberate scheme by the former president to provide the government a false certification that no classified documents remained in the former president or his office's possession—for him to have provided rebuttal evidence to the Court *ex parte*, offering an innocent explanation for the government's indication that "government records were likely concealed and removed from the storage room . . . to obstruct the government's investigation." Gov't's Mot. at 6. No such explanations have been offered and, while, certainly, the burden rests with the government to justify application of the crime-fraud exception, the former president's suggestion that he has *no* "notice of the factual basis for asserting the crime/fraud exception," Resp't's Opp'n at 13—is simply incorrect.

**B.    Attorney-Client Privilege as a Threshold Matter**

In moving to compel the witnesses' testimony and documents, the government avoids the more painstaking approach of arguing which subject communications are not protected at all by the attorney-client privilege by instead arguing that, "[e]ven assuming the testimony and

48

Subject to Protective Order

USA-01288883

documents withheld by Per. 18 and ▮▮▮ otherwise meet the requirements for the attorney-client or work-product privileges," the crime-fraud exception vitiates those privileges regardless. Gov't's Mot. at 1. At the same time, the government urges in a footnote that "much of" Per. 18 testimony does not concern privileged communications at all because the testimony would not reveal communications seeking or providing legal advice. *See id.* at 14 n.4. Though not entirely clear due to the lack of specifics, the government appears to overstate the degree to which Per. 18 testimony falls outside the privilege.

Certainly, not all exchanges between an attorney and his client fall within the protection of the attorney-client privilege—particularly where, as here, the attorney performs both legal and non-legal functions. The attorney-client privilege protects only communications for which "obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication." *Boehringer*, 892 F.3d at 1267 (quoting *Kellogg*, 756 F.3d at 759) (emphasis in original). *Matter of Feldberg* is particularly instructive for defining the contours of the privilege when a lawyer is closely involved in the mechanics of a search in response to a grand jury subpoena. *See* 862 F.2d 622 (7th Cir. 1988). In *Matter of Feldberg*, an attorney played a key role in the search for documents in response to a subpoena, which search yielded a suspiciously incomplete return of the client's files. Judge Easterbrook held that "[t]here is no need for a privilege to cover information exchanged in the course of document searches, which are mostly mechanical yet which entail great risks of dishonest claims of complete compliance. Dropping a cone of silence over the process of searching for documents would do more harm than good." *Id.* at 627. At the same time, when the attorney served both "mechanical and advisory" functions, line-drawing as to privilege protection might not be clear-cut, since "questions about the mechanics (who, how, when, where) of the search" fell outside the privilege, but other questions about the search—such as the substance of the attorney's conversation with the client,

49

USA-01288884

or how the attorney concluded that the files produced were complete, might be protected. *Id.* at 628 (remanding as to the latter questions).

Contrary to the government's cursory assertion, many of the questions that ▆Per. 18▆ declined to answer on the basis of the privilege appear to elicit privileged attorney-client communications of an advisory, rather than mechanical, nature. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆ At the same time, most questions seeking what Judge Easterbrook would call mechanical information about ▆Per. 18▆ task, such as how, when, and where he conducted the search, were properly answered without an invocation of privilege, *see, e.g., id.* at 94:25–95:11; 96:10–100:8.

On the other side of the line, however, rest the government's inquiries as to the identities of the individuals with whom ▆Per. 18▆ spoke to determine the location of potentially responsive documents. *See, e.g., id.* at 58:1–20. This assertion of attorney-client privilege fails because the

50

USA-01288885

fact that Per. 18 sought out the input of certain individuals—without revealing the substance of those interactions—does not reveal "any litigation strategy or other specifics of the representation or any confidential client communications." *United States v. Naegele*, 468 F. Supp. 2d 165, 171 (D.D.C. 2007) (holding that billing statements not privileged for this reason); *United States v. Halliburton Co.*, 74 F. Supp. 3d 183, 190 (D.D.C. 2014) (noting that "the fact of the consultation" between an attorney and client is not privileged). Perhaps Per. 18 invoked the attorney-client privilege in this context because he contacted individuals recommended by his client, and revealing those identities would thus reveal the contents of a client communication— but this justification fails, too. The attorney-client privilege protects only the "*communication* of facts" when those facts are conveyed for the purpose of seeking legal advice, not the "underlying facts" themselves. *Boehringer*, 892 F.3d at 1268; *see also Alexander v. FBI*, 192 F.R.D. 12, 16 (D.D.C. 2000) (Lamberth, J.) (holding no attorney-client privilege where privilege claimant failed to provide factual basis that "questions would 'necessarily' reveal the content of [privileged] communications"). The prosecutor does not over-step on the attorney-client privilege by querying the identities of individuals with whom Per. 18 spoke in his efforts to respond to the May 2022 Subpoena; the prosecutor would only elicit privileged communications if she asked whom the former President told Per. 18 to contact, or what the resultant conversations entailed.[14] In short, whether the crime-fraud exception applies, Per. 18 must answer questions about the identities of the persons with whom he spoke to prepare for responding to the May 2022 Subpoena.

---

[14] The former president further urges that the list of individuals questioned by Per. 18 constitutes opinion work product, even if the attorney-client privilege does not attach. *See* Resp't's Suppl. Mem. at 3–5. As discussed *infra* in Part III.D, Per. 18 opinion work product is not sought by the government, and the scope of testimony and documents properly shielded behind this doctrine is addressed in that part of this Memorandum Opinion.

51

Subject to Protective Order

USA-01288886

## C. Application of the Crime-Fraud Exception

The crime-fraud exception involves a two-pronged inquiry, requiring first that the movant make a prima facie showing that the client committed a crime or fraud, and second, that the attorney-client communications or work product at issue furthered the criminal scheme. A discussion of how the exception's requirements are met here follows review of the nature of the prima facie standard against which the government's evidence is measured.

### 1. *The Prima Facie Standard*

The crime-fraud exception applicable to overcome the attorney-client privilege was first set out by the Supreme Court in *Clark v. United States*, which held that, "[t]o drive the privilege away, there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact." 289 U.S. at 15 (quotation marks omitted). Thereafter, the D.C. Circuit and Supreme Court have both acknowledged the "confusion" arising from the "prima facie" standard for finding the crime-fraud exception. *See, e.g., In re Sealed Case (March 1997),* 107 F.3d at 49 ("What was the nature of [the government's burden to apply the crime-fraud exception]? Here we encounter some confusion."); *Zolin*, 491 U.S. at 564 n.7 (noting, without offering resolution, that the *Clark* Court's concept of a "prima facie" standard had "caused some confusion," because this standard is typically used in civil litigation as merely a burden of production, which when satisfied, shifts the burden of proof to the opposing party— rather than a standard that, as in the crime-fraud exception context, "is used to dispel the privilege altogether"). The prima facie standard is "among the most rubbery of all legal phrases; it usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome." *In re Grand Jury*, 705 F.3d 133, 152 (3d Cir. 2012) (quoting *In re Grand Jury Proceedings*, 417 F.3d 18, 22–23 (1st Cir. 2005)).

52

USA-01288887

Tasked with applying the standard in practice, federal courts have offered a range of interpretations as to the burden the movant must satisfy. The First and Third Circuits have required a "reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." *In re Grand Jury Proceedings*, 417 F.3d at 23; *see also In re Grand Jury*, 705 F.3d at 153 (adopting reasonable basis standard in the Third Circuit). Other courts have described the standard as one of more rigorous probable cause. *See United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *In re Grand Jury Proceedings, G.S., F.S.*, 609 F.3d 909, 913 (8th Cir. 2010). Yet others have conceived of the standard in terms of burden-shifting between the parties, where the movant must "produc[e] evidence that will suffice until contradicted and overcome by other evidence" as to the applicability of the exception. *In re Boeing Co.*, Case No. 21-40190, 2021 WL 3233504, *2 (5th Cir. July 29, 2021); *see also United States v. Boender*, 649 F.3d 650, 655–56 (7th Cir. 2011) (describing that, after the government presents its prima facie case, the defendants may "come forward with an explanation for the evidence," an explanation that the district court then accepts or rejects). The D.C. Circuit, for its part, has rejected the probable cause articulation, instead requiring the government to offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Sealed Case (March 1997)*, 107 F.3d at 49–50 (quotation marks omitted) (criticizing the D.C. Circuit's earlier dicta in *In re Sealed Case (1985)*, 754 F.2d at 399 n.3, indicating that "there was little practical difference" between its stated prima facie standard and the Second Circuit's probable cause standard).

