**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

               Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

---

**PRESIDENT TRUMP'S MOTION FOR RELIEF RELATING TO THE MAR-A-LAGO**
**RAID AND UNLAWFUL PIERCING OF ATTORNEY-CLIENT PRIVILEGE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

DISCUSSION ....................................................................................................................1

I. The Mar-a-Lago Raid Violated President Trump's Constitutional Rights ......................1

    A.    Relevant Facts ................................................................................................. 1

        1.    The Decision To Raid Mar-a-Lago .................................................... 1

        2.    The Warrant Application .................................................................... 2

        3.    The General Warrant .......................................................................... 3

        4.    The Illegal Raid ................................................................................. 4

    B.    Applicable Law ............................................................................................... 5

        1.    Misrepresentations In Search Warrant Affidavits................................ 5

        2.    The Fourth Amendment Particularity Requirement ............................ 5

    C.    Discussion ....................................................................................................... 6

        1.    A *Franks* Hearing Is Warranted........................................................ 6

        2.    The Warrant Lacked Particularity....................................................... 9

        3.    The Mar-a-Lago Raid Was Executed In An Egregious Fashion And In Bad Faith 12

II. The Special Counsel's Office Violated President Trump's Attorney-Client Privilege............13

    A.    Relevant Facts ............................................................................................... 14

        1.    The May 10, 2022, Subpoena To President Trump's Office ................. 14

        2.    The May 23, 2022, Meeting At Mar-a-Lago ...................................... 14

        3.    The June 2 and 3, 2022, Meetings At Mar-a-Lago .............................. 14

        4.    The Trump Organization Subpoena..................................................... 15

        5.    The Per. 18 And ▅▅▅ Subpoenas........................................................ 15

        6.    The Motion To Compel ...................................................................... 16

        7.    The Compelled Testimony .................................................................. 17

    B.    Applicable Law ............................................................................................. 17

        1.    Attorney-Client Privilege And Work Product .................................... 17

        2.    The Crime-Fraud Exception .............................................................. 18

    C.    Discussion ..................................................................................................... 19

        1.    The Special Counsel's Office Failed To Make A *Prima Facie* Showing............... 19

        2.    The Communications Did Not Further Any Crimes................................ 21

        3.    The Compelled Waiver Was Overly Broad ......................................... 22

        4.    The Court Misapplied The Opinion Work Product Doctrine ................. 23

CONCLUSION...............................................................................................................25

i

## INTRODUCTION

President Donald J. Trump respectfully submits this motion to suppress evidence seized during the unconstitutional raid of Mar-a-Lago and evidence obtained from the subsequent unlawful violation of President Trump's attorney-client privilege by the Special Counsel's Office, and to dismiss the Superseding Indictment based on prejudice arising from the privilege violation.[1]

## DISCUSSION

### I.    The Mar-a-Lago Raid Violated President Trump's Constitutional Rights

On August 8, 2022, armed FBI agents stormed the private residence of a former president of the United States.  What was unthinkable with respect to President Clinton's recordings, and deemed unwarranted with respect to Hillary Clinton's destruction of evidence, was determined to be appropriate by the Biden Administration for President Biden's chief political rival.  Personally authorized by Attorney General Garland, and supported over FBI objections by DOJ leadership who did not "give a damn about the optics" of these unprecedented steps, the raid of Mar-a-Lago was unconstitutional.  Compel Mot. Ex. 35 at USA-00940276.[2]

#### A.  Relevant Facts

##### 1.  The Decision To Raid Mar-a-Lago

In August 2022, the FBI did not believe that it was necessary to raid Mar-a-Lago.  *See* Ex. 1 at USA-00940268.  In an August 1 internal FBI email, Special Agent **FBI 19** wrote that "DOJ/FBI would respectfully request Former President Trump's cooperation via Mr. ███ **Per. 18**" via a "Consensual Search."  *Id.*  According to Steven D'Antuono, who was the Assistant

---

[1] President Trump reserves the right to supplement this motion and file any other motions based on discovery provided as a result of the motions to compel.  *See* ECF No. 314.

[2] "Compel Mot." refers to the Defendants' motions to compel discovery.  ECF No. 262.  "Compel Oppn." refers to the Special Counsel's Office's response to the Defendants' motions to compel discovery.  ECF No. 277.

Director in Charge of the FBI's Washington Field Office at the time, the FBI's preference in "dealing with cases like this" was to seek consent from ▇Per. 18▇ D'Antuono Interview at 23.[3] D'Antuono "firmly believed" that "the best scenario would have been consent," for "the FBI, for former President Trump, and for the country." *Id.* D'Antuono took that position in "emails" that were "written back and forth" but have not been produced. *Id.*; *see also id.* at 24 (D'Antuono confirming that he "put in a communication that [he] had some concerns about not doing the normal protocol of . . . attorneys working together").

DOJ and the FBI appear to have debated this issue during, for example, an August 1, 2022, meeting at "FBIHQ" regarding "Search Warrant Discussion." Compel Mot. Ex. 34. On August 3, Deputy Assistant Attorney General George Toscas and Jay Bratt participated in a follow-up call with agents from the FBI's Washington Field Office regarding the warrant. *See* Compel Mot. Ex. 35 at USA-00940276. According to an email regarding the call, Toscas stated "that 'he frankly doesn't give a damn about the optics'" of the unprecedented raid, and the group discussed how "Bratt already has built an antagonistic relationship with FPOTUS's attorney . . . ." *Id.* Ultimately, Attorney General Garland "personally" approved the raid.[4]

## 2.   The Warrant Application

On August 5, 2022, Special Agent ▇FBI 21A▇ submitted an application for a search warrant in this District that targeted Mar-a-Lago. Ex. 2. The affidavit in support of the warrant claimed inaccurately that the "investigation began" as a result of a referral from NARA on

---

[3] H. Comm. on the Judiciary, Interview of: Steven D'Antuono (June 7, 2023) (the "D'Antuono Interview"), *available at* https://shorturl.at/adovL.

