UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.

Case No. 23-80101-CR
CANNON/REINHART

**PRESIDENT TRUMP'S REPLY BRIEF IN FURTHER SUPPORT OF
MOTION FOR RELIEF RELATING TO THE MAR-A-LAGO RAID AND
UNLAWFUL PIERCING OF ATTORNEY-CLIENT PRIVILEGE**

**TABLE OF CONTENTS**

I. Conclusory Assertions Regarding Particularity Do Not Suffice ................................................. 1

II. The Good Faith Exception Cannot Protect The Egregious Manner In Which The Search Warrant Was Obtained And Executed ..................................................................................................... 5

III. A *Franks* Hearing Is Also Warranted ...................................................................................... 7

IV. The Special Counsel's Office Has Not Met Its Burden On The Crime-Fraud Exception ........ 8

V. Conclusion ............................................................................................................................... 10

President Donald J. Trump respectfully submits this reply in support of his motion relating to the illegal raid of Mar-a-Lago, as well as the unlawful violation of his attorney-client privilege (the "Motion"), and in response to the opposition brief filed by the Special Counsel's Office (the "Opposition").  These violations warrant dismissal of the Superseding Indictment or, at minimum, evidentiary hearings.

I.     **Conclusory Assertions Regarding Particularity Do Not Suffice**

The Special Counsel's Office seeks unsuccessfully to defend the lack of particularity of the warrant used to raid Mar-a-Lago based on conclusory and unsupported assertions.  The Court should reject each of them.

The Fourth Amendment requires "particularity describing the place to be searched . . . ."  In this regard, the Special Counsel's Office failed to meaningfully respond to President Trump's argument that the warrant application "did not establish a basis for rummaging through the majority of [the] rooms" at Mar-a-Lago.  Mot. at 9.  Rather, at most, the application focused on six specific locations.  *See id.* at 3.  This was not a situation in which agents planned to search an urban apartment or a residential home, where it is arguably more difficult to identify and segregate sectors likely to contain evidence or contraband.  DOJ and the FBI targeted President Trump's enormous Mar-a-Lago property, and there was no basis for a warrant to search almost every room "used or available to be used" by President Trump.  Mot. Ex. 2 at USA-00043192.

The warrant was also deficient with respect to the Fourth Amendment's requirement of particularity as to the "things to be seized."  *Maryland v. Garrison* lends no support to the argument by the Special Counsel's Office's that "the warrant was 'carefully tailored to its justifications.'"  Opp'n at 11 (quoting 480 U.S. 79, 84 (1987)).  In *Garrison*, "there [was] no claim that the 'persons

or things to be seized' were inadequately described." 480 U.S. at 85. Here, that is precisely President Trump's argument.

The Special Counsel's Office does not suggest, nor could they, that the Court can rely on the warrant application to cure the warrant's lack of particularity. *See* Mot. at 10. In light of that concession, any "context" in which the challenged terms "were used," or the "nature of the activity under investigation," is only relevant to the extent it is reflected in the warrant itself. Opp'n at 11; *see, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) ("The fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity." (emphasis in original)).

The warrant provided no "context." Opp'n at 11. Rather, Attachment B to the warrant cited to the U.S. Code and did not even summarize the alleged crimes established at those citations. In assessing this particularity challenge to the warrant, the Court cannot assume that the search participants understood, even generally, what is prohibited by "18 U.S.C. §§ 793, 2071, or 1519." Mot. Ex. 2 at USA-00043193. The Special Counsel's Office cites no authority for the assertion that this sort of "context" can address a particularity deficiency.

Nor did the four subparagraphs of Attachment B remedy the particularity problem. The subparagraphs served as non-exhaustive examples. The scope of the illegal seizures authorized by the warrant "include[ed]," but were not limited to, the items described in those subparagraphs. Mot. Ex. 2 at USA-00043193. Compounding that problem, the examples in the subparagraphs failed to provide sufficient guidance to the searching agents to limit their discretion. *See Berger v. New York*, 388 U.S. 41, 58 (1967) ("[N]othing is left to the discretion of the officer executing the warrant." (cleaned up)).

There were five specific deficiencies in Attachment B's subparagraph exemplars. First, the warrant left it to FBI agents to determine what constituted "national defense information" ("NDI"). President Trump has already raised "arguments warranting serious consideration" regarding the vagueness of the NDI Clause in § 793(e), including the lack of enforcement criteria, and the meaning of NDI is one of the "still-fluctuating definitions" that the warrant required agents to apply on the fly. ECF No. 402 at 1. The Special Counsel's Office was concerned enough about ambiguity in the meaning of this term to include in the warrant application certain "judicial gloss," which did not cure the problem for the reasons set forth in President Trump's void-for-vagueness submissions. *See* Mot. Ex. 2 at USA-00043173 n.2. But the Office failed to even include that same "gloss" in the warrant to guide the participants in the search.

