**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP, *et al.*,

          Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

**PRESIDENT DONALD J. TRUMP'S MOTION TO DISMISS BASED ON**
**SPOLIATION OF EVIDENCE IN VIOLATION OF DUE PROCESS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

    I.       The Raid At Mar-A-Lago ......................................................................................... 3

    II.      Relevant Proceedings in *Trump v. United States* ................................................... 5

    III.   Post-Indictment Interviews Of The Filter Team ...................................................... 6

    IV.   President Trump's Discovery Demands ..................................................................... 6

    V.     Misrepresentations By The Special Counsel's Office .............................................. 7

    VI.   Untimely Disclosures By The Special Counsel's Office .......................................... 8

    VII.  President Trump's Additional Discovery Demands ................................................ 11

    VIII.  The May 2024 Filter Team Interviews By The Special Counsel's Office ................ 11

    IX.   The May 2024 Untimely Disclosures By The Special Counsel's Office .................. 12

APPLICABLE LAW ............................................................................................................... 14

DISCUSSION .......................................................................................................................... 16

    I.       The Prosecution Team Failed To Preserve Material, Exculpatory Evidence ............ 16

    II.      The Prosecution Team Failed To Preserve Potentially Useful Evidence .................. 19

    III.   The Prosecution Team Acted In Bad Faith .............................................................. 20

    IV.   The Bad-Faith Inquiry Requires Complete Disclosures Of Animus .......................... 21

    V.     The Untimely Disclosures Further Demonstrate That The Special Counsel's Office Is Not In Compliance With Their Discovery Obligations ............................................. 22

CONCLUSION ........................................................................................................................ 25

**<u>INTRODUCTION</u>**

President Donald J. Trump respectfully submits this motion to dismiss the Superseding Indictment, and to suppress all evidence seized in connection with the August 2022 raid at Mar-a-Lago, based on the FBI's destruction of important exculpatory evidence relating to the locations of the allegedly classified documents at issue.[1]

The prosecution team destroyed exculpatory evidence supporting one of the most basic defenses available to President Trump in response to the politically motivated charges in this case. The Special Counsel's Office has wrongfully alleged that President Trump was aware of the contents of boxes in August 2022, where those boxes were packed by others in the White House and moved to Florida in January 2021. The fact that the allegedly classified documents were buried in boxes and comingled with President Trump's personal effects from his first term in office strongly supported the defense argument that he lacked knowledge and culpable criminal intent with respect to the documents at issue. Any proximity between allegedly classified documents and other dated materials from years before the move, such as letters and newspapers, would have further strengthened this argument. The prosecution team's instructions to agents who executed the raid essentially acknowledged these propositions, and directed the agents to take care to document the location of both seized items and potentially privileged materials.

However, the agents disregarded those instructions. The government was more interested in staging—and leaking—manipulated photographs to the press than preserving key exculpatory evidence that has now been lost forever. *Trump*, ECF No. 48-1.[2] The agents did not maintain the

---

[1] On May 31, 2024, President Trump sought leave to file this motion, ECF No. 593 at 2, and the timing is due to a series of untimely disclosures by the Special Counsel's Office of exculpatory information and discoverable evidence that began with a May 3, 2024 public filing, ECF No. 522.

[2] References to "*Trump*" are to public filings in *Trump v. United States*, No. 22 Civ. 81294 (S.D. Fla.).

order of the documents, and they did not take photographs that would have served as alternative evidence of the documents' sequence in each box.  In July 2023, the agents disclosed this fact during a meeting with prosecutors from the Special Counsel's Office and the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL").  But the Office did not timely disclose the notes from that meeting for almost a full year.  Indeed, they persisted in that suppression, notwithstanding that the notes were responsive to an October 2023 discovery request from President Trump, while urging the Court to rush to trial based on false assurances that they were in compliance with their discovery obligations.

In hearings during March and April 2024, the Special Counsel's Office misrepresented to the Court that the pre-raid sequence of the documents was intact.  Only after an evidence inspection by counsel for President Trump's co-defendants revealed the extent of the problem did the Office disclose in a May 3, 2024 filing that the documents were not intact as had been claimed previously.  Vague language in that submission and corresponding additional discovery demands from President Trump caused these due process violations to further unravel.

The Constitution required far more than the Special Counsel's Office and the FBI were willing to do.  That is evident from the spoliation at issue herein, as well as from separate pretrial motions seeking to compel other important discovery, suppress unlawfully seized evidence, remedy additional prosecutorial misconduct, enforce the presidential immunity doctrine and the Appointments and Appropriations Clauses, and dismiss the charges on the basis of selective and vindictive prosecution.  To date, the Office's discovery obligations and ethical requirements have taken a back seat to President Biden's election-interference mission.  That must stop.  For the reasons set forth below, the Court should dismiss the Superseding Indictment, suppress evidence

seized during the Mar-a-Lago raid, and conduct such fact-finding as is necessary to shed light on the misconduct by those responsible for destroying exculpatory evidence.

## BACKGROUND

### I.       The Raid At Mar-A-Lago

On August 8, 2022, the FBI carried out an unprecedented raid targeting the residence and office of a former President of the United States at Mar-a-Lago.  As the Court is aware, the participants in the raid relied on a search warrant that is already the subject of a multi-faceted motion to suppress.  *See* ECF No. 566.

