**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CV-CANNON(s)**

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.

**DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**AMICUS CURIAE AMERICA FIRST LEGAL'S BRIEF
IN SUPPORT OF DEFENDANT DONALD J. TRUMP'S
OPPOSITION TO THE GOVERNMENT'S MOTION FOR
MODIFICATION OF CONDITIONS OF RELEASE**

Daniel Z. Epstein
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave. SE
  #231
Washington, DC 20003

Judd E. Stone II
Ari Cuenin
STONE | HILTON PLLC
P.O. Box 150112
Austin, Texas 78715
judd@stonehilton.com
ari@stonehilton.com
(737) 465-7248

Samuel J. Salario, Jr.
Florida Bar No. 83460
LAWSON HUCK GONZALEZ, PLLC
1700 S. MacDill Ave., Ste. 300
Tampa, Florida 33629
samuel@lawsonhuckgonzalez.com
(850) 825-4334

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Table of Contents.................................................................................................. i

Table of Authorities............................................................................................ ii

Introduction and Interest of Amicus Curiae................................................ 1

Memorandum of Law ......................................................................................... 2

I.     Gag orders, like other prior restraints, are incongruent with the First Amendment and have long been disfavored by courts. ..................................... 2

II.    Restricting a presidential candidate's freedom to speak on political matters is a particularly grave intrusion on the Framers' design..................................... 9

III.   The government cannot overcome constitutional restrictions on prior restraints, let alone impose conditions to infringe President Trump's First Amendment rights on asserted safety or prejudice grounds........................... 12

      A.    President Trump's statements are not an incitement to violence. ...... 13

      B.    In any case, the government has not met the statutory requirements for imposing additional conditions on safety grounds................................ 15

      C.    Gagging President Trump to avoid prejudice contravenes the statutory bounds on conditions of release and constitutional rights. .................. 16

Conclusion.......................................................................................................... 20

Certificate of Service ....................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Benton v. Maryland,*
   395 U.S. 784 (1969) ................................................................................... 2

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) ...................................................................... 7, 10, 14

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ....................................................................... 8, 12, 15

*CBS, Inc. v. Davis,*
   510 U.S. 1315 (1994) ............................................................................. 5, 13

*Counterman v. Colorado,*
   600 U.S. 66 (2023) ................................................................................... 5, 8

*Dennis v. United States,*
   341 U.S. 494 (1951) ..................................................................................... 6

*Eu v. S.F. Cnty. Democratic Cent. Comm.,*
   489 U.S. 214 (1989) ..................................................................................... 12

*Gentile v. State Bar of Nev.,*
   501 U.S. 1030 (1991) ................................................................................... 18

*Girouard v. United States,*
   328 U.S. 61 (1946) ....................................................................................... 1

*Gitlow v. New York,*
   268 U.S. 652 (1925) ................................................................................. 6, 9

*Konigsberg v. State Bar of Cal.,*
   366 U.S. 36 (1961) ....................................................................................... 7

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1, 22 (2022) ................................................................................... 9

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ..................................................................................... 4

*Neb. Press Ass'n v. Stuart,*
   427 U.S. 539 (1976) .................................................................. 4, 5, 18, 20

*Palko v. Connecticut,*
   302 U.S. 319 (1937) ..................................................................................... 2

*Roth v. United States,*
   354 U.S. 476 (1957) ................................................................................... 11

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546 (1975) ..................................................................................... 4

*United States v. Collins*,
    No. 11-CR-00471-DLJ (PSG), 2012 WL 3537814 (N.D. Cal. March 16, 2012) ...... 17

*United States v. Dennis*,
    183 F.2d 201 (2d Cir. 1950) ................................................................................. 7

*United States v. Ingram*,
    415 F. Supp. 3d 1072 (N.D. Fl. 2019) ................................................................ 17

*United States v. Schwimmer*,
    279 U.S. 644 (1929) .................................................................................... 1, 10

*United States v. Trump*,
    88 F.4th 990 (D.C. Cir. 2023),
    *reh'g denied*, No. 23-3190, 2024 WL 252746 (D.C. Cir. Jan. 23, 2024) ...... 13, 14, 18

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ......................................................................................... 12

*Whitney v. California*,
    274 U.S. 357 (1927) .............................................................................. 6, 8, 10, 11