What is clear is that the invocation of the crime-fraud exception is not an invitation for the Court to usurp the role of a petit jury in finding that the government has proven its case beyond a reasonable doubt, nor even the task of a grand jury in finding probable cause to believe that a crime was committed and the person charged committed that crime. As the D.C. Circuit

53

USA-01288888

has written in the context of the application of the crime-fraud exception to materials subject to a

grand jury subpoena, "[t]he point is not to convict anyone of a crime or to anticipate the grand

jury, but only to determine whether the possibility that a privileged relationship has been abused

is sufficient to alter the balance of costs and benefits that supports the privilege." *In re Sealed*

*Case (1982),* 676 F.2d at 814; s*ee also Matter of Feldberg*, 862 F.2d at 626 ("The question here

is not whether the evidence supports a verdict but whether it calls for inquiry.") The Circuit has

acknowledged certain practical realities, including that "[i]n making this determination courts

will not be able to receive a complete adversary presentation of the issues, since one of the

parties will not be privy to the information at issue," and, further, that "[a]ny system that requires

courts to make highly refined judgments—perhaps concerning volumes of documents—will

most likely collapse under its own weight." *In re Sealed Case (1982),* 676 F.2d at 814.

Consequently, "courts do not require proof beyond a reasonable doubt that someone has

committed a crime or fraud." *Id.*

Thus, the government's evidentiary showing in this posture is "not a particularly heavy

one," *In re Grand Jury,* 705 F.3d at 153 (internal quotation marks omitted), and it does not

require the Court to conduct a "minitrial," *In re Sealed Case (1985),* 754 F.2d at 402 n.7.

Indeed, a grand or petit jury, having heard the evidence presented by the government and the

former president on a more fulsome record, assessed the credibility of the witnesses, and

weighed potential defenses asserted, including by any claimant of the privilege, may reasonably

come to a different conclusion than this Court.

### 2. *Prong One: Evidence of Criminal Violations*

The government has satisfied its burden of showing "evidence that if believed by the trier

of fact would establish the elements" of criminal violations. *In re Grand Jury*, 475 F.3d at 1305.

The government contends that the former president "orchestrated a scheme to hide from the

54

Subject to Protective Order

government and the grand jury documents with classification markings that he unlawfully retained," including by knowingly misleading his attorneys—including Per. 18 —and causing those attorneys to provide the government with a false certification in response to a grand jury subpoena. Gov't's *Ex Parte* Mem. at 1; *accord* Gov't's Reply at 8–9. Specifically, the government cites as the criminal statutes the former president may have violated: 18 U.S.C. §§ 793(e) (willful and unauthorized retention of national defense information), 1001(a)(1)–(2) (false statements), 1512(b), 1512(c)(1), and 1519 (obstruction of justice), as well as 18 U.S.C. § 2 (liability for causing crime to be committed). Gov't's *Ex Parte* Mem. at 33; *see generally* Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. The elements of the unauthorized retention statute, followed by the elements of the obstruction statutes, are considered in turn.

      *a)*     *Unauthorized Retention of National Defense Information*

Section 793(e) criminalizes the "unauthorized possession of . . . any document . . . relating to the national defense" when an individual "willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it." 18 U.S.C. § 793(e). As a result, proof of this criminal violation requires evidence that (1) the defendant "lack[ed] authority to possess, access or control (2) information relating to the national defense (3) in either tangible or intangible format, and (4) willfully (5) [undertook] the [] conduct" proscribed by the statute, including failing to deliver the information. *United States v. Aquino*, 555 F.3d 124, 130–31 (3d Cir. 2009); *see also* Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. at 2 (describing the same elements with a slightly different formulation).

The first element—whether the former president "lack[ed] authority to possess, access or control" the documents—is not dispositive, because a prima facie violation of a crime is made out either way: Section 793(d) criminalizes exactly the same conduct where the perpetrator is in lawful possession of the documents. *Compare* 18 U.S.C. 793(d) *with* 793(e); *see also* Gov't's

55

Subject to Protective Order

March 10, 2023 *Ex Parte* Suppl. Mem. at 4, n.3; *United States v. Kiriakou*, 898 F. Supp. 2d 921,

923 n.2 (E.D. Va. 2012) (noting the minor difference that, under Section 793(e), failing to return

the documents is criminalized even when there has been no demand for their return). In any

case, the government has made a sufficient prima facie showing that the former president was

not authorized to retain the documents. The former president would have been authorized to

possess classified information only upon the current administration's waiver of the need-to-know

requirement and only so long as the "information [was] safeguarded in a manner consistent with"

Exec. Order No. 13, 526, but the classified documents were stored in unauthorized and

unsecured locations. Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. at 4 n. 2 (quoting Nov.

2022 Mem. Op. at 30–31); *see also* MAL Warrant Aff. ¶ 61(noting that government counsel sent

Trump's counsel a letter that "reiterated that [Mar-a-Lago] [is] not authorized to store classified

information")..

The government has proffered sufficient evidence that the former president possessed

tangible documents containing national defense information (elements two and three), and

further that he failed to deliver those documents to an officer entitled to receive them (element

five). The former president's Office received a subpoena on May 11, 2022 for all documents

with classification markings in his and his office's possession; in response, they provided the

government—via **Per. 18** and **Per. 12**—only a small fraction of the classified documents in his

possession, as outlined *supra,* in Parts I.C. & E. Two months after the former president yielded

38 unique classified documents to the government on June 3, 2022, the government discovered

over 100 additional classified documents stored in Mar-a-Lago during execution of the August 8,

2022 search warrant that the former president had failed to deliver. The documents were

classified to levels as high as TOP SECRET, with some documents bearing additional sensitive

compartment indications, *see supra* Part I.C; undoubtedly, these documents contained national

56

Subject to Protective Order

defense information. *See United States v. Abu-Jihaad*, 630 F.3d 102, 135 (2d Cir. 2010)

(holding that, because document related to Navy ship movements was classified as

"confidential," there "can be no question that this information related to the national defense");

Gov't's Suppl. *Ex Parte* Mem. at 5 n.4 (representing that "[d]ozens of documents recovered by

the government on August 8" would be "potentially damaging to the United States" if disclosed).

More classified-marked documents still were uncovered in November 2022 in a leased storage

unit, in December 2022 in the Office at Mar-a-Lago, and apparently sometime thereafter in the

former president's own bedroom at Mar-a-Lago.

As to the *mens rea* element of the statute, which requires that the former president

retained the classified documents "willfully," the government has also provided sufficient

evidence to meet its burden. As detailed *supra* in Part I.C.3, the government provided evidence

that the former president knew that Per. 18 limited his search for responsive documents on

June 2, 2022 to Mar-a-Lago's storage room: he met with Per. 18 both before and after the

lawyer's search. The former president also knew that all of the boxes potentially containing

classified information were not located in the storage room at the time of Per. 18 search.

Between May 22, 2022 and June 1, 2022, WITNESS 5 moved over sixty boxes from the storage

room to the former president's suite. *See supra* at Part I.C.2. By June 1, 2022, the boxes in the

suite had grown so numerous that Per. 30 expressed concern to WITNESS 5 that their

plane would not have room for them—to which WITNESS 5 responded that the former president

"told [him] to put them in the room," where he believed "Trump wanted to pick from them,"

rather than bring them on the plane. Gov't's *Ex Parte* Mem., Ex. 11, Texts between WITNESS 5

and Per. 30 (May 30, 2022). The next day, mere hours before Per. 18 arrived to

search the storage room, WITNESS 5 and WITNESS ▮ returned only about 25 to 30 of the boxes

back to the storage room. The timing of this choreography of box movements—which

57

 USA-01288892

WITNESS 5 directly attributed to the former president's orders—is strong evidence that the former president intended to hide boxes from his attorney's search efforts to comply with the grand jury subpoena, and resultantly, unlawfully to retain any classified documents contained inside any of the boxes purposely removed from the attorney search.

Other evidence demonstrates that the former president willfully sought to retain classified documents when he was not authorized to do so, and knew it. First, even before the issuance of the May 11, 2022 subpoena, he deliberately curtailed his staff's efforts to comply with NARA's requests to return missing presidential records. As described *supra* in Part I.B, in the months leading up to January 2022, the former president reviewed only fifteen to seventeen of the boxes retrieved from his storage room before telling his staff, "that's it," and instructing WITNESS ▮ to tell one of the former president's lawyers that no more boxes remained at Mar-a-Lago. The former president knew at the time that he had only reviewed a fraction of the total boxes in the storage room, because his staff had showed him a picture of the floor-to-ceiling stacks numbering over sixty boxes. *See* MAL Warrant Aff. ¶ 46. The former president's misdirection of NARA was apparently a dress rehearsal for his actions in response to the May 11, 2022 subpoena.