[4] U.S. Dep't of Justice, Attorney General Merrick Garland Delivers Remarks (Aug. 11, 2022), https://www.justice.gov/opa/speech/attorney-general-merrick-garland-delivers-remarks.

February 9, 2022, and that the FBI "opened a criminal investigation" only "[a]fter initial review of the NARA Referral." *Id.* at USA-00043152; *see also id.* at USA-00043158-59.  Special Agent FBI 21A affidavit specified the following locations at Mar-a-Lago, only, where witnesses had claimed boxes were stored:

- "[T]he White and Gold Ballroom within Mar-a-Lago," *id.* USA-00043162 ¶ 30;

- "[A] ground floor storage room," *i.e.*, the "Storage Room," *e.g.*, *id.* USA-00043164 ¶ 34;

- "[A] room . . . that leads to the [Storage Room]" (the "Anteroom"), *e.g.*, *id.* at USA-00043175 ¶ 65;

- "[T]he entryway of [President Trump's] personal residential suite," *e.g.*, *id.* USA-00043165 ¶ 39;

- "Pine Hall, the anteroom to [President Trump's] personal residential suite," *id.* USA-00043165 at n.1; and

- "The '45 Office,' an office space used by [President Trump] at [Mar-a-Lago]," *id.* USA-00043178 ¶ 71.

### 3.  The General Warrant

Attachment A to the warrant sought, and obtained, by Special Agent FBI 21A described the "Property to be search" as the entirety of Mar-a-Lago: "a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate," including "the '45 Office,' all storage rooms, and all other rooms or areas within the premises . . . in which boxes or documents could be stored, including all structures or buildings on the estate."  Ex. 2 at USA-00043188.  The definition of the area to be searched purported to exclude "areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo [sic] members) and not otherwise used or available to be used by [President Trump] and his staff, such as private guest suites."  *Id.*

Attachment B to the warrant authorized the seizure of "all physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519," "including":

- "[A]ny containers/boxes (including any other contents)" in which documents "with classification markings" were "located," stored or found together";

- "Information . . . regarding the retrieval, storage, or transmission of national defense information . . . ."; and

- "Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021."

Ex. 2 at USA-00043189.

### 4.  The Illegal Raid

According to an "Operations Order" produced in discovery, the FBI believed its objective for the Mar-a-Lago raid was to seize "classified information, NDI, and US Government records as described in [the] search warrant."  Ex. 3 at USA-01285174.  The Order contained a "Policy Statement" regarding "Use Of Deadly Force," which stated, for example, "Law enforcement officers of the Department of Justice may use deadly force when necessary . . . ."  *Id.* at USA-01285183.  The agents planned to bring "Standard Issue Weapon[s]," "Ammo," "Handcuffs," and "medium and large sized bolt cutters," but they were instructed to wear "unmarked polo or collared shirts" and to keep "law enforcement equipment concealed."  *Id.* at USA-01285184.

The FBI commenced the raid at approximately 9:00 a.m. on August 8, 2022.  Ex. 4 at USA-00940244.  The agents did not leave Mar-a-Lago until approximately 6:40 p.m. that evening.  *Id.* at USA-00940245.  The roving and highly inappropriate search covered, for example, a "gym," "kitchen" the "Former First Lady Master Bedroom Suite" and the "Child's bedroom suite" used by President Trump's son.  Ex. 5 at USA-01285293-300.  The only places in which the agents allegedly found purported classified documents were the Storage Room, the 45 Office, and rooms

4

adjacent to the 45 Office.   Ex. 4 at USA-00940245.   From those areas, the agents seized approximately 45 items they considered to be "pieces of evidence, comprised of boxes and sets of miscellaneous documents." *Id.*

### B.   Applicable Law

#### 1.   Misrepresentations In Search Warrant Affidavits

"To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause.'" *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).   "Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009).

#### 2.   The Fourth Amendment Particularity Requirement

"The Fourth Amendment's particularity requirement sought to remedy the evils of the 'general warrant,' which permitted officers' exploratory rummaging in colonial America." *United States v. McCall*, 84 F.4th 1317, 1327 (11th Cir. 2023).   Thus, "searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).   "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Berger v. New York*, 388 U.S. 41, 58 (1967) (cleaned up).   "[A] description of property [to be seized] will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982).

5

## C.  Discussion

The Mar-a-Lago raid was unconstitutional.  Agent ▮FBI 21A▮ misled the magistrate judge to obtain the warrant, and the warrant lacked the particularity required by the Fourth Amendment. The good-faith exception is unavailable because of the egregious manner in which the search was executed.  Therefore, the Court should resolve any disputed factual issues through *Franks* and suppression hearings, and suppress the fruits of the search.

### 1.  A *Franks* Hearing Is Warranted

A *Franks* hearing is necessary because Agent ▮FBI 21A▮ intentionally or recklessly misled the issuing magistrate concerning at least four issues.