Second, in the same subparagraph, the warrant authorized seizures of "classified material." Mot. Ex. 2 at USA-00043193. This is another instance where the Special Counsels' Office included definitional information in the application but not the warrant. *See id.* at USA-00043155 (defining "classified information" in the warrant application by reference to E.O. 13526). Moreover, in a separate subparagraph, the warrant referred to "documents with classification markings." Mot. Ex. 2 at USA-00043193. Thus, the additional reference to "classified material" broadened the scope of the warrant and conferred additional boundless discretion on the searching agents. In addition, contrary to the Office's assertion, the term "classified material" in Attachment B was not "connect[ed]" to NDI. Opp'n at 11. The warrant separated the two terms: "national defense information <u>or</u> classified material." Mot. Ex 2 at USA-00043189. Both lacked adequate particularity.

Third, the reference in Attachment B to "Presidential Records" also violated the particularity requirement. For the reasons set forth in President Trump's submissions in support

3

of the motion to dismiss based on the Presidential Records Act ("PRA"), it was unlawful to authorize federal agents to apply the PRA's definition of "Presidential Records" during the search—and, in doing so, contest the PRA designations that President Trump made as President. *See Jud. Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 300 (D.D.C. 2012) ("The only reference in the entire statute to the designation of records as personal versus Presidential also calls for the decision to be made by the [President] . . . .").

In addition, as with NDI and "classified material," the warrant did not even provide the search participants with the PRA's definitions of "Presidential Records" and "personal records." Furthermore, the warrant application acknowledged that the definition of "Presidential Records" excluded "extra copies of documents produced only for convenience of reference, when such copies are clearly so identified." Mot. Ex. 2 at USA-00043158 (citing 22 U.S.C. § 2201(2)(B)). Search participants could not possibly have distinguished between originals and duplicates, or determined whether copies were "clearly so identified" as such when presented to President Trump while he was the Commander in Chief.

Fourth, Attachment B also contained a broad and undefined authorization for agents to seize "government . . . Records." We identified this problem in our opening brief. *See* Mot. at 10-11. The Special Counsel's Office failed to explain what the term means in their Opposition brief, and, even if they had, the post-search definition would not have remedied this problem with the warrant itself. Instead, the Office focuses on the time limitation in that subparagraph. Opp'n at 11. But a timeframe restriction did not cure the subject-matter problem of relying on broad, undefined terms in the warrant. For example, because IRS documents are plausibly "government Records," the terms of the warrant authorized the seizure of every IRS tax document located in any room that was "available to" President Trump at Mar-a-Lago in that timeframe, including

4

rooms occupied or used by his family, despite the clear fact that those types of documents had no connection to the investigation. The agents relied on that vague, non-particularized authority to improperly seize such records, among other improperly seized documents. *See Trump v. United States*, 625 F. Supp. 3d 1257, 1265 (S.D. Fla. 2022) ("[T]he seized materials include medical documents, correspondence related to taxes, and accounting information.").

Fifth, the Special Counsel's Office cannot avoid the particularity problem presented by the warrant's authorization to seize "any containers/boxes (including any other contents)" in which "documents with classification markings" were located, as well as "any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes." Mot. Ex 2 at USA-00043193 (emphasis added). The Office claims that this language "provided sufficiently specific guidance to searches." Opp'n at 11. That is incorrect and misleading. To the extent the language provided any guidance at all to the search participants, the guidance was: seize any and all boxes or documents they saw.

Thus, in effect—and without meaningful limitation—Attachment B of the warrant authorized the seizure of every box and every piece of paper at Mar-a-Lago: "All physical documents and records," "including," "any containers/boxes (including any other contents) in which such documents are located." Mot. Ex. 2 at USA-00043193. This violated the Fourth Amendment's particularity requirements as to the places to be searched and the items to be seized.

II. **The Good Faith Exception Cannot Protect The Egregious Manner In Which The Search Warrant Was Obtained And Executed**

In light of the warrant's facial deficiencies, it is no surprise that the Special Counsel's Office quickly pivots to the good-faith exception. *See* Opp'n at 11. However, the exception does not apply "when a warrant is so facially deficient—*i.e.*, in failing to particularize the place to be searched or things to be seized—that the executing officers cannot reasonably presume it to be

5

valid." *United States v. McCall*, 84 F.4th 1317, 1323 (11th Cir. 2023) (cleaned up).  This warrant was that deficient.  Only biased agents on a politically motivated mission to raid President Trump's residence could have regarded the document as providing adequate limitations and guidance.