Prior to the raid, the government's investigative team designated a "Filter Team" that consisted of three attorneys—one from DOJ's National Security Division, and two from the USAO-SDFL—as well as a Squad Supervisor and four Special Agents from the FBI's Miami Field Division.  *See Trump*, ECF No. 40 at 2-3.  This Filter Team was responsible for the "initial search and review" of President Trump's office at Mar-a-Lago (the "45 Office"), as well as the Storage Room referenced in the Superseding Indictment.  *Id.* at 3; *see also* ECF No. 85 ¶ 90.  Thus, the Filter Team was the tip of the spear for the government's raid and, as far as the defense can tell, responsible for the initial search of every box, desk drawer, and other container in the 45 Office and the Storage Room that the government unlawfully targeted.

Prior to the raid, one of the Filter Team attorneys provided detailed instructions to the Filter Team agents in a memorandum and via email.  *See* Ex. 1 at USA-01291482.[3]  The instructions included the following:

_____

[3] The exhibits submitted in connection with this motion have been redacted in a manner consistent with the Court's prior rulings regarding sealing of judicial documents.  Although the Court's deadlines and the press of business may not always allow pre-filing conferral on specific redactions, we disclosed our proposed redactions to the Special Counsel's Office on June 8, 2024 as part of the conferral process for this motion.

If, during the search of the 45 Office, the filter team identifies a document marked as classified that is comingled in a container with potentially privileged materials, the filter team should *document the location of the classified document, photograph it and the location where it was found, including with the comingled documents and container*, and then provide the classified document to the case team so that it can be handled appropriately.

*Id.* at USA-01291483 (emphasis added).

The instructions also directed the Filter Team to be "mindful" of the fact that

photographs taken by [the FBI's Evidence Response Team] ERT of any responsive materials in the 45 Office, *including the location where the materials were found and any other comingled materials*, may also contain potentially privileged materials.

*Id.* (emphasis added).

According to the government's Return associated with the raid, the FBI seized 39 "boxes and/or sets of documents [that] contained comingled items described in Attachment B" to the warrant, and six additional "boxes and/or sets of documents" that "contained potentially privileged items comingled with items described in Attachment B" to the warrant. Ex. 2. The Filter Team was responsible for the initial review of each of these boxes, as well as unseized items, on-site at Mar-a-Lago. However, as discussed in more detail below, notwithstanding the foregoing instructions, the Filter Team made little if any effort to document the location of seized items within a box or to maintain the order of documents within each box that they searched.

The FBI transported the 45 seized "boxes and/or sets of documents" to Washington, D.C. on the morning of August 9, 2022. That afternoon, in an email that illustrates immediate concern about the Filter Team's failure to follow the instructions regarding documenting the location of seized items, an agent from the FBI's Washington Field Office sent an email asking one of the Filter Team agents to "Please call me . . . asap" via "[Instant Messenger] IM or desk [phone]." Ex. 3. The Miami agent responded that another member of the Filter Team had "assisted me with what

4

we discussed," and that the other agent "also has more updated information concerning where the documents were allegedly located." *Id.*

## II.      Relevant Proceedings in *Trump v. United States*

On August 22, 2022, President Trump initiated the *Trump* matter in the Southern District of Florida, in an effort to protect his rights following the unprecedented raid of Mar-a-Lago.

In an August 30, 2022 responsive filing signed by, among others, Jay Bratt, the government made at least three arguments that impliedly acknowledged the relevance of the location of documents within the seized boxes. *See Trump*, ECF No. 48. First, the government argued that the "location" of passports the FBI unlawfully seized during the raid constituted "relevant evidence in an investigation of unauthorized retention and mishandling of national defense information." *Id.* at 12 n.6. Second, the government argued that "[e]vidence of commingling personal effects with documents bearing classification markings is relevant evidence of the statutory offenses under investigation." *Id.* at 16. Third, the government cited *United States v. Wuagneux*, for the proposition that it was "reasonable for the agents to remove *intact files*" from Mar-a-Lago in connection with the raid. *Id.* at 17 (citing 683 F.2d 1343, 1353 (11th Cir. 1982) (emphasis added)).

Also on August 30, 2022, attorneys from the Filter Team filed a report with the Court. *See Trump*, ECF No. 40. Despite detailed discussion of search procedures, the report did not describe the pre-raid instructions to "document" the location of seized evidence. Nor did the Filter Team's report disclose that the agents had failed to maintain the order of the documents as they rummaged through boxes at Mar-a-Lago, much less that certain of the agents regarded the instructions from the attorneys on the Filter Team to have been "impossible" to comply with.

In October 2022, in response to an order from the Court and instructions from the Special Master, the government caused a third-party vendor in Virginia to scan unclassified documents

seized from Mar-a-Lago.  Ex. 4.  On September 28, 2022, "FBI Agent 19" sent an email regarding planning for the project.  Ex. 5.  The instructions included: "[a]ll classified placeholders must be removed [from the boxes] and replaced with generic spreadsheets at appropriate level.  We will talk through a generic marking system with ['FBI Agent 9'] later this morning."  *Id.*

Based on disclosures by the Special Counsel's Office, including their May 3, 2024 submission, ECF No. 522, it appears that the FBI's handling of the "classified placeholders" may have led to further reshuffling of the order of the documents within the boxes.  It also appears that the FBI failed to document the scanning process until June 5, 2023.  *See* Ex. 4.