**Statutes**

18 U.S.C. § 3142 ............................................................................................ 15, 16

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................. 4

**Other Authorities**

1 ANNALS OF CONG. 738 (Aug. 15, 1789) ............................................................ 3

1 JOURNALS OF THE CONTINENTAL CONGRESS (1774) ......................................... 10

4 ANNALS OF CONG. 934 (1794) ........................................................................... 3

4 WILLIAM BLACKSTONE, COMMENTARIES ............................................................ 3

ADAMS' ARGUMENT FOR THE DEFENSE (December 3-4, 1770),
    *Founders Online,* National Archives, *available at*
    https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016; .......... 8

Andrew P. Napolitano, *Protecting Hatred Preserves Freedom: Why Offensive*
    *Expressions Command Constitutional Protection*,
    25 J.L. & POL'Y 161 (2016) ................................................................................ 9

Arthur Schlesinger, *America: Experiment or Destiny?*,
    82 AM. HIST. REV. 505 (1977) ............................................................................ 3

FROM BENJAMIN FRANKLIN TO BENJAMIN VAUGHAN (March 14, 1785),
  *Founders Online,* National Archives, *available at*
  https://founders.archives.gov/documents/Franklin/01-43-02-0335 ......................... 8

JAMES W. DAVIS, THE AMERICAN PRESIDENCY (2d ed. 1995) ......................................... 5

JOHN STUART MILL, ON LIBERTY 35 (1859),
  available at https://eet.pixel-
  online.org/files/etranslation/original/Mill,%20On%20Liberty.pdf ........................ 11

Karen W. Biestman, *Abolitionism and Wooden Nutmegs: Repealing the Gag Rule*,
  8 NAT'L BLACK L.J. 408 ................................................................................................. 19

Robert G. Natelson, *The Constitution and the Public Trust*,
  52 BUFF. L. REV. 1077 (2004) ...................................................................................... 3

STERLING D. SPERO, GOVERNMENT AS EMPLOYER 121 (1948) ...................................... 18

THOMAS JEFFERSON, FIRST INAUGURAL ADDRESS (1801)
  *available at* https://avalon.law.yale.edu/19th_century/jefinau1.asp ...................... 10

Va. Declaration of Rights art. XII,
  *available at* https://avalon.law.yale.edu/18th_century/virginia.asp ................. 3, 11

William E. Nelson, *Reason & Compromise in the Establishment of the Federal
  Constitution, 1787-1801,*
  44 WILLIAM & MARY Q. 458, 476-77 (1987) ............................................................... 4

iv

### INTRODUCTION AND INTEREST OF AMICUS CURIAE*

The First Amendment's protections of speech, the press, and association safeguard all other American liberties. Those rights belong to all the people, whether innocent or guilty, convicted or acquitted, incarcerated or free. And when the rights of the criminally accused are at stake, the First Amendment requires constant judicial vigilance to ensure that those rights are not diminished by overzealous or politically motivated prosecutorial overreach. *See United States v. Schwimmer*, 279 U.S. 644, 654 (1929) (Holmes, J., dissenting), *overruled by Girouard v. United States*, 328 U.S. 61 (1946). Especially when a defendant's views "might excite popular prejudice," the Constitution most "imperatively calls for . . . free thought—not free thought for those who agree with us but freedom for the thought that we hate." *Id.* at 654-55.

Here, the government asks this Court to restrict President Trump's ability to speak freely before trial. ECF No. 592 at 11. But imposing such a prior restraint should be undertaken with great caution and with particular attention to the Framers' and the Supreme Court's disdain for trampling crucial First Amendment rights. The government offers no evidence of the type of extreme disruption that could meet the statutory standard for gagging a defendant before trial. *See* ECF Nos. 592-1–592-5; 18 U.S.C. § 3142(c). It necessarily cannot meet the extremely high constitutional standard for prior restraints of President Trump's speech. The attempt

---

* No counsel for any party authored this brief, in whole or in part, nor did counsel for any party or either party make a monetary contribution intended to fund this brief in whole or part. No person or entity other than amicus and counsel for amicus contributed monetarily to this brief's preparation or submission.

to do so—months before President Trump stands for election against the President whose Attorney General appointed the special prosecutor—is especially troubling.