Second, the documents submitted by ▮Per. 18▮ for the Court's *in camera* review reveal the former president's desire to conceal classified information in his possession from the government in response to the subpoena—as well as his being advised that doing so was wrongful. *See Zolin,* 491 U.S. at 569–70 (holding that communications considered *in camera* may be used for the purpose of establishing the crime-fraud exception). ▮

▮

▮ "we just don't respond at all or don't

58

Subject to Protective Order

USA-01288893

play ball with them," and asked, "wouldn't it be better if we just told them we don't have

anything here?" *See* P. 18-PRIV-082 at 15–16, 22.[15]

"she didn't get in any trouble." *Id.* at 24.

he recounted that the former president "made a funny motion"

indicating that "if there's anything really bad in there, like, you know, pluck it out."

083 at 6.

Without discussing any criminal statute specifically, the former president contends that

the "mere fact that the [June 3, 2022 Certification] post hoc is claimed by the Government to be

inaccurate" does not suffice for the crime-fraud exception to apply. Resp't's Opp'n at 12. This

Court agrees, but the problem for the former president is that the first inaccurate certification is

not the sole factual basis presented by the government to invoke the exception.

At the March 9th hearing, his counsel urged that the former president's later efforts to

comply with the May 11, 2022 subpoena—including the searches of five different locations,

including Mar-a-Lago, across October through December of 2022, *see supra* Part I.G—

demonstrate the former president's diligent efforts to provide the government "everything they

could ever ask"—even if those efforts were admittedly undertaken "under the shadow of Court

contempt." March 9, 2023 Hr'g Tr. at 60:8–24. He urged that the December 2022 discovery of

---

[15]    A key principle of the crime-fraud exception, as discussed *infra*, is that it does not strip the attorney-client
privilege from consultations in which "a client seeks counsel's advice to determine the legality of conduct before the
client takes any action," *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989). If a client expresses an interest
in an illegal course of conduct, is advised against it by his lawyer, and then decides to take his lawyer's advice, then
the attorney-client relationship has worked exactly as intended and deserves the utmost protection. For this reason,
one of the crime-fraud exception's requirements is that client must have "actually 'carried out the crime or fraud.'"
*In re Sealed Case (2000)*, 223 F.3d at 778 (quoting *In re Sealed Case (March 1997)*, 107 F.3d at 49). The former
president's statements to Per. 18 taken alone may be insufficient to establish the applicability of the crime-fraud
exception—but they are relevant in resolving the discrete question here: whether evidence is sufficient for a prima
facie showing that Trump acted willfully in retaining the classified documents.

59

USA-01288894

four documents with classification markings in the Office's designated space within the Mar-a-Lago compound did not demonstrate the former president's intent to retain the records, emphasizing that the box was in the possession of a young staffer who believed it contained "essentially daily summaries of the President's activities," and who stored it in a closet, apparently of her own accord. *Id.* at 63:16–65:3.

To be sure, the government has not provided direct evidence that the former president deliberately retained, or was even aware of, the particular classified-marked documents located by his counsel at Mar-a-Lago in December 2022. Again, if the uncovering of these four classified-marked documents, even combined with the inaccurate June 3, 3022 Certification, were the only evidence of the former president's retention of classified documents, the government would have failed to make a prima facie showing of willfulness. That is not the limited scope of the factual record before this Court, however. Notably, no excuse is provided as to how the former president could miss the classified-marked documents found in his own bedroom at Mar-a-Lago. Instead, the government has provided evidence to demonstrate that the full arc of the criminal violation had already concluded more than six months before this search of Mar-a-Lago, when the evidence demonstrates that the former president intentionally failed to provide all of the classified documents in his possession to the government with the June 3, 2022 Certification. As the government correctly argues, the former president's later efforts to uncover additional classified documents do not undermine that showing. *See* Gov't's Suppl. *Ex Parte* Mem. at 15.

Accordingly, the Court finds that the government has made a sufficient prima facie showing that the former president violated 18 U.S.C. § 793(e).

> b)    *Obstruction of Grand Jury Investigation*

60

Subject to Protective Order

USA-01288895

The government contends that the former president's conduct in responding to the May

11, 2022 subpoena can be viewed through another lens of criminal liability: obstruction of

justice. By apparently causing ▉Per. 18▉ to provide the government with the June 3, 2022

Certification, the government argues, the former president obstructed a grand jury's ongoing

investigation and made false statements to government officials, in violation of 18 U.S.C. §§

1001(a)(1), 1001(a)(2), 1512(b)(2)(A), 1512(c)(1), and 1519.

First, making deliberate false representations to the government is criminalized under 18

U.S.C. §§ 1001. The first two subsections of the statute prohibit "knowingly and willfully . . .

falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact" or

"mak[ing] any materially false, fictitious, or fraudulent statement or representation" in matters

within the jurisdiction of any branch of the United States government. 18 U.S.C. §§ 1001(a)(1)–

(2). The elements of these criminal violations that the government must satisfy are that: (1) "the

defendant had a duty to disclose material information," *United States v. Craig*, 401 F. Supp. 3d

49, 62–63 (D.D.C. 2019) (quoting *United States v. White Eagle*, 721 F.3d 1108, 1116 (9th Cir.

2013)); (2) the defendant either falsified, concealed, or covered up such a fact by trick, scheme,

or fraud, for § 1001(a)(1), or the defendant made "any . . . false, fictitious, or fraudulent

statement or representation," for § 1001(a)(2); (3) "the falsified, concealed, or covered up fact

was material," *Craig*, 401 F. Supp. 3d at 62–63; (4) "the falsification and/or concealment was

knowing and willful," *id.*; and (5) "the material fact was within the jurisdiction of the Executive

Branch," *id.*

The government has sufficiently demonstrated all four *actus reus* elements of the two

offenses. First, the former president had a duty to disclose his possession of any classified

documents in response to the May 11, 2022 subpoena, which sought "[a]ny and all documents or

writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump

61

 USA-01288896

bearing classification markings." May 2022 Subpoena at 1. The June 3, 2022 Certification, however, represented that, after a "diligent search was conducted of the boxes that were moved from the White House to Florida . . . Any and all responsive documents accompany this certification." June 3, 2022 Certification at 1. In this way, the certification satisfies the second element of both (a)(1) and (a)(2) of the statute by both covering up the fact that the former president continued to retain the documents, and effecting that cover-up in the form of a false statement. *See Craig,* 401 F. Supp. 3d at 63 ("[T]he law is clear that both the making of false statements and the deliberate withholding of material facts in the face of a duty to disclose them can be among the necessary affirmative acts" for the purposes of proving a violation of Section 1001(a)(1).) As to the third and fifth elements, the misrepresented fact was clearly material to the grand jury and FBI's investigation of whether additional classified-marked documents remained unlawfully in the former president's possession. *See* Gov't's *Ex Parte* Suppl. Mem. at 9–10.

As to whether the former president made or aided and abetted the making of the false statements contained in the June 3, 2022 Certification knowingly and willfully, the same reasons that support the Court's finding that his retention of the classified documents was willful support a parallel finding of intent here. In the context of this particular violation, however, the former president might claim that he did not know what **Per. 18** and **Per. 12** wrote in the June 3, 2022 Certification. After all, the certification was signed by **Per. 12** not the former president, and no documentation or testimony to date indicates that the former president was shown or told about the contents of the certification. The extent of the former president's awareness of the substance of the certification is one of the precise topics upon which the government presently seeks **Per. 18** testimony. *See supra* Part I.H. Still, even without proof that the former president read or was advised about the contents of, the certification, the government has sufficiently

62

Subject to Protective Order

USA-01288897

demonstrated that he knew  **Per. 18** intended to inform the government that the responsive documents located in the storage room provided a comprehensive response to the May 2022 Subpoena—a representation that the former president, for the reasons already detailed, knew to be wrong.

The *in camera* submissions bear this conclusion out.

The government has provided evidence to demonstrate that, at the time of that June 2, 2022 conversation, the former president knew that **Per. 18** understanding of the existence of responsive documents was blinkered, and his certification concerning the results of a search limited to the storage room could not possibly be accurate. As a result, the former president's willfulness as to this violation has been adequately demonstrated.