*First*, Agent ▮FBI 21A▮ failed to disclose that the FBI had taken the position—in writing, apparently—that it was not necessary to execute a search warrant at Mar-a-Lago.  The FBI's assessment conflicted with Agent ▮FBI 21A▮ sworn assertion that the warrant application needed to be sealed because "disclosure . . . may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness . . . ."  Ex. 2 at USA-00043181.  To the contrary, ADIC D'Antuono, who was Agent ▮FBI 21A▮ boss at the time, believed it was appropriate to seek consent for the search from President Trump's attorney, ▮Per. 18▮  D'Antuono's preference was consistent with DOJ's handling of the investigation of Hillary Clinton where, despite the evidence of extensive evidence deletion, "the prosecutors sought to obtain digital and documentary evidence by consent whenever possible."  Horowitz OIG Report at 81.[5]

*Second*, Agent ▮FBI 21A▮ failed to disclose that presidents are not required to obtain clearances and that sensitive briefings including classified information had been provided to President Trump

---

[5] Office of the Inspector General, U.S. Department of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance OF THE 2016 ELECTION (June      2018)      (the      "Horowitz      OIG      Report"),      *available      at* https://www.justice.gov/file/1071991/download.

at Mar-a-Lago and other residences before and during his presidency.  *See* Compel Oppn. at 49 n.25 ("Presidents are not required to obtain security clearances before accessing classified information . . . ."); Compel Mot. at 42-43 (discussing evidence of sensitive briefings provided to President Trump).  The omissions took on added significance in light of Agent ██████'s assertion that classified information could only be possessed by individuals with a security clearance, and his decision to quote an email from Bratt claiming, falsely, that Mar-a-Lago was not "secure."  Ex. 2 at USA-00043156 ¶ 17, USA-00043173 ¶ 61.

*Third*, Agent ██████ suggested that the FBI had only initiated its investigation after the sham referral from NARA-OIG on February 9, 2022.  This misrepresentation is consistent with the Superseding Indictment, which alleges that the FBI "opened a criminal investigation" on March 30, 2022.  ECF No. 85 ¶ 51.  In fact, the FBI was working with DOJ before NARA-OIG sent the referral email.  *See* Ex. 6; *see also* Compel Mot. Ex. 18 at USA-00309423 (Keller informing NARA-OIG on February 10 "that the Counterintelligence Division of FBI is also assessing these allegations").

*Fourth*, Agent ██████ included in the affidavit the definition of "Presidential Records" from the Presidential Records Act ("PRA") but omitted the definition of "personal records," 44 U.S.C. § 2201(3), and the caselaw conferring on President Trump alone the discretion to designate documents as Personal Records, *e.g.*, *Judicial Watch*, 845 F. Supp. 2d at 300-01.  *See* Ex. 2 at USA-00043158-59 ¶¶ 22, 24.  The omission of these legal authorities is significant in light of ██████'s decision to include caselaw regarding the NDI Element.  *See id.* at USA-00043173 n.2.

Collectively, these omissions misled the magistrate judge regarding the investigation's lack of legal and factual integrity.  Agent ██████ also improperly suggested exigencies relating to "allowing criminal parties an opportunity to flee" or "destroy evidence," when in fact the FBI

7

believed that the objective of the search could have been accomplished through a call to [Per. 18].
Ex. 2 at USA-00043181.  Even during these proceedings, the Special Counsel's Office has argued
falsely that it had "no choice but to seek a search warrant."  Compel Oppn. at 13.  The intentional
and improper nature of this omission is further supported by Toscas' previously private
declaration, as a DOJ supervisor, that he did not "give a damn about the optics" of the raid.  Compel
Mot. Ex. 35.

The allegations in the affidavit concerning evidence of President Trump's intent would
have been undercut substantially had Agent [FBI 21A] disclosed that President Trump had never been
required to obtain a clearance but had been provided classified briefings in his residences.  Equally
important, Agent [FBI 21A] hid from the magistrate that (1) NARA had been improperly coordinating
with DOJ and the Biden Administration dating back to at least September 2021, *see, e.g.*, Compel
Mot. Ex. 5 at USA-00383606, (2) NARA lacked authority to demand the 15 Boxes from President
Trump under *Judicial Watch* and related authority, and (3) NARA-OIG's referral was therefore
improper.

Misrepresentations are "assume[d]" to be "deliberate or reckless" where "it is unclear how
[the agent] could have made such statements of an affirmative character for which there was no
basis."  *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).  Information concerning the
15 Boxes constituted a large proportion of the allegations relied upon by Agent [FBI 21A].  *E.g.*, Ex.
2 at ¶¶ 1, 3, 38-50, 70, 73, 78.  Agent [FBI 21A] would not have been able to establish probable cause
if he had made complete disclosures concerning the foregoing matters, particularly in light of the
staleness problems that were apparent on the face of the affidavit.  *See United States v. Martin*,

297 F.3d 1308, 1314 (11th Cir. 2002) ("The information in the affidavit must also be fresh.").[6]  As a result, President Trump has made the required "substantial showing" that a *Franks* hearing is necessary to facilitate fact-finding regarding the motive behind the material omissions and their impact on the warrant application.

## 2. The Warrant Lacked Particularity

The warrant at issue lacked the particularity required by the Fourth Amendment.

Mar-a-Lago is an enormous property, and Agent ▉▉▉▉ did not establish a basis for rummaging through the majority of its rooms.  In the affidavit, Agent ▉▉▉▉ described the property as a "17-acre estate," which includes a "mansion with approximately 58 bedrooms" and "33 bathrooms."  Ex. 2 at USA-00043188.  However, Agent ▉▉▉▉ presented allegations of boxes in only six discrete locations at Mar-a-Lago: the 45 Office, President Trump's residential suite, the Storage Room, the Anteroom, Pine Hall, and the White and Gold Ballroom.