The application of the good-faith exception cannot be resolved on the papers.  An evidentiary hearing is required.  *See United States v. Martin*, 297 F.3d 1308, 1319 (11th Cir. 2002) ("[A] majority of circuits have taken into consideration facts outside the affidavit when determining whether the *Leon* good faith exception applies.").  In arguing otherwise, the Special Counsel's Office cites *United States v. Blake*.  Opp'n at 11 (citing 868 F.3d 960, 975 (11th Cir. 2017)).  In *Blake*, however, the district court held a lengthy suppression hearing, which resulted in a 223-page transcript, before reaching that conclusion.  *See* Transcript of Suppression Hearing, *United States v. Blake*, No. 13 Cr. 80054 (S.D. Fla. Nov. 5, 2014), ECF No. 249.  The Office also cites the Eleventh Circuit's application of the good-faith exception in *United States v. Travers*.  Opp'n at 11 (citing 233 F.3d 1327 (11th Cir. 2000)).  *Travers*, too, involved "an evidentiary hearing." 233 F.3d at 1329.  So did the third case cited by the Office, *Hudson v. Michigan*.  Opp'n at 11 (citing 547 U.S. 586 (2006)); *see also* 2005 WL 2600989, at *1 ("Before trial, an evidentiary hearing was held . . . .").

While a hearing relating to "good faith" under *Leon* must address the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal," it is equally true that "all of the circumstances . . . may be considered." *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984); *see also* Opp'n at 11-12.  The relevant circumstances include (1) the "knowledge and experience" of the participants in the search, including the prosecutors DOJ sent to Mar-a-Lago to oversee the search as "adjuncts to the law enforcement team," *Herring v. United States*, 555 U.S. 135, 145 (2009); *United States v. Herring*, 492 F.3d

1212, 1217 (11th Cir. 2007); and (2) whether the search participants "sought to deceive the magistrate judge or otherwise acted culpably or in a way that necessitates deterrence," *United States v. Taylor*, 935 F.3d 1279, 1291 (11th Cir. 2019). Under those authorities, evidence of political animus is discoverable, must be produced, and may be presented by President Trump at the suppression hearing.

### III. A *Franks* Hearing Is Also Warranted

Under *Franks*, in light of the extensive legal authorities included in the warrant application, the Court should infer that the omission of facts and key legal authorities calling into question the legality of investigative steps was done with "reckless disregard for the truth." *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009). In response, the Special Counsel's Office offers only conclusory arguments that are very much in dispute, as illustrated at the March 14, 2024 hearing.[1] The Office also claims that "none" of the omitted information "would have remotely affected" probable clause. Opp'n at 7. However, the application already faced severe staleness problems. *See* Mot. at 9 & n.6. Information indicating that NARA exceeded its legal authority in efforts to collect the 15 Boxes and colluding with DOJ to route the subsequent referral through NARA-OIG called into question the integrity of evidence that was central to the application.

The evidence relating to the exclusionary rule and good-faith exception overlaps to some extent with the evidence supporting President Trump's motion for a *Franks* hearing. *See* Mot. at

---

[1] *Compare* Opp'n at 7 (arguing that President Trump "lacked authority to possess classified documents at Mar-a-Lago after [his first term] ended and he became a private citizen"), *with* ECF No. 85 ¶ 24 (allegation invoking "the practice of former officials maintaining access to our Nation's most sensitive secrets long after their time in Government has ended"). *Compare* Opp'n at 8 (arguing that President Trump's "suggestion that he may have designated records in the boxes as personal under the PRA has no bearing on the validity of criminal charges for violating 18 U.S.C. § 793(e) after he left office"), *with* 3/14/24 Tr. at 91 ("I think you have . . . some forceful arguments referencing *Judicial Watch*.").

7

6-7. The Court should conduct both hearings in the same proceeding. Agents seeking to establish that they relied on the defective warrant in good faith will be confronted with the fact that their management did not think a search was appropriate or necessary, that the affiant falsely suggested there was a risk of flight, and that the affiant omitted critical information undercutting the meritless theory of the legal violations at issue. *See id.* Accordingly, the Court should permit a *Franks* inquiry at the same hearing that is necessary to resolve "the exclusionary-rule/good-faith inquiry." *Taylor*, 935 F.3d at 1291.