## III.      Post-Indictment Interviews Of The Filter Team

Beginning on July 11, 2023, after the Indictment was filed, a member of the Special Counsel's Office and an attorney from the USAO-SDFL met with FBI agents, including from the Filter Team, "to discuss the execution of the August 8, 2022 search of Mar-a-Lago."  Ex. 6.  Notes from the meeting include the following entries:

- "Filter searches – order not preserved, filter material pulled to front/top of box for DC to explore."  Ex. 7 at USA-01291278.

- "Filter at some point, started pulling class out + placed on top.  Search team still went through every doc."  *Id.* at USA-01291280.

The notes refer to the need for a "follow on" call with two other agents, which does not appear to have happened.

As discussed below, the Special Counsel's Office did not produce these notes to the defense until May 23, 2024, over 10 months after the meeting occurred.

## IV.      President Trump's Discovery Demands

On June 21, 2023, the Special Counsel's Office started to produce discovery.  On September 1, 2023, the Office produced what it described as "NARA Box Scans," which we

understand to relate to the so-called 15 Boxes that President Trump voluntarily disclosed to NARA.[4]

On October 9, 2023, President Trump asked the Special Counsel's Office to disclose "[a]ll documents relating to the planning and execution of the search" at Mar-a-Lago, and "[a]ll documents relating to personnel present for the search." Ex. 8 (Request 2).   The defense defined the term "documents" broadly, to include:

> (i) all communications, including memoranda, reports, letters, notes, emails, text messages, and other electronic communications; (ii) hard copies and electronically stored information, whether written, printed, or typed; and (iii) all drafts and copies.

*Id* at 1.

In response to the request, the Special Counsel's Office claimed, falsely, that it had "already produced all responsive material to which the defense is entitled." Ex. 9 at 2.   In connection with the response, the Office disclosed the Operations Order that is central to their pending motion for a gag order, *see* ECF No. 592, and an additional FBI photo log—but not all FBI electronic communications regarding the execution of the search, not the instructions to the Filter Team, and not the notes from the July 2023 meeting in which the Filter Team disclosed that they failed to maintain the order of the documents in the boxes during the raid.

## V.      Misrepresentations By The Special Counsel's Office

At least twice, the Special Counsel's Office misrepresented to the Court that the order of the documents within each box was intact, *i.e.*, the documents were in the same order as they were at the time the raid commenced.

---

[4] During a conferral with the Special Counsel's Office on June 6, 2024, President Trump's counsel asked the Office whether the order of the documents in the 15 Boxes is intact.  As of this filing, the Office has not addressed that question.

On March 1, 2024, the Court conducted a hearing relating to, *inter alia*, scheduling.  In connection with a discussion of time necessary to review discovery, counsel for Mr. Nauta asserted that he needed to "sit with Mr. Nauta and review the contents of those boxes, *including the documents as they existed in the box* with the classification marking, albeit, at this moment in time, with the classified information redacted from . . . ."  3/1/24 Tr. 57 (emphasis added).  In partial response to counsel's point, Bratt later argued:

> [T]he boxes have always been available for defense review.  That was in our first discovery letter to all defendants.  Now, as I think I explained, the *actual classified documents were pulled out and are stored elsewhere, but there are markers as to where they're found*.

*Id.* at 83 (emphasis added).

On March 12, 2024, counsel for Mr. Nauta and Mr. De Oliveira reviewed the contents of certain boxes in Washington, D.C.  During the inspection, counsel were advised, misleadingly, "that as a result of the Special Master's review of the boxes, their contents may not be in the same order as when they were seized."  ECF No. 507 at 6 n.4.  In fact, the documents in the boxes are not in the same order as when they were seized principally because the Filter Team made no effort to preserve the documents in that fashion.

On April 12, 2024, the Court held a hearing relating to additional pretrial motions filed by Mr. Nauta and Mr. De Oliveira.  During the hearing, Bratt made the following misrepresentation:

> THE COURT: Are the boxes in their original, intact form as seized?

> MR. BRATT: They are, with one exception; and that is that the classified documents have been removed and placeholders have been put in the documents.

4/12/24 Tr. 65.

## VI.    Untimely Disclosures By The Special Counsel's Office

On May 1, 2024, counsel for Mr. Nauta joined a pending application for an adjournment of the deadline for Defendants' CIPA § 5 Notice.  ECF No. 507.  In that filing, counsel reiterated

that "[t]he contents of the boxes, *including where documents with classification markings were within the boxes*, is therefore relevant to Mr. Nauta's defense." *Id.* at 4 (emphasis added); *see also id.* at 12 ("Where those documents were stored in the boxes, and whether they were there at all, is unquestionably material to Mr. Nauta's defense and necessary to his determination of what classified discovery he reasonably expects to disclose or cause to be disclosed at trial.").

In a responsive filing on May 3, 2024, the Special Counsel's Office disclosed for the first time—despite being on notice of this fact since July 11, 2023, *see* Ex. 7—that the Filter Team "was not focused on maintaining the sequence of documents within each box" during the raid. ECF No. 522 at 6.  Subsequent disclosures to the defense have revealed that the phrase "not focused" was, at best, a remarkable understatement.  Some Filter Team agents now claim that the task they were instructed to perform was "impossible."

The Special Counsel's Office also disclosed on May 3, 2024, that the "investigative team" had "removed" and "segregated" from the boxes documents allegedly bearing classification markings, and "replaced" those documents in the boxes with "cover sheet[s]."  ECF No. 522 at 6. In Washington, D.C., the FBI "*generally* replaced the handwritten sheets with classified cover sheets annotated with the index code." *Id.* at 7 (emphasis added).  It remains unclear, to an unacceptable extent, what the Office's "generally" qualifier was intended to mean.