*Amicus curiae* is America First Legal, a non-profit organization dedicated to advocacy and action to defend citizens from unconstitutional government overreach, to stand up for free speech, and to uphold America's Founding documents, the rule of law, and our nation's most cherished principles and traditions. *Amicus* has a special interest in protecting First Amendment liberties like those at issue in this case and, consistent with its mission, advocating for the proper functioning of the criminal-justice system. Most importantly, *Amicus* writes to protect the freedom of a major-party presidential candidate in the upcoming election to speak freely on matters affecting politics and government—core areas of First Amendment expression.

## MEMORANDUM OF LAW

I.   **Gag orders, like other prior restraints, are incongruent with the First Amendment and have long been disfavored by courts.**

**A.** The freedom to speak has been central to American life since the Founding. The Framers understood that liberty as essential to the functioning of a free society. And they had strong historical reason to believe as much. Indeed, "freedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969). The Framers' understanding that free speech would form the cornerstone of government predated the nation itself. The Framers drew this principle directly from the groundbreaking ideals of the Enlightenment. Arthur Schlesinger, *America: Experiment or Destiny?*,

82 AM. HIST. REV. 505, 507-08 (1977); Robert G. Natelson, *The Constitution and the Public Trust*, 52 BUFF. L. REV. 1077, 1095-1101 (2004). Sir William Blackstone, moreover, echoed that "[e]very free man has an undoubted right to lay what sentiments he pleases before the public." 4 WILLIAM BLACKSTONE, COMMENTARIES *15. These principles were understood to reinforce other crucial rights, including freedom of the press. *Id.* For instance, George Mason's Virginia Declaration of Rights, a precursor to the Bill of Rights, stated that "the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments." Va. Declaration of Rights art. XII, *available at* https://avalon.law.yale.edu/18th_century/virginia.asp.

In debating the Bill of Rights in Congress, James Madison urged the adoption of "simple, acknowledged principles, the ratification [of which] will meet with but little difficulty." 1 ANNALS OF CONG. 738 (Aug. 15, 1789). He would later express the "simple, acknowledged principle" that "the censorial power is in the people over the government, and not in the government over the people." 4 ANNALS OF CONG. 934 (1794). This idea was so widely adopted as essential and foundational that there was hardly any debate over it. 1 ANNALS OF CONG. 731-49 (Aug. 15, 1789). After all, only through the freedom to dissent and to speak freely on matters of opinion, political philosophy, and governmental theory did the Constitution and the Bill or Rights— each a great triumph of compromise—come to be. *Cf.* William E. Nelson, *Reason & Compromise in the Establishment of the Federal Constitution, 1787-1801*, 44 WILLIAM

& MARY Q. 458, 476-77 (1987). The Constitution thus enshrines that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

Judicial interpretations of that freedom have long reflected that the First Amendment leaves every man free to "speak, write, and print his opinions upon any subject whatsoever, without any prior restraint." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733-53 (1931) (Butler, J., dissenting). A speaker is subject to a "prior restraint" when a public official prohibits speech before its expression, as opposed to punishing or holding liable the speaker after the fact. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Any such restraint "bear[s] a heavy presumption against its constitutional validity." *Id.* at 558. So disfavored are prior restraints that this presumption is even heavier than that against criminalizing expression. *Id.* at 558-59. As the Framers, their own forebears, and the Supreme Court have emphasized, "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Id.* at 559.

**B.** To overcome the heavy presumption against prior restraints, any such restriction must first come "within one of the narrowly defined exceptions to the prohibition against prior restraints." *Id.* And it must be "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* After all, if the "threat of criminal or civil sanctions after publication chills speech, a prior restraint freezes it." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). And prior restraints—particularly such content-based ones like that at issue here— pose particular dangers for American politics. The President, just

like an editor, has an inherent role in informing the public and contributing to public debate. *See, e.g.*, JAMES W. DAVIS, THE AMERICAN PRESIDENCY 136-56 (2d ed. 1995).

Prior restraints are acceptable only in "exceptional cases," and even in the face of national security concerns, the "most extraordinary remed[y]" of prior restraint passes muster only where the evil that would result "is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., as Circuit Justice) (alteration in original). Incitement, defamation, obscenity, and true threats may qualify because they lie outside the First Amendment's protection. *Counterman v. Colorado*, 600 U.S. 66, 73-74 (2023). These "traditional and historical categories" of speech are deemed unprotected because they are "of such slight social value as a step to truth" that "social interest in their proscription" outweighs "any benefit that may be derived from them." *Id.* But outside those limited categories, the First Amendment's protections are near absolute.