Second, Section 1519 criminalizes altering or destroying records in order to obstruct justice. The statute prohibits "knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of" the United States government. 18 U.S.C. § 1519. This offense has three elements, as relevant here: the defendant (1) knowingly, (2) concealed or covered up a record, document, or tangible object, (3) with the intent to "impede, obstruct or influence [an] investigation." *United States v. Hassler*, 992 F.3d 243, 247 (4th Cir. 2021) (quoting *United*

63

Subject to Protective Order

USA-01288898

*States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012)); *accord* Gov't's March 10, 2023 *Ex Parte*
Suppl. Mem. at 12–13 (articulating a slightly different formulation).

The government has sufficiently demonstrated all three elements of this obstruction
statute by providing evidence that the former president intentionally concealed the existence of
additional documents bearing classification markings from ▆Per. 18▆ knowing that such
deception would result in ▆Per. 18▆ providing an unknowingly false representation to the
government. As a result, the former president's actions were intended to impede the FBI's
investigation of his unlawful retention of classified documents—establishing a prima facie
violation of Section 1519.[16]

### 3. *Prong Two: The "In Furtherance" Requirement*

A prima facie showing of unlawful or fraudulent conduct alone does not strip away the
attorney-client privilege; rather, the government must also establish "some relationship between
the communication at issue and the prima facie violation" for the privilege's protection of the
communications to be pierced. *In re Sealed Case (1985)*, 754 F.2d at 399. This second
requirement "defines the extent to which the privilege is lost once the exception is shown to
apply, because only those individual documents that a court finds to have been prepared in
preparation for, or in furtherance of, fraudulent activity are excepted from the privilege's
protection." PAUL RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 8:14 (2022)
(footnote omitted). For this condition to be satisfied, "the client must have made or received the
otherwise privileged communication with the intent to further an unlawful or fraudulent act," *In
re Sealed Case (March 1997)*, 107 F.3d at 49. *See also Zolin*, 491 U.S. at 556 (noting the
exception only applies to "communications in furtherance of future illegal conduct").

---

[16]     The Court need not address the government's arguments that it has also demonstrated prima facie showings
that the former president violated Sections 1512(b)(2)(A) and (c)(1), given its satisfactory showing as to the other
criminal statutes cited.

64

Subject to Protective Order

The D.C. Circuit has staked two clear guideposts in the proper application of this nexus requirement. At one end, as an upper limit on the movant's burden, the government need not "make a specific showing of the client's intent in consulting the attorney," *In re Sealed Case (1985)*, 754 F.2d at 402; nor a "specific showing of . . . the attorney's intent in performing his or her duties," *In re Sealed Case (1982),* 676 F.2d at 815. Any stiffer burden would "lead to either the kind of 'minitrial' forbidden by the Supreme Court in *United States v. Dionisio*, 410 U.S. 1 (1973), or a near evisceration of the exception." *In re Sealed Case (1985)*, 754 F.2d at 402 n.7. At the other end, the D.C. Circuit has repeatedly affirmed that merely "[s]howing temporal proximity between the communication and a crime is not enough." *In re Sealed Case (March 1997)*, 107 F.3d at 50; *accord In re Sealed Case (1985)*, 754 F.2d at 402 ("mere coincidence in time" not sufficient to link crime and communications).

In addition, the crime-fraud exception pierces the attorney-client privilege even when the attorney is an unknowing tool of his client. The attorney need not have the intent of furthering the misconduct; rather, "[t]he privilege is the client's, and it is the client's fraudulent or criminal intent that matters." *In re Sealed Case (March 1997),* 107 F.3d at 49. In *In re Sealed Case (1985)*, for example, a tax-exempt non-profit destroyed and altered evidence sought by subpoenas and civil discovery requests, and through its lawyers, filed false declarations and presented perjured testimony and altered documents in civil litigation. *See* 754 F.2d at 396–98. In holding that the crime-fraud exception applied to require two of the organization's lawyers to testify before a grand jury about the destruction and alteration of evidence, the D.C. Circuit held that the lawyers' "knowledge of the cover-up . . . need not be established in order for the government to sustain its burden," because the law is "well settled that an attorney's ignorance of his client's misconduct will not shelter that client from the consequences of his own wrongdoing." *Id.* at 402. The key is that the lawyers were "instrumentalities in the ongoing

65

 USA-01288900

cover-up whether they realized it or not," and thus, the privilege was defeated as to communications regarding criminal violations that occurred while the lawyers represented the organization. *Id.* at 402–403.

The nexus requirement operates differently in the context of the work-product doctrine in two key ways. First, the D.C. Circuit has articulated a looser standard for work product, requiring that a court only "find some valid relationship between the work product under subpoena and the prima facie violation," emphasizing that "the standard [need] not be too precise or rigorous." *In re Sealed Case (1982)*, 676 F.2d at 814–15. Courts focus on the "client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication." *In re Sealed Case (2000)*, 223 F.3d at 778. Second, as Per. 18 correctly argues, the work-product doctrine, unlike the attorney-client privilege, is held—and may be independently invoked—by both the client and the attorney. Per. 18 Opp'n at 2, 8–11.

Here, the government does not seek attorney opinion work product, *see* Gov't's Resp. at 1–2, ECF No. 9, and thus the focus is on fact work product.[17] Several courts of appeals have held that while an innocent attorney may independently stand on the work-product doctrine as to his opinion work product, "fact work product . . . may be discovered upon prima facie evidence of a crime or fraud as to the client only and thus even when the attorney is unaware of the crime or fraud." *In re Grand Jury Proceedings #5*, 401 F.3d 252, 252 (4th Cir. 2005). *See also In re Green Grand Jury Proceedings*, 492 F.3d 976, 981 (8th Cir. 2007); *In re Grand Jury*

---

[17]    Nor does the government appear to dispute that the work-product doctrine applies as a threshold matter in this context, even though litigation was not pending at the time of the materials and topics subject to the government's motion. The Court assumes for the purposes of this decision that, in the wake of the receipt of the May 2022 Subpoena, Per. 18 work product was created "in anticipation" of litigation, *Deloitte*, 610 F.3d at 135. *See In re Sealed Case*, 29 F.3d 715, 718 (D.C. Cir. 1994) (holding that attorney work product may be created with an eye toward litigation even before a grand jury investigation has begun, such as in the context of an attorney investigating suspected criminal violations). This conclusion is supported by Per. 18 reference to potential "motion[s] pertaining to this investigation" in his May 25, 2022 letter to a Department of Justice official regarding the May 2022 Subpoena. *See* MAL Warrant Aff., Ex. 1, Letter from                    Per. 18                    , to Jay Bratt, DOJ (May 25, 2022) at 3.

66

Subject to Protective Order

USA-01288901

*Proceedings*, 867 F.2d 539, 541 (9th Cir. 1989); *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 52 (7th Cir. 1980)). As a result, whether claimed by the former president, ▓Per. 18▓ or ▓▓▓ the fact work-product sought by the government may be disclosed upon the proper showing of relatedness.

With the contours of the nexus requirement established, ▓Per. 18▓ and ▓▓▓ withheld testimony, followed by their withheld documents, are each evaluated.

*a)*  ▓Per. 18▓  *Withheld Testimony*

As described *supra* in Part I.H, ▓Per. 18▓ withheld testimony from the grand jury regarding five topics related to his efforts to respond to the May 11, 2022 subpoena and his creation of the June 3, 2022 certification, as well as a sixth topic regarding ▓Per. 18▓ June 24, 2022 phone call with Trump. The government has made a sufficient showing that his testimony as to all six of these topics reflects communications "made in furtherance of a crime." *In re Grand Jury*, 475 F.3d at 1305. Consequently, so long as the government tailors its questions to elicit only testimony regarding fact work product and communications that would otherwise be attorney-client privileged, the crime-fraud exception vitiates ▓Per. 18▓ claims.