By its terms, the warrant conferred extraordinary and improper discretion on FBI agents to seize essentially every document at Mar-a-Lago.  The warrant authorized agents to use their judgment to seize "[a]ll" evidence relating to alleged "violation[s]" of 18 U.S.C. §§ 793, 2071, or 1519. Ex. 2 at USA-00043189.  The warrant provided an illustrative list of the types of documents that were "includ[ed]" within its scope, but the list did not limit the agents' ability to seize anything that caught their eye within the 17 acres.  *See United States v. Leary*, 846 F.2d 592, 601, 603 (10th Cir. 1988) (reasoning that "a series of decisions from other circuits have held that reference to a

---

[6] *See* Ex. 2 ¶ 71 ("▉▉▉▉ has not observed documents at [Mar-a-Lago] with classification markings" after June 3, 2022); *id.* ¶ 75 ("▉▉▉▉" informed the FBI that he/she "did not recall observing boxes" in the vicinity of President Trump's personal suite, which is adjacent to the First Lady's personal suite, on June 26, 2022); *id.* ¶ 76 ("▉▉▉▉ informed the FBI that he/she is regularly in the residential suite at [Mar-a-Lago], and that as recently as July 28, 2022, ▉▉▉▉ did not observe any Bankers boxes or boxes of documents currently in the residential suite or the Pine Hall anteroom to the residential suite.").

broad federal statute is not a sufficient limitation on a search warrant," and a "list of business records to be seized" did not "provide any meaningful limitation").

Three items from the warrant's list of examples were especially problematic.  The warrant referred to "information . . . regarding the retrieval, storage, or transmission of national defense information . . . ."  Ex. 2 at USA-00043189 ¶ (b).  As discussed in connection with President Trump's vagueness challenge to § 793(e), this extremely broad term has posed interpretive problems to courts and jurors for more than 100 years.  Acknowledging this issue, Agent FBI 21A included in the affidavit caselaw with judicial interpretations of the term.  *Id.* at USA-00043173 n.2.  However, whatever assistance those citations may have provided to the magistrate—and in this prosecution, the cases cited provide no meaningful assistance—the citations were not included in the warrant.  *See United States v. Travers*, 1998 WL 36030672, at *4 (S.D. Fla. 1998) ("[T]he particularity of an affidavit may cure an overbroad warrant only if the affidavit is attached to the warrant and if the warrant specifically references the affidavit.").  Because agents participating in the search reviewed the warrant but not the affidavit, Agent FBI 21A's citations did not mitigate the particularity issue relating to the phrase "national defense information."  *See* Ex. 3 at USA-01285182.

The warrant also authorized agents to seize documents they believed to be "government and/or Presidential Records."  Ex. 2 at USA-00043189 ¶ (c).  Neither the affidavit nor the warrant articulates a basis for seizing "government" records, and the warrant provided no guidance regarding the scope of that term.  Similarly, the affidavit included the PRA's definition of Presidential Records, but the warrant did not.  Even if the PRA definition had been included, the citation in the affidavit to 44 U.S.C. § 2201(2) elided the factual and legal complexities concerning,

*inter alia*, President Trump's virtually unreviewable discretion to designate records as personal—as discussed in President Trump's motion to dismiss pursuant to the PRA.

Finally, in addition to the impermissible discretion conferred on seizing agents to apply vague terms such as "national defense information," "government" records, and "Presidential Records," the warrant authorized the seizure of "any containers/boxes (including any other contents" that included "physical documents with classification markings," "as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes." Ex. 2 at USA-00043189 ¶ (a). Based on this subparagraph, the agents were essentially authorized to seize *all* "containers/boxes" at Mar-a-Lago, so long as there was a plausible claim that the "container/box" was "stored or found together" with another "container/box" that contained a marked-classified document. *Id.* Read together, the limitless nature of the warrant's introductory language concerning "all" evidence of specified crimes, the limitless nature of certain terms on the illustrative list in the warrant's subparagraphs, and the authorizations relating to "containers/boxes," fail to meet the Fourth Amendment's particularity requirements.

The warrant was "framed to allow seizure of most every sort of book or paper at the described premises . . . ." *Application of Lafayette Acad., Inc.*, 610 F.2d 1, 3 (1st Cir. 1979); *cf. McCall*, 84 F.4th at 1328 (finding particularity problem with warrant that "allowed a search of all the conceivable data on the account without any meaningful limitation"); *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (same). The Special Counsel's Office cannot "articulate any explanation, let alone a persuasive explanation, as to why the warrant did not contain more precise descriptions of the documents and other items to be seized." *Travers*, 1998 WL 36030672, at *5.

Accordingly, suppression is required because the warrant did not meet the particularity requirement.

### 3.   The Mar-a-Lago Raid Was Executed In An Egregious Fashion And In Bad Faith

The Special Counsel's Office cannot save this search by reliance on the good-faith exception under *United States v. Leon*, 468 U.S. 897 (1984). *See United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000) ("The officers do not act in objective good faith, however, if the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid."). President Trump is seeking evidence bearing on this issue in the pending motions to compel, and fact-finding will likely be necessary before the Court can resolve it. *See, e.g.*, *United States v. Accardo*, 749 F.2d 1477, 1481 (11th Cir. 1985) (reasoning that "[b]oth parties should be given an opportunity to present evidence touching upon the conduct of the officers," and remanding for "a hearing on the good faith issue"). However, several known circumstances already counsel against a finding in favor of the Office on this fact-specific inquiry.