### IV. The Special Counsel's Office Has Not Met Its Burden On The Crime-Fraud Exception

In seeking to defend the unlawful violation of President Trump's attorney communications and confidences, the Special Counsel's Office does not address evidentiary gaps identified in the suppression motion and tries to defend an erroneous ruling in the District of Columbia by relying on caselaw from the wrong Circuit.

Accessing attorney work product from lawyers representing a former President of the United States is an extraordinarily serious encroachment. In order to do so, the Special Counsel's Office strung together a series of ambiguous and innocuous statements that most clients would be expected to discuss with their lawyers. For example, it is easy to imagine a current or former public official facing a criminal investigation, including President Biden, asking his attorneys questions about whether and how to comply with a demand for documents, or pointing out the manner in which another former official had addressed similar circumstances. *See* Opp'n at 13 ("[W]hat happens if we just don't respond at all or don't play ball?"); *see also id.* at 14 (referring to the investigation of Hillary Clinton). It should be no surprise that a private citizen, much less a former President, "[didn't] want anybody looking through [his] boxes." *Id.* at 13. Particularly where, as here, the "anybody" in question was DOJ and the FBI, such a statement is evidence of

8

rational thought reflecting commonly held views about privacy in one's home and possessions—not criminal intent. Of course a client would want to know whether his attorney views the results of a document review as "'bad' or '[g]ood.'" *Id.*

It was a meritless stretch indeed for the Office to rely on a lawyer's interpretation of a client's "funny motion"—rather than an actual statement—as evidence that President Trump was suggesting, in the Office's words, that "Attorney 1 hide or destroy documents rather than produce them to the government." Opp'n at 15, 19. As Attorney 1 noted, President Trump "didn't say that." *Id.* at 15. These remarks fall far short of a *prima facie* case that President Trump "attempted to enlist" Attorney 1 in any wrongdoing. *Id*. at 22-23.

To bolster unfair and baseless inferences from President Trump's unremarkable comments, divorced from the unprecedented circumstances he faced at the time, the Special Counsel's Office relied on a "choreography of box movements." Mot. at 19. Those movements, undertaken by others, do not suggest that assistance from Attorney 1 and Attorney 3 "was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987). Similarly, the Office suggests a connection between President Trump and the preparation of the certification relating to the grand jury subpoena, but they do not cite specific evidence to back that claim. Opp'n at 23. Nor do they address the commonalities between the challenged certification and similar certifications they accepted from third parties during the investigation, such as Federal Express and Apple. *See* Mot. at 23 & Ex. 20. Taken to its logical conclusion, the position of the Special Counsel's Office is that, once a prosecutor believes obstructive conduct has occurred, the target of the investigation is no longer entitled to privilege and work product protections for communications with his attorney. That would destroy the sanctity of the attorney-client relationship and chill citizens from seeking legal

advice at critical junctures of engagement with the government. The Court cannot let that position stand.

Finally, the Special Counsel's Office acknowledges that it did not seek "opinion work product," and they do not respond directly to arguments that the D.C. court misapplied that doctrine by requiring disclosures relating to the May 2022 Recording and the June 2022 Recording. *See* Mot. at 23-24. Rather, the Office extends an invitation to error by declaring that the Eleventh Circuit forecloses this argument. *See* Opp'n at 23-24. In fact, the law of the D.C. Circuit applies to this motion because that is where the unlawful action occurred, and that is the law applied by the judge who erroneously endorsed the encroachment that gives rise to the suppression remedy. *See United States v. Ozuna*, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001) ("The few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a lex loci (*i.e.*, the 'law of the place' of the conduct) approach."). Because the D.C. court wrongly applied the scope of the opinion work product doctrine, evidence relating to the Recordings must be suppressed. *See* Mot. at 23-24.

V.     **Conclusion**

For the foregoing reasons, President Trump respectfully submits that the Court should (1) suppress the evidence seized during the unconstitutional raid of Mar-a-Lago and obtained from the unlawful violation of President Trump's attorney-client privilege, following a hearing on disputed issues of fact; and (2) dismiss the Superseding Indictment following a hearing on prejudice resulting from the privilege violation.

Dated: March 24, 2024                               Respectfully submitted,

*/s/ Emil Bove*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

## **CERTIFICATE OF SERVICE**

I, Emil Bove, certify that on March 24, 2024, I filed the foregoing document via email to the Court and Counsel of Record.

*/s/ Emil Bove*
Emil Bove