In an effort to explain why some handwritten cover sheets remain in the boxes, *see* ECF No. 522 at 7, the Special Counsel's Office added that "any handwritten sheets that currently remain in the boxes do not represent additional classified documents—they were just not removed when the classified cover sheets with the index code were added." *Id.* at 7.  The submission does not meaningfully engage with the import of the FBI's September 2022 email thread concerning

removal of "[*a*]*ll* classified placeholders," replacement with "generic spreadsheets," and a "generic marking system."  Ex. 5 (emphasis added).

In a further strained effort to explain the current composition of the boxes, the Special Counsel's Office added: "In many but not all instances, the FBI was able to determine which document with classification markings corresponded to a particular placeholder sheet."  ECF No. 522 at 7.  The Office made no effort to specify or explain the "many but not all instances" for which that statement was accurate, and we still do not know with specificity what the Office meant.

The Special Counsel's Office finally acknowledged that "there are some boxes where the order of items within that box is not the same as in the associated scans."  ECF No. 522 at 8.  Based on subsequent discovery disclosures about the Filter Team's approach to the raid, including notes from the July 2023 meeting that the Office possessed when it filed the May 3, 2024 submission, it appears that by "some boxes" the prosecutors meant "all of the boxes."

The Special Counsel's Office also relegated to a footnote the additional troubling admission that the current situation "is inconsistent with what Government counsel previously understood and represented to the Court."  ECF No. 522 at 8 n.3.  The Office offered "several possible explanations," but failed to disclose the most obvious.  *Id.* at 8.  Specifically, as the Office had known since July 2023 but not disclosed to the Court or defense counsel, the Filter Team did not even try to preserve the order of the documents in each (and every) box that was targeted during the raid.  *See* Ex. 7.  Instead of making that clear, the Office speculated in a misleading fashion that there were "instances in which the boxes were accessed"—after the raid and the Filter's Team rummaging through the boxes—and suggested that "the size and shape of certain items in the boxes possibly leading to movement of items."  ECF No. 522 at 8.  Notwithstanding that the source of the problem was the execution of the raid itself in August 2022, the Office also suggested to the

Court and counsel that the "best evidence available" of "the order the documents were in when seized" was the October 2022 scans of the boxes.  *Id.*

## VII.        President Trump's Additional Discovery Demands

In response to the new disclosures in the May 3, 2024 filing by the Special Counsel's Office, President Trump transmitted additional discovery demands to the Office on May 4, 2024. ECF No. 529-1.  President Trump sought, among other things, (1) the instructions provided to the Filter Team and investigative team concerning the raid (Requests 1, 2); (2) all communications relating to the execution of the raid (Request 3); (3) documents and communications relating to chain of custody (Requests 4, 5, 10, 11); (4) documents and communications relating to the Office's representation that the FBI had "generally" used handwritten placeholders in connection with seized documents (Requests 7-9); and (5) documents that led to the disclosures in the Office's May 3, 2024 filing (Request 13).  *Id.*  We also asked the Office to identify the boxes for which they "currently concede that 'the order of items within that box is not the same as in the associated scans.'"  *Id.* at 4 (Request 12).

## VIII.       The May 2024 Filter Team Interviews By The Special Counsel's Office

After President Trump sent the discovery demands, members of the Special Counsel's Office interviewed FBI personnel from the Filter Team.  Ex. 10.  Whereas it appears that the July 2023 meeting was conducted in a group setting, the Office interviewed the agents individually in May 2024.

During one interview, a member of the Filter Team ("FBI Agent 36") asserted that it was "not practical to ensure" that the order of documents within the boxes was maintained during the raid.  Ex. 11 at USA-01291468.  Another agent ("FBI Agent 5") claimed that it would have been "impossible" to maintain the order of the documents within each box.  Ex. 11 at USA-01291473

("impossible to maintain exact order"); *id.* at USA-01291474 ("Not possible to maintain exact order as when first opened").

Similarly, "FBI Agent 13" indicated that it would have been "impossible to maintain exact order." Ex. 11 at USA-01291472. "FBI Agent 13" added that s/he "[d]id not focus on maintaining order nor did [s/he] think [s/he] could even if [s/he] was focused on it." *Id.* "FBI Agent 13" also disclosed that s/he "believe[d]" s/he had pulled documents with alleged classification markings from their location within a box and placed those documents at the top of each box. *See id.* ("'I believe I did' when asked if he pulled classified out and placed on top.").

"FBI Agent 17" told the Special Counsel's Office that he "can't say w[ith] 100% certainty everything [was] in same order." Ex. 12 at USA-01291476. "FBI Agent 17" also disclosed that an unspecified set of notes relating to the raid was "in his desk in Miami" rather than uploaded to the FBI's electronic case file as they should have been. *Id* at USA-01291477.

## IX.      The May 2024 Untimely Disclosures By The Special Counsel's Office

On May 23, 2024, the Special Counsel's Office responded to President Trump's May 4, 2024 discovery demands and made additional disclosures concerning the deeply flawed execution of the raid and the improper handling of the documents in the boxes. *See* Ex. 13. Although the disclosures are plainly relevant to defense motion practice, as reflected in this submission, the Office took the untenable position that the materials included in the production "exceed[ed] our current discovery obligations." *Id.* at 1.