For example, the Court refused to bless even a temporary prior restraint against publication of the Pentagon Papers, a restraint the government argued was necessary to protect national security. *Stuart*, 427 U.S. at 558-59. Moreover, the Supreme Court has carefully examined the relationship between the First and Sixth Amendments and found that even tension between them cannot usually justify a prior restraint. In *Stuart*, the Court explained that "sensational" pretrial publicity can imperil the right of an accused to be tried by an impartial jury. *Id.* at 551. While trial courts must guard against such harm, they must be conscious of tension between that interest and the First Amendment rights of participants and nonparticipants

alike. *Id.* at 561. There is no hierarchy in the Bill of Rights: the Framers "did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other." *Id.* So the guarantees of impartiality and fairness in criminal proceedings cannot alone overcome the high barriers to prior restraint—to hold otherwise would rewrite the Constitution and abandon one of the Supreme Court's longest standing and most consistent canons. *Id.*

The "incitement" exception—the only exception even arguably applicable to this case—has received particular judicial disfavor. It was once "not open to question" that the state "may punish those who abuse th[e] freedom [of speech] by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means." *Whitney v. California*, 274 U.S. 357, 372 (1927) (citing *Gitlow v. New York*, 268 U.S. 652, 667 (1925)). Speech could be prohibited when it bore a "clear and present danger" of "substantive evils." *Gitlow*, 268 U.S. at 671. But Justice Brandeis's now-famous *Whitney* concurrence, in which Justice Holmes joined, expressed great concern with the articulation and application of that presumed dogma, reasoning that no speech should be criminalized without the "opportunity for full discussion." 274 U.S. at 377. "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education," then the appropriate "remedy to be applied is more speech, not enforced silence." *Id.*

Before long, that reasoning would "incline[ the Court] toward the Holmes-Brandeis rationale." *Dennis v. United States*, 341 U.S. 494, 507 (1951) (collecting

6

cases). In *Dennis*, the Court explained that "[i]n each case [courts] must ask whether the gravity of the evil, discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." 341 U.S. at 510 (alteration in original) (quoting *United States v. Dennis*, 183 F.2d 201, 212 (2d Cir. 1950)). Yet, over time, *Dennis*'s rule likewise proved unworkable. While the "clear and present danger" test may have been "a great advance toward individual liberty over some previous notions," *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 63 (1961), the Court would ultimately reject it altogether as fundamentally incompatible with the First Amendment, *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (per curiam).

In *Brandenburg*, the Court held that the "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. The "mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448 (citation omitted). "A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments" as it "sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id.* Justices Douglas and Black concurred in the decision to emphasize that the "clear and present danger" test "should have no place in the interpretation of the First

Amendment," *id.* at 449-50 (Black, J., concurring), as it had "never been faithful to" the First Amendment ideal, *id.* at 452-53 (Douglas, J., concurring).

Although incitement may "inhere[] to particular words in particular contexts," the First Amendment protects against punishment "unless the speaker's words were intended (not just likely) to produce imminent disorder." *Counterman*, 600 U.S. at 76. This scienter requirement protects against chilling or deterring "mere advocacy," which falls within the First Amendment's core. *Id.* It prevents "the collateral effect of inhibiting protected expression" and "avoid[s] the hazard of self-censorship. *Id.* at 77. The result is that people will be less inclined to "steer wide" of the First Amendment's outer bounds, and more permissible speech will exist in the marketplace of ideas which undergirds American democracy and society. *See id.* at 75; *Whitney*, 274 U.S. at 375; *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976).

This principle, of course, comes at a cost: "it makes prosecution of otherwise proscribable, and often dangerous, communications harder." *Counterman*, 600 U.S. at 78. That result, however, is unsurprising. The same society that believes in "more speech, not enforced silence," *Whitney*, 274 U.S. at 377, prefers that ten guilty men go free than one innocent man suffer, 4 WILLIAM BLACKSTONE, COMMENTARIES *352; ADAMS' ARGUMENT FOR THE DEFENSE (December 3-4, 1770), *Founders Online,* National Archives, *available at* https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016; FROM BENJAMIN FRANKLIN TO BENJAMIN VAUGHAN (March 14, 1785), *Founders Online,* National Archives, *available at* https://founders.archives.gov/documents/Franklin/01-43-02-0335.   But   more

fundamentally, as Justice Holmes recognized, if "[e]very idea is an incitement," difference between "the expression of an opinion and an incitement" loses all constitutional significance. *Gitlow*, 268 U.S. at 673 (Holmes, J., dissenting).