The former president contends that ▓Per. 18▓ actions were "undertaken in an effort to appropriately respond to the Government's subpoena," Resp't's Suppl. Mem. at 7, ECF No. 12, and where an attorney's advice is "'intended to prevent unlawful conduct' . . . even inaccurate or wavering advice does not constitute a communication rendered in furtherance of a crime or fraud," *id.* (quoting *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989)). Trump leans heavily on *United States v. White,* a bribery case in which the D.C. Circuit reversed a criminal conviction because key evidence presented at trial was protected by the attorney-client privilege. There, a former government official defendant Lester Finotti introduced evidence that, during a meeting with a co-defendant William White—one of the businessmen accused of bribing him—

67

USA-01288902

and White's lawyer, the lawyer had told Finotti that the scheme would be legal with Finotti's superiors' approval. 887 F.2d at 269. The government introduced evidence that, later that day, the same lawyer privately told White the opposite: that the arrangement was illegal regardless. *Id.* The district court had ruled pretrial that the crime-fraud exception was inapplicable to the afternoon conversation, but at trial reversed course, citing the exception as a basis for permitting the government to introduce testimony regarding the afternoon conversation. *Id.* at 271–72. On appeal, the D.C. Circuit rejected the application of the crime-fraud exception to the afternoon conversation, writing that the district court's "second thoughts on the crime-fraud exception would deny White the privilege where even its stern critics acknowledge that the justifications for the shield are strongest—where a client seeks counsel's advice to determine the legality of conduct *before* the client takes any action." *Id.* at 272 (emphasis in original).[18]

*White* does not bear the weight that the former president attempts to assign it. As the district court's decision makes clear, the lawyer's involvement in the scheme was limited to "what essentially amounts to a single conversation or consultation . . . [that] began . . . with White and others before lunch, and [that] went on immediately after lunch . . . with White alone." *United States v. Finotti*, 701 F. Supp. 830, 834 (D.D.C. 1988). *White* illustrates the

---

[18] The D.C. Circuit was plainly troubled by the procedural history in the case, where the district court had a change of heart mid-trial as to the crime-fraud exception's applicability to the afternoon attorney-client consultation. Before trial, the trial Judge granted a motion *in limine* by White and a fellow corporate executive co-defendant that sought to exclude consultations with the lawyer as protected by the attorney-client privilege. *See United States v. Finotti*, 701 F. Supp. 830, 832 (D.D.C. 1988). The morning consultation, however, was not privileged due to the presence of third parties, and Finotti was permitted to elicit testimony at trial regarding that exchange. In response, the government sought to elicit testimony regarding the afternoon consultation, prompting the two corporate executive co-defendants to seek exclusion of that evidence in reliance on the pretrial ruling. The Judge denied their motion on the basis of waiver, though no such waiver occurred, and by holding that the "door was opened," *id.* at 833, which was door-opening was done by Finotti, not the privilege-holder defendants, and, thirdly, noted that "if there were no other way to prevent the unjust result of permitting the defendants to place before the jury legal advice that was retracted within an hour or two . . . the Court would be prepared to reexamine its [pre-trial] ruling" and hold that the afternoon consultation was "in furtherance of the criminal enterprise." *Id.* at 836. The D.C. Circuit's discomfort with the ends-justified flip by the district court permeates the D.C. Circuit opinion. *See White*, 887 F.2d 267 at 269 (noting the trial court's "readiness to overturn an earlier ruling"); *id.* at 271 (holding that the lawyer's advice did not further the crime, "in line with the district court's initial ruling"); *id.* at 272 (describing the district court's "second thoughts on the crime-fraud exception").

68

USA-01288903

principle that, where an attorney's advice vis-à-vis a proposed criminal scheme is the type a Magic 8 Ball might provide (*e.g.,* "yes," "no," "try again"), the crime-fraud exception does not apply. As the Third Circuit has explained, if a client who intends to undertake an illegal course of action "tells the attorney the proposed course of action, and the attorney advises that the course of action is illegal," the consultation remains privileged; so too when the same client shops out the idea to another attorney, who says the course of conduct is legal. *In re Grand Jury Subpoena,* 745 F.3d 681, 693 (3d Cir. 2014). In both cases, "because the attorneys merely opined on the lawfulness of a particular course of conduct, [] this advice cannot be used 'in furtherance' of the crime." *Id.*

An attorney's services further his client's crime, however, where the attorney does something more, such that "the lawyer's advice or other services were misused." *In re Grand Jury Investigation,* 445 F.3d at 279. Courts have found this requirement satisfied where an attorney elaborated upon his advice by "provid[ing] information about the types of conduct that violate the law" such that the client could "shape the contours of conduct intended to escape the reaches of the law." *In re Grand Jury Subpoena,* 745 F.3d at 693. Also sufficient was an attorney's communications with his client informing her of the government's interest in certain emails, which advice she used to delete (or acquiesce in the deletion of) them. *See In re Grand Jury Investigation,* 445 F.3d at 279. Other courts, including the D.C. Circuit, have been satisfied where a client "took advantage of his attorney's expertise in aid of his endeavor to mislead others with a false cover-story regarding his conduct." *In re Green Grand Jury Proceedings,* 492 F.3d at 986; *see also In re Sealed Case (1985),* 754 F.2d at 402; *see also In re Grand Jury Investigation,* Case No. 17-mc-2336 (BAH), 2017 WL 4898143, \*7–10 (D.D.C. Oct. 2, 2017) (applying the crime-fraud exception where an attorney submitted false Foreign Agent

69

Subject to Protective Order

USA-01288904

Registration Act filings on behalf of her clients, based on the clients' material omissions and misleading information).

Per. 18 "legal advice or other services" in his efforts to comply with the May 11, 2022 subpoena, unlike the lawyer's advice in *White*, "were misused" by the former president omitting to alert Per. 18 that the Mar-a-Lago storage room was not the only repository with boxes transferred from the White House. *In re Grand Jury Investigation*, 445 F.3d at 279. The government has proffered sufficient evidence to show that the former president—much like the non-profit organization in *In re Sealed Case (1985)*—used Per. 18 as an "instrumentalit[y]" or a "front m[a]n" to obstruct the government's investigation and perpetuate the former president's unlawful retention of any classified documents contained in boxes transferred from the White House that he knew had been removed from the storage room at the time of Per. 18 search. 754 F.2d at 402.

As described *supra* in Part I.C.2–5, Per. 18 and Per. 12 provided the government with a response to the May 11, 2022 subpoena that turned out to be wholly inaccurate. Contrary to the June 3, 2022 Certification's attestations, Per. 18 had not searched all of the boxes moved to Florida from the White House—instead, many had been surreptitiously removed from the storage room before his arrival—

paled in comparison to the over 100 documents responsive to the subpoena that the government ultimately located as the result of executing a search warrant on Mar-a-Lago two months later. *See supra* Part I.E. The government has not demonstrated that Per. 18 was aware his search was incomplete, but it has shown that his legal services to his client between May 11, 2022 and the provision of the June 3, 2022 Certification—

—may have directly

70

Subject to Protective Order

USA-01288905

furthered his client's criminal conduct. Thus, to the extent that the first five topics of testimony

sought by the government reveal attorney-client privileged communications, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—

all actions that, unknowingly or not, furthered his client's criminal actions. To the extent this

withheld testimony reveals any fact work-product—such as information Per. 18 collected as to

the potential locations of responsive documents, *see, e.g.,* Per. 18 GJ Tr. 58:21–23

(withholding testimony on this issue)—the even lower standard of "some valid relationship

between the work product under subpoena and the prima facie violation," *In re Sealed Case

(1982)*, 676 F.2d at 814–15, is satisfied.

The sixth topic—the substance of Per. 18 phone call with the former president on

June 24, 2022—stands alone as occurring outside the period of Per. 18 efforts to respond to

the May 11, 2022 subpoena and at a time that Per. 18 was likely considering a response to a

different subpoena, issued on June 24, 2022 for security camera footage from within Mar-a-

Lago. The government contends that this conversation furthered a different stage of the former

President's ongoing scheme to foil the government's attempts to retrieve all classified-marked

documents responsive to the subpoena. During an *ex parte* portion of the March 9, 2023 hearing,

the government explained its view of the linkage between the June 24, 2022 phone call and

ongoing criminal violations as follows.

As recounted *supra* in Part I.D, shortly after Per. 18 phone call with the former

president, and on the same day as service of the government's subpoena for Mar-a-Lago security

footage from the area around the storage room, WITNESS 5 rearranged his travel to fly to West

Palm Beach the following day, falsely telling his colleagues that the change in plans was for

personal reasons. Within two hours of landing in Florida, WITNESS 5 and WITNESS ▮ entered

71

Subject to Protective Order

USA-01288906

the storage room, and WITNESS ▊ can be seen gesturing toward the camera. March 9, 2023

Hr'g Tr. at 44:4–12. The government urged that this scramble to Mar-a-Lago in the wake of the

June 24, 2022 phone call reflects the former president's realization that the removal of the boxes

from the storage room before `Per. 18` search was captured on camera—and his attempts to

ensure that any subsequent movement of the boxes back to the storage room could occur off-

camera. *Id.* at 44:13–45:2. This theory draws support from the curious absence of any video

footage showing the return of the remaining boxes to the storage room, which necessarily

occurred at some point between June 3, 2022—when the room had approximately ▊▊▊

boxes, according to FBI agents and `Per. 18`—and the execution of the search warrant on

August 8, 2022—when agents counted 73 boxes. *Id.* at 44:8–22 (Government counsel: "We

have the footage from the relevant time period. And at least on those cameras—and we have

requested additional footage—we never see the boxes or the documents being returned to the

storage room." (*ex parte*)); Gov't's *Ex Parte* Mem. at 19 n.14 ("The security footage reviewed

by the government to date does not depict movement of boxes into the storage room between

June 3 and August 8.").