Without no basis whatsoever, in the affidavit or otherwise, FBI agents searched the private bedrooms of the First Lady and President Trump's youngest son. *See Walter v. United States*, 447 U.S. 649, 657 (1980) ("[A] warrant to search for a stolen refrigerator would not authorize the opening of desk drawers."). The FBI's photo log demonstrates that the agents took extensive photographs of those rooms—42 and 27, respectively—for no apparent reason. *See* Ex. 5 at USA-01285293-300. There was no factual basis for the agents to rummage through rooms not specified in the warrant and, not surprisingly, they seized nothing from these other rooms.

Nor was there any basis for the FBI to bring firearms into Mar-a-Lago. There were no threats and no risk to agents' safety arising from their allegations relating to possession of documents at a premises already guarded by the Secret Service. But the agents appear to have

done so, based on documents produced in discovery, in order to search for alleged contraband they pretended was life threatening in Mar-a-Lago's gym and kitchen (five and four pictures, respectively).

The government has already acknowledged that, notwithstanding the constitutionally infirm capaciousness of the warrant, the FBI exceeded its scope. *See Trump v. United States*, 625 F. Supp. 3d 1257, 1265 (S.D. Fla. 2022) ("The Government also has acknowledged that it seized some '[p]ersonal effects without evidentiary value.'"). The agents improperly seized passports, "medical documents, correspondence related to taxes, and accounting information." *Id.*

Lastly, evidence of politically motivated animus toward President Trump by prosecutors, agents, NARA personnel, and White House Officials, is relevant to the Court's analysis of the suppression remedy. *See United States v. Herring*, 492 F.3d 1212, 1217 (11th Cir. 2007) (reasoning that a precondition to the application of the exclusionary rule under *Leon* is "misconduct by the police or by *adjuncts to the law enforcement team*" (emphasis added)). Some of that evidence has already surfaced, but much more must be disclosed by the Special Counsel's Office for the reasons set forth in the Defendants' motions to compel.

## II.    The Special Counsel's Office Violated President Trump's Attorney-Client Privilege

Apparently dissatisfied with the outcome of the Mar-a-Lago raid, or concerned about the manner in which it was conducted, the Special Counsel's Office took extraordinary and unlawful steps to gain access to evidence of privileged communications between President Trump and his attorneys. The unconstitutional nature of those efforts is illustrated by the fact that the Office relied on the constitutionally defective Mar-a-Lago warrant to bolster its motion in the District of Columbia. It was error to apply the crime-fraud exception, and the resulting evidence must be suppressed.

### A. Relevant Facts

#### 1. The May 10, 2022, Subpoena To President Trump's Office

In April 2022, President Trump engaged attorney ██Per. 18██.  At the time, attorney ██████████ was also representing President Trump.  ██Per. 18██ initiated contact with Bratt in late April.  At the time, NARA and DOJ were pressuring President Trump to present executive-privilege claims relating to the 15 Boxes.  *See* Compel Mot. Exs. 23, 24.  On May 11, 2022, Bratt sent ██Per. 18██ a subpoena addressed to the "Custodian of Records" for "The Office of Donald J. Trump."  Ex. 7 at USA-00041547 (the "Trump Office Subpoena").  The Trump Office Subpoena was dated May 11 and returnable on May 24, which Bratt later extended until June 7, and it called for "all documents or writings . . . bearing classification markings."  *Id.* at USA-00041545; *see also* ECF No. 85 ¶¶ 53-57 (referring to ██Per. 18██ as "Trump Attorney 1" and ██ as "Trump Attorney 2").

#### 2. The May 23, 2022, Meeting At Mar-a-Lago

On May 23, 2022, ██Per. 18██ and ██ met with President Trump at Mar-a-Lago.  *See* ECF No. 85 ¶ 55.  ██Per. 18██ subsequently created an audio recording with his impressions from the meeting, which was transcribed in connection with litigation in the District of Columbia.  Ex. 8 (the "May 2022 Recording").

#### 3. The June 2 and 3, 2022, Meetings At Mar-a-Lago

On June 2, 2022, ██Per. 18██ again met with President Trump at Mar-a-Lago.  After speaking to President Trump, ██Per. 18██ reviewed the contents of boxes in a basement storage room (the "Storage Room").  *See* ECF No. 85 ¶¶ 64-65.  ██Per. 18██ identified documents that he believed were responsive to the Trump Office Subpoena, and he asked Bratt and the FBI to collect the materials at Mar-a-Lago the following day.  *See* ECF No. 85 ¶¶ 66-68.

On June 3, 2022, **Per. 18** met with Bratt and FBI agents who had traveled to Mar-a-Lago. An attorney named **Per. 12** also participated in the meeting, and **Per. 12** provided a written certification of compliance with the Trump Office Subpoena. Ex. 9 at USA-00940536; *see also* ECF No. 85 ¶¶ 69-70 (referring to **Per. 12** as "Trump Attorney 3"). **Per. 18** gave Bratt and the FBI a sealed redweld containing approximately 38 documents that **Per. 18** believed were responsive to the Trump Office Subpoena. Ex. 9 at USA-00940537; *see also* ECF No. 85 ¶¶ 8(b), 72. During the meeting, President Trump spoke to Bratt and the FBI agents voluntarily, and he permitted them to view the Storage Room. Ex. 9 at USA-00940537. As with **Per. 18**'s May 2022 trip to Mar-a-Lago, **Per. 18** created an audio recording with his impressions from the trips to Mar-a-Lago on June 2 and June 3, which was also transcribed in connection with litigation in the District of Columbia. Ex. 10 (the "June 2022 Recording").