In addition to the notes from the May 2024 interviews of the Filter Team, the fifteenth production of unclassified discovery by the Special Counsel's Office included the following plainly discoverable materials:

- Additional internal FBI emails from between August 8 and August 11, 2022, including communications relating to FBI efforts to turn off CCTV during the search, which is

relevant to the application of the good-faith doctrine in connection with suppression motions;

- The above-referenced August 9, 2022 email chain between FBI agents requesting a "call . . . asap," which apparently related to "information concerning where the documents were allegedly located," Ex. 3;

- Summaries of instructions provided to the Filter Team, which demonstrate that the agents disregarded instructions to document the specific locations of seized documents (and which were responsive to President Trump's October 9, 2023 discovery demand), *see* Ex. 1;

- An FBI report and handwritten notes from the Office's July 2023 meeting with the Filter Team, which disclosed, contrary to subsequent in-court representations, that the order of documents within the boxes was not intact, *see* Exs. 6 and 7;

- A report relating to the FBI's review of the 15 Boxes from NARA and removal of allegedly classified documents, which the FBI failed to document until March 5, 2024, Ex. 14;

- FBI notes from monitoring defense counsel's March 12, 2024 inspection of the boxes, which include details regarding counsel's review that arguably invaded the Defendants' work product privilege such as how much time counsel spent reviewing each box, Ex. 15; and

- A previously classified report, declassified on May 21, 2024, relating to the FBI's "late documentation" of allegedly classified items removed from boxes seized during the raid, Ex. 16.

The May 23, 2024 letter from the Special Counsel's Office also purported to respond to President Trump's May 4, 2024 discovery demands. *See* Ex. 13 at 2. The substance of the responses further illustrates the lack of professionalism and diligence that the Office has employed thus far in connection with its discovery obligations.

Regarding President Trump's request for instructions provided to the Filter Team and the investigative team, the Special Counsel's Office argued that they had "already produced all responsive material to which the defense is entitled" but had included "early Jencks material" in the fifteenth production. Ex. 13 at 2. The incorrectness of those legal arguments is illustrated by the fact that materials from the fifteenth production are part of the basis for this motion. *See* Fed. R. Crim. Proc. Rule 16(a)(1)(E)(i). In connection with conferral relating to this motion, the Office

13

indicated it was withholding the remainder of the pre-raid memorandum to the Filter Team on the basis of "work-product privilege," which is a position the defense contests.

In the fifteen production, the Special Counsel's Office also suggested that they were producing "updated chain of custody information" as some kind of courtesy, "even though you did not specifically request it." *See* Ex. 13 at 2. To the contrary, President Trump's Requests 4, 5, and 11 plainly called for such information. *See* ECF No. 529-1 at 3-4. Moreover, particularly under circumstances where the FBI had to retroactively document chain-of-custody information because the agents failed to timely do so in the first place, these documents are automatically discoverable under *Brady* irrespective of a defense request. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995) ("There was a considerable amount of . . . *Brady* evidence on which the defense could have attacked the investigation as shoddy.").

Finally, with little explanation, the Special Counsel's Office refused to provide details regarding the vague claims that they made in the May 3, 2024 submission and the basis for those claims. *Compare* ECF No. 529-1 at 4-5 (Requests 10, 12, and 13), *with* Ex. 13 at 3. For example, in response to Request 12, the Office did not identify the boxes for which documents are no longer in the same order as they were at the time of the raid. In response to Request 13, the Office did not disclose the steps that it had taken to verify the disclosures in the May 3, 2024 submission.

## APPLICABLE LAW

When the government "suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (first citing *Brady v. Maryland*, 373 U.S. 83 (1963); and then citing *United States v. Agurs*, 427 U.S. 97 (1976)).

"Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The government also has a "duty" to "preserve evidence" that "might be expected to play a significant role in the suspect's defense."  *Id.* at 488. A "significant role in the suspect's defense" under *Trombetta* is the "standard of constitutional materiality" under *Brady* and *Agurs*.  *Id.* at 489.  The materiality standard requires the government to "disclose during pretrial discovery (or later, at the trial) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings."  *United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).  Where materiality is "fairly debatable," the government should either disclose it or "mark the material as a court exhibit and submit it to the court for *in camera* inspection."  *Id.* (emphasis added); *see also United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020) (reasoning that "[t]he retrospective definition of materiality is appropriate only in the context of appellate review," and "trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial." (cleaned up)); Justice Manual § 9-5.001(B)(1) ("Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence.").

Even where the unpreserved evidence was not material under *Brady* and *Agurs*, the "failure to preserve" evidence that is "potentially useful" violates due process if the defendant "can show bad faith on the part of the police."  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also United States v. Garcia-Solar*, 775 F. App'x 523, 530 (11th Cir. 2019) ("If the destroyed evidence was not clearly exculpatory but only 'potentially useful,' a defendant must show that the government acted in bad faith.").

15

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*.  Bad faith under *Youngblood* is a factual question, which must be addressed through evidence, and courts routinely hold hearings to address these types of motions.  *See, e.g.*, *Garcia-Solar*, 775 F. App'x at 531 (describing hearing testimony of "Officer Hadley"); *United States v. Gayle*, 608 F. App'x 783, 786, 790 (11th Cir. 2015); *United States v. Lanzon*, 639 F.3d 1293, 1297 (11th Cir. 2011); *United States v. Hameen*, 2018 WL 6580996, at *1, 8 (M.D. Fla. 2018); *United States v. Stoll*, 2011 WL 703875, at *1-2 (S.D. Fla. 2011); *United States v. Portocarrero-Reina*, 2006 WL 1232827, at *1-2 (M.D. Fla. 2006).