Moreover, history requires vigilance against abuses when the accused is a political figure. For instance, John Adams notoriously weaponized the 1798 Alien and Sedition Acts against disfavored political speech to "torment" opponents in the press. Andrew P. Napolitano, *Protecting Hatred Preserves Freedom: Why Offensive Expressions Command Constitutional Protection*, 25 J.L. & POL'Y 161, 168 n.22 (2016). President Adams used the Acts to prosecute politicians like Representative Matthew Lyons, whose libel conviction for speech criticizing Adams was upheld under the Acts. *Id.* This dangerous history of using the law to silence political enemies led to the demise of the Acts. As then-Vice President Jefferson remarked, by targeting political speech, the "general government ha[d] . . . become more arbitrary and has swallowed more of the public liberty than even that of England." *Id.*

## II. Restricting a presidential candidate's freedom to speak on political matters is a particularly grave intrusion on the Framers' design.

In addition to the First Amendment issues noted above, the Framers were particularly concerned about preserving the democratic function of society by ensuring that matters of politics and government would be the subject of popular debate. The historical context in which the Framers conceived the First Amendment and its core protection of expression informs this analysis. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 22 (2022) (explaining that constitutional

analysis should be rooted in "text and history"). That context reveals several of the tyrannical practices that the Framers desired to ameliorate.

Chief among those wrongs was the practice of suppressing discourse on matters of politics and government. 1 JOURNALS OF THE CONTINENTAL CONGRESS 108 (1774) (letter to the inhabitants of Quebec); *see also Whitney*, 274 U.S. at 374, *overruled by Brandenburg*, 395 U.S. 444, (The "state is, ordinarily, denied the power to prohibit dissemination of social, economic and political doctrine . . . "). Thus, even the freedom to engage in political speech that "a vast majority of . . . citizens believes to be false and fraught with evil consequence" is protected to no lesser degree than any other expression. *Whitney*, 274 U.S. at 374; *United States v. Schwimmer*, 279 U.S. 644, 654 (1929) (Holmes, J., dissenting) ("If there is any principle of the Constitution that more imperatively calls for attachment than any other it is . . . freedom for the thought that we hate."). Thomas Jefferson, in his first inaugural address, said that

> having banished from our land that religious intolerance under which mankind so long bled and suffered, we have yet gained little if we countenance a political intolerance as despotic, as wicked, and capable of as bitter and bloody persecutions. . . . *If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it.*

THOMAS JEFFERSON, FIRST INAUGURAL ADDRESS (1801) (emphasis added), *available at* https://avalon.law.yale.edu/19th_century/jefinau1.asp.

The Framers thought only a despotic government would deny citizens the right to speak on topics that might garner attention in the public square. Va. Declaration of Rights art. XII, *available at* https://avalon.law.yale.edu/18th_century/virginia.asp;

Schlesinger, *supra*, at 507-08. They believed that the government of a free state should be governed by deliberative forces, not the arbitrary enforcement of dogma. *Whitney*, 274 U.S. at 375 ("They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth."). Thus, the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

Indeed, on matters of "infinite[] complicat[ion]," such as "morals, religion, [and] politics," the pursuit of truth demands the intense study of the case put forth by one's adversary. JOHN STUART MILL, ON LIBERTY 35 (1859), available at https://eet.pixel-online.org/files/etranslation/original/Mill,%20On%20Liberty.pdf (discussing Cicero's commitment to study the political philosophy of his enemies). Without such a study based on contrary opinions that are freely publicized and discussed, a citizen could never be confident in his own position. America's First Amendment ethos thus reflects that free discussion protects more surely against "noxious doctrine" than does suppression, "that the greatest menace to freedom is an inert people," and "that public discussion is a political *duty*." *Whitney*, 274 U.S. at 375 (Brandeis, J., concurring) (emphasis added). After all, "the fitting remedy for evil counsels is good ones," and "[o]nly an emergency can justify repression." *Id.*

The Supreme Court has accordingly treated political speech—discussion on the topics of government and civil life—as a foundational area of protection. This principle, above all else, is the "fixed star in our constitutional constellation[:] that no

official, high or petty, can prescribe what shall be orthodox in politics[ or] nationalism . . . or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.). Therefore, "[d]iscussion of public issues and debate on the qualifications of candidates" are considered "integral" to the functioning of our way of government and are afforded the "broadest protection." *Buckley*, 424 U.S. at 14.