The government has provided sufficient evidence to demonstrate that the June 24, 2022

phone call may have furthered the former president's efforts to obstruct the government's

investigation. The Third Circuit's *In re Grand Jury Investigation* case, 445 F.3d at 278–280, is

directly on point. There, the attorney informed his client about the contents of a new government

subpoena—information which the client then used to delete, or acquiesce in the deletion of,

responsive emails. *Id.* ▊▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊▊▊▊, setting into motion WITNESS 5's

72

Subject to Protective Order

USA-01288907

frenzied return to Mar-a-Lago.[19] █████████████████████████████████████████

█████ Per. 18 █ provided information to the former President that he could misuse to "shape the contours of conduct intended to escape the reaches of the law," *In re Grand Jury Subpoena*, 745 F.3d at 693—specifically, as the government urges, by likely instructing his agents to avoid the surveillance cameras he then understood to have been deputized by the government. Indeed, just four days before his trip to Mar-a-Lago, WITNESS 5 had testified before a grand jury that he was aware of the use of security cameras there, but he did not "know exactly where they're all at." WITNESS 5 GJ Tr. at 42–43. As a result, the government has sufficiently demonstrated that the final topic reflects communications that furthered the criminal scheme.

*b)*    Per. 18   *Withheld Documents*

As described *supra* in Part I.J, Per. 18 has submitted for the Court's *in camera* review the 104 documents that he determined to be responsive to the grand jury subpoena but withheld on the basis of attorney-client privilege or the work-product doctrine.[20] Having reviewed these

---

[19]    More than mere "temporal proximity between the communication and a crime" has been demonstrated here. *In re Sealed Case (March 1997)*, 107 F.3d at 50. ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████.   *See also Zolin,* 491 U.S. at 569–70 (holding that communications considered *in camera* may be used for the purpose of establishing the crime-fraud exception).

[20]    Five different privilege logs prepared by Per. 18 have been submitted in the record and clarification is in order as to the privilege log used by the Court in making the determinations described in the text. First, the government provided to the Court, as Exhibit 16 of the *ex parte* supplement to its motion to compel, what it described as the privilege log provided by Per. 18 to the government in response to the subpoena. *See* Gov't's *Ex Parte* Mem., Ex. 16, Privilege Log, ECF No. 2. Later, in a March 6, 2023 supplemental filing, the government clarified that its earlier submission actually reflected a privilege log Per. 18 provided the government on January 6, 2023—which contained a mistake corrected by Per. 18 in a new privilege log on January 11, 2023—and submitted the correct, January 11, 2023 privilege log. Gov't's *Ex Parte* Suppl. Resp., ECF No. 10. Third, in opposition to the government's motion, Per. 18 attached a "Revised Privilege Log" listing approximately 52 documents, winnowing down the January 11, 2023 privilege log to list only documents Per. 18 counsel understood to be responsive to the six topics of withheld testimony described in the government's motion. *See* Per. 18 Opp'n at 4–5; Per. 18 Opp'n, Ex. A, Revised Privilege Log, ECF No. 5-1. This "Revised Privilege Log" also reflected withdrawn assertions of attorney work product doctrine as to four documents. In response to this Court's March 4, 2023 Minute Order, Per. 18 submitted a fourth privilege log, the "Second Revised Privilege Log," identifying whether each withheld document on the "Revised Privilege Log" contained fact or opinion work product, and whether any opinion work product was severable. Per. 18 Resp., Ex. A, Second Revised Privilege Log, ECF No. 8-1. Then, the government, in response to this Court's order, clarified that it sought "all withheld documents that satisfy the crime-fraud exception, *i.e.,* all documents listed in Per. 18 privilege log from January

73

USA-01288908

documents, and in light of the Court's findings *supra* in Part III.C.2 regarding the nature of the former president's prima facie criminal violations, and the sufficiency of the evidence showing the former president's misuse of [Per. 18] legal services to perpetrate those violations, the Court is satisfied that eighty-eight of the documents withheld by [Per. 18] were sufficiently "in furtherance" of the former president's criminal scheme that any attorney-client privilege or fact work-product is vitiated by the crime-fraud exception.

> i. *Communications and Work Product in Furtherance of May 2022*
> *Subpoena Compliance*

Of the 104 records withheld, 81 clearly concern [Per. 18] representation of the former president in connection with the May 2022 Subpoena. *See generally* [Per. 18] *Ex Parte* Suppl. Resp. to Court's March 11, 2023 Min. Order, Ex. B, Third Revised Privilege Log ("[Per. 18] Privilege Log"), ECF No. 16-2.[21] Any attorney-client privilege or fact work-product protection that would shield these documents from production is vitiated by the crime-fraud exception.

These documents cover the lifespan of [Per. 18] work in response to the May 2022 Subpoena, including correspondence, handwritten notes, invoices reflecting his work on the matter, and transcriptions of his audio recordings.

---

11, 2023—except for those documents or portions of documents that contain opinion work product—that reflect communications and consultations intended to further or facilitate the prima facie violations identified in the government's motion." Gov't's Resp. at 2–3. Given the coterminous subject matter of the subpoena document request and the six topics of [Per. 18] withheld testimony and records, the Court ordered [Per. 18] to provide *all* withheld documents on his January 11, 2023 privilege log for *in camera* review, Min. Order (March 9, 2023), and a privilege log for each of those documents with the same information reflected on the Second Revised Privilege Log, Min. Order (March 11, 2023). [Per. 18] then filed a fifth log, titled "Third Revised Privilege Log," providing the same information as to all 104 documents, and further, identifying each document on the privilege log by the file names with which they were submitted to the Court. [Per. 18] March 12, 2023 *Ex Parte* Suppl. Mem., Ex. B, Third Revised Privilege Log, ECF No. 16-2. The upshot of this tortured process is simple: the operative privilege log is the fifth, final one.

[21]     These documents are identified by their file names—given that they were submitted without Bates stamps or other identifying markings on the face of the documents—as the following: [P. 18]-PRIV-002 to –7; [P. 18]-PRIV-009 to –17; [P. 18]-PRIV-021 to -27; [P. 18]-PRIV-031 to –36; [P. 18]-PRIV-039; [P. 18]-PRIV-043 to –70; [P. 18]-PRIV-079 to –89; [P. 18]-PRIV-091 to -99; and [P. 18]-PRIV-0101 to –104.

74



. After

the May 23, 2022 meeting, Per. 18 recorded audio notes, the transcription of which is included

in this tranche as well, *see* P. 18-PRIV-082. Other documents reflect Per. 18 draft and actual

correspondence with Department of Justice officials regarding compliance with the subpoena.

*See, e.g.,* P. 18-PRIV-023 to –25 (

Finally, Per. 18 recorded another set of audio notes

describing his work on the May 2022 subpoena response from June 1 through June 3, 2022, the

transcription of which is included in the documents as P. 18-PRIV-083.[22]

The government has adequately demonstrated that all 81 of these documents were "in

furtherance of future illegal conduct," *Zolin*, 491 U.S. at 556, because they reflect Per. 18

services on behalf of the former president to respond to the May 2022 Subpoena—the very work

that the government has shown that the former president appears to have subverted in service of

his own criminal scheme. The scope of the crime-fraud exception's reach in *In re Sealed Case*

*(1985)* is instructive: there, the D.C. Circuit affirmed the lower court's order requiring the "front

men" attorneys to answer "any questions which the grand jury may ask in connection with the

---

[22]    The document is titled "May 24, 2022 Attorney Notes of Per. 18 ," but this appears to be an
attorney error, as P. 18-PRIV-082 is titled the same. The contents of this document recount Per. 18 activities
during June 1 through June 3, 2022, and Per. 18 describes these events as taking place                giving rise to
the inference that the recording was made sometime during the week of June 6, 2022.