### 4. The Trump Organization Subpoena

On June 22, 2022, Bratt issued a subpoena to the Trump Organization for Mar-a-Lago CCTV footage. Ex. 11 at USA-00806262 (the "Trump Organization Subpoena"). Bratt emailed the subpoena to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and ▓▓▓▓ forwarded it to **Per. 18** *Id.* at USA-00806261. On June 24, ▓▓▓▓▓ discussed the Trump Organization Subpoena with President Trump during a phone call.

### 5. The **Per. 18** And ▓▓▓▓ Subpoenas

On November 21, 2022, Senior Assistant Special Counsel Julie Edelstein issued a subpoena calling for testimony and documents from **Per. 18**. Ex. 12 (the "**Per. 18** Subpoena"). The **Per. 18** Subpoena called for materials relating to, among other things, "instructions or guidance" concerning the Trump Office Subpoena, **Per. 18**'s June 2, 2022 search of the Storage Room, and the certification executed by **Per. 12** *Id* at 12 at USA-00806078. Beginning on the

December 8, 2022, through counsel, Per. 18 produced non-privileged documents in response to the Per. 18 Subpoena. Per. 18 provided a privilege log to the Special Counsel's Office on or about January 6, 2023. Ex. 13. On January 12, 2023, Per. 18 declined to answer certain of the Office's questions during testimony before the grand jury.

On January 25, 2023, David Harbach issued a subpoena calling for testimony and documents from ▇. Ex. 14 (the "▇ Subpoena"). Through counsel, ▇ informed the Special Counsel's Office that she would invoke the attorney-client privilege if required to testify.

### 6.  The Motion To Compel

On February 7, 2023, the Special Counsel's Office filed an *ex parte* motion in the District of Columbia to compel Per. 18 and ▇ to answer questions and produce documents regarding six topics:

1. "[E]fforts to determine where documents responsive to the May 11 subpoena may be located";

2. "[W]hy Per. 18 believed all responsive documents were in the storage room at Mar-a-Lago";

3. "[C]ircumstances surrounding the selection of Per. 12 as custodian of records;

4. "[T]he sources and bases for the false statements in the certification and reasons for edits to the certification";

5. "[T]he awareness of the former President or anyone in his Office regarding the certification or approval of the certification"; and

6. "[T]he phone call between Per. 18 and the former President on June 24[, 2022]."

Ex. 15 at USA-01287430 (exhibits omitted). In reply to opposition submissions by President Trump and Per. 18 the Office conceded that "Per. 18's independent assertion of the work-product privilege raises unsettled questions about the application of the crime-fraud exception to opinion work product." Ex. 16 at USA-01288436. Acknowledging concerns about the Office's

aggressive position in the opening submission, they agreed to "seek[] only ███████'s fact work product." *Id*.

Following a March 9, 2023, hearing attended by the Special Counsel's Office and counsel for President Trump and ███████, Judge Howell granted, in part, and denied, in part, the motion. Ex. 17. The court ordered ███████ to produce documents "reflecting his efforts to comply" with the Trump Office Subpoena, and that "may have informed his knowledge" of the Trump Organization Subpoena. Judge Howell also required ███████ to produce the May 2022 Recording and the June 2022 Recording, based on reasoning set forth in separate orders. Exs. 18, 19. On March 22, 2023, the D.C. Circuit denied motions by President Trump and ███████ to stay Judge Howell's rulings. *See* Order, *In re Sealed Case*, Nos. 23-3035, 23-3036 (D.C. Cir. Mar. 22, 2023).

### 7. The Compelled Testimony

On March 24, 2023, the Special Counsel's Office required ███████ and ███████ to testify before a grand jury in the District of Columbia—despite the lack of venue for any of the offenses under consideration. The prosecutors questioned ███████ extensively regarding, *inter alia*, the otherwise-privileged communications with President Trump, the May 2022 Recording, and the June 2022 Recording.

### B. Applicable Law

### 1. Attorney-Client Privilege And Work Product

"Traditionally, the attorney-client privilege, like the privilege extending to attorney work product, is sacrosanct." *United States v. Stein*, 2023 WL 2585033, at *2 (S.D. Fla. 2023) (cleaned up). "The attorney-client privilege attaches, of course, to confidential communications between an attorney and client for the purposes of securing legal advice or assistance." *Drummond Co.,*

*Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1334 (11th Cir. 2018).  Protection of the privilege "promote[s] broader public interests in the observance of law and administration of justice," and "encourage[s] full and frank communication between attorneys and their clients."  *United States v. Zolin*, 491 U.S. 554, 562 (1989) (cleaned up).

The work product doctrine recognizes that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).  "Material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories, is referred to as opinion work product."  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994) (cleaned up).  "[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances."  *Id.* .

> An attorney's independent assertion of his work product privilege, on the other hand, stands on a very different footing because the attorney's privilege is based on the attorney's interest in protecting his opinions and thought processes from disclosure.  This is a protection that benefits all of the attorney's clients because it accords the attorney a measure of privacy within which he can candidly compose his thoughts.

*In re Green Grand Jury Proc.*, 492 F.3d 976, 980 (8th Cir. 2007).

## 2.  The Crime-Fraud Exception

The crime-fraud exception applies in "rare circumstances."  *Drummond Co.*, 885 F.3d at 1335.  "[C]ourts apply a two part test."  *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987).

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice.  Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

18

*Id.* "[A]n attorney may assert the work product privilege with regard to opinion work product even if the client has used the attorney's services to commit a crime or perpetrate a fraud, so long as the attorney was unaware that the client was doing so." *In re Green Grand Jury Proc.*, 492 F.3d at 981. "[O]nce the grand jury has . . . heard testimony that the putative defendant contends was protected by privilege," "the appropriate remedy is a post-indictment motion *in limine* to suppress the use of the evidence or testimony at trial." *In re Grand Jury Proc.*, 142 F.3d 1416, 1428 (11th Cir. 1998).