## **DISCUSSION**

The Court should dismiss the charges against President Trump based on the combination of spoliation of exculpatory evidence, affirmative misrepresentations regarding the spoliation, and untimely disclosures regarding these failures despite earlier defense discovery demands that called for this information.  Additionally, the facts set forth in this motion further support suppression of evidence seized in connection with the Mar-a-Lago raid, as well as compelled disclosures regarding evidence of official bias, political animus, and other bad-faith behavior by members of the prosecution team.

**I.     The Prosecution Team Failed To Preserve Material, Exculpatory Evidence**

The prosecution team violated President Trump's due process rights by failing to keep the documents intact and in the same order as they were found during the raid.  This is true whether the Filter Team's conduct is evaluated under the rubric of suppression of materially exculpatory evidence under *Brady*, or a failure to preserve such evidence under *Trombetta*.  Dismissal is the

only appropriate remedy for such violations, and that is true irrespective of the Filter Team's bad faith. *See Fisher*, 540 U.S. at 549 (reasoning that "the applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence").

As the government plotted to raid Mar-a-Lago, it was manifest that the location of allegedly classified documents within the boxes—*i.e.*, buried and comingled with President Trump's personal effects—would play a "significant role" in President Trump's defense against any future charges. *Trombetta*, 467 U.S. at 488. That is because, for any such charges, the government would be required to demonstrate that President Trump was aware that the boxes contained allegedly classified documents in August 2022, notwithstanding his *de minimis* role in packing the boxes and "caus[ing]" them to be moved to Mar-a-Lago in early 2021. ECF No. 85 ¶ 25.

The temporal gap between the packing and moving of the boxes from Washington, D.C., to Florida by third parties, and the subsequent alleged possession and retention of documents in those boxes by President Trump, was apparent on the face of the search warrant application. *See* ECF No. 566-2 at 16-17. The government also focused on this issue in the instructions to the Filter Team before the raid. Specifically, while the Special Counsel's Office is improperly withholding portions of those instructions based on disputed work-product arguments, it is clear that the Filter Team was directed to "document the location of the classified document, [and] photograph it and the location where it was found, including with the comingled documents and container . . . ." Ex. 1 at USA-01291483. Those same instructions anticipated that photographs taken during the Filter Team's work would include "the location where the materials were found and any other comingled materials." *Id.* Following the raid, in an August 30, 2022 filing in the *Trump* litigation, the

government acknowledged the relevance of the "location" of the documents and the fact that they were "comingled" with President Trump's personal items.  *See Trump*, ECF No. 48 at 12 n.6, 16. Hindsight reveals tremendous irony in the government's citation to *Wuagneux* in the same public filing, *see id.* at 17, because in that case the Eleventh Circuit relied on hearing testimony from a searching agent "that whole files *were kept intact so that the agents could identify where individual documents came from* and where they belonged . . . ."  *Wuagneux* 683 F.2d at 1353 (emphasis added).

As early as September 2023, the Special Counsel's Office acknowledged, as they must, that the § 793 offenses at issue require proof that President Trump knew allegedly classified documents were stored in the boxes.  *See* ECF No. 165 at 4; *see also* 11/1/23 Tr. 54-55.  The Office argued in their proposed jury instructions that the first element of the charged § 793 offenses requires proof of "unauthorized possession."  ECF No. 428 at 14.  President Trump agrees with the Office's assertion that "[a]ctual possession" means a person "*knowingly* has direct physical control" of the item.  *Id.* at 16 (emphasis added).  The Office also argued that the third element of the § 793 offenses requires proof that President Trump "willfully retained the document."  *Id.* at 15.  For purposes of that element, the Office asserted that "willfully" means that the retention "was committed *voluntarily and purposely*, with the intent to do something the law forbids."  *Id.* at 17 (emphasis added).  But the Filter Team failed to preserve important evidence that directly supported those defenses and instead destroyed that evidence by rummaging through the boxes in an undisciplined and undocumented fashion.

Dismissal was "the only available and appropriate reaction" to similar spoliation of evidence in a case before the judge who later acted as Special Master in the *Trump* litigation.  *See United States v. Soriano*, 401 F. Supp. 3d 396, 405 (E.D.N.Y. 2019).  In *Soriano*, customs officials

identified heroin packages secreted in food containers packed in a defendant's luggage. *See id.* at 398. The agents destroyed the luggage and the food items, and, as here, there were "no relevant photographs of items as they were found." *Id.* at 403. Regarding the materiality of the destroyed evidence, Judge Dearie reasoned that "where knowledge is the principal issue," "little things can mean an awful lot" and "even seemingly inconsequential facts viewed in the context of the overall story can and often do have substantial import for the fact finder." *Id.* Customs officials handled the defendant's luggage and its contents in a manner similar to the way the Filter Team handled documents during the raid, and "[p]ictures taken after-the-fact of only some, but not all, items, after the bags were thoroughly searched and all the contents removed have little if any probative worth whatsoever." *Id.* at 404. "To suggest otherwise is disingenuous to say the least." *Id.*

Judge Dearie also found an inquiry into "the issue of bad faith" to be "genuinely out of place and inappropriate," and "beside the point," because "[t]he damage is done" and "[i]t cannot be undone." *Soriano*, 401 F. Supp. 3d at 404. The defendant was "irreparably crippled, and even an accurate assessment of the extent of the damage is lost to the unknown as a result of purposeful conduct by a government actor." *Id.* So too here. The FBI failed to preserve the order of the documents within the boxes, and there are no photographs or logs documenting the nature in which the allegedly classified documents were comingled with personal effects and out of plain view. That evidence was materially exculpatory as to the knowledge and intent requirements of the § 793(e) charges, and the Superseding Indictment should be dismissed to remedy these due process violations.