Because "uninhibited, robust, and wide-open" debate enables "the citizenry to make informed choices among candidates for office," "the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Id.* at 14-15 (citations omitted). Within this core protection for political discourse, the candidates' own speech—undoubtedly the purest source of information for the voter about that candidate—must take even further primacy. *Cf. Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222-24 (1989) (explaining that political speech by political parties is especially favored). This must be especially true when, as here, the candidate engages in a "pure form of expression involving free speech alone rather than expression mixed with particular conduct." *Buckley*, 424 U.S. at 17 (cleaned up) (contrasting picketing and parading with newspaper comments or telegrams). These principles layer together to strongly shield candidates for national office from restrictions on their speech.

## III.   The government cannot overcome constitutional restrictions on prior restraints, let alone impose conditions to infringe President Trump's First Amendment rights on asserted safety or prejudice grounds.

The government has moved the Court to impose conditions of release on President Trump that would interfere with his First Amendment free-speech rights.

The government claims to do so in the name of safety and to avoid prejudice to this proceeding. ECF No. 592 at 3. But the government falls far short of overcoming the constitutional scrutiny that applies to its request for a prior restraint on President Trump's speech. And in any event, the government's arguments fail under their own terms. The government has not made the necessary showings concerning safety to satisfy the statutory conditions necessary to impose conditions of release. Additionally, the government fails to establish grounds for an order guarding against prejudice to the proceedings, which could not justify the imposition of conditions consistently with Framers' concerns about political speech explained above. *Cf., e.g.*, *United States v. Trump*, 88 F.4th 990, 1010 (D.C. Cir. 2023), *reh'g denied*, No. 23-3190, 2024 WL 252746 (D.C. Cir. Jan. 23, 2024) (citing "threatening public statements" and "messaging daggered at likely witnesses and their testimony" as posing a "significant and imminent threat" to prosecution of President Trump).

### A. President Trump's statements are not an incitement to violence.

Tellingly, the government practically ignores the Constitution, mentioning the First Amendment's constraints only in passing. ECF No. 592 at 9-10. The government never establishes that this is an "exceptional case[]," in which some evil "is both great and certain and cannot be mitigated by less intrusive measures," before it may obtain the "most extraordinary remed[y]" of prior restraint. *Davis*, 510 U.S. at 1317.

The only possible constitutional exception to free speech the government has identified is incitement. But it cannot rely on that exception to justify infringing President Trump's rights. President Trump has not engaged in speech that "prepare[s] a group for violent action [or] steel[s] it to such action." *Brandenburg*, 395

U.S. at 448. It cannot be said that by merely criticizing—or, even as some may argue, mischaracterizing—the government's actions and intentions in executing a search warrant at his residence, President Trump is advocating for violence or lawlessness, let alone inciting imminent action. The government's own exhibits prove the point. *See generally* ECF Nos. 592-1, 592-2. 592-3, 592-5. The government presents no evidence that President Trump advocated a violent attack or other lawless action against the Department of Justice, the FBI, President Biden, this Court, any witness, or any other person. Much less has the government proved a call to arms or any request, demand, instruction, or implication that supporters should violate any law.

Rather, President Trump's statements reflect his intent to "*peacefully* win back the White House in November." ECF No. 592-2 at 4 (emphasis added). They request financial contribution and the votes of his supporters. *Id.* And they suggest that action under the Twenty-Fifth Amendment may be necessary to remove President Biden from office. ECF No. 592-1 at 2. Properly understood in context, President Trump's alleged statements reflect political speech, not incitement.

On this record, the government cannot overcome the Constitution's strong prohibition on prior restraints. Though the government also gestures toward upholding the "integrity" of judicial proceedings, it has not articulated a specific potential threat to establish a compelling interest. *Trump*, 88 F.4th at 1009. And even if it had, the government would run headlong into case law prohibiting comparable restrictions. The Supreme Court disfavors limiting "[d]iscussion of public issues and debate on the qualifications of candidates," topics "integral" to democracy to which it

14

gives the "broadest protection." *Buckley*, 424 U.S. at 14. Restricting a candidate's conduct of his campaign and reducing the information available to voters through a prior restraint contravenes that principle. *Id*. at 14-15, 17. To achieve that result, not only would the government have to justify a prior restraint, it would also have to overcome strict scrutiny by establishing a compelling state interest which the prior restraint would advance, and by narrowly tailoring that restraint to the interest established. *Eu*, 489 U.S. at 222. In the absence of another compelling state interest, that extremely high standard is fatal to the Government's requested relief.