75

Subject to Protective Order                USA-01288910

alleged violations," which the D.C. Circuit interpreted to refer only to violations occurring at the time that the attorneys represented (and were misused by) the organization. 754 F.2d at 402–03. In order to distinguish between testimony regarding "prior acts or confessions beyond the scope of the continuing fraud," which remained privileged, and "prior acts forming the basis of the ongoing cover-up," the D.C. Circuit further held that a "question-by-question determination" was required. *Id.* at 403. Here, too, the crime-fraud exception properly pierces any privilege that would otherwise protect all documents arising from ▮Per. 18▮ work on behalf of the former president and his Office in response to the May 2022 Subpoena—a determination that this Court has made upon review of each of these documents.

▮Per. 18▮ Privilege Log at 30, but the Court is unable to discern any connection between this out-of-context screenshot and ▮Per. 18▮ efforts to comply with the May 2022 Subpoena. Rather, as the privilege log indicates, this exchange occurred over a month after ▮Per. 18▮ provided the government with the June 3, 2022 Certification. As a result, the Court can discern no basis to pierce the attorney-client privilege or fact work product claims protecting this communication.

        *ii.*    *Communications and Work Product Related to June 24 Subpoena*

Twenty-two of the withheld documents reflect ▮Per. 18▮ communications or work product related to the June 2022 Subpoena seeking video footage from Mar-a-Lago.[23] In contrast to the subverted nature of the attorney-client relationship in ▮Per. 18▮ representation of

---

[23]    These documents are identified in their file names—though they were submitted without Bates stamps or other identifying markings on the face of the documents—as the following: ▮P. 18▮-PRIV-001; ▮P. 18▮-PRIV-008; ▮P. 18▮-PRIV-018 to -20; ▮P. 18▮-PRIV-028 to -30; ▮P. 18▮-PRIV-037 to -38; ▮P. 18▮-PRIV-040 to -42; ▮P. 18▮-PRIV-071 to -78; and ▮P. 18▮-PRIV-090.

76

Subject to Protective Order

USA-01288911

the former president in connection with the May 2022 Subpoena—where the government has

demonstrated the former president used ██Per. 18██ as an unknowing instrumentality of his

apparent criminal scheme—the case for the former president's misuse of ██Per. 18██ work in

response to the June 2022 Subpoena is far narrower, mainly turning on a single phone call. As a

result, ██Per. 18██ communications concerning the June 2022 Subpoena only furthered the

former president's criminal violations to the extent that they informed ██Per. 18██ conversation

with the former president on June 24, 2022.

Resultantly, the crime-fraud exception only pierces any attorney-client privilege and fact

work product protection over a small fraction of this category of documents. The six documents

labeled as ██P. 18██-PRIV-028, -29, -37, -38, -41, and -42 comprise six emails in the same chain. █

████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ These seven documents (comprising the emails and the attachment)

informed ██Per. 18██ preparations for his phone call with the former president that the

government has sufficiently demonstrated provided his client with information furthering the

former president's ongoing scheme to misrepresent full compliance with the May 2022

Subpoena, and thus, lose protection due to the application of the crime-fraud exception. The

remaining fifteen documents in this tranche may be withheld as not in furtherance of the criminal

scheme for which a prima facie showing has been made.

        *c)*    ████  *Intent to Withhold Testimony and Document*

77

USA-01288912

The findings that vitiate the former president's asserted privilege over ▮Per. 18▮ testimony apply with equal force to ▮▮▮ whose role in the efforts to comply with the May 2022 Subpoena was more circumscribed. Consequently, she may not stand on the attorney-client privilege to withhold testimony regarding the five topics related to the May 2022 Subpoena. [24] There is no indication on the record, however, that ▮▮▮ had any connection to the sixth topic, concerning ▮Per. 18▮ June 24, 2022 phone call with the former president, *see* Gov't's *Ex Parte* Mem. at 25, n. 16 (indicating the government only has reason to believe that ▮▮▮ can testify as to the first two topics for which testimony is sought, based on her attendance at the May 23, 2022 meeting). Thus, what privileged communications, exactly, the government seeks to pierce—and whether those communications furthered the apparent criminal scheme—are unclear.

Also too underdeveloped by the government is the single document withheld by ▮▮▮ The government has not indicated on the record to what topic the withheld document pertains, nor even provided to the Court the subpoena issued to ▮▮▮ to clarify the scope of the documents responsive to the subpoena. The crime-fraud exception cannot be wielded in the dark, and here, the record supplied by the government is an insufficient basis for the Court to make a *Zolin* finding as to this mystery document. Accordingly, although the former president's privilege claims cannot shield ▮▮▮ testimony on the five topics related to efforts to comply

---

[24]     The former president's contention that the government's motion to compel is not ripe as to ▮▮▮ is unpersuasive. Resp't's Opp'n at 5. ▮▮▮ has declared her intent to withhold testimony on the basis of the former president's attorney-client and work-product privileges and to withhold a responsive document. Gov't's Reply at 6. The former president's assertion that the Court would be compelling a witness to respond to "hypothetical questions" is a mischaracterization, Resp't's Opp'n at 5, given that the topics about which ▮▮▮ is compelled to testify are clearly set out, and the Court has made "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976) (cited in Resp't's Opp'n at 5). The cases cited in support of the former president's argument concern the privilege against self-incrimination, which is not relevant here.

78

Subject to Protective Order

USA-01288913

with the May 2022 Subpoena, the government failed it discharge its burden to overcome any privilege protecting the final topic of testimony and withheld document.[25]

### D.   The Appropriate Scope of ▮Per. 18▮ Withheld Opinion Work Product

Having determined the legitimate metes and bounds of the crime-fraud exception's application to the attorneys' withheld testimony and documents, a final question arises: the validity of ▮Per. 18▮ claims in defense of his own opinion work-product—materials ▮Per. 18▮ prepared reflecting his own "mental impressions, conclusions, opinions, or legal theories . . . concerning the litigation," *Deloitte*, 610 F.3d at 135. The government does not seek ▮Per. 18▮ opinion work product, *see* Gov't's Resp. at 2; as a result, the question here is not whether the attorney's opinion work product claims may be pierced by the crime-fraud exception, but rather, whether the doctrine is properly invoked at the outset.

The opinion work product doctrine emerged to create a zone of privacy in which attorneys could strategize for litigation. The work product doctrine's originating case, *Hickman v. Taylor*, 329 U.S. 495 (1947), did not distinguish fact from opinion work product, but its emphasis on the need for an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference" laid the groundwork. *Id.* at 511. The Supreme Court in *Hickman*, and later, in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), evinced particular protectiveness over oral statements by witnesses memorialized in an attorney's notes, writing that such documents "tend[] to reveal the attorney's mental processes," *id.* at 399, such as "what he saw fit to write down," *id.* (quoting *Hickman*, 329 U.S. at 513). As the D.C. Circuit has written, the key

---

[25]     A small number of the documents withheld by ▮Per. 18▮ and reviewed by the Court *in camera* are communications involving ▮▮ If the mystery document withheld by ▮▮ is merely a duplicate of any of these documents, for which the Court has already ruled that the crime-fraud exception applies to vitiate the former president's privilege claims, then that finding applies.

Subject to Protective Order                                                                  USA-01288914

distinction between opinion and fact work product—including in the context of an attorney's written recollections of witness interviews—is whether "the lawyer has [] sharply focused or weeded the materials." *In re Sealed Case (Aug. 1997),* 124 F.3d at 237 (holding that portions of a lawyer's notes from a meeting with his client "could be classified as opinion only on a virtually omnivorous view of the term"). *See also Clemens*, 793 F. Supp. 2d at 244–53 (exhaustively mapping the boundaries between fact and opinion work product).

This Part first evaluates the former president's claim that the identities of the individuals ▮Per. 18▮ contacted regarding the potential whereabouts of responsive documents fall within this protected category, then proceeds to ▮Per. 18▮ document-by-document redactions on the basis of his own invocation of opinion work-product.

**1.** ▮Per. 18▮ *Withheld Testimony on Pre-Search Contacts*

During his grand jury appearance, ▮Per. 18▮ repeatedly declined to reveal the identities of the individuals with whom he spoke to determine the location of potentially responsive documents, citing attorney-client privilege and the work-product doctrine. ▮Per. 18▮ GJ Tr. at 58:1–20; 134:2–8. Having determined, *supra,* in Part III.B, that the attorney-client privilege does not shield ▮Per. 18▮ testimony in response to this question, the Court further holds that this testimony does not reveal opinion work product.