### C. Discussion

#### 1. The Special Counsel's Failed To Make A *Prima Facie* Showing

Judge Howell erred in finding that the Special Counsel's Office had made a *prima facie* showing with respect to 18 U.S.C. §§ 793(e), 1001, 1512, and 1519. *See* Ex. 18 at USA-01288890, 01288896. Reliance on § 793(e) to access privileged communications was especially problematic in light of the impermissible risk of arbitrary enforcement arising from the statute's unconstitutional ambiguity, as discussed in President Trump's void-for-vagueness motion. For all of the statutes, the Office's proffer was limited mostly to what Juge Howell described as a "choreography of box movements" prior to Per. 18's June 2, 2022 search of the Storage Room. *Id.* at USA-01288892; *see also id.* at USA-01288907 (finding "curious" the "absence of any video footage showing the return of the remaining boxes to the storage room"). The Office lacked—and still lacks—evidence demonstrating that President Trump knew there were marked-classified documents in boxes that were allegedly not returned to the Storage Room.

Seeking to bridge that gap, Judge Howell cited an assertion attributed to President Trump in the May 2022 Recording that Hillary Clinton ▇▇▇▇▇▇▇▇▇▇ Ex. 18 at USA-01288893. Even if made, the remark was not inculpatory if DOJ's decision not to prosecute Clinton is considered valid. In fact, although at least one prosecutor who participated in the

investigation of Hillary Clinton thought there were "pretty good arguments" that there was a "waiver of privilege," the prosecutors did not pursue it.  Horowitz OIG Report at 117 n.102.  The prosecutors reportedly made that decision because Clinton's attorneys lacked "nefarious intent" or "criminal mens rea."  *Id.*  The Special Counsel's Office conceded that the same was true for **Per. 18** and ███, but the Biden Administration's political objectives required the Office to take a different course in this case.  Nevertheless, the Horowitz OIG Report illustrates the flawed nature of the court's reasoning regarding this alleged comment by President Trump.

Judge Howell acknowledged that (1) President Trump could plausibly "claim that he did not know what **Per. 18** and ▪Per. 12▪ wrote in the June 3, 2022 Certification," and (2) there was no evidence that President Trump "deliberately retained, or was even aware of, the particular [four] classified-marked documents located by his counsel at Mar-a-Lago in December 2022."  Ex. 18 at USA-01288895, 01288897.  The court, however, placed undue emphasis on a *question* attributed to President Trump: "we just don't respond at all or don't play ball with them," "wouldn't it be better if we just told them we don't have anything here?"  *Id.* at USA-01288893-94.  That is a natural client for any client to have under the circumstances, and the equally available inference from this evidence is that President Trump believed the boxes that were moved contained sensitive items he had designated as Personal Records under the PRA and were not responsive to the Trump Office Subpoena.  And, as Judge Howell acknowledged, neither President Trump nor **Per. 18** responded to the Trump Office Subpoena by claiming that ████████████████  *See id.* at USA-01288894 n.15 (reasoning that President Trump's question "taken alone may be insufficient to establish the applicability of the crime-fraud exception" where "the attorney-client relationship has worked exactly as intended and deserves the utmost protection"); *see also In re Grand Jury Subpoena*, 745 F.3d 681, 691 (3d Cir. 2014) (reasoning that the crime-fraud exception

"does not by its terms apply to a situation where a client consults an attorney about a possible course of action and later forms the intent to undertake that action").

Finally, the Special Counsel's Office did not establish any nexus to alleged criminality concerning Per. 18's June 24, 2022 call with President Trump.  The Office's evidentiary proffer focused on the issuance of the Trump Organization Subpoena, and Waltine Nauta's efforts to return to Mar-a-Lago shortly thereafter.  This evidence was equally supportive of the inference that President Trump and others took the Trump Organization Subpoena seriously, and the Office was not entitled to access President Trump's privileged communications regarding that issue.

### 2.   The Communications Did Not Further Any Crimes

At the second step of the crime-fraud analysis, Judge Howell erred by concluding that President Trump's communications with Per. 18 and ▮▮▮▮, and related work product, furthered the alleged offenses relied upon by the Special Counsel's Office.  *See* Ex. 18 at USA-01288905. The evidence of steps taken by Per. 18 and Per. 12, and the corresponding advice they provided to President Trump, demonstrated that the "advice was intended to prevent unlawful conduct." *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (Bader Ginsburg, J.).

Even if the Office had established that President Trump "fail[ed] to heed his lawyer's counsel," and they did not do so, such a failure "does not alter this crucial facet of the case."  *White*, 887 F.2d at 271; *see also United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997) ("A wrongdoer's failure to heed the advice of his or her lawyer does not remove the privilege."); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) ("The crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity").  The fact that a privileged communication "may help prove" that a crime occurred—which did not happen here—

"does not mean" that the communication "was used in perpetrating" the crime. *Pritchard-Keang Nam Corp. v. Jaworski,* 751 F.2d 277, 283 (8th Cir. 1984). "It does not suffice that the communications may be related to a crime." *White*, 887 F2d at 271. Judge Howell's ruling eviscerated President Trump's privilege under circumstances "where even its stern critics acknowledge that the justifications for the shield are strongest—where a client seeks counsel's advice to determine the legality of conduct before the client takes any action." *White*, 887 F.2d at 272.

### 3.   The Compelled Waiver Was Overly Broad

"[D]istrict courts should define the scope of the crime-fraud exception narrowly enough so that information outside of the exception will not be elicited before the grand jury." *In re Grand Jury Subpoenas*, 144 F.3d 653, 661 (10th Cir. 1998). Judge Howell failed in this regard, too.

For example, the court failed to explain how Per. 18's invoices, "execution of an engagement letter," and "correspond[ence] with an associate *in advance of* his May 23, 2022 meeting" could possibly have furthered the allegedly illegal conduct. Ex. 18 at USA-01288910 (emphasis added). *See Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Att'ys, P.A.*, 519 F. Supp. 3d 1184, 1222 (S.D. Fla. 2021) ("[T]he existence of a crime or fraud does not create a blanket evisceration of the privilege; it only extinguishes the privilege for those communications and documents connected to the crime or fraud.").

Judge Howell also required disclosure of six emails and a draft of the Trump Organization Subpoena that Bratt sent to ▆▆▆▆. *See* Ex. 18 at USA-01288912. The court reasoned that these documents "informed Per. 18's preparations" for the June 24, 2022 call with President Trump. *Id.* However, there was no basis to conclude that Per. 18's preparations for the call furthered any of the alleged misconduct. *See In re Grand Jury Subpoena*, 419 F.3d 329, 343 (5th Cir. 2005)

("[T]he proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents *in furtherance of the contemplated or ongoing criminal or fraudulent conduct*." (emphasis added)).  Therefore, the Special Counsel's Office was not entitled to those documents.

Judge Howell also ordered disclosures relating to the certification that ▮Per. 12▮ signed regarding the Trump Office Subpoena.  Ex. 18 at USA-01288851.  The certification stated that the representations it contained were "[b]ased upon the information that has been provided to me." *Id.* No one from President Trump's side hid that.  However, the court reasoned inaccurately the certification was "incorrect and unreliable, or, at worst, [an] intentional misrepresentation[]," and drew improper inferences about what a "fulsome certification would entail."  *Id.* at USA-01288857, 01288860.  The certifications produced by the Special Counsel's Office in discovery illustrate that the court was wrong.  Ex. 20.  Based on this erroneous reasoning, the court improperly ordered disclosures of privileged information relating to the certification.

### 4.   The Court Misapplied The Opinion Work Product Doctrine

Although the Special Counsel's Office conceded that it had no right to ▮Per. 18▮'s opinion work product, Judge Howell defined that category in an unlawfully narrow and extremely prejudicial fashion with respect to the May 2022 Recording and the June 2022 Recording.  The Office quoted from the Recordings extensively in the Superseding Indictment.  *See* ECF No. 85 ¶¶ 21-22, 25.

The Recordings reflected ▮Per. 18▮'s observations of events he deemed to be significant during his representation of President Trump, visits to Mar-a-Lago, and assistance in responding to the Trump Office Subpoena.  "[O]pinion work product may be reflected in something as subtle

as the act of selecting or ordering documents because this may reflect an attorney's opinion as to the significance of those documents in the preparation for his case." *United States v. Pepper's Steel & Alloys, Inc.*, 132 F.R.D. 695, 698 (S.D. Fla. 1990); *see also Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) ("Attorney notes reveal an attorney's legal conclusions because, when taking notes, an attorney often focuses on those facts that she deems legally significant."); *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) ("[T]he selection and compilation of documents by counsel in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product."). Therefore, in addition to disclosing communications that were subject to the attorney-client privilege, the May 2022 Recording and the June 2022 Recording disclosed Per. 18's opinion work product in connection with representing President Trump. The Special Counsel's Office expressly was not seeking such materials because of legal problems with their theory, and the Office should not have been granted access to the Recordings. Therefore, evidence relating to the May 2022 Recording and the June 2022 Recording should be suppressed.

Finally, because of the highly prejudicial nature in which the Special Counsel's Office used the privileged evidence, including through extensive quotations in the Superseding Indictment, the Court should dismiss the charges. *See United States v. DeLuca*, 663 F. App'x 875, 878 (11th Cir. 2016) (describing multi-day hearing relating to extent of privilege violation and assessment of resulting prejudice).

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the Court should (1) suppress the evidence seized during the unconstitutional raid of Mar-a-Lago and obtained from the unlawful violation of President Trump's attorney-client privilege, and (2) dismiss the Superseding Indictment following a hearing on prejudice resulting from the privilege violation.

Dated: February 22, 2024                              Respectfully submitted,

                                                      */s/ Todd Blanche*
                                                      Todd Blanche (PHV)
                                                      toddblanche@blanchelaw.com
                                                      Emil Bove (PHV)
                                                      emil.bove@blanchelaw.com
                                                      BLANCHE LAW PLLC
                                                      99 Wall Street, Suite 4460
                                                      New York, New York 10005
                                                      (212) 716-1250

                                                      */s/ Christopher M. Kise*
                                                      Christopher M. Kise
                                                      Florida Bar No. 855545
                                                      ckise@continentalpllc.com
                                                      CONTINENTAL PLLC
                                                      255 Alhambra Circle, Suite 640
                                                      Coral Gables, Florida 33134
                                                      (305) 677-2707

                                                      *Counsel for President Donald J. Trump*

<u>**CERTIFICATE OF SERVICE**</u>

I, Christopher M. Kise, certify that on February 22, 2024, I filed the foregoing document and served it on the Special Counsel's Office via email, or CM/ECF to the extent possible, as required by the Court's February 20, 2024 Order.  ECF No. 320.

*/s/ Christopher M. Kise*
Christopher M. Kise