**II.     The Prosecution Team Failed To Preserve Potentially Useful Evidence**

The Filter Team's misconduct also destroyed a related type of "potentially useful" evidence under *Youngblood*. In addition to the exculpatory nature of the fact that the allegedly classified

documents were not positioned in visible locations at the tops of the boxes, the proximity of allegedly classified documents to other materials bearing dates long before the boxes' removal from the White House would have added force to the defense argument regarding lack of knowledge and the absence of willful retention.  In *Soriano*, Judge Dearie reached a conclusion that applies equally to this aspect of President Trump's motion: "[A]n accurate assessment of the impact of the Government's inexplicable destruction of patently relevant evidence is not possible since the physical evidence is gone and there are no reliable substitutes given the Government's admitted failure to document in any comprehensive form what was destroyed."  *Id.* at 402-03.

Nevertheless, we do know that the boxes contained items such as newspapers and letters dated long before President Trump's first term in office ended.  It would have been potentially useful, and likely powerful in some instances, for the defense to be able to use this proximity to show how long the allegedly classified documents had resided in those boxes.  Due to the spoliation, however, there are no comparable means to present the most forceful articulation of this argument at trial.

**III.    The Prosecution Team Acted In Bad Faith**

Unlike the *Trombetta* violation relating to spoliation concerning the general location of allegedly classified documents within the boxes, the *Youngblood* violation arising from the failure to preserve potentially exculpatory evidence of the documents' neighbors requires a showing of bad faith on the part of the responsible parties.  The record supports such a finding, and an evidentiary hearing would add force to the conclusion.

In *Soriano*, Judge Dearie identified a series of considerations that are probative of bad faith, which are also present in this case.  Like the Filter Team's disregard of the order of the documents during the raid, there was "complete and immediate destruction of the bulk of the relevant

evidence" in *Soriano*.  401 F. Supp. 3d at 404.  The customs officials in *Soriano* acted in violation of "agency policy" and a memorandum of understanding with DOJ; the Filter Team agents in this case acted in violation of the pre-raid instructions that were provided to them (but that have not been fully disclosed to the defense).  *Id.*  Prior to destroying the defendant's bags and containers, the customs officials in *Soriano* had debriefed her "thoroughly."  *Id.*  In this case, based on interactions with President Trump's PRA representatives, "Trump Attorney 1," and "Trump Attorney 2," *see* ECF No. 85 ¶ 53, the prosecution team was well aware that part of President Trump's response to any allegations would be that he did not know there were additional allegedly classified documents in boxes at Mar-a-Lago.  Finally, in *Soriano* and in this case, there was a "failure to photograph, inventory or otherwise document all evidence."  *Id.* at 405.  Here, that failure was in direct contravention of the instructions provided to the Filter Team.  All of these considerations support a finding of bad faith and, at minimum, a hearing on these issues.

## IV.      The Bad-Faith Inquiry Requires Complete Disclosures Of Animus

Should fact finding be necessary, the Supreme Court and the Eleventh Circuit have looked to "official animus" as a relevant consideration in the bad-faith inquiry.  *Trombetta*, 467 U.S. at 488; *United States v. Revolorio-Ramo*, 468 F.3d 771, 775 (11th Cir. 2006) ("As in *Trombetta*, the record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence." (cleaned up)).  Thus, *Trombetta* and *Revolorio-Ramo* serve as at least the fourth basis for granting President Trump's pending motion to compel discovery of all evidence—including internal communications by or between members of the prosecution team— regarding "bias and/or political animus toward President Trump."  ECF No. 469 at 51-55.[5]

---

[5] The other bases for granting the Defendants' motions to compel disclosure of all evidence reflecting official bias and political animus include: (1) discovery on President Trump's motion to

**V.      The Untimely Disclosures Further Demonstrate That The Special Counsel's Office Is Not In Compliance With Their Discovery Obligations**

Since at least September 2023, President Trump has called attention to the objective truth that the Special Counsel's Office is much more interested in rushing to trial for purposes of election interference than complying with their discovery obligations. *See, e.g.*, ECF No. 160. Indeed, if Jack Smith had gotten his wish in this case, the trial would have been over long before any of these issues came to light. *See* ECF No. 34 (seeking December 11, 2023 trial date). As the Office has continued to push ahead recklessly on behalf of President Biden, they have assured the Court in unsworn briefs that they have "complied with" and "exceeded" their discovery obligations. ECF No. 187 at 1. Pleased to provide "curated lists of important evidence" and "an exhaustive roadmap" of their favorite politically motivated allegations, the Office has claimed that the unclassified discovery is "extensive, prompt, and well-organized." ECF No. 522 at 4; ECF No. 173 at 1. They have also averred that they are in "full compliance" with the Justice Manual. 3/1/24 Tr. 80.

This motion is the most recent illustration of the reality that those claims are patently false. For example, the Justice Manual required the Special Counsel's Office to review the entire case file maintained by the prosecution team. *See* Justice Manual §§ 9-5.001(B), 9-5.002(B). While the scope of the prosecution team is currently disputed, the Office concedes that it includes FBI agents in Miami and Washington, D.C. who worked on this case. Had that review actually taken place in the required fashion, the prosecutors would have identified and, presumably, produced

---

dismiss for selective and vindictive prosecution, *see* ECF No. 300 at 6-11, ECF No. 508 at 26; (2) fact-finding on the good-faith defense by the Special Counsel's Office in response to other unlawful aspects of the Mar-a-Lago raid, *see* ECF No. 568 at 5-7; and (3) the Defendants' entitlement to evidence that can be used to impeach the integrity of the investigation under *Kyles* and its progeny, *see* ECF No. 469 at 43-45.

much sooner the notes from the July 2023 meeting where the Filter Team disclosed that the "order" of the documents was "not preserved" during the raid, potentially privileged "filter material" had been "pulled to [the] front/top of box" for FBI agents in "DC to explore," and that "at some point" the agents started "pulling" allegedly classified material "out" of the boxes and "plac[ing it] on top." Ex. 7 at USA-01291278, USA-01291280. Similarly, had the case-file review proceeded as required, the Office would presumably have provided much earlier the recently produced electronic communications by FBI agents participating in the search, including messages regarding trying to turn off CCTV at Mar-a-Lago and where some of the seized documents "were allegedly located," Ex. 3. One of the recently produced FBI emails references use of "IM," or Instant Messenger. *Id.* Given all that has transpired, we can no longer assume that the Office has carried out its obligation to search the relevant files, including the prosecution team's instant messages and personal electronic devices, for discoverable evidence. The Justice Manual required that course of action at the outset of this case, as did *Brady* and Rule 16, and the Office's failure to timely carry it out with respect to the spoliation issue is further cause for concern about ongoing non-compliance.

It is exceedingly difficult to write off the untimely disclosure of the July 2023 notes in May 2024 as some sort of negligence in light of the fact that President Trump specifically requested that type of information in an October 2023 request for "[a]ll documents relating to the planning and execution of the search." Ex. 8 (Request 2). The subsequent approach to these issues by the Special Counsel's Office is just as concerning. The Office made misrepresentations to the Court regarding the status of the boxes at hearings in March and April 2024. 3/1/24 Tr. 83; 4/12/24 Tr. 65. Through the use of terms like "generally," "was not focused," and "many but not all instances," the Office's May 3, 2024 submission raised more questions than it answered—including but not

limited to whether the same spoliation occurred with respect to the 15 Boxes turned over to NARA. ECF No. 522 at 6-7.

Remarkably, only after making written claims in the May 3, 2024 filing that compounded the problems with the prior verbal misrepresentations to the Court, and only after President Trump sent additional specific discovery demands on May 4, did the Office individually interview members of the Filter Team in May 2024.  Those interviews revealed a callous attitude toward President Trump's rights and a disregard of basic professionalism that strongly support the relief requested herein.  It would not have been "impossible" to keep the documents intact.  Ex. 11 at USA-01291468, USA-01291473.  Rather, it would simply have required the agents to focus more and devote additional time to the extraordinarily sensitive task they were undertaking during the raid.  The Office displayed a similar disregard for basic fairness and their ethical obligations in the May 23, 2024 discovery letter by characterizing notes from the May 2024 interviews as "early Jencks material" (as opposed to constitutionally mandated discovery), by withholding portions of the instructions to the Filter Team on the basis of a work-product claim that is as strained as their previous privilege assertions, *see* ECF No. 300 at 25-28, and by suggesting that production of "updated" chain of custody information that further documented the agents' failure to follow applicable policies and procedures was a courtesy to the defense rather than constitutionally required under *Kyles*.  Ex. 13 at 2.

This course of conduct is relevant to all of the bad-faith inquiries presented in the Defendants' pretrial motions, including dismissal under *Trombetta* and *Youngblood*, suppression based on spoliation, and suppression based on the unlawful warrant used to raid Mar-a-Lago.

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the Court should dismiss the Superseding Indictment, and suppress all evidence seized in connection with the August 2022 raid at Mar-a-Lago, based on destruction of exculpatory evidence.

Dated: June 10, 2024      Respectfully submitted,

            */s/ Todd Blanche / Emil Bove*
            Todd Blanche (PHV)
            toddblanche@blanchelaw.com
            Emil Bove (PHV)
            emil.bove@blanchelaw.com
            BLANCHE LAW PLLC
            99 Wall Street, Suite 4460
            New York, New York 10005
            (212) 716-1250

            */s/ Christopher M. Kise*
            Christopher M. Kise
            Florida Bar No. 855545
            ckise@continentalpllc.com
            CONTINENTAL PLLC
            255 Alhambra Circle, Suite 640
            Coral Gables, Florida 33134
            (305) 677-2707

            *Counsel for President Donald J. Trump*

## CERTIFICATE OF CONFERENCE

I hereby certify that on June 6, 2024, counsel for President Trump and the Special

Counsel's Office conferred in a good faith effort to resolve the issues herein, but were unable to

do so.  The Special Counsel's Office requested that we include the following statement:

> The Government opposes defendant Trump's spoliation motion.  The defendant has failed to provide factual or legal support for a spoliation claim under controlling Eleventh Circuit and Supreme Court caselaw.  The Government has met and exceeded its discovery and other legal obligations.  The defendant's misconduct allegations are, once again, false.

*/s/ Christopher M. Kise*
Christopher M. Kise

**CERTIFICATE OF SERVICE**

I, Christopher M. Kise, certify that on June 10, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

*/s/ Christopher M. Kise*
Christopher M. Kise