**B.     In any case, the government has not met the statutory requirements for imposing additional conditions on safety grounds.**

Aside from the constitutional failings, the government has not met the statutory burden to impose additional conditions in the name of safety. The Court's authority to impose conditions of release on pretrial criminal defendants derives from 18 U.S.C. § 3142. That statute provides that a court may release a person charged with an offense "subject to the least restrictive . . . combination of conditions[] that [the court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id*. § 3142(c)(1)(B). In addition to a laundry list of statutory conditions from which to choose, a court can impose "any other condition that is reasonably necessary" to achieve the statute's dual goal of appearance and safety. *Id*. § 3142(b)(1)(B)(xiv). And a court can modify an order imposing conditions of release "at any time." *Id*. § 3142(b)(2).

From this statutory language and framework, several considerations emerge. First, additional conditions may not be imposed unless the court makes a threshold

showing that the baseline conditions "will not reasonably assure the appearance of the person . . . or will endanger the safety of any other person or the community." *Id.* §§ 3142(b), 3142(c)(1). Second, the court must ensure that the additional conditions imposed are the least restrictive possible. *Id.* § 3142(c)(1)(B). And third, the court must be convinced that any judicially crafted condition imposed above and beyond the laundry list is "reasonably necessary." *Id.* § 3142(c)(1)(B)(xiv).

Of the two statutory objectives of pretrial conditions, appearance of the defendant and safety, the government relies on the latter, arguing that President Trump's ability to speak freely risks the safety of agents who carried out the Mar-a-Lago search warrant. ECF No. 592 at 1. It contends that this speech "pose[s] a significant, imminent, and foreseeable danger to law enforcement agents." *Id.* at 3. Thus, the government must establish that (1) the lack of restriction "will endanger the safety of any other person" and (2) any restriction on speech is "reasonably necessary" to prevent that danger. It has not done so. The agents whose safety is supposedly imperiled are anonymous. And there is no reason to think that, should any of them testify, the Court could not adequately protect their safety at that time. The government offers no evidence that any agent has been threatened. Thus, the Government's amorphous reliance on safety fails.

### C.    Gagging President Trump to avoid prejudice contravenes the statutory bounds on conditions of release and constitutional rights.

Finally, the government cannot impose an additional condition in the name of preventing prejudice. The government asserts a need to protect this Court and this proceeding from prejudice that President Trump's speech may create. But the

statutory authorization for imposition of conditions of release has only two objectives—appearance of the defendant and safety—and all conditions must be imposed in service of those objectives. Preventing prejudice is a laudable aim. But it is simply not a ground that Congress chose for restricting defendants' freedoms. *United States v. Ingram*, 415 F. Supp. 3d 1072, 1077 (N.D. Fl. 2019) ("The policy of the Bail Reform Act of 1984 is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant and the safety of the community." (cleaned up)). Courts must be especially mindful of the Bail Reform Act's constraints when asked to restrict First Amendment liberties. *United States v. Collins*, No. 11-CR-00471-DLJ (PSG), 2012 WL 3537814, at *4 (N.D. Cal. March 16, 2012) (In conditioning release, courts must "do so in a manner which would result in no greater intrusion upon defendant's [First Amendment] rights . . . than reasonably necessary in order to effectuate the objectives of the Bail Reform Act." (cleaned up)).

Though courts cannot condition release on preventing prejudice, the government might argue that a more generic form of order restricting President Trump's speech is warranted. Assuming the Court has inherent power to issue such an order on criminal defendants, the government cannot meet the standard that would arguably apply under Supreme Court cases. That standard asks "(1) whether the Order is justified by a sufficiently serious risk of prejudice to an ongoing judicial proceeding; (2) whether less restrictive alternatives would adequately address that risk; and (3) whether the Order is narrowly tailored, including whether the Order

effectively addresses the potential prejudice." *Trump*, 88 F.4th at 1007 (citing *Stuart*, 427 U.S. at 562; *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075-76 (1991)).

The government fails that test. It has not sufficiently described the alleged prejudice and it has not outlined any particular harm to the fair administration of justice or to the Court's ability to govern its proceedings that might come from President Trump's right to speak freely. *Cf., e.g.*, *Trump*, 88 F.4th at 1020 (citing concerns about trial participants' speech on "actual or potential jurors"). And as discussed above, President Trump's statements are not inciting or threatening to any judicial officer, officer of the court, witness, party, agent, or investigator. So there is no compelling interest to justify a speech restriction. *Id.* at 1009. Nebulous references to integrity and prejudice, while associated with potential governmental interests, are not enough to articulate a compelling interest with any specificity. For example, in *Trump*, the circuit court felt that the President's statement that "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" could have portended a threat to witnesses. *Id.* at 1010. The government has not introduced any evidence of a similar statement in this case that could be interpreted as a threat, veiled or otherwise.

The Court should also view the government's request skeptically in view of the historical context explored above. Efforts to stifle political debate have long posed problems. For example, the National Association of Letter Carriers sought higher salaries for its members during the 1901-02 congressional session. STERLING D. SPERO, GOVERNMENT AS EMPLOYER 121 (1948). President Teddy Roosevelt, who had promised higher pay during his prior campaign for Vice President, was annoyed by

the Association's reminder of this pledge, and issued an order forbidding all federal employees from seeking legislation on their behalf. *Id.* at 121-22. Employees violating the order risked termination. *Id.* at 122. And the government could take action against individuals and groups engaged in disfavored political activities. *Id.* Though the letter carriers maintained their association during this period, other organizations of federal employees fell apart. *Id.* at 124. This result meant that the government had total control over the Association. But it also stifled citizens' rights to speak freely and petition the government and hampering labor relations.

A more drastic example was the U.S. House's gag rule governing slavery, which was in place from 1836 to 1844. That rule ordered that all materials relating to slavery—"petitions, memorials, resolutions, propositions, or papers"—would be tabled immediately and that no action could be taken. Karen W. Biestman, *Abolitionism and Wooden Nutmegs: Repealing the Gag Rule*, 8 NAT'L BLACK L.J. 408, 409-10. Congressmen who were not abolitionist believed that the best solution to the slavery issue was to ignore it and to prevent debate on the topic in the name of "allay[ing] excitement, repress[ing] agitation, . . . and establish[ing] harmony and tranquility within the Union." *Id.* at 409. Not only did this have the effect of hamstringing all pursuit of congressional action on slavery, but the resulting campaign by abolitionists flooded the House with petitions, meaning that the House spent days on end "listening to presentations of petitions, voting on whether to receive them, and laying them on the table." *Id.* at 411. Citizens were effectively denied their right to petition the government and their right to fair representation during this

19

time. The House silenced political debate on an inconvenient topic for the promise of "harmony." And as the Civil War would ultimately prove, that promise was as illusory as it was ineffective in avoiding controversy.

These examples highlight the problem inherent in gagging political speech on controversial topics to maintain order (or the appearance thereof). The "'dynamics of [prior restraint] drive toward excesses, as the history of all censorship shows.'" *Stuart*, 427 U.S. at 590 (Brennan, J., concurring) (citation omitted). But as with the Framers' views on core political debate, matters of great political salience can never truly be silenced. To take the particularly stark example from the abolitionist era, even arguably well-intentioned efforts to quell unrest through silence may produce the opposite result by channeling the avenues for disagreement away from the public square. The Court should reject the government's invitation to do so here.

## CONCLUSION

The Court should deny Motion for Modification of Conditions of Release.

Dated: June 20, 2024.                    Respectfully submitted,

By: /s/ Judd E. Stone                    By: /s/ Samuel J. Salario
Judd E. Stone II                         Samuel J. Salario, Jr.
Ari Cuenin                               Florida Bar No. 83460
STONE | HILTON PLLC                      LAWSON HUCK GONZALEZ, PLLC
P.O. Box 150112                          1700 S. MacDill Ave., Ste. 300
Austin, Texas 78715                      Tampa, Florida 33629
judd@stonehilton.com                     samuel@lawsonhuckgonzalez.com
(737) 465-7248                           (850) 825-4334

Daniel Z. Epstein
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003

*Counsel for Amicus Curiae*

20

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2024, this document was electronically filed with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ Samuel J. Salario
Samuel J. Salario