The former president urges adoption of the reasoning in the forfeiture action *United States v. All Assets Held at Bank Julius Baer & Co.,* where the government's request was denied for an interrogatory answer from a claimant to disclose the identities of the individuals the claimant interviewed, holding the answer was shielded by the work product doctrine. 270 F. Supp. 3d 220, 222–26 (D.D.C. 2017). *See* Resp't's Suppl. Mem. at 3–5. The former president described ▮Per. 18▮ as "adopt[ing] a legal strategy by undertaking a diligent search for responsive documents," which "guided his decision to consult with certain individuals regarding

80

Subject to Protective Order

USA-01288915

the search [for] potentially responsive documents." *Id.* at 5. In so arguing, the former president

seeks to distinguish *Savignac v. Jones Day*, which reached the opposite conclusion in the context

of a defendant seeking the identities of the individuals consulted by plaintiff in anticipation of

the civil litigation. 586 F. Supp. 3d 16, 17–22 (D.D.C. 2022).

The former president has it backwards. In *All Assets Held at Bank Julius Baer,* the

government's request sought "to narrow a list of several hundred individuals that Claimant has

identified as knowledgeable about the facts of this case by identifying for Plaintiff those

individuals that Claimant's counsel determined were worth interviewing." 270 F. Supp. 3d at

225. There, government's sole justification was to "cull[] down the voluminous number of

witnesses" identified by the parties—an attempt to discern which witnesses its adversary had

deemed "most important, or problematic" to use as a "valuable filter." *Id.* at 225. Clearly, this is

not the reason for the government's queries in the instant matter, which are motivated by the

government's need to discern █████████████████████████████████████

█████████████████████ Unlike in *All Assets Held at Bank Julius Baer,* the identities of the

individuals Per. 18 contacted would not reveal whom Per. 18 deemed more or less important

or problematic for his legal strategy; for all the government knows, many of the individuals he

contacted may have provided no useful information. Nor would the list serve the purpose of

giving the government a chance to leapfrog off its adversary's work. Rather than serving the

improper purpose of helping the government "cull" potential witnesses, the information sought is

directly relevant to a key issue in the pending investigation—whether Per. 18 was intentionally

misled by the former president into believing only the storage room contained potentially

responsive documents. *Accord Savignac*, 586 F. Supp. 3d at 20 (holding that list of contacted

individuals was not work product where the list would neither "reveal anything about

[plaintiffs'] strategy for the case," nor "borrow the benefit of Plaintiffs' trial preparation to save

81

                                                    USA-01288916

Defendants from engaging in the litigation-related leg work that Plaintiffs have previously

devoted to their cause"); *Alexander*, 192 F.R.D. at 18–19 ("[C]ertain information, such as

whether investigators have talked to certain individuals in the course of their investigations, is

not protected by the attorney work-product doctrine").

Thus, ▮▮Per. 18▮▮ has no valid basis to withhold testimony in response to the government's

queries as to the identities of the individuals with whom he spoke to discern the location of

potentially responsive documents.

### 2. *Documents Withheld on Basis of Opinion Work Product*

In Part III.C.3.b., the Court determined that the crime-fraud exception vitiated any

attorney-client privilege or fact work-product claims protecting 88 of ▮▮Per. 18▮▮ withheld

documents from disclosure. ▮▮Per. 18▮▮ has one final card to play, however, because the

government concedes that it does not seek the lawyer's independent opinion work product. Of

these 88 documents, ▮▮Per. 18▮▮ peels off 18 more that consist entirely of his opinion work

product, which may be withheld. A further twelve documents contain severable opinion work

product and must be disclosed with redactions.

Most of ▮▮Per. 18▮▮ claims that the documents contain opinion work product are valid,

but the Court disagrees with several of his proposed redactions—minor instances of overreach

that can largely be attributed to ▮▮Per. 18▮▮ attempt to shield statements that fail to reveal any

substantive opinions or legal theories related to his legal services. The proposed redactions

within the documents titled ▮P. 18▮-PRIV-012, ▮P. 18▮-PRIV-047, and ▮P. 18▮-PRIV-059—all emails

in the same chain between ▮▮Per. 18▮▮ and an associate at his law firm—illustrate.

The most generous interpretation of ▮▮Per. 18▮▮ attempt to withhold this

82

USA-01288917

sentence is that the sentence reveals that ███████████████████████████████

███████████████████████████████. Opinion work product does not protect "an attorney's

mental impressions [when they] are those that 'a layman would have as well as a lawyer in these

particular circumstances, and in no way reveal anything worthy of the description 'legal

theory,'"" *Federal Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 153

(D.C. Cir. 2015) (quoting *In re HealthSouth Corp. Secs. Litig.*, 250 F.R.D. 8, 11 (D.D.C. 2008)

(Bates, J.)). The same flaw undermines ▐Per. 18▐ claims to the opinion work product's

protection for ▐P. 18▐-PRIV-023, ▐P. 18▐-PRIV-024 and ▐P. 18▐-PRIV-025 ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████ and

for ▐P. 18▐-PRIV-050, ▐P. 18▐-PRIV-053, ▐P. 18▐-PRIV-055, ▐P. 18▐-PRIV-057, and ▐P. 18▐-PRIV-058

████████████████████████████████████████████

█████████████████████████████


▐Per. 18▐ claims that the document titled ▐P. 18▐-PRIV-089, containing ▐▐ undated, brief

handwritten notes is entirely protected as opinion work product, but he has failed to meet ▐▐

burden to claim the doctrine's protection. *See United States v. ISS Marine Servs., Inc.*, 905 F.

Supp. 2d 121, 127 (D.D.C. 2012) ("It is well established that the proponent of a privilege bears

the burden of demonstrating facts sufficient to establish the privilege's applicability." (quoting *In*

*re Subpoena Duces Tecum Issued to Commodity Future Trading Comm'n*, 439 F.3d 740, 750

(D.C. Cir. 2006)). No context is provided to understand whether this document entirely reflects

▐Per. 18▐ "mental processes," or comprises "purely factual material." *In re Sealed Case (Aug.*

*1997),* 124 F.3d at 236.

83

USA-01288918

Finally, Per. 18 has proposed redactions to two documents, P. 18-PRIV-082 and P. 18-PRIV-083, that contain transcriptions of Per. 18 audio recordings reflecting on Per. 18 work related to the May 2022 Subpoena. ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████. Per. 18 proposed redactions are rooted in three bases, all of which the Court finds valid and largely adopts: Per. 18 own opinion work product, ████ opinion work product, and highly personal details. The few instances in which the Court departs from Per. 18 redactions are explained in brief.

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████. Nothing distinguishes this exchange—which largely comprises Per. 18 quotations of the former president—from Per. 18 many recollected quotations of the former president in the same document over which no opinion work product claim is asserted. Instead, in the context of Per. 18 apparently comprehensive attempt to memorialize Per. 18 experiences, Per. 18 straightforward recounting of this particular exchange—with the minimal redactions retained by the Court— does not reflect any particular "sharply focus[ing] or weed[ing]" of the materials. *In re Sealed Case (Aug. 1997),* 124 F.3d at 236.

The document titled P. 18-PRIV-083 contains several instances of overextended opinion work product claims. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████. An

84

USA-01288919

attorney's logistical updates to his client may fall within the ambit of the attorney-client privilege, but such statements hardly fall within the uniquely private domain of an attorney's materials reflecting his or her preparation for litigation via the assembly and analysis of information or preparation of legal theories or strategy. *See Hickman*, 329 U.S. at 511.

**P. 18** description of the contents of the boxes he searched, located on pages four and five, is also not opinion work product, as it merely recounts his visual observations rather than revealing any of the attorney's opinions, theories, or impressions regarding the litigation. So too for **P. 18** recollection of the former president's communicative hand "motion" located on page six. Finally, one sentence of **Per. 18** proposed redaction on page nine is not necessary, as it reveals nothing about **Per. 18** mental impressions regarding the matter.

The Court's document-by-document determinations of what may be withheld or redacted are reflected in the accompanying Order's appendices.

## IV.    CONCLUSION

Based on the foregoing analysis, the crime-fraud exception entirely vitiates the attorney-client and work-product privileges that **Per. 18** has invoked to withhold testimony regarding the six topics identified by the government; the exception vitiates any privileges intended to be invoked by the former president as to _____ testimony on the first five of those topics. Further, 58 of the documents over which **Per. 18** claimed privilege have been pierced by the crime-fraud exception and do not comprise opinion work-product. An additional twelve documents that **Per. 18** withheld have been pierced by the crime-fraud exception, but contain severable opinion work product that may be redacted before disclosure.

Accordingly, the government's motion to compel testimony from these two grand jury witnesses is GRANTED IN PART AND DENIED IN PART.

85

Subject to Protective Order    USA-01288920

Date: March 17, 2023

BERYL A. HOWELL
Chief Judge

86

Subject to Protective Order

USA-